**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY
378 N Main Avenue
Tucson, AZ 85701

DEFENDERS OF WILDLIFE
1130 17th Street NW
Washington, DC 20036

TURTLE ISLAND RESTORATION
NETWORK
9255 Sir Francis Drake Boulevard
Olema, CA 94950

　　　　　　　　　*Plaintiffs*,

　　　v.

NATIONAL MARINE FISHERIES SERVICE
1315 East-West Highway
Silver Spring, MD 20910

GINA RAIMONDO, *in her official capacity as*
*Secretary of Commerce*
U.S. Department of Commerce
1401 Constitution Avenue NW
Washington, DC 20230

　　　　　　　　　*Defendants*.

Civ. No.　1:21-cv-930

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.　　　Plaintiffs Center for Biological Diversity, Defenders of Wildlife, and Turtle Island

Restoration Network challenge the issuance of a final regulation that arbitrarily and unlawfully

scaled back a proposed expansion of turtle excluder device (TED) requirements for shrimp

trawls that capture and kill imperiled sea turtles in the Gulf of Mexico and southeastern United

States. Defendants National Marine Fisheries Service and Gina Raimondo, in her official

capacity as Secretary of Commerce (collectively, NMFS), issued this regulation [hereinafter,

TED Rule] in violation of the Endangered Species Act (ESA), National Environmental Policy Act (NEPA), and Administrative Procedure Act (APA).

2.      The waters off the Gulf and southeastern coasts are home to five sea turtle species listed as endangered or threatened under the ESA: the Kemp's ridley, green, loggerhead, hawksbill, and leatherback. Human activities in the region have decimated their populations, which struggle to recover despite decades of statutory protections.

3.      Incidental capture in fisheries remains one of the primary causes of sea turtle mortality in the United States. The southeastern shrimp fisheries are the biggest source of fishing-related mortality, killing more sea turtles each year than all other U.S. fisheries combined.

4.      Sea turtles must surface to breathe. When shrimp trawls pull nets through the water column for hours at a time to sweep up shrimp, they sometimes also capture sea turtles and cause them to drown from forced submergence. NMFS accordingly has required most—but not all—types of shrimp trawl vessels to use TEDs, which are devices that allow sea turtles to escape the net while allowing shrimp to pass through the bars and be caught.

5.      However, NMFS exempted certain types of shrimp trawl gear—skimmer trawls, pusher-head trawls, and wing nets—from the TED requirements. Those vessels continue to capture and kill thousands of sea turtles each year.

6.      In 2016, NMFS proposed a rule to extend TED requirements to the exempted gear types, estimating that doing so would prevent up to 2,500 sea turtle deaths per year. At that time, the agency explained that requiring TEDs on these vessels was necessary to help the five sea turtle species survive and recover.

7.      Three years later, NMFS issued a final TED Rule that drastically scaled back the

proposed new TED requirements to cover only a fraction of the shrimp vessels considered in the proposed rule. The final rule requires TEDs only on skimmer trawl vessels longer than 40 feet, exempting shorter skimmer trawl vessels and all vessels using pusher-head trawls or wing nets. NMFS estimates that the TED Rule will result in more than 1,300 sea turtle deaths annually from capture in exempted shrimp vessels.

8.      NMFS issued the TED Rule without providing any notice that it was considering exempting these vessel categories from the rule, depriving Plaintiffs of their statutorily guaranteed opportunity to comment on those exemptions or their impacts, in violation of the APA and NEPA. NMFS also failed to provide any rational basis or evidentiary support for limiting the TED Rule to only skimmer trawl vessels longer than 40 feet and failed to acknowledge or explain its decision to require lesser measures than those it had stated are necessary and advisable for the conservation of sea turtles in the proposed rule, in violation of the APA. And NMFS failed to take a hard look at the environmental consequences of the scaled-back rule, in violation of NEPA, and failed to ensure the TED Rule does not jeopardize listed species, in violation of the ESA.

9.      Plaintiffs therefore ask the Court to declare that the final TED Rule and accompanying environmental impact statement are not in accordance with the law, in violation of the ESA, NEPA, and APA, and to remand the Rule to NMFS with an order to issue a new rule that fully complies with all ESA and APA requirements, along with a legally adequate environmental impact statement, within six months.

## JURISDICTION AND VENUE

10.     This case is brought under the APA, 5 U.S.C. §§ 701–06, and the ESA, 16 U.S.C. §§ 1531–1544. This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(g)(1)

(ESA), and 28 U.S.C. § 1331 (federal question). The APA waives Defendants' sovereign immunity. 5 U.S.C. § 702.

11.     This Court has authority to grant the requested relief in this case pursuant to the APA, 5 U.S.C. § 706, the ESA, 16 U.S.C. § 1540(g), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

12.     Venue properly vests in this District pursuant to 28 U.S.C. § 1391(e)(1) because (1) Defendants reside in this District, (2) a substantial part of the events or omissions giving rise to the claim occurred in this District, and (3) Plaintiff Defenders of Wildlife is headquartered in and Plaintiff Center for Biological Diversity maintains an office in this District.

13.     As required by the ESA, Plaintiffs provided Defendants a 60-day notice of their intent to sue on January 11, 2021, regarding Defendants' violation of that statute. *See* 16 U.S.C. § 1540(g)(2)(A). Defendants have not remedied the violation described in the 60-day notice.

## PARTIES

14.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a nonprofit corporation that maintains offices across the United States—including in Washington, D.C.— and in Baja California Sur, Mexico. The Center advocates for the protection of threatened and endangered species and their habitats through science, policy, and environmental law. The Center's mission also includes protecting air quality, water quality, and public health. The Center's Oceans Program focuses specifically on conserving marine ecosystems and seeks to ensure that imperiled species such as sea turtles, marine mammals, and corals are properly protected from destructive practices in our oceans. In pursuit of this mission, the Center has been actively involved in protecting sea turtles in the Atlantic and Gulf of Mexico. The Center has more than 81,800 members, including members who live and recreate throughout the Gulf of

Mexico and Atlantic coast. The Center brings this action on behalf of itself and as representative of its members.

15.   Plaintiff DEFENDERS OF WILDLIFE (Defenders) is a nonprofit, science-based conservation organization dedicated to the protection and restoration of all native wild animals and plants in their natural communities and the preservation of the habitats that they depend on. Founded in 1947, it is one of the nation's leading advocates for imperiled species, including marine species such as sea turtles, whales, dolphins, and sharks, and their habitats. Headquartered in Washington, D.C., Defenders has regional and field offices around the country in Alaska, Arizona, California, Colorado, Florida, Montana, New Mexico, North Carolina, Ohio, Oregon, Texas, Washington, and Wyoming as well as an office in Mexico. Defenders has more than nearly 2.3 million members and supporters nationwide, including members who live and recreate along the Atlantic and Gulf coasts. In the United States, Defenders has worked for decades to protect sea turtles on land and at sea in the Southeast and along the Gulf of Mexico by advocating to preserve nesting beaches and foraging areas, improve coastal construction policies so that jetties and sea walls do not prevent nesting, promote responsible lighting along nesting beaches, and ensure responsible fishing. Defenders brings this action for itself and as representative of its members, many of whom regularly enjoy studying, observing, and photographing sea turtles on nesting beaches and in the water.

16.   Plaintiff TURTLE ISLAND RESTORATION NETWORK (TIRN) is a nonprofit environmental organization that has been the leading advocate for the world's oceans and marine wildlife. TIRN and its members work to protect and restore populations of endangered sea turtles and other vulnerable marine species such as whales and dolphins, and to protect marine biodiversity throughout the Gulf of Mexico and southeastern United States. TIRN's Ocean

Program works to recover endangered sea turtles through promotion of policy change, strategic litigation to ensure laws are properly enforced, promoting the recovery and rehabilitation of injured turtles along the Texas coast, and active beach protection programs, monitoring and research of turtle populations throughout the world. TIRN and its members have a vested interest in securing a future for vulnerable sea creatures and preventing their extinction. TIRN does so in part by ensuring such creatures do not end up as "bycatch" in non-target fisheries, such as the southeastern U.S. shrimp fisheries, which historically are associated with extremely high levels of sea turtle bycatch. TIRN also has a vested interest in seeing the continued survival of sea turtles in the Gulf of Mexico and Atlantic Ocean, iconic species that are an integral part of a healthy marine ecosystem. TIRN and its members are concerned that the sea turtle populations have suffered a tremendous loss over the last few decades and without attention and enforced regulations, could plummet to dangerously low levels. TIRN's members and staff study, visit, observe, and photograph marine wildlife and habitats in the Gulf of Mexico and along the Atlantic coast on a regular, ongoing basis, and intend to continue to do so in the future. TIRN brings this action on behalf of itself and as representative of its members.

17.     Plaintiffs and Plaintiffs' members and constituents regularly use, enjoy, and benefit from the marine environment along the Atlantic and Gulf coasts. Plaintiffs and Plaintiffs' members and constituents also regularly use, enjoy, and benefit from the presence of healthy marine life, including sea turtles, within the Gulf of Mexico and Atlantic Ocean for recreational, aesthetic, commercial, scientific, and environmental purposes, such as wildlife watching, scientific study, boat touring, underwater diving, fishing, and photography. The ability of Plaintiffs and Plaintiffs' members to pursue these interests hinges on the well-being of threatened and endangered sea turtles, as well as the marine ecosystems on which they depend.

18.     The interests of Plaintiffs and Plaintiffs' members have been, are being, and will be adversely affected by NMFS's violations of the ESA, NEPA, and APA, as described herein. NMFS's failure to comply with these laws also has caused and is causing Plaintiffs' members and staff procedural harms connected to their substantive conservation, recreational, scientific, and aesthetic interests. These harms can only be remedied if the Court orders NMFS to comply with the ESA, NEPA and APA. Plaintiffs have no other adequate remedy at law.

19.     Defendant NATIONAL MARINE FISHERIES SERVICE is the federal agency within the U.S. Department of Commerce with primary responsibility for administering and implementing the ESA with respect to sea turtles in the marine environment, including promulgating regulations for the conservation of such species. NMFS is responsible for complying with the ESA when taking any action that may affect threatened or endangered species.

20.     Defendant GINA RAIMONDO is sued in her official capacity as Secretary of the U.S. Department of Commerce. The Secretary is responsible for administering and implementing the ESA with respect to certain marine species. The Secretary is responsible for complying with the ESA when taking any action that may affect threatened or endangered species.

## STATUTORY BACKGROUND

I.     ENDANGERED SPECIES ACT

21.     Congress enacted the ESA in response to the extinction crisis to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Congress defined "conservation" as "the use of *all* methods and procedures which are necessary to bring any endangered species or threatened species to the point" of recovery. *Id.* § 1532(3) (emphasis added).

22.     In broad strokes, the ESA seeks to protect and recover imperiled species and populations by first listing them as threatened or endangered based on enumerated statutory factors. *Id.* § 1533(a)(1)(A)–(E); *see id.* § 1532(6), (20).

23.     The ESA prohibits the "take" of any endangered species by any person. *Id.* § 1538(a)(1)(B). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19).

24.     Section 4(d) of the ESA requires NMFS to issue regulations deemed "necessary and advisable to provide for the conservation of" any threatened species. *Id.* § 1533(d).

25.     Section 7 of the ESA requires each federal agency, in consultation with the appropriate wildlife agency—here, NMFS—to insure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any threatened or endangered species. *Id.* § 1536(a)(2). "Action" is broadly defined to include "actions intended to conserve listed species," "the promulgation of regulations," or any other action that may "directly or indirectly cause modifications to the land, water, or air." 50 C.F.R. § 402.02.

26.     Section 7 requires an action agency to engage in formal or informal consultation when it determines that its proposed action "may affect" listed species or critical habitat. *Id.* §§ 402.13, 402.14. "The minimum threshold for an agency action to trigger consultation with [the wildlife agencies] is low." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011). "*Any possible* effect, whether *beneficial*, benign, adverse, or of an undetermined character, triggers the formal consultation requirement . . . ." 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) (emphases added); *see also* U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook*, at xvi (1998) ("May affect [is] the appropriate conclusion when a proposed action may pose *any* effects on listed species or designated critical

habitat."). Both the action agency and the consulting agency must "use the best scientific and commercial data available" in evaluating the action's effects and completing the consultation process. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d), (g)(8).

27.     If an action may affect a listed species or critical habitat, the action agency must either engage in formal consultation or obtain NMFS's written concurrence that the action is not likely to adversely affect listed species or critical habitat. 50 C.F.R. §§ 402.13(a), 402.14. Formal consultation concludes in the issuance of a biological opinion that determines whether the action is likely to jeopardize the continued existence of the listed species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h). Jeopardy exists if an action reasonably would be expected, directly or indirectly, to appreciably reduce the likelihood of the survival and recovery of a listed species in the wild. 50 C.F.R. § 402.02. If NMFS concludes that the proposed action is likely to jeopardize the species, it must specify reasonable and prudent alternatives that would avoid the likelihood of jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

28.     The ESA requires NMFS to provide an incidental take statement with the biological opinion when it anticipates that incidental take of a threatened or endangered species will occur. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). The statement must specify the permissible level of take. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i). In addition, the incidental take statement must specify reasonable and prudent measures that NMFS considers necessary or appropriate to minimize the effects of take, as well as reporting requirements and other terms and conditions with which the action agency must comply in order to implement the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4)(B); 50 C.F.R. § 402.14(i)(1).

29.     Congress established the section 7 consultation process explicitly "to ensure compliance with the [ESA's] substantive provisions." *Thomas v. Peterson*, 753 F.2d 754, 764

(9th Cir. 1985). Therefore, until a federal agency completes any necessary consultation, it is out of compliance with both its procedural and substantive section 7(a)(2) obligations.

II.      NATIONAL ENVIRONMENTAL POLICY ACT

30.      NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2019).[1] NEPA serves two purposes: (1) "it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) it "guarantees that the relevant information will be made available" to the public so it may play a role in the decisionmaking process. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *see* 42 U.S.C. § 4321.

31.      The Council on Environmental Quality has promulgated regulations implementing NEPA, which are "binding on all Federal agencies." 40 C.F.R. § 1500.3; *see id.* §§ 1500.1–1508.28.

32.      Under NEPA, a federal agency is required to prepare an environmental impact statement (EIS) for any major federal action significantly affecting the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. The "primary purpose" of an EIS is to "serve as an action-forcing device" to be used by federal agencies "to plan actions and make decisions." 40 C.F.R. § 1502.1. Agencies must "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b).

33.      The EIS "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which

---

[1] The Council on Environmental Quality amended NEPA's implementing regulations on July 16, 2020, after NMFS issued the TED Rule. 85 Fed. Reg. 43,304 (July 16, 2020). NMFS's compliance with NEPA and this case are governed by the NEPA regulations that were operative at the time NMFS issued the TED Rule. Accordingly, all citations to the NEPA regulations are to the 2019 version of the Code of Federal Regulations unless otherwise noted.

would avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.*
§ 1502.1. The agency must identify in the EIS the direct, indirect, and cumulative impacts of the
proposed action, consider alternative actions and their impacts, and identify all irreversible and
irretrievable commitments of resources associated with the proposed action. 42 U.S.C. §
4332(2)(C); 40 C.F.R. §§ 1508.7, 1508.8, 1502.14.

34.    A federal agency must in the EIS take a "hard look" and ensure that "the adverse
environmental effects of the proposed action are adequately identified and evaluated."
*Robertson*, 490 U.S. at 350; 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1501.4, 1502.1.
1502.2, 1502.5. This "ensures that important effects will not be overlooked or underestimated
only to be discovered after resources have been committed or the die otherwise cast." *Robertson*,
490 U.S. at 349.

35.    Effects include both beneficial and detrimental effects and agencies should
evaluate "[t]he degree to which the action may adversely affect an endangered or threatened
species." 40 C.F.R. §§ 1508.8, 1508.27. When "economic or social and natural or physical
environmental effects are interrelated," the EIS must "discuss all of these effects on the human
environment." *Id.* § 1508.14.

36.    An agency's evaluation of environmental effects must be based on "accurate
scientific" information of "high quality." *Id.* §§ 1500.1(b), 1502.24. An analysis that includes
erroneous data, or that is otherwise misleading, violates NEPA.

37.    An agency also must, "to the fullest extent possible . . . identify and assess the
reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these
actions upon the quality of the human environment." *Id.* § 1500.2(e). This discussion of
alternatives is "the heart of the environmental impact statement" and must provide a "clear basis

for choice among options by the decisionmaker and the public." *Id.* § 1502.14.

38.     An agency is required to prepare a supplemental EIS if, after issuing its latest draft EIS, "[t]he agency makes substantial changes to the proposed action that are relevant to environmental concerns." *Id.* § 1502.9(c)(1)(i). Whether a change is "substantial" so as to warrant a supplemental EIS is "determined not by the modification in the abstract, but rather by the significance of the environmental effects of the changes." *Pub. Emps. for Env't Resp. v. U.S. Dep't of the Interior*, 832 F. Supp. 2d 5, 29–30 (D.D.C. 2011).

III.     ADMINISTRATIVE PROCEDURE ACT

39.     The APA governs federal agencies' rulemaking processes. 5 U.S.C. § 553.

40.     An agency must give the public adequate notice of any rulemaking, which must include "the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* § 553(b)(3). After providing notice, the agency must give "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c).

41.     The agency's final rule must be a "logical outgrowth" of the terms of the proposed rule. *See Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005). A final rule is a logical outgrowth of a proposed rule only if interested parties "should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004). "By contrast, a final rule fails the logical outgrowth test and thus violates the APA's notice requirement where interested parties would have had to divine the agency's unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079−80 (D.C. Cir. 2009) (citation omitted).

42.     To ensure that the public comment opportunity is meaningful, NMFS must first "disclose in detail the thinking that has animated the form of a proposed rule and the data upon which that rule is based." *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977).

43.     The APA grants a right of judicial review to any person adversely affected by agency action. 5 U.S.C. § 702.

44.     Under the APA, a court must hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2)(A). An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co*., 463 U.S. 29, 43 (1983). If an agency reverses course, it is "obligated to supply a reasoned analysis for the change." *Id.* at 42.

45.     The adequacy of an agency's NEPA analysis and its administration of the ESA are reviewed pursuant to the APA.

## STATEMENT OF FACTS

I.     SEA TURTLES IN THE GULF OF MEXICO AND SOUTH ATLANTIC

46.     Sea turtles are among the world's largest reptiles and have inhabited the oceans for over 100 million years. They are also among the most imperiled marine wildlife species.

47.     Sea turtles are highly migratory and travel thousands of miles between the habitats where they are born, forage, and reproduce. Females migrate to sandy beaches—often the same beach where they were born—to come ashore and lay nests. Most sea turtle species exhibit fidelity to their foraging areas as well, returning to the same places year after year.

48.     Five of the world's seven sea turtle species are found in the Gulf of Mexico and South Atlantic coastal waters in the U.S.: the Kemp's ridley sea turtle (*Lepidochelys kempii*), green sea turtle (*Chelonia mydas*), loggerhead sea turtle (*Caretta caretta*), hawksbill sea turtle (*Eretmochelys imbricata*), and leatherback sea turtle (*Dermochelys coriacea*). These waters serve as important migratory corridors, foraging habitat, and breeding habitat for these turtles. All five species also nest on U.S. Gulf and Atlantic beaches.

49.     All five sea turtle species found in U.S waters are listed as threatened or endangered under the ESA. The species have been harmed by and continue to confront several common threats, including capture in fisheries, poaching, climate change, coastal development and loss of habitat, pollution, vessel strikes, cold stun events, and oil and gas development. Sea turtles in the U.S. are struggling to recover in the face of these threats.

50.     The Kemp's ridley sea turtle is the smallest and most critically endangered sea turtle species in the world. *See* Figure 1. It is listed as endangered under the ESA. The Kemp's ridley is unique among sea turtles in that it relies almost entirely on a single beach for nesting, in the western Gulf of Mexico. Females come ashore there in large, synchronized aggregations to lay their eggs together in events known as "arribadas." Kemp's ridleys take approximately 12 years to reach reproductive maturity.

51.     The primary foraging habitat for most Kemp's ridleys is the Gulf of Mexico's shallow, nearshore waters less than 120 feet deep. Long-term satellite tracking data suggest shallow waters of the northern Gulf of Mexico, especially off Louisiana, provide critical foraging habitat.

52.     Many Kemp's ridleys migrate out of the Gulf of Mexico to coastal waters along the Atlantic Coast. Those individuals are believed to return to the Gulf as adults to reproduce.



Figure 1. Kemp's ridley sea turtle. Source: National Park Service,
https://www.nps.gov/pais/learn/nature/kridley.htm.

53.    The Kemp's ridley's limited range and low population make it particularly
vulnerable to the threats that all sea turtle species face. The species almost went extinct in the
1980s due to overexploitation and fishing gear impacts. The Kemp's ridley has since begun to
recover due to concerted conservation efforts. But its population remains significantly below
historical levels, and recent data show the population may be declining.

54.    Kemp's ridleys are commonly found stranded (washed ashore or floating in the
water, dead or alive but harmed) in the northern Gulf of Mexico, composing more than 80% of
sea turtle strandings in the area.[2] Necropsy results indicate that many of these stranded Kemp's
ridleys died due to forced submergence, which is commonly the result of capture in fishing gear.

55.    Green sea turtles from both the threatened North Atlantic distinct population
segment (DPS)[3] and South Atlantic DPS inhabit waters in the Gulf of Mexico and South
Atlantic. The green sea turtle is the largest of the hardshell sea turtles, growing to up to 350

---

[2] A stranded sea turtle is one that is found washed ashore or floating, alive or dead.
[3] The ESA allows NMFS to separately list individual DPSs of species as threatened or
endangered. *See* 16 U.S.C. § 1532(16) (defining "species" to include "any distinct population
segment of any species of vertebrate fish or wildlife which interbreeds when mature").

pounds. Adult green sea turtles are the only strictly herbivorous sea turtle. Green sea turtles mature very slowly, requiring 20−50 years to reach reproductive maturity.

56.     Females in the North Atlantic DPS nest on U.S. beaches between Texas and North Carolina. Green sea turtles from both the North and South Atlantic DPS forage in U.S. nearshore waters, primarily in the seagrass beds and macroalgae found in shallow waters such as lagoons, channels, inlets, and bays.

57.     Nesting data indicate that the North Atlantic DPS population may be increasing, but it remains well below historical levels. NMFS has indicated that there are not adequate data on the South Atlantic DPS to detect a population trend, but this DPS, too, is much smaller than its historical population.

58.     Loggerhead sea turtles from the threatened Northwest Atlantic Ocean DPS are found in the Gulf of Mexico and South Atlantic. The majority of loggerhead nesting in the U.S. occurs along the South Atlantic coast, although loggerheads have nested as far north as Delaware Bay.

59.     Loggerheads that hatch on U.S. beaches typically follow Atlantic Ocean currents that carry them close to Europe and northern Africa before returning to the western Atlantic's coastal waters, where they remain as adults. Adult and older juvenile loggerheads forage, reproduce, and migrate along the U.S. Gulf and Atlantic coasts. The estuarine and shallow-water environments along these coasts provide particularly important foraging habitat.

60.     The Northwest Atlantic loggerhead DPS population remains well below its historical levels. It is not clear from population data whether the DPS is declining, increasing, or staying at the same low level.

61.     Endangered hawksbill sea turtles and endangered leatherback sea turtles are

relatively less common in Gulf and South Atlantic waters than other sea turtle species. However, both species nest on South Atlantic U.S. beaches and are known to forage in the nearshore waters of the Gulf and Atlantic.

## II.   THE SOUTHEASTERN U.S. SHRIMP FISHERIES

62.   Of all the commercial and recreational fisheries in the United States, NMFS has determined that shrimp trawling is the most detrimental to the recovery of sea turtle populations.

63.   The southeastern shrimp fisheries operate in state waters (within 9 miles of the coast in the Gulf and within 3 miles of the coast in the Atlantic) and federal waters from Texas to North Carolina.

64.   Generally, NMFS is responsible for managing shrimp fishing in federal waters under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1891d, while states are responsible for managing shrimp fishing within their respective state waters. NMFS also has authority under the ESA to regulate activities, including fisheries, in both state and federal waters to protect threatened and endangered species. As described below, NMFS requires TEDs and other measures to address sea turtle bycatch as part of its obligation to conserve listed species under the ESA.

65.   Commercial vessels use a variety of trawl gear to catch shrimp. The most common gear type is the otter trawl, which NMFS has required be outfitted with TEDs since the late 1980s.

66.   In nearshore waters in Louisiana, Mississippi, Alabama, and North Carolina, however, many shrimpers use the skimmer trawl, which operates close to the water surface. A skimmer trawl consists of two nets that taper back to tail bags (called cod ends) and are elevated above the water by a rigid L-shaped or triangular net frame off the sides of the vessel and pushed through the upper water column. *See* Figure 2.



Figure 2. Diagram of typical skimmer trawl with a TED installed. The "BRD" is a bycatch reduction device used to allow finfish to escape from the trawl. Source: NMFS, *Reinitiation of Endangered Species Act (ESA) Section 7 Consultation on the Continued Implementation of the Sea Turtle Conservation Regulations under the ESA and the Continued Authorization of the Southeast U.S. Shrimp Fisheries in Federal Waters under the Magnuson-Stevens Fishery Management and Conservation Act (MSFMCA)* 22 (2014).

67.     Some shrimpers in these nearshore waters use wing nets (also called butterfly trawls), which consist of two rectangular frames, or pusher-head trawls, which consist of two poles suspended from the bow of the vessel in an inverted "V" configuration.

68.     Each of these three trawl gear types can harm and kill sea turtles. Sea turtles encountering a trawl net moving through the water often try to outswim it. When the trawl net overtakes the sea turtle, the sea turtle is swept into the cod end of the net, where it becomes trapped underwater.

69.     Sea turtles are air-breathing reptiles, so they must be able to come to the surface to breathe. When they are captured in these nets, they become trapped underwater and are unable

to breathe. Many trapped sea turtles drown. Those that survive often suffer harmful physiological effects, including the buildup of acid in their lungs and muscles. These turtles can die or become stranded after being released from the nets.

70.     NMFS estimates that 5,837 vessels (5,660 in the Gulf; 177 in the South Atlantic) use skimmer trawls, pusher-head trawls, or wing nets. NMFS also estimates that approximately 2,165−2,942 sea turtles die annually as a result of being incidentally caught by these vessels.

71.     NMFS developed these estimates by extrapolating data reported by observers onboard shrimping vessels using skimmer trawls. Currently, there is only approximately 2% and 1% observer coverage in the Gulf of Mexico and South Atlantic shrimp fisheries, respectively. Thus, over 98% of all the shrimping trips taken have no observer on board.

III.    TURTLE EXCLUDER DEVICE REQUIREMENTS

72.     The use of TEDs has been instrumental in reducing sea turtle mortalities and promoting the recovery of many sea turtle populations.

73.     A TED is a piece of fishing gear consisting of a metal grid with horizontal or vertical bars that is sewn at an angle inside a trawl net. *See* Figure 3. TEDs allow incidentally caught sea turtles to safely escape the net through an escape flap in the mesh before reaching the cod end (back end). The TED still allows shrimp to pass between the bars to the back of the net.

74.     The ESA prohibits the unpermitted take of any sea turtle. 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. § 223.205. NMFS by regulation allows the *incidental* take of sea turtles by most shrimp trawlers operating in the southeastern U.S. shrimp fisheries *if* an approved TED is installed in each net that is rigged for fishing. 50 C.F. R. § 223.206(d)(2). NMFS may only approve the use of a TED design that is at least 97% effective in safely releasing sea turtles caught in shrimp trawls. *Id.* § 223.207(e)(1).



Figure 3. TED diagram. Source: NMFS, *Environmental Impact Statement to Reduce the Incidental Bycatch and Mortality of Sea Turtles in the Southeastern U.S. Shrimp Fisheries* (Final) at vi (2019) [hereinafter FEIS].

75.     NMFS has recognized in its sea turtle recovery plans that TED requirements are a necessary and commonsense step for promoting the recovery of these species. The Kemp's ridley Recovery Plan lists the need to "[r]equire TEDs, or other equally effective bycatch reduction measures as appropriate, in all trawl fisheries of concern."[4] The United States and Mexico Kemp's Ridley Bi-National Recovery Team found in 2014 that "requir[ing] TEDs in U.S. skimmer trawl fisheries and other trawl fisheries in coastal waters" was one of the "most critical actions" needing attention for Kemp's ridley recovery.[5] The Loggerhead Recovery Plan also lists the need to "promulgat[e] regulations to require TEDs in trawl fisheries where they currently are not required" as a Priority 1 recovery action.[6] The Northwest Atlantic Loggerhead Recovery Team reiterated that need and determined in its 2019 recovery progress report for the loggerhead

---

[4] NMFS et al., *Bi-National Recovery Plan for the Kemp's Ridley Sea Turtle (*Lepidochelys kempii*)* at II-14 (2011), https://www.fws.gov/kempsridley/Finals/kempsridley_revision2.pdf.
[5] Kemp's Ridley Bi-National Recovery Team, *Recommendations of the Kemp's ridley Bi-National Recovery Team Meeting* 3 (2015), https://www.fws.gov/kempsridley/pdfs/KempsRidley_BiNationalTeam_Nov2014.pdf.
[6] NMFS & U.S. Fish & Wildlife Serv., *Recovery Plan for the Northwest Atlantic Population of the Loggerhead Sea Turtle (*Caretta caretta*)* at xii (2008), https://repository.library.noaa.gov/view/noaa/3720.

sea turtle that TEDs must be mandated for skimmer trawls.[7]

76.     NMFS has, however, exempted from TED requirements those shrimp fishing vessels that have "only a pusher-head trawl, skimmer trawl, or wing net rigged for fishing." 50 C.F.R. § 223.206(d)(ii)(A)(3) (2019). NMFS permits such vessels to incidentally take sea turtles without using TEDs if they limit their net "tow times" to 55 or 75 minutes (depending on the time of year). *Id.* § 223.206(d)(3)(i). The tow time limits require shrimpers to pull their nets out of the water and release any captured sea turtles at required intervals, with the objective of releasing turtles before they are submerged long enough to drown.

77.     As part of its authorization of the southeastern shrimp fisheries, NMFS must periodically complete updated ESA consultations to ensure that fishing operations are not jeopardizing the continued survival of sea turtle species or destroying or adversely modifying their critical habitat.

78.     NMFS reinitiated ESA consultation on the effects of the southeastern shrimp fisheries in 2010 after the *Deepwater Horizon* oil spill resulted in the oiling and stranding of thousands of sea turtles.

79.     In 2010 and 2011, sea turtle mortality in the Gulf of Mexico and South Atlantic increased dramatically compared to annual strandings during the preceding two decades. Based on the federal government's modeling assumptions and inspection reports, thousands of sea turtles likely drowned in 2010–2011, largely because these turtles were caught as bycatch in the southeastern shrimp fisheries.

---

[7] NW Atlantic Loggerhead Recovery Team, *Recovery Plan for the Northwest Atlantic Population of the Loggerhead Sea Turtle (*Caretta caretta*) Second Revision (2008): Assessment of Progress Toward Recovery* 18 (2019), https://www.fws.gov/northflorida/seaturtles/Docs/FINAL_NW_Atl_CC_Loggerhead_Recovery_Team_Progress_Report_12-19-19.pdf.

80.     After NMFS failed to complete the reintiated consultation by the statutory deadline, the Center, Defenders, and TIRN filed suit in 2011 against the agency for failing to ensure its actions were not jeopardizing listed species and for missing its deadline to conclude consultation and issue a biological opinion. Compl., *Turtle Island Restoration Network v. NMFS*, No. 1:11-cv-01813-ABJ (D.D.C. Oct. 13, 2011), ECF. No. 1.

81.     The parties reached a settlement agreement in which NMFS agreed to issue a new biological opinion and a new proposed rule that would require the use of TEDs on skimmer trawl nets. Settlement Agmt. & Stip. Dismissal, *Turtle Island Restoration Network v. NMFS*, No. 1:11-cv-01813-ABJ (D.D.C. Apr. 26, 2012), ECF. No. 11.

82.     On May 10, 2012, NMFS published a biological opinion addressing NMFS's continued implementation of the sea turtle conservation regulations, including proposed new TED regulations, and the continued authorization of the southeastern shrimp fisheries in federal waters under the Magnuson-Stevens Act.

83.     NMFS concurrently issued a proposed rule that would have required all skimmer trawls, pusher-head trawls, and wing nets to use TEDs in their nets, instead of tow time restrictions. 77 Fed. Reg. 27,411 (May 10, 2012). NMFS recognized in the proposed rule that tow time restrictions failed to effectively protect sea turtles; shrimpers regularly exceeded the tow time limits, and the limits were difficult to enforce. *Id.* at 27,411, 27,413. NMFS accordingly determined that requiring TEDs instead of tow time restrictions was necessary. *Id.* at 27,411.

84.     After NMFS proposed the rule, it obtained new information indicating that the standard bar spacing on TEDs was ineffective at keeping the smaller sea turtles these trawls often encounter out of the nets. 78 Fed. Reg. 9024, 9025 (Feb. 7, 2013). NMFS accordingly withdrew the proposed rule. *Id.*

85.     In 2015, another conservation organization filed a lawsuit challenging NMFS's

2012 biological opinion covering the southeastern shrimp fisheries' impacts to listed sea turtles.

Complaint, *Oceana, Inc. v. Ross*, No. 1:15-cv-00555-PLF (D.D.C. Apr. 14, 2015), ECF No. 1.

The parties agreed to stay that case in September 2016 after NMFS indicated that it intended to

propose a rule withdrawing the alternative tow time restriction and requiring that all skimmer

trawls, pusher-head trawls, and wing nets use TEDs. Stip. Agreement & Mot. Stay Case 2–3,

*Oceana*, No. 1:15-cv-00555-PLF (D.D.C. Sept. 7, 2016), ECF No. 11.

IV.     PROPOSED TED RULE

86.     In March 2016, NMFS invited public comment and conducted public meetings on

the scope of new sea turtle regulatory requirements in the southeastern shrimp fisheries rule. *See*

81 Fed. Reg. 13,772 (Mar. 15, 2016). Plaintiffs and their conservation allies submitted extensive

comments in support of expanding the TED requirements to all shrimp vessels. In particular, the

letter highlighted NMFS's finding that nearly 500,000 sea turtles are captured in the nets of the

southeastern shrimp fisheries annually and that 50,000 of these animals may be killed. The letter

strongly supported closing the TEDs loophole and urged the agency to implement additional

protections across the entire southeastern shrimp fisheries and to ensure adequate enforcement

resources and measures to address ongoing compliance deficiencies throughout the fisheries.

87.     On December 16, 2016, NMFS published a proposed rule to withdraw the

alternative tow time restriction and require all skimmer trawls, pusher-head trawls, and wing

nets[8] to use TEDs with 3-inch maximum bar spacing. 81 Fed. Reg. 91,097 (Dec. 16, 2016).

88.     NMFS's stated intent was "to reduce incidental bycatch and mortality of sea

turtles in the southeastern U.S. shrimp fisheries, and to aid in the protection and recovery of

---

[8] Except vessels participating in the Biscayne Bay wing net fishery in Florida.

listed sea turtle populations." *Id.* at 91,097. NMFS specifically "preliminarily determined" that requiring TEDs on all skimmer trawls, pusher-head trawls, and wing nets is "necessary and advisable to conserve threatened and endangered sea turtle species," as well as "necessary and appropriate to enforce the requirements of the ESA." *Id.* at 91,099.

89.     NMFS proposed the expanded TED requirements to address multiple critical shortcomings with the existing regulations, specifically: 1) law enforcement data, past public comments, and anecdotal information indicated that skimmer trawls exceed the tow time requirements; 2) enforcement was difficult due to the time required to monitor a given vessel actively towing, the inability to monitor covertly, and the limited visibility at night, when most vessels fish; and 3) an increase in trawl vessel sizes has allowed for fishing in deeper waters and with larger nets, which can make it harder for shrimpers to see turtles caught within the mouth of the net during a cursory cod end inspection. *Id.* at 91,098.

90.     NMFS considered seven alternatives for the proposed rule, using different combinations of trawl types and vessel lengths: Alternative 1 would have involved taking no action; Alternative 2 would have extended TED requirements to only vessels 26 feet and greater in length using skimmer trawls, pusher-head trawls, and wing nets; Alternative 3 would have extended TED requirements to all vessels using skimmer trawls, pusher-head trawls, and wing nets; Alternative 4 would have extended TED requirements to only vessels 26 feet and greater in length using skimmer trawls; Alternative 5 would have extended TED requirements to vessels of any length using skimmer trawls; Alternative 6 would have extended TED requirements to all shrimp vessels in state waters, regardless of trawl type; and Alternative 7 would have extended TED requirements to all shrimp vessels in any waters, regardless of trawl type. *Id.* at 91,102.

91.     NMFS did not consider any alternative that would have extended TED

requirements to only vessels larger than 40 feet.

92.     NMFS explained in its draft environmental impact statement that it chose the 26-foot cut-off for some alternatives because it had less data on TED efficacy for vessels less than 26 feet in length; specifically, NMFS lacked observer data from vessels less than 26 feet in length and lacked TED testing data from skimmer trawl vessels less than 27 feet in length. NMFS, *Environmental Impact Statement to Reduce the Incidental Bycatch and Mortality of Sea Turtles in the Southeastern U.S. Shrimp Fisheries* (Draft) 20 (2016) [hereinafter DEIS]. NMFS stated that it believed setting the cut-off at 26 feet would address the "safety at sea issues" raised during the scoping process. *Id.*

93.     NMFS selected Alternative 3, which would have required TEDs in all vessels using skimmer trawls, pusher-head trawls, and wing nets, as its preferred action because it would prevent the greatest number of sea turtle deaths among the alternatives targeting skimmer trawls, pusher-head trawls, and wing nets: up to an estimated 2,500 sea turtles every year. 81 Fed. Reg. at 91,102. NMFS stated it did not select the other alternatives targeting those three gear types because they "would be expected to result in less protection of sea turtles." *Id.*

94.     NMFS stated multiple times in the draft environmental impact statement that it believes requiring TEDs on all vessels using skimmer trawls, pusher-head trawls, and wing nets is "necessary" to the recovery of sea turtles. *E.g.*, DEIS at 240, 258.

95.     Plaintiffs and their conservation allies again submitted detailed comments and evidence in support of the proposal to require TEDs on all vessels using skimmer trawls, pusher-head trawls, and wing nets. In particular, the letter emphasized the scientific and conservation justification for the proposed rule given the agency's own finding that skimmer trawl fisheries exempt from TED requirements cause an estimated 2,118–2,868 mortalities per year and that

closing the loophole would prevent an estimated 1,730–2,500 mortalities each year. The letter again encouraged the agency to go beyond the scope of the TED regulatory process to implement additional protections and implement enforcement measures throughout the fisheries, and highlighted that the proposed alternative failed to establish new reporting, record-keeping, or other compliance requirements necessary to strengthen the regulation.

V.   FINAL TED RULE

96.   NMFS issued the final TED Rule three years later, departing drastically from its original proposal. The final Rule extends TED requirements only to commercial shrimp vessels greater than 40 feet in length using skimmer trawls. 84 Fed. Reg. 70,048 (Dec. 20, 2019).

97.   NMFS did not consider that alternative or any similar variation in its proposed rule or DEIS. Nor did NMFS provide any indication before issuing the final TED Rule that it was considering using 40 feet as a vessel size cut-off.

98.   The final TED rule dramatically reduces sea turtle protections compared to the measures NMFS found necessary and advisable to conserve these species just three years earlier. Compared to the proposed rule, NMFS estimates the TED Rule will allow 4,775 commercial shrimp trawl vessels to continue to operate without protective TEDs installed. *See* Table 1. Despite finding that shrimp trawls represent one of the greatest obstacles to sea turtle recovery, NMFS issued a rule that allows a substantial portion of the commercial shrimp fleet to operate without the necessary safeguards to prevent sea turtles from being injured and drowned in their nets. NMFS itself projects the final TED Rule will result in the deaths of up to 1,342 more sea turtles per year than would have occurred under the proposed rule. *See* Table 1.

|  | TED Rule (Alt. 8) | Proposed Rule (Alt. 3) | TEDs on Skimmer Trawls ≥26 ft (Alt. 4) | Status Quo (Alt. 1) |
|---|---|---|---|---|
| Vessels Covered | 1,062 | 5,837 | 2,913 | 0 |
| Annual Sea Turtle Mortality* | 1,364–1,786 | 435–444 | 753–904 | 2,165–2,944 |
| Sea Turtles Protected (vs. Status Quo) | 801–1,158 | 1,730–2,500 | 1,412–2,040 | 0 |

Table 1. Comparison of alternatives. Data source: FEIS at 145–46, 241 (Table 128).
*Mortality total from all skimmer trawl, pusher-head trawl, or wing net shrimp vessels.

99.     The TED Rule amends 50 C.F.R. § 223.206 to allow exceptions to the prohibition against taking sea turtles in 50 C.F.R. § 223.205 for vessels that have "only a pusher-head trawl or a wing net, or has a skimmer trawl on a vessel less than 40 ft (12.2 m) in length." 84 Fed. Reg. at 70,063 (revising 50 C.F.R. § 223.206(d)(2)(ii)(A)(3)). Such vessels only have to comply with the same tow time restrictions that previously had been in place for all skimmer trawls, pusher-head trawls, and wing nets. *Id.* (revising 50 C.F.R. § 223.206(d)(3)(i)).

100.     NMFS originally set an effective date of April 1, 2021, for the TED Rule. *Id.* at 70,048. On March 31, 2021, NMFS delayed the effective date to August 1, 2021. 86 Fed. Reg. 16,676 (Mar. 31, 2021).

101.     The final TED Rule marks a 180-degree course change in NMFS's approach from the proposed rule. The agency's decision completely disregards its prior conclusions that requiring TEDs on *all* vessels using skimmer trawls, pusher-head trawls, and wing nets is necessary for the conservation and recovery of the imperiled sea turtle populations in the Gulf of Mexico and southeastern United States.

A.     Failure to Require Measures Deemed Necessary and Advisable for the Conservation of Sea Turtles

102.     NMFS indicates in its final environmental impact statement (FEIS) that it issued the TED Rule under section 4(d) of the ESA, 16 U.S.C. § 1533(d). FEIS at 14. NMFS states that it found the alternative implemented in the TED Rule "to be necessary and advisable in further

reducing sea turtle incidental bycatch and mortality and recovering listed sea turtle populations." *Id.*

103.    Nowhere in the FEIS or TED Rule does NMFS acknowledge that it had previously in the proposed rule and DEIS deemed it "necessary and advisable for the conservation" of sea turtles to require TEDs on *all* vessels using skimmer trawls, pusher-head trawls, or wing nets, or that the TED Rule requires only a subset of the conservation measures NMFS had deemed necessary and advisable.

104.    NMFS does not acknowledge that its new "necessary and advisable" finding in the FEIS conflicts with its prior necessary and advisable findings, nor does NMFS offer any rationale or factual basis for departing from its prior findings.

B.    <u>Lack of Rational Basis for Limiting TED Requirements to Only Skimmer Trawl Vessels 40 Feet and Longer</u>

105.    NMFS does not provide a rational explanation or evidence to support its decision to only require TEDs on skimmer trawl vessels that are 40 feet or more in length.

106.    NMFS states it chose to exempt skimmer trawl vessels shorter than 40 feet due to "safety and other practical concerns about using TEDs on small skimmer trawls." 84 Fed. Reg. at 70,055–56. NMFS does not explain what those concerns are, much less why it believes a 40-foot vessel cutoff is necessary to address any safety or practical concerns.

107.    In contrast, NMFS explains in the FEIS that vessels between 26 and 30 feet are able to use the largest TED frames and have enough deck space to accommodate TED storage. FEIS at 26. And in the DEIS, NMFS found that using a 26-foot cutoff for skimmer trawls would address safety and practical concerns. NMFS offers no new information requiring a higher, 40-foot cutoff to address safety and practical concerns. The higher cutoff will result in hundreds more sea turtle deaths per year than the 26-foot cutoff NMFS used in the proposed rule. *See*

Table 1.

108.     NMFS states it chose to exempt pusher-head trawls and wing nets due to

"concerns about applying TED testing data from skimmer trawl operations" to those gear types,

"coupled with a lack of observer data." 84 Fed. Reg. at 70,049. NMFS does not explain what

those concerns are or why a lack of observer data justifies allowing those vessels to fish without

TEDs.

109.     Conversely, NMFS's comparison of Alternatives 3 (requiring TEDs on all

vessels) and 5 (exempting pusher-head trawls and wing nets) demonstrates that using TEDs on

pusher-head trawls and wing nets would be effective at reducing sea turtle mortality—by

between 106 and 152 deaths per year.

110.     In addition, recent TED testing studies in smaller skimmer trawls and wing nets

have found that TEDs can function properly in these small gear types.

111.     NMFS also states it limited new TED requirements based on "new information

indicating significantly lower levels of sea turtle mortality in the offshore fleet." *Id.* NMFS does

not describe what that new information is or explain why it justifies limiting TED requirements.

112.     NMFS ultimately fails to explain how it chose the particular, narrow class of

vessels to be covered by the TED Rule.

C.     Lack of Notice or Supplemental Environmental Analysis Before Adopting
       Drastically More Limited Action Alternative

113.     Nothing in the proposed rule or DEIS gave any indication NMFS was considering

exempting skimmer trawl vessels less than 40 feet in length.

114.     NMFS made its final decision to exempt pusher-head trawls, wing nets, and

vessels smaller than 40 feet in length using skimmer trawls from TED requirements without

providing public notice that it was considering that option or any opportunity for the public to

comment on it.

115.    None of the action alternatives explored in the DEIS remotely compare to the final TED Rule. Each of the action alternatives NMFS considered would have protected at least 1,400 sea turtles each year and would have required TEDs on at least the 2,913 skimmer trawl vessels that are 26 feet or more in length.

116.    The broad exemption introduced for the first time and adopted in the final TED Rule requires TEDs on approximately one-third the number of vessels as compared to the proposed rule and is expected to result in twice the number of sea turtle deaths per year compared to the *least* protective action alternative considered in the DEIS.

117.    NMFS did not complete a supplemental environmental impact statement to analyze the effects of the final TED Rule, even though it made substantial changes to the proposed action that significantly reduce the amount of protection afforded to threatened and endangered sea turtles, and that will result in thousands of additional sea turtle deaths.

118.    NMFS also states that it made its change from the proposed rule based on "new information" about sea turtle mortality levels and "[n]ew information" about differences in how pusher-head trawls and wing nets operate compared to skimmer trawls. 84 Fed. Reg. at 70,049, 70,058, 70,062. NMFS did not complete a supplemental environmental impact statement explaining and analyzing such "new information," let alone seek public comment on the "new information."

119.    NMFS ignored these changes and self-described "new information," and declined to complete a supplemental EIS based on its erroneous assertion that "we have not made substantial changes in the proposed action that are relevant to environmental concerns, and no significant new circumstance or information relevant to environmental concerns exists that bears

upon the proposed action or its impacts." FEIS 20–21.

       D.    <u>Failure to Take a "Hard Look" at the TED Rule's Environmental Effects</u>

           1.    *Irrational assessment of impacts to sea turtles*

    120.    NMFS's analysis of the TED Rule's effects on sea turtles relied on inaccurate mortality estimates and failed to consider the population-level impacts of anticipated mortality.

    121.    First, NMFS relied on an inaccurate assessment of bycatch-related mortality in evaluating the TED Rule's effects on sea turtles. NMFS justifies the TED Rule based in part on a study by Babcock et al. (2018) that NMFS claims indicates significant lower levels of sea turtle morality in shrimp otter trawl fisheries. 84 Fed. Reg. at 70,054–55; *see also* FEIS at 145. The Babcock et al. study, however, significantly underestimated sea turtle mortality in the shrimp fisheries.

    122.    The Babcock et al. study used observer data on the condition of sea turtles upon release, after capture, to estimate mortality. It incorrectly assumed that all sea turtles that are alive at the moment they are released will survive in the longer term.

    123.    As NMFS itself acknowledges, the "best available information and expert opinion . . . indicate that persistent or delayed effects can lead to mortality (post-interaction mortality), including deaths of some turtles that appear to be in good health at the time of release." 84 Fed. Reg. at 70,050. Incorporating post-interaction mortality can increase total mortality estimates by orders of magnitude. *See, e.g.*, *id.* (noting that "using current criteria for estimating post-interaction mortality for trawl fisheries . . . indicated that mortality could be more than triple the number estimated based on dead and comatose turtles alone").

    124.    By failing to incorporate post-interaction mortality, the Babcock et al. study significantly underestimated mortality rates and total numbers for the otter trawl shrimp fisheries. NMFS, in turn, inappropriately relied on this inaccurate assessment of total sea turtle

mortality in the shrimp fisheries when assessing the impacts of the TED Rule on sea turtle populations, resulting in a flawed effects analysis.

125.    Second, NMFS failed to analyze the TED Rule's effects on a species-specific basis.

126.    Skimmer trawls, pusher-head trawls, and wing nets capture five different sea turtle species at different rates, based on factors such as species population range and density, time of year, water depth, and location. Likewise, the five species use the shallow waters of the Gulf of Mexico and southeastern Atlantic waters of the U.S. at different life stages. As such, the TED Rule will have differing effects on each species' population and ability to recover.

127.    NMFS did not consider differences in species, life histories, habitat use, locations, or other factors heterogeneity in its assessment of effects to sea turtles. Ignoring that heterogeneity obscures the risk that some species may be disproportionately harmed by take in skimmer trawls, pusher-head trawls, and wing nets, potentially to the point of suffering substantial population-level effects.

128.    NMFS simply states it "think[s]" that 80% of current sea turtle mortalities are Kemp's ridleys and the other 20% are green sea turtles. FEIS at 265. NMFS provides no factual basis for its hypothesis. The hypothesis also fails to account for the fact that skimmer trawls, pusher-head trawls, and wing nets also cause mortality to three other sea turtle species.

129.    Moreover, NMFS did not use these assumed ratios to analyze the effects of the rule to either the Kemp's ridley or green sea turtle populations, as opposed to simply counting individual turtles affected. NMFS did not consider population-level effects for *any* sea turtle species.

130.    Third, NMFS failed to consider the likelihood that gear switching under the TED

Rule may result in higher sea turtle mortality than anticipated. In both the DEIS and FEIS, NMFS stated that requiring TEDs on all three additional gear types—skimmer trawls, pusher-head trawls, and wing nets—would prevent shrimpers from potentially switching gears to circumvent TED requirements, which NMFS assumed some would do if TEDs were required only on skimmer trawls. The TED Rule requires TEDs only on skimmer trawls, so creates an incentive to switch gears to circumvent TED requirements. NMFS does not address the likelihood of such gear switching occurring under the TED Rule or the potential effects of such gear switching on sea turtle populations.

131.   Fourth, the FEIS contains no information showing that NMFS considered tow time compliance levels when analyzing the TED Rule's effects on sea turtles. NMFS acknowledges that "tow time limits may not be as effective in reducing sea turtle bycatch and mortality as previously thought." 84 Fed. Reg. at 70,050. As a result of poor compliance, vessels exempted from TED requirements under the TED Rule likely kill more sea turtles than NMFS has estimated. NMFS offers no indication that its mortality estimates account for poor tow time compliance.

2.   *Inaccurate assumptions and failure to consider relevant information in presenting economic burdens*

132.   NMFS made a number of inaccurate assumptions and failed to consider relevant information when presenting the economic burdens of the alternatives in the FEIS.

133.   First, NMFS overestimated the net economic costs by failing to incorporate any economic benefit to vessels or the local economy that would result from the changes in TED use. NMFS included only landings loss, gross revenue loss (during the first year and over the long term), and TED costs in quantifying economic burdens. Evidence before the agency shows that TEDs improve fuel efficiency, reduce finfish bycatch, reduce sorting and processing time of

shrimp, improve ecotourism, and improve local seafood economy. NMFS did not include these benefits in its quantification of economic burdens.

134.    NMFS also overestimated the TED costs input to its economic burden quantification by failing to incorporate into the cost estimate evidence of funding sources that offset TED costs to shrimpers. *Cf., e.g.*, 84 Fed. Reg. at 70,057 (expecting assistance from Fishery Finance Program); 77 Fed. Reg. at 27,414 (describing funding availability).

E.    Failure to Consult Under Section 7 of the ESA

135.    As a rule centered on regulating harm to sea turtles by the shrimp fisheries, the TED Rule will have direct and indirect effects on each of five ESA-listed sea turtle species: the Kemp's ridley, leatherback, hawksbill, Northwest Atlantic DPS of loggerhead, and North and South Atlantic DPSs of green sea turtle. The effects of continuing to exempt shrimp trawl vessels from TED requirements include: changes to sea turtle bycatch frequency and location in the shrimp fisheries; increased severe injury and death of sea turtles; and interference with feeding, breeding, and migration, among other things—all of which plainly "may affect" sea turtle populations.

136.    Despite these adverse effects, NMFS did not complete formal or informal ESA section 7 consultation before issuing the TED Rule. Rather, it states in the FEIS that it "will reinitiate section 7 consultation on the effects of the shrimp fisheries in both the South Atlantic and Gulf of Mexico areas" upon publication of the final TED Rule. FEIS at 305.

137.    NMFS has indicated its intent to issue a new biological opinion for the southeastern shrimp fisheries by April 30, 2021. NMFS has not issued the biological opinion as of this date. Moreover, NMFS's issuance of a biological opinion *after* issuance of the TED Rule will not cure the ESA violation it committed by failing to complete consultation before promulgating the final rule.

138.    NMFS also has indicated that it is "reconsidering" whether to expand TED requirements for skimmer trawl vessels less than 40 feet in length. But NMFS has not committed to taking any particular action, nor offered any timeline for its process. The agency's vague statement about potential future actions does not remedy its legal violations in promulgating a wholly inadequate TED Rule and does not prevent sea turtles from being captured and killed by skimmer trawls in the meantime.

## CLAIMS FOR RELIEF

### Count 1 – NMFS Failed to Explain Its Decision to Omit TED Requirements It Previously Stated Were Necessary and Advisable, in Violation of the APA.

139.    The allegations made in paragraphs 1–138 are realleged and incorporated by this reference.

140.    The TED Rule is a final agency action for which there is no other adequate remedy in a court. *See* 5 U.S.C. § 704.

141.    NMFS promulgated the TED Rule pursuant to ESA section 4(d). ESA section 4(d) requires NMFS to issue regulations it "deems necessary and advisable to provide for the conservation of" species listed as threatened. 16 U.S.C. § 1533(d).

142.    In its proposed rule, NMFS stated that it deemed it necessary and advisable for the conservation of threatened sea turtles to require TEDs on all skimmer trawls, pusher-head trawls, and wing nets.

143.    The final TED Rule does not require TEDs on all skimmer trawls, pusher-head trawls, and wing nets. NMFS provides no acknowledgement that the final Rule requires less than the conservation measures the agency previously stated are necessary and advisable, let alone provide a factual basis and rational explanation for its about-face from the proposed to the final rule.

144.     NMFS's issuance of a TED Rule that, without explanation, requires lesser

measures than the agency had deemed necessary and advisable in the proposed rule is arbitrary,

capricious, an abuse of discretion, and contrary to law, in violation of the APA. 5 U.S.C. §

706(2).

### Count 2 – NMFS Failed to Provide Any Rational Basis for Its Decision to Exempt Certain Vessels from TED Requirements, in Violation of the APA.

145.     The allegations made in paragraphs 1–138 are realleged and incorporated by this

reference.

146.     NMFS states it exempted skimmer trawl vessels shorter than 40 feet and all

pusher-head and wing net vessels from TED requirements based on purported safety and

practical concerns, data concerns for wing nets and pusher-head trawls, and "new information"

on sea turtle mortality. 84 Fed. Reg. at 70,049, 70,055.

147.     NMFS provides no explanation of what those concerns or new information are,

and offers no evidence in support of its purported concerns.

148.     NMFS's "safety and practical concerns" justification for using a 40-foot cutoff

also runs counter to its previous findings, based on the evidence before the agency, that vessels at

least 26 feet in length do not have "safety at sea" concerns and are able to effectively use the

largest TEDs without practical concerns.

149.     NMFS's justification also fails to reflect recent research showing that TEDs can

be effectively used on small skimmer trawls and wing nets.

150.     NMFS has failed to articulate a rational connection between the facts found and

its choice, to consider all important aspects of the issue, and to provide an adequate, factually

supported justification for exempting skimmer trawl vessels shorter than 40 feet and all pusher-

head and wing net vessels from TED requirements, rendering the TED Rule arbitrary, capricious,

an abuse of discretion, and not in accordance with law, in violation of the APA. 5 U.S.C. §

706(2).

### Count 3 – NMFS Failed to Provide Adequate Notice and Comment on the Final Rule, in Violation of the APA.

151.    The allegations made in paragraphs 1–138 are realleged and incorporated by this

reference.

152.    The APA requires that NMFS provide the public adequate notice of any

rulemaking. 5 U.S.C. § 553(b).

153.    The APA also requires that NMFS provide interested persons a meaningful

"opportunity to participate in the rule making through submission of written data, views, or

arguments." *Id.* § 553(c).

154.    The TED Rule is not a logical outgrowth of the proposed rule, which would have

required TEDs on all skimmer trawls, pusher-head trawls, and wing nets. NMFS did not provide

adequate notice of its intent to adopt a rule that limits new TED requirements to only skimmer

trawl vessels at least 40 feet in length.

155.    The proposed rule gave no indication that NMFS was considering exempting

skimmer trawl vessels less than 40 feet in length from TED requirements. Using 40 feet as a

cutoff for skimmer trawl vessels was not within the range of alternatives under consideration in

the proposed rule, which included requiring TEDs on either all skimmer trawl vessels or all

skimmer trawl vessels at least 26 feet in length. NMFS gave no indication that any more

extensive exemption of skimmer trawl vessels longer than 26 feet was possible.

156.    The TED Rule covers only approximately one-third the number of vessels and

protects approximately half the number of sea turtles as the least protective action alternative

considered in the proposed rule. NMFS did not provide information or data about these reduced

protection values in the proposed rule or DEIS.

157.    Plaintiffs and other members of the public submitted detailed comments both at the scoping stage and the proposed rule stage based on the information and alternatives NMFS presented at each stage. But Plaintiffs could not have anticipated the broad exemptions NMFS enacted in the final rule because the agency failed to provide any notice that it was considering those exemptions, let alone provide Plaintiffs and the public with an opportunity to comment on the substance.

158.    NMFS accordingly failed to provide the public or Plaintiffs adequate notice or opportunity to comment on or participate in its decision to apply new TED requirements to only skimmer trawl vessels at least 40 feet in length, in violation of 5 U.S.C. § 553(b) and (c). NMFS's failure to provide the public adequate notice of rulemaking or an adequate opportunity to participate in the rulemaking is arbitrary and capricious, an abuse of discretion, and not in accordance with law in violation of the APA. 5 U.S.C. § 706(2).

**Count 4 – NMFS Failed to Prepare a Supplemental Environmental Impact Statement for the TED Rule, in Violation of NEPA and the APA.**

159.    The allegations made in paragraphs 1–138 are realleged and incorporated by this reference.

160.    An agency must prepare a supplemental EIS if: "(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1).

161.    NMFS made a substantial change to the proposed action before issuing the final TED Rule. The final rule extending new TED requirements to only skimmer trawl vessels at least 40 feet in length is substantially different from the proposed rule's action of extending TED

requirements to all skimmer trawl, pusher-head trawl, and wing net vessels. The action in the final rule is also substantially different from all other alternatives considered in the proposed rule and DEIS.

162.    The final rule's change to the proposed action will result in significantly different environmental effects. Specifically, NMFS estimates it will result in 929 to 1,342 more sea turtle deaths per year than the proposed rule, and 611 to 882 more sea turtle deaths per year than the least protective action alternative considered in the proposed rule and DEIS.

163.    NMFS therefore made a substantial change to the proposed action that significantly alters the environmental effects of its action, requiring preparation of a supplemental EIS. *Id.*

164.    NMFS also states that it made its change from the proposed rule based on "new information" about sea turtle mortality levels and differences in how gear types operate. 84 Fed. Reg. at 70,049, 70,058, 70,062.

165.    The new information is "relevant to environmental concerns"—specifically sea turtle mortality and bycatch of sea turtles in different gear types—and has "bearing on the proposed action" because NMFS relied on the new information to justify its change from the proposed rule. 40 C.F.R. § 1502.9(c)(1)(ii). The new information therefore required preparation of a supplemental EIS. *Id.*

166.    NMFS did not prepare a supplemental EIS.

167.    NMFS's failure to prepare a supplemental EIS violates NEPA and its implementing regulations, and is arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2); 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.9(c)(1).

**Count 5 – NMFS Failed to Take a Hard Look at the Environmental Effects of Its Action, in Violation of NEPA and the APA.**

168.    The allegations made in paragraphs 1–138 are realleged and incorporated by this reference.

169.    NEPA requires NMFS to take a hard look at the environmental effects of the proposed action and to use high-quality, accurate scientific information to ensure the scientific integrity of their analyses. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.1(b), 1501.2, 1502.24.

170.    NMFS failed to take a hard look at the action's effects on threatened and endangered sea turtle populations in several ways:

- NMFS relied on an inaccurate assessment of bycatch-related mortality in evaluating the TED Rule's effects on sea turtles;

- NMFS failed to analyze the TED Rule's effects on a species-specific basis;

- NMFS failed to consider the effects of likely gear switching to evade the TED Rule's requirements; and

- NMFS failed to consider low tow time compliance levels when estimating sea turtle mortality.

171.    These failures prevented the agency from adequately identifying and evaluating the effects of the proposed action on sea turtle populations and determining whether its action will recover or improve the statuses of the sea turtle species.

172.    NMFS also failed to use accurate information when presenting the economic burdens of the alternatives. NMFS overestimated economic burdens by failing to incorporate any economic benefits from TED use and by ignoring the existence of funding to offset TED costs.

173.    NMFS's failure to accurately evaluate the direct, indirect, and cumulative effects

of the TED Rule violates its duties to use "[a]ccurate scientific analysis" and "high quality" information and to take a hard look at the environmental effects of its actions, in violation of NEPA and its implementing regulations, and is arbitrary and capricious, in violation of the APA. 5 U.S.C. § 706(2); 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1500.1(b), 1502.24.

174.    By relying on a FEIS that fails to meet the requirements of NEPA and its implementing regulations, NMFS's decision to issue the TED Rule violates NEPA, 42 U.S.C. § 4332, and is arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2).

**Count 6 – NMFS Failed to Complete ESA Section 7 Consultation, in Violation of the ESA.**

175.    The allegations made in paragraphs 1–138 are realleged and incorporated by this reference.

176.    Section 7 of the ESA requires each federal agency to ensure that any action the agency takes is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2).

177.    NMFS's issuance of the TED Rule is an agency action under the ESA. *See* 50 C.F.R. § 402.02.

178.    The TED Rule "may affect" the Kemp's ridley sea turtle, leatherback sea turtle, hawksbill sea turtle, loggerhead sea turtle Northwest Atlantic DPS, and North and South Atlantic green sea turtle DPSs by altering bycatch mitigation measures on shrimp vessels that capture these species.

179.    NMFS therefore was required by ESA section 7(a)(2) to initiate and complete consultation to insure the action will not jeopardize the continued existence of these sea turtle species before issuing the TED Rule. 16 U.S.C. § 1536(a)(2).

180.   NMFS did not initiate or complete consultation before issuing the TED Rule.

181.   NMFS has violated the ESA by issuing the TED Rule without first completing the legally required ESA consultation for this action, which "may affect" threatened and endangered sea turtle species. NMFS's failure to complete consultation to ensure that its action is not likely to jeopardize the continued existence of any of the species violates the ESA, 16 U.S.C. § 1536(a)(2), its implementing regulations, and the APA, 5 U.S.C. § 706(2).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court to enter the following relief:

1.   Declare that the final TED Rule is arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of the ESA, NEPA, and APA;

2.   Declare that the environmental effects analysis in the FEIS accompanying the TED Rule is arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of NEPA, its implementing regulations, and the APA;

3.   Declare that NMFS failed to complete required ESA section 7(a)(2) consultation before issuing the TED Rule, in violation of the ESA;

4.   Remand the TED rule and EIS to NMFS and order the agency to prepare a new rule within six months that fully complies with the ESA, NEPA, and APA;

5.   Maintain jurisdiction over this action until NMFS is in compliance with the ESA, NEPA, APA, and every order of this Court;

6.   Award Plaintiffs their costs and reasonable attorney fees pursuant to 16 U.S.C. § 1540(g)(4) and/or 28 U.S.C. § 2412; and

7.   Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 6th day of April, 2021.

<div style="margin-left:40%">

*/s/ Stephen D. Mashuda*
Stephen D. Mashuda (DDC Bar. WA0005)
Grace P. Bauer (*pro hac vice* pending)
Christopher D. Eaton (*pro hac vice* pending)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 | Telephone
415-217-2040 | Fax
smashuda@earthjustice.org
gbauer@earthjustice.org
ceaton@earthjustice.org

*Attorneys for Plaintiffs*

</div>