**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | Case No. 1:21-cv-930-BAH |
| Plaintiffs, | |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE, et al., | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION .............................................................................................................1

STATEMENT OF FACTS ................................................................................................2

     I.      Bycatch in fisheries is putting sea turtles in danger of extinction. .........................2

     II.     TEDs are proven, effective tools to prevent sea turtle bycatch mortality...............4

     III.    The exemptions to the TED requirements are ineffective and inadequate. ............6

     IV.    NMFS proposed requiring TEDs on nearly all shrimp trawl vessels. ....................8

     V.     NMFS unexpectedly and arbitrarily developed a new final rule that exempts the vast majority of the shrimping fleet and protects only a fraction of sea turtles. ...................................................................................9

LEGAL FRAMEWORK ..................................................................................................12

     I.      APA Notice and Comment Rulemaking................................................................12

     II.     National Environmental Policy Act ......................................................................13

STANDARD OF REVIEW ..............................................................................................14

ARGUMENT ...................................................................................................................15

     I.      NMFS violates the APA by arbitrarily disregarding its prior findings that more comprehensive TED requirements are necessary and by failing to provide a rational justification for the final TED Rule. ........................................16

           A.     NMFS arbitrarily fails to explain why it disregards its previous determinations that more comprehensive TED regulations are necessary (Count 1)....................................................................................16

           B.     NMFS's justifications for limiting TED requirements to skimmer trawl vessels 40 feet and greater in length lack any rational basis or support (Count 2). ...................................................................................19

     II.     NMFS's 40-foot final rule is not a logical outgrowth of the proposed rule, in violation of the APA (Count 3)...........................................................................25

     III.    NMFS violates NEPA by failing to take a hard look at the environmental effects and failing to conduct a required supplemental environmental analysis....................................................................................................................29

A.      NMFS fails to take a hard look at the effects on sea turtle species
        or at foregone economic benefits, in violation of NEPA (Count 5). .........29

        1.      NMFS fails to consider the rule's effects on individual sea
                turtle species.................................................................................29

        2.      NMFS overestimates the economic burden of its action. .............33

B.      NMFS fails to conduct supplemental environmental analyses of the
        substantial changes to its proposed action, in violation of NEPA
        (Count 4). ....................................................................................................36

CONCLUSION....................................................................................................................38

# TABLE OF AUTHORITIES

**Cases**                                                         **Page(s)**

*Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
429 F.3d 1136 (D.C. Cir. 2005) ....................................................................... 18, 19

*Am. Water Works Ass'n v. EPA*,
40 F.3d 1266 (D.C. Cir. 1994) ......................................................................... 26, 28

*AT & T Info. Sys., Inc. v. Gen. Servs. Admin.*,
810 F.2d 1233 (D.C. Cir. 1987) ............................................................................ 24

*Butte Cnty. v. Hogen*,
613 F.3d 190 (D.C. Cir. 2010) ........................................................................ 19, 20

*California v. Bernhardt*,
472 F. Supp. 3d 573 (N.D. Cal. 2020) ............................................................ 21, 34

*Catawba Cnty. v. EPA*,
571 F.3d 20 (D.C. Cir. 2009) ................................................................................ 21

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .............................................................................................. 24

*City of Olmsted Falls v. FAA*,
292 F.3d 261 (D.C. Cir. 2002) .............................................................................. 36

*\*CSX Transp., Inc. v. Surface Transp. Bd.*,
584 F.3d 1076 (D.C. Cir. 2009) ................................................................. 26, 27, 28

*Ctr. for Biological Diversity v. Everson*,
435 F. Supp. 3d 69 (D.D.C. 2020) ........................................................................ 27

*Ctr. for Biological Diversity v. Kelly*,
93 F. Supp. 3d 1193 (D. Idaho 2015) ................................................................... 28

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008) .............................................................................. 34

*Defs. of Wildlife v. U.S. Dep't of Interior*,
931 F.3d 339 (4th Cir. 2019) .......................................................................... 31, 32

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) .......................................................................................... 24

*\*Dist. Hosp. Partners, L.P. v. Burwell*,
786 F.3d 46 (D.C. Cir. 2015) .......................................................................... 17, 19

*Engine Mfrs. Ass'n v. EPA*,
20 F.3d 1177 (D.C. Cir. 1994) .......................................................................... 19

*Env't Def. Fund v. Marsh*,
651 F.2d 983 (5th Cir. 1981) ............................................................................ 37

*Env't Integrity Project v. EPA*,
425 F.3d 992 (D.C. Cir. 2005) .......................................................................... 25

*Fertilizer Inst. v. U.S. EPA*,
935 F.2d 1303 (D.C. Cir. 1991) .............................................................. 26, 27, 38

*Flyers Rts. Educ. Fund, Inc. v. FAA*,
864 F.3d 738 (D.C. Cir. 2017) .................................................................... 20, 22

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ........................................................................................ 16

*Fund for Animals v. Babbitt*,
903 F. Supp. 96 (D.D.C. 1995) ............................................................... 15, 19, 25

*Louisiana, ex rel. Guste v. Verity*,
853 F.2d 322 (5th Cir. 1988) ............................................................................ 34

*High Country Conservation Advocs. v. U.S. Forest Serv.*,
52 F. Supp. 3d 1174 (D. Colo. 2014) ........................................................... 34, 35

*Home Box Off., Inc. v. FCC*,
567 F.2d 9 (D.C. Cir. 1977) .............................................................................. 15

*Hughes River Watershed Conservancy v. Glickman*,
81 F.3d 437 (4th Cir. 1996) ...................................................................... 33, 34, 36

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ........................................................................................ 16

*Int'l Union, United Mine Workers v. Mine Safety & Health Admin.*,
407 F.3d 1250 (D.C. Cir. 2005) .................................................................... 13, 26

*Lewis v. Sec'y of Navy*,
195 F. Supp. 3d 277 (D.D.C. 2016) .................................................................... 14

*Long Island Care at Home, Ltd. v. Coke*,
551 U.S. 158 (2007) ........................................................................................ 25

*Marsh v. Oregon Nat. Res. Council*,
490 U.S. 360 (1989) ............................................................................... 14, 36, 37

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,
    463 U.S. 29 (1983) ..................................................................................15, 19, 24, 25

Nat. Res. Def. Council, Inc. v. Daley,
    209 F.3d 747 (D.C. Cir. 2000) ...............................................................................15

Nat. Res. Def. Council v. EPA,
    489 F.3d 1250 (D.C. Cir. 2007) .............................................................................38

Nat. Res. Def. Council v. EPA,
    489 F.3d 1364 (D.C. Cir. 2007) .............................................................................16

Nat. Res. Def. Council v. U.S. Forest Serv.,
    421 F.3d 797 (9th Cir. 2005) ............................................................................33, 35

Nat'l Audubon Soc'y v. Dep't of Navy,
    422 F.3d 174 (4th Cir. 2005) .................................................................................32

Nat'l Wildlife Fed'n v. NMFS,
    524 F.3d 917 (9th Cir. 2008) .................................................................................31

Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget,
    358 F. Supp. 3d 66 (D.D.C. 2019) .........................................................................22

Native Ecosystems Council v. U.S. Forest Serv.,
    418 F.3d 953 (9th Cir. 2005) .................................................................................14

Ne. Md. Waste Disposal Auth. v. EPA,
    358 F.3d 936 (D.C. Cir. 2004) ..........................................................................26, 27

Oceana, Inc. v. Pritzker,
    No. 1:15-cv-00555-PLF (D.D.C. Apr. 14, 2015)..................................................7, 8

Owner–Operator Indep. Drivers Ass'n v. FMCSA,
    494 F.3d 188 (D.C. Cir. 2007) ...............................................................................28

Pub. Emps. for Env't. Resp. v. Beaudreau,
    25 F. Supp. 3d 67 (D.D.C. 2014) ...........................................................................14

Pub. Emps. for Env't Resp. v. U.S. Dep't of the Interior,
    832 F. Supp. 2d 5 (D.D.C. 2011) ...........................................................................36

Pub. Emps. for Env't Resp. v. U.S. Fish & Wildlife Serv.,
    177 F. Supp. 3d 146 (D.D.C. 2016) ..................................................................32, 33

Richards v. INS,
    554 F.2d 1173 (D.C. Cir. 1977) .............................................................................14

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989) ................................................................................................... 13

*Shands Jacksonville Med. Ctr. v. Burwell,*
   139 F. Supp. 3d 240 (D.D.C. 2015) ............................................................................ 28

*Sierra Club v. FERC,*
   867 F.3d 1357 (D.C. Cir. 2017) .................................................................................. 13

*Sierra Club v. Sigler,*
   695 F.2d 957 (5th Cir. 1983) ...................................................................................... 35

*Taylor v. FDIC,*
   132 F.3d 753 (D.C. Cir. 1997) .............................................................................. 14, 15

*Tenn. Valley Auth. v. Hill,*
   437 U.S. 153 (1978) ...................................................................................................... 4

*Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
   437 F.3d 75 (D.C. Cir. 2006) ......................................................................... 19, 23, 25

*Turtle Island Restoration Network v. NMFS,*
   No. 1:11-cv-01813-ABJ (D.D.C. Oct. 13, 2011) ......................................................... 7

*U.S. Lines, Inc. v. Fed. Mar. Comm'n,*
   584 F.2d 519 (D.C. Cir. 1978) .................................................................................... 20

*\*U.S. Sugar Corporation v. EPA,*
   830 F.3d 579 (D.C. Cir. 2016) .............................................................................. 21, 22

*Utah Physicians for a Healthy Env't v. U.S. Bureau of Land Mgmt.,*
   528 F. Supp. 3d 1222 (D. Utah 2021) ........................................................................ 33

*Util. Solid Waste Activities Grp. v. EPA,*
   901 F.3d 414 (D.C. Cir. 2018) .................................................................................... 20

*\* Authorities upon which we chiefly rely are marked with an asterisk*

## Statutes

5 U.S.C. § 553 ...................................................................................................... 12, 13, 25

5 U.S.C. § 706 ................................................................................................................. 15

16 U.S.C. § 1532 ...................................................................................................... 4, 5, 18

16 U.S.C. § 1533 .......................................................................................................... 4, 17

16 U.S.C. § 1536 ......................................................................................................4

16 U.S.C. § 1538 ......................................................................................................5

16 U.S.C. § 1539 ......................................................................................................5

16 U.S.C. § 1540 ....................................................................................................17

42 U.S.C. 4332 .......................................................................................................13

**Regulations**

40 C.F.R. § 1500.1 (2019) ...................................................................................8, 14

40 C.F.R. § 1501.4 (2019) .......................................................................................13

40 C.F.R. § 1502.1 (2019) .......................................................................8, 9, 10, 13

40 C.F.R. § 1502.9 (2019) ....................................................................14, 36, 37, 38

40 C.F.R. § 1502.14 (2019) .....................................................................................13

40 C.F.R. § 1502.16 (2019) .....................................................................................13

40 C.F.R. § 1502.24 (2019) .....................................................................................14

40 C.F.R. § 1508.8 (2019) .......................................................................................33

40 C.F.R. § 1508.14 (2019) .....................................................................................33

40 C.F.R. § 1508.27 (2019) .....................................................................................32

50 C.F.R. § 223.205 ..................................................................................................5

50 C.F.R. § 223.206 ...............................................................................................5, 6

50 C.F.R. § 223.207 ..................................................................................................5

50 C.F.R. § 402.14 ..................................................................................................30

**Federal Register**

35 Fed. Reg. 18,309 (Dec. 2, 1970) ..........................................................................3

35 Fed. Reg. 8491 (Jun. 2, 1970) ..............................................................................3

43 Fed. Reg. 32,800 (Jul. 28, 1978) ......................................................................3, 4

86 Fed. Reg. 16,676 (Mar. 31, 2021) ......................................................................12

**Rules**

Fed. R. Civ. P. 56...........................................................................................................14

**INTRODUCTION**

This case challenges the National Marine Fisheries Service's (NMFS) unlawful reversal of a proposed rule aimed at reducing the thousands of sea turtle deaths that occur each year in the southeastern U.S. shrimp fisheries through the required use of turtle excluder devices (TEDs). Without informed decisionmaking or public participation, NMFS issued a final rule (TED Rule) implementing a novel alternative that arbitrarily excludes over 80 percent of the targeted shrimp vessels from the rulemaking and more than halves its sea turtle protections, in violation of the Administrative Procedure Act (APA) and National Environmental Policy Act (NEPA).

Since 1987, NMFS has required a majority of shrimp trawlers in the southeastern U.S. shrimp fisheries to install TEDs in their nets to allow sea turtles to safely swim through an escape hatch in the net and avoid being forcefully submerged and drowned. These requirements have saved countless threatened and endangered sea turtles while enabling shrimp catch to continue. However, nearly 3,000 unnecessary sea turtle deaths still occur each year due to an exemption from TED requirements for certain categories of shrimp trawlers.

In 2016, following years of advocacy and litigation by Plaintiffs Center for Biological Diversity, Defenders of Wildlife, and Turtle Island Restoration Network (Conservation Groups) and others, NMFS finally proposed a rule to close the regulatory loophole and require TEDs across nearly the entire fleet. NMFS expressly stated that doing so is necessary to conserve sea turtles. Three years later, however, NMFS inexplicably reversed course and issued a final rule that continues to exempt a vast majority of the targeted vessels. Without any prior public notice or rational justification, NMFS has created and adopted a new alternative that arbitrarily removes from the rulemaking two entire categories of vessels and all vessels less than 40 feet in length from another category. The new alternative is barely half as protective as the *least* protective alternative put forth at the proposed rule stage. NMFS does not acknowledge or attempt to

1

explain why it has abandoned its prior determinations of what is necessary for the conservation of sea turtle species and fails to provide rational bases for its justifications for the changes. It also has evaded its duty to provide the public a meaningful opportunity for notice and comment on the new action. Furthermore, NMFS fails to consider what effects its changes will have on imperiled sea turtle populations or the economic benefits of TED use and fails to disclose such effects to the public.

The TED Rule leaves five threatened and endangered sea turtle species at continued risk of drowning in shrimp trawl nets, with thousands of turtles expected to die annually. NMFS's arbitrary and unsupported reversal in the final rule violates the APA and NEPA and hampers the survival and recovery of multiple imperiled sea turtle populations. Conservation Groups are entitled to summary judgment on Claims 1 through 5, and seek declaratory relief and a court order remanding the TED Rule without vacatur and requiring NMFS to issue a new rule within six months that complies with the law.

## STATEMENT OF FACTS

### I.     Bycatch in fisheries is putting sea turtles in danger of extinction.

Sea turtles are ancient reptiles, having inhabited the oceans millions of years before humans appeared on earth. RR-100593.[1] There are seven species of sea turtles in the world, five of which rely on U.S. waters and beaches for important foraging and nesting habitat. RR-100593−95. Sea turtles are highly migratory and travel thousands of miles between the habitats where they are born, forage, and reproduce. *E.g.*, RR-100633. Females migrate to sandy nesting beaches—often the same beaches where they were born—to come ashore and lay eggs. RR-

---

[1] NMFS Bates stamped the documents in the administrative record "that are cited in documents included in Parts I–V" with "RR-#." *See* ECF No. 17-1, at 2. It stamped the documents listed in the administrative record index with "AR#." *See id.*

100594, 100602, 100625. Most sea turtle species exhibit fidelity to their foraging areas as well, returning to the same places year after year. *E.g.*, RR-100616–17, 100628. The U.S. coastal waters of the Gulf of Mexico and southeastern Atlantic Ocean, in particular, serve as important migratory corridors, foraging habitat, and breeding habitat for sea turtles. RR-100593−95, 100615−17.

All five sea turtle species in the U.S. are listed as threatened or endangered under the ESA: the endangered Kemp's ridley sea turtle, threatened green sea turtle, threatened loggerhead sea turtle, endangered hawksbill sea turtle, and endangered leatherback sea turtle. 35 Fed. Reg. 8491 (Jun. 2, 1970) (listing hawksbill and leatherback); 35 Fed. Reg. 18,309 (Dec. 2, 1970) (listing Kemp's ridley); 43 Fed. Reg. 32,800 (Jul. 28, 1978) (listing loggerhead and green). Kemp's ridleys are the most critically endangered among all the sea turtles in the world and are of particular concern in this case. AR001708.

Unique among sea turtles, Kemp's ridleys rely primarily on the shallow, nearshore waters of the northern Gulf of Mexico, especially off Louisiana, for critical foraging habitat and use almost exclusively a single beach for nesting in the western Gulf of Mexico. RR-100417, 100615−17, 100771. The Kemp's ridley's limited range and low population make it particularly vulnerable; the species almost went extinct in the 1980s due to overexploitation and fishing gear impacts in the Gulf of Mexico. *See* RR-100595−97.

In spite of decades of protection under the ESA, all five sea turtle species remain at risk of extinction and are struggling to recover. RR-100919, 100996−97, 101078, 101167, 101245. Sea turtles face many threats, *see* AR001667–68, but incidental catch from commercial fishing is one of the most significant impediments to their recovery, AR001734; RR-100682. Of all the fisheries in the United States, NMFS has determined that shrimp trawling is the *most* detrimental

to the recovery of sea turtle populations. RR-100018; *see also* AR011394. In fact, shrimp trawling kills more sea turtles in the U.S. than all other human activities combined: collectively, all other reported causes of sea turtle deaths amount to less than 15 percent of the mortality caused by shrimp trawling. AR002006; RR-100667−68, 100738.

Shrimp trawling occurs in the southeastern U.S. shrimp fisheries in nearshore and offshore waters from Texas through North Carolina. AR001688. Trawling involves towing nets through the water, which can incidentally catch and kill sea turtles. AR002003. Sea turtles must surface to breathe, and a captured turtle may drown due to forced and prolonged submergence. *Id.* Those that survive frequently suffer harmful physiological effects, including the buildup of acid in their lungs and muscles, and become susceptible to delayed death, predation, boat strikes, and other sources of injury and mortality. AR001793, 002003. Even turtles that appear to be in good health after capture often die following their release. AR009458. Without sufficient mitigation methods or gear to prevent trawlers from incidentally capturing sea turtles in their nets, shrimp trawling will continue to be one of the most significant threats to sea turtles. RR-100739−40.

## II.    TEDs are proven, effective tools to prevent sea turtle bycatch mortality.

NMFS is charged with protecting and ensuring the recovery of sea turtles under the ESA. *See* AR001667; 16 U.S.C. § 1536(a)(1). Congress enacted the ESA with the intention "to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). The ESA seeks to protect and recover imperiled species and populations by first listing them as threatened or endangered based on enumerated statutory factors. 16 U.S.C. § 1533(a)(1)(A)–(E); *see id.* § 1532(6), (20) (defining "endangered" and "threatened"). The ESA and its implementing regulations prohibit the "take" of any endangered or threatened sea turtle, which includes harming, capturing, or killing, unless NMFS specifically

authorizes take that is "incidental" to a lawful activity. *Id.* §§ 1532(19), 1538(a)(1)(B), (G), 1539(a)(1)(B); 50 C.F.R. § 223.205(a).

Shrimp trawlers take sea turtles by capturing and often injuring or killing them in trawl nets. RR-100674. To sanction the operation of the fisheries, in 1987, NMFS issued regulations authorizing the incidental take of sea turtles by most shrimpers only if they installed an approved TED in each net rigged for fishing. 50 C.F.R. § 223.206(d)(2). TEDs are metal grids that are attached to the inside of trawl nets with an escape hatch and are highly effective at simultaneously reducing sea turtle mortality while maintaining shrimp catch. AR001659; RR-100610. NMFS's regulations require TEDs to be at least 97 percent effective in safely releasing sea turtles, which ensures that very few turtles captured in nets with TEDs will die or suffer significant injury. *See* 50 C.F.R. § 223.207(e)(1); AR001659. At the same time, shrimpers fishing with TEDs successfully retain approximately 95 percent of their catch. AR001496. The use of TEDs on shrimp trawl nets has been instrumental in reducing sea turtle mortality and promoting the recovery of many sea turtle populations. *E.g.*, RR-100439 (50 percent instantaneous reduction in mortality of all sea turtles corresponding with more widespread use of TEDs in U.S. waters).

While NMFS requires TEDs on most shrimping vessels, it has long exempted a subset of such vessels—including those using skimmer trawl, pusher-head trawl, and wing net fishing gear—from TED requirements based on a now-outdated assumption that vessels with these gear types do not pose a threat to sea turtles. AR001658 (describing gear types and summarizing exemptions). In deciding to create the exemption, NMFS reasoned at the time that, unlike other shrimp trawl vessels, these vessels tow their nets through the water for short enough time intervals that any incidentally caught turtles could be released by the crew before the turtles

drowned. AR000267. NMFS accordingly set time limits on towing for these shrimpers in lieu of TED requirements. 50 C.F.R. § 223.206(d)(2)(ii)(A)(*3*).

### III.    The exemptions to the TED requirements are ineffective and inadequate.

Unfortunately, NMFS's assumption on the efficacy of tow time limits proved unfounded. Decades of scientific evidence and enforcement data have demonstrated that tow time restrictions fail to effectively protect sea turtles. RR-100598; AR002155, 010993. An estimated nearly 3,000 sea turtles die annually as a result of being incidentally caught in skimmer trawls, pusher-head trawls, and wing nets. AR001661. Poor compliance with and enforcement of the tow time limits, in particular, have rendered the limits ineffective. AR002155. Observational data show that the majority of these exempt shrimp trawl vessels do not adhere to the tow time limits, towing their nets through the water for far longer than authorized. AR001669; *see* AR010845 (noting a 38 percent compliance rate as the "highest" compliance rate over the span of three years). NMFS and its partner agencies have been unable to enforce the tow time restrictions due to the practical difficulties and time-intensive drain on their resources. *See, e.g.*, AR001308−09, 002155. For example, to catch a violator, law enforcement agents must observe active shrimp trawling in the open water for more than the hour-long tow time limit without being detected by the shrimp vessel. AR001308−09.

Sea turtles incidentally caught in nets being towed for over an hour have no chance to breathe and thus drown or suffer severe stress and harm. AR002003; RR-100683. The effects of these failed preventative measures may be considerable, as indicated by multiple mass stranding events in the Northern Gulf of Mexico in which thousands of sea turtles have been found dead; NMFS attributed the deaths to forced submergence by fisheries. AR000013, 000266, 001712−13.

NMFS has long known it must take additional actions to protect and recover sea turtle species. Repeatedly, NMFS has identified the need to remove its regulatory tow time loophole and require TEDs on all shrimp trawl vessels. *See* RR-100500 (listing the need to "[r]equire TEDs, or other equally effective bycatch reduction measures as appropriate, in all trawl fisheries of concern"); RR-100085 (a Priority 1 recovery action for loggerhead sea turtles is to "promulgat[e] regulations to require TEDs in trawl fisheries where they currently are not required"); AR011355–56 (reiterating one of the "most critical actions" is to "require TEDs in U.S. skimmer trawl fisheries and other trawl fisheries").

Despite this knowledge, NMFS has needed continual pressure over the past decade through litigation for the agency to take steps to require TEDs across the shrimping fleet. A decade ago, Conservation Groups sued NMFS for failing to address the need for expanded TED requirements in the southeastern U.S. shrimp fisheries. Compl., *Turtle Island Restoration Network v. NMFS*, No. 1:11-cv-01813-ABJ (D.D.C. Oct. 13, 2011), ECF. No. 1. The parties settled after NMFS agreed, *inter alia*, to issue a proposed rule that would address sea turtle interactions with skimmer trawls. Settlement Agreement & Stip. Dismissal, *Turtle Island Restoration Network v. NMFS*, No. 1:11-cv-01813-ABJ (D.D.C. Apr. 26, 2012), ECF. No. 11. NMFS subsequently published a proposed rule in 2012 to remove the tow time exemption and require TEDs on all commercial shrimp trawlers using skimmer trawls, pusher-head trawls, and wing nets in the southeastern U.S. shrimp fisheries. AR000265 (2012 Proposed Rule). NMFS withdrew the proposal, however, citing a need to address the high capture rates of smaller-sized sea turtles in these gear types. AR000288 (2013 Withdrawal of Proposed Rule). It then took another conservation organization's lawsuit in 2015 for NMFS to once again commit to proposing a rule requiring TEDs on the exempt vessels. *See* Compl., *Oceana, Inc. v. Pritzker*,

No. 1:15-cv-00555-PLF (D.D.C. Apr. 14, 2015), ECF No. 1; Stip. Agreement & Mot. Stay Case 2–3, *Oceana*, No. 1:15-cv-00555-PLF (D.D.C. Sept. 7, 2016), ECF No. 11. NMFS began the rulemaking at issue in this case following that litigation.

## IV.   NMFS proposed requiring TEDs on nearly all shrimp trawl vessels.

In 2016, NMFS issued its proposed rule requiring TEDs on all commercial shrimp trawlers using skimmer trawls, pusher-head trawls, and wing nets,[2] stating the rule was necessary for sea turtle recovery. AR002154. The intent of the rule was to "reduce incidental bycatch and mortality of sea turtles in the southeastern U.S. shrimp fisheries, and to aid in the protection and recovery of listed sea turtle populations." *Id.* NMFS estimated the rule would save up to 2,500 sea turtles every year from unnecessarily drowning in trawl nets. AR002156. This would have equated to preventing over 80 percent of sea turtle deaths currently caused by the southeastern U.S. shrimp fisheries. AR001531.

NMFS "preliminarily determined" that requiring TEDs on all vessels using skimmer trawls, pusher-head trawls, and wing nets is "necessary and advisable to conserve threatened and endangered sea turtle species" and to enforce the requirements of the ESA. AR002156. In accordance with NEPA, NMFS considered seven alternatives for new TED regulations, including a "no action" alternative, and issued a draft environmental impact statement (EIS) evaluating the environmental impacts of its proposed action. AR001291−301; *see* 40 C.F.R. §§ 1500.1(b), 1502.1. NMFS estimated that each of the alternatives, other than the no action alternative, would prevent a minimum of 1,400 and a maximum of over 2,000 sea turtle deaths annually. *See infra* Fig. 1. In the draft EIS, NMFS identified its preferred alternative requiring TEDs on all vessels using skimmer trawls, pusher-head trawls, and wing nets—and preventing

---

[2] With the exception of Biscayne Bay wing net fishery vessels in Miami-Dade County, Florida.

up to 2,500 sea turtle deaths a year—because the other alternatives were "expected to result in less protection of sea turtles." AR001558. NMFS stated its proposed action is "critical and necessary" to achieving its objective to recover sea turtle species. AR001532.

**V.    NMFS unexpectedly and arbitrarily developed a new final rule that exempts the vast majority of the shrimping fleet and protects only a fraction of sea turtles.**

Three years passed before NMFS finally issued the final TED Rule in December 2019. AR009456. In the rule, NMFS sets a novel, arbitrary 40-foot cutoff for skimmer trawl vessels, exempting all shorter skimmer trawl vessels, and exempting pusher-head trawls and wing nets from TED requirements. AR009457. The final rule exempts over 80 percent of the targeted shrimp vessels from the rulemaking and more than halves its sea turtle protections. *See* AR001662. The record contains no evidence supporting this significant departure from the proposed rule or the selection of a 40-foot vessel length in particular.

Through its arbitrary selection of a new alternative, NMFS drastically curtails the TED Rule's protections for sea turtles: the final rule will potentially save up to only 1,158 turtles—and as few as 801—compared to up to 2,500 under the proposed rule. *See infra* Fig. 1. In fact, the final rule is barely *half* as protective as any of the alternatives NMFS had initially rejected as insufficiently protective. *Id.*



**Figure 1.** Comparison of estimated ranges of annual sea turtle deaths prevented among all alternative proposals considered by NMFS.

*Data taken from FEIS Tbl. I. AR001662.*

NMFS's decision to slash protections and vessel coverage lacks any support in the record. NMFS states it chose to exempt skimmer trawl vessels shorter than 40 feet due to "safety and other practical concerns about using TEDs on small skimmer trawls." AR009463. NMFS does not explain what those concerns are, much less why it believes a 40-foot vessel cutoff is necessary to address any safety or practical concerns. NMFS states it chose to exempt pusher-head trawls and wing nets due to "concerns about applying TED testing data from skimmer trawl operations" to those gear types, "coupled with a lack of observer data." AR009457. NMFS does not explain what those concerns are or why a lack of observer data justifies allowing those vessels to fish without TEDs. NMFS also states it limited TED requirements based on "new information indicating significantly lower levels of sea turtle mortality in the offshore fleet." *Id*. NMFS does not describe what that new information is or explain why it justifies limiting TED requirements.

Instead, the record indicates NMFS repurposed justifications it previously used to support adopting a 26-foot cutoff—i.e., Alternatives 2 and 4 in the draft EIS—to justify its novel 40-foot vessel length cutoff. Shortly before publishing the 40-foot final rule in the Federal Register, NMFS's Deputy Assistant Administrator signed a Record of Decision (ROD) approving a final rule establishing a 26-foot vessel length cutoff (Alternative 4). AR002072. While NMFS now claims in a litigation affidavit that the finalization of a 26-foot rule was a clerical error, AR011338, the ROD provides NMFS's justifications and support for a rule setting a 26-foot vessel length cutoff that include the same safety concerns, data concerns, and new information NMFS now relies on for its final 40-foot rule. AR002075−76. The ROD makes no mention of a 40-foot vessel length cutoff. *See id.*

The ROD's justifications for using a 26-foot cutoff—as opposed to a different length—to address safety, practical, and data concerns match the evidence in the record. For instance, the agency cites these same safety, practical, and data concerns under Alternatives 2 and 4 of the draft EIS. AR001312−14. It also describes these concerns in its Issues Advisory, explaining that "small skimmer trawl vessels (e.g., less than 25-26 feet in length)" have limited deck space, a potential need for vessel rigging modifications, and potential navigational concerns, and that NMFS has no data testing TEDs on skimmer trawl vessels 26 feet or smaller. AR009403. It notes the same concerns in its Decision Memo for the Final Rule and in its Congressional Report. AR009435, 009484−85. Even public comments regarding data limitations and logistical differences refer only to vessels less than 26 feet. *See, e.g.*, AR002178 (owner of "a small 17ft boat" expressed concern that "our nets are so small I don't see any way to include a exclusion device"), 002181 (operator of a "small (19') boat" indicated that having more gear on board

would make smaller boats unsafe). Conversely, nothing in the record connects the agency's rationale for the 40-foot vessel length cutoff with any factual support.

Pursuant to NEPA, NMFS issued a final EIS for its final rule that examines the new preferred alternative for a 40-foot cutoff (Alternative 8). AR001673; *see infra* Argument § III. The final EIS contains several deficiencies in its analysis of the effects of each alternative. First, NMFS purports to evaluate the effects on sea turtles, but the final EIS does not consider impacts on individual sea turtle populations. *See* AR001793−1811. It instead estimates general "sea turtle" mortality, combining the expected annual deaths from all five sea turtle species and making no effort to consider the effects of mortality on a species-specific basis. *See, e.g.*, AR001662. NMFS also purports to evaluate the direct and indirect economic costs of the alternatives, but the final EIS fails to incorporate foregone economic benefits from the rule in its calculus. AR001818−74. Finally, despite the significant change to the action with the final rule, NMFS summarily states in the final EIS that there are "no significant new circumstance or information relevant to environmental concerns" requiring preparation of a supplemental EIS. AR001673−74.

The TED Rule was initially set to go into effect on April 1, 2021. AR009456. However, on March 31, 2021, NMFS delayed the effective date to August 1, 2021, nearly 18 months after the rule was issued. 86 Fed. Reg. 16,676 (Mar. 31, 2021).

## LEGAL FRAMEWORK

### I.    APA Notice and Comment Rulemaking

The APA requires agencies to give the public adequate notice of any rulemaking, which must include "the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). After providing notice, the agency must give interested persons a meaningful "opportunity to participate in the rule making through submission of

written data, views, or arguments" and comment on a proposed version of the rule. *Id.* § 553(c).

Congress imposed these notice requirements "(1) to ensure that agency regulations are tested via

exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give

affected parties an opportunity to develop evidence in the record to support their objections to

the rule and thereby enhance the quality of judicial review." *Int'l Union, United Mine Workers v.

Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005).

## II.   National Environmental Policy Act

NEPA requires an agency to engage in a full discussion of the significant environmental

impacts of its action to "inform decisionmakers and the public of the reasonable alternatives

which would avoid or minimize adverse impacts or enhance the quality of the human

environment." 40 C.F.R. § 1502.1 (2019).[3] NEPA accordingly requires an agency to prepare an

environmental impact statement that thoroughly discusses the direct and indirect effects of the

full range of alternatives considered by the agency for any major federal action significantly

affecting the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.4, 1502.14,

1502.16 (2019). The EIS process "forces the agency to take a 'hard look' at the environmental

consequences of its actions, including alternatives to its proposed course," and "ensures that

these environmental consequences, and the agency's consideration of them, are disclosed to the

public." *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) (citations omitted); *see also

Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (explaining NEPA

"ensures that important effects will not be overlooked or underestimated only to be discovered

after resources have been committed or the die otherwise cast").

---

[3] The pre-2020 NEPA regulations are applicable here, as the 2020 amendments to the regulations occurred after NMFS issued the final TED Rule. All other citations to regulations are to the current versions (2021).

To take the requisite "hard look," an agency "may not rely on incorrect assumptions or data in an EIS." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005) (citing 40 C.F.R. § 1500.1(b) (2019)). The agency must perform its NEPA duties using high-quality, accurate scientific information and must ensure the scientific integrity of its analyses. 40 C.F.R. §§ 1500.1(b), 1502.24 (2019).

The "hard look" requirement persists "even after a proposal has received initial approval." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989). Accordingly, an agency must prepare a supplemental EIS if, after issuing the draft EIS, "(i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1) (2019). The agency must prepare a supplemental EIS if the new information affects the environment "in a significant manner or to a significant extent not already considered." *Marsh*, 490 U.S. at 361.

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997). Challenges to final agency actions under NEPA are reviewed under the standards provided by the APA. *See Pub. Emps. for Env't. Resp. v. Beaudreau*, 25 F. Supp. 3d 67, 94 (D.D.C. 2014). "In the APA context, summary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Lewis v. Sec'y of Navy*, 195 F. Supp. 3d 277, 283 (D.D.C. 2016); *accord Richards v. INS*, 554 F.2d 1173, 1177 (D.C. Cir. 1977).

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). An agency action is:

> arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co*., 463 U.S. 29, 43 (1983). Courts "do not hear cases merely to rubber stamp agency actions," *Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000), nor can they "accept [an agency's] bare conclusory allegations as fact," *Taylor*, 132 F.3d at 762. Courts must consider "whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995). A court's review must be "searching and careful," and the agency must articulate a "rational connection between the facts found and the choice made." *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 35 (D.C. Cir. 1977) (citation omitted).

## ARGUMENT

NMFS issued a novel TED Rule that violates multiple legal obligations to the public and the environment because it: 1) arbitrarily fails to explain its decision to omit TED requirements it previously determined were necessary and fails to provide any rational basis for its final decision to exempt certain vessels from TED requirements, in violation of the APA; 2) is not a "logical outgrowth" of the proposed rule, in violation of the APA; and 3) fails to take a hard look at the environmental effects and engage in requisite supplemental environmental analysis of the new

action, in violation of NEPA. Conservation Groups are entitled to summary judgment as a matter of law.[4]

## I.      NMFS violates the APA by arbitrarily disregarding its prior findings that more comprehensive TED requirements are necessary and by failing to provide a rational justification for the final TED Rule.

NMFS violates the APA's requirement for rational decisionmaking in two significant respects. First, NMFS fails to acknowledge or explain why it disregards its prior determinations that more comprehensive TED requirements are necessary for the conservation of sea turtles and to enforce the requirements of the ESA. Second, the TED Rule lacks any evidentiary support or rational basis for its asserted justifications to exempt certain vessels from TED requirements.

### A.      NMFS arbitrarily fails to explain why it disregards its previous determinations that more comprehensive TED regulations are necessary (Count 1).

The APA requires an agency to explain material inconsistencies between a proposed and final rule. If it fails to do so, its action is arbitrary and capricious. In the proposed rule, NMFS found it "necessary and advisable" for conserving sea turtle species and "necessary and appropriate" for enforcing the ESA to require TEDs on *all* skimmer trawl, pusher-head trawl, and wing net shrimp vessels. In promulgating the final rule requiring TEDs on fewer than all

---

[4] Conservation Groups have standing to bring this action on their own behalf and on behalf of their members, as demonstrated by the declarations attached to this Motion. Conservation Groups' members have protectable aesthetic, recreational, scientific, and other interests in the survival and recovery of the sea turtle species affected by NMFS's TED Rule and legal violations described in the Complaint. These interests have been injured by NMFS's legal violations; the injuries are directly traceable to these violations and are redressable by a favorable decision from this Court. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–84 (2000); Exs. A–E. Conservation Groups have associational standing to represent their members' interests. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977) ("[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."); *accord Nat. Res. Def. Council v. EPA*, 489 F.3d 1364, 1370 (D.C. Cir. 2007).

such shrimp trawl vessels, it acts inconsistently with its prior findings. NMFS does not acknowledge this inconsistency, much less explain it, in violation of the APA.

An agency action is arbitrary and capricious "if there are unexplained inconsistencies in the final rule." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 58–59 (D.C. Cir. 2015). This follows from the requirement that an agency "must examine *the relevant data* and articulate a *satisfactory explanation for its action* including a rational connection between the facts found and the choice made." *Id.* at 59 (quoting *State Farm*, 463 U.S. at 43). While an agency is not inexorably bound to its statements or findings in a proposed rule (or, as in *Burwell*, an advance notice of proposed rulemaking), if the final rule says something different or is otherwise inconsistent, the agency must acknowledge that inconsistency and explain why it reached a different conclusion. *Id.* NMFS does not meet those obligations here.

In the proposed rule, NMFS "preliminarily determined" that requiring TEDs on all skimmer trawls, pusher-head trawls, and wing nets is "necessary and advisable to conserve threatened and endangered sea turtle species," as well as "necessary and appropriate to enforce the requirements of the ESA." AR002156. NMFS made these determinations in accordance with ESA section 4(d), which requires the agency to issue regulations it "deems necessary and advisable to provide for the conservation of" threatened species, and section 11(f), which authorizes it to "promulgate such regulations as may be appropriate to enforce" the ESA. 16 U.S.C. §§ 1533(d), 1540(f).

NMFS's determinations were grounded in its findings that tow time requirements do not work, whereas TEDs have been proven effective. *E.g.*, AR001306, 001308–09, 002155. Specifically, tow time restrictions are an inadequate substitute for TEDs because the southeastern

U.S. shrimp fisheries have a known history of noncompliance with tow time restrictions and the restrictions are difficult, if not impossible, to enforce. *See supra* Statement of Facts § III.

NMFS's determination that TEDs are necessary on all vessel types for the "conservation" of sea turtles should be viewed in the context of the ESA's definition of that term: "conservation" is "the use of *all* methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary"—that is, until the point of full recovery. 16 U.S.C. § 1532(3) (emphasis added). NMFS effectively determined the proposed rule is necessary to bring listed sea turtles back to the point where listing is no longer required. This is consistent with the agency's recurrent findings in multiple sea turtle recovery plans that TEDs are crucial and indeed necessary for the sea turtle species' recoveries. *See, e.g.*, AR009459, 011355−56 (requiring TEDs in all exempted U.S. shrimp trawl vessels is one of the "most critical actions" needed to recover Kemp's ridleys), 011358; RR-100085, 100500. NMFS noted such in the draft EIS, declaring that "the proposed action is critical and necessary to achieving [its] objective" to recover sea turtle species. AR001532.

The final TED Rule requires measures far less than what NMFS had previously found necessary and advisable for conserving sea turtles and enforcing the requirements of the ESA. It requires TEDs on only a small portion of skimmer trawls, leaving nearly 5,000 vessels using the ineffective tow time limits. *See* AR001662 (Table I) (comparing 5,837 vessels under Alternative 3 (proposed rule) with 1,062 vessels under Alternative 8 (final rule)). NMFS does not acknowledge in the final rule that it is implementing less than what it had originally deemed necessary, or even that it had previously made such determinations, much less offer any explanation for the rule's inconsistency with those determinations. *See, e.g.*, *Advocs. for*

*Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1147 (D.C. Cir.

2005) (finding final rule arbitrary and capricious because agency "abandoned" previous

recommendations "without reasonable explanation"); *see also State Farm*, 463 U.S. 43 (action

arbitrary and capricious when agency "entirely failed to consider an important aspect of the

problem"). The unexplained inconsistency with NMFS's earlier determinations renders the TED

Rule arbitrary and capricious and contrary to law, in violation of the APA. *See Burwell*, 786 F.3d

at 58–59; *see also Engine Mfrs. Ass'n v. EPA*, 20 F.3d 1177, 1182 (D.C. Cir. 1994) ("In the face

of such apparent inconsistency, unadorned by any attempt at explanation or justification, the

court can have no confidence that the agency" made a reasonable determination).

> **B.      NMFS's justifications for limiting TED requirements to skimmer trawl vessels 40 feet and greater in length lack any rational basis or support (Count 2).**

NMFS violates the APA by offering bare conclusory statements regarding safety,

practical, and data concerns to support its decision to set a 40-foot cutoff for skimmer trawl

vessels and exclude all pusher-head trawls and wing nets from TED requirements. The record is

devoid of any factual support for the statements, and in fact supports a different proposed

alternative—one that NMFS was apparently prepared to promulgate, but abandoned—requiring

TEDs on all skimmer trawl vessels greater than 26 feet. NMFS's conclusory, unsupported

attempt to justify its final rule is arbitrary and capricious, in violation of the APA.

The APA requires an agency's decision to have some basis in the record. *Babbitt*, 903 F.

Supp. at 105. When an agency implements a new standard, it must articulate the standards that

guided its analysis and some metric for its classification. *See Tripoli Rocketry Ass'n, Inc. v.*

*Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 81 (D.C. Cir. 2006). "The

agency's statement must be one of 'reasoning'; it must not be just a 'conclusion'; it must

'articulate a satisfactory explanation' for its action." *Butte Cnty. v. Hogen*, 613 F.3d 190, 194

(D.C. Cir. 2010) (quoting *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001)). A court must be able to determine whether an agency "adequately considered all relevant factors," which at a minimum requires the agency to disclose "what factors or data were in fact considered by the agency." *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 533 (D.C. Cir. 1978); *see also Flyers Rts. Educ. Fund, Inc. v. FAA*, 864 F.3d 738, 746 (D.C. Cir. 2017) ("We cannot affirm the sufficiency of what we cannot see."). Agency conclusions and assumptions are arbitrary if there is "no evidence in the record supporting" them. *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 432 (D.C. Cir. 2018).

NMFS's stated justifications for limiting TED requirements to only skimmer trawl vessels 40 feet and greater in length lack any rational basis or evidentiary support in the record. First, NMFS asserts the new 40-foot cutoff is necessary due to "safety and other practical concerns about using TEDs on small skimmer trawls." AR009463. NMFS provides no explanation of what those concerns are, much less how a 40-foot cutoff would address such concerns. Using "safety and other practical concerns" to justify a 40-foot cutoff runs counter to its previous findings that vessels at least 26 feet in length do *not* have "safety at sea" concerns and are able to effectively use the largest TEDs. *E.g.*, AR001679 (vessels greater than 26 feet "have enough deck space to accommodate TED storage"), 001312−13 (stating a 26-foot cutoff (Alternative 2) would address safety at sea issues with "small" vessels). In fact, the record shows NMFS's stated safety justification is specifically used for a nearly final rule setting a 26-foot cutoff. *See infra* p. 23. The record also shows the agency originally defined a "small" skimmer trawl vessel as a vessel less than 26 feet long. *See, e.g.*, AR001312 (Alternative 2 exempting "small vessels (i.e., less than 26 ft in length)" from TED requirements), 001314 (Alternative 4 exempting the same). Without explanation, NMFS seemingly alters its definition of "small" in

Case 1:21-cv-00930-BAH   Document 23-1   Filed 11/12/21   Page 30 of 47

the final rule to encompass vessels less than 40 feet—that is, over 80 percent of all skimmer trawl vessels.

This situation is similar to *U.S. Sugar Corporation v. EPA*, where, in a final rule, the Environmental Protection Agency extended a regulatory exemption to certain facilities on the basis that they were "similar in size and sophistication" to the facilities that would have been exempted in the proposed rule. 830 F.3d 579, 649–50 (D.C. Cir. 2016), *on reh'g en banc in part*, 671 F. App'x 824 (D.C. Cir. 2016). The court held the change was arbitrary and capricious because the agency's justifications "flatly contradict[ed]" the agency's explanation in its proposed rule indicating the facilities were meaningfully different, and the agency had provided no data or examples to support that the facilities were actually similar. *Id.* Just so here, NMFS's assertions that vessels between 26 and 40 feet have the same safety and practical concerns as vessels 26 feet and smaller "flatly contradict" its earlier discussions.

Second, NMFS asserts the 40-foot cutoff is based on "new information indicating significantly lower levels of sea turtle mortality in the offshore fleet." AR009457. NMFS provides no indication what that new information is. Moreover, NMFS fails to explain how the alleged new information justifies limiting TED requirements or is relevant to a decision to set a 40-foot cutoff for skimmer trawl vessels. Indeed, the record indicates any such "new information" on mortality estimates has no bearing on the agency's analysis. Between the draft and final EISs, NMFS made no changes to its mortality estimates, despite any "new information" on mortality. *Compare* AR001300, *with* AR001661−62; *see Catawba Cnty. v. EPA*, 571 F.3d 20, 51−52 (D.C. Cir. 2009) (finding agency's changed rationale between initial and final designations "not justified" when there was "no apparent change in data"); *California v. Bernhardt*, 472 F. Supp. 3d 573, 604 (N.D. Cal. 2020) (finding agency's stated basis for

reversing course unfounded because underlying findings did "not differ in any material way"
between the two rules).

Finally, NMFS claims it relied on a public comment as the impetus for its new decision
to exempt all skimmer trawls less than 40 feet in length from the TED requirements, AR009466,
but the record contains no evidence such a comment ever existed. Specifically, NMFS claims a
comment stated: "NOAA should exempt all skimmer trawls less than 40 feet in length from the
TED requirements." *Id.* In its response to comments, NMFS then states: "Based on public
comment and further deliberation, we revised our final rule to exempt skimmer trawl vessels less
than 40 feet in length." *Id.* However, there is no record of such a comment in the administrative
record, which has been certified by the agency as containing the "Comments received during the
December 16, 2016 - February 14, 2017, public comment period." ECF 17-1, at 4. In over 7,000
pages of comments, not a single one mentions a 40-foot vessel length or raises issues with
vessels anywhere close to that length. *See* AR002162−9400.[5] NMFS cannot rely on such a blind
"declaration of fact that is capable of exact proof but is unsupported by any evidence" in the
record. *Flyers Rts. Educ. Fund, Inc.*, 864 F.3d at 746 (citations omitted); *see also U.S. Sugar*,
830 F.3d at 644 (rejecting agency's assertion where agency "point[ed] to no comments or
evidence supporting this assertion"). In any case, "an agency cannot simply rely on the
speculation of commenters" without "conduct[ing] a critical examination of comments on which
it relies," which NMFS does not do. *Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget*, 358 F.
Supp. 3d 66, 91 (D.D.C. 2019). Simply put, NMFS provides "virtually nothing to allow the court

---

[5] Due to the large quantity of pages, for practical considerations Conservation Groups omit
AR002162−9400 from the Appendix, but can supply the Court with a copy if requested.

to determine whether its judgment reflects reasoned decisionmaking." *Tripoli Rocketry*, 437 F.3d at 81.

The record instead suggests that in the late stages of its rulemaking, NMFS arbitrarily came up with a novel 40-foot vessel cutoff for skimmer trawl vessels by simply replacing "26 feet" with "40 feet" and retaining the considerations and rationale it developed for a 26-foot vessel cutoff. *See supra* p. 10. While the record contains no factual basis for a 40-foot cutoff, it is replete with information supporting a 26-foot cutoff for "small" skimmer trawls—which would have been implemented under either Alternative 2 or 4 from the proposed rule. *See, e.g.*, AR001312−14. This information includes public comments, data limitations, and logistical differences with vessels less than 26 feet. *See, e.g.*, AR001312−13, 009403, 009435, 009484−85, 002178, 002181. Justification for a 26-foot cutoff, however, is not justification for a 40-foot cutoff. The record lacks any evidence—scientific, technical, or otherwise—indicating a 40-foot cutoff in particular has any practical or substantive implication for TED performance, safety, or vessel operation. The record instead indicates NMFS arbitrarily appropriated its reasoning for pre-existing alternatives to support a novel and very different alternative.

Indeed, NMFS's Deputy Assistant Administrator had signed a ROD approving a final rule with a 26-foot cutoff for skimmer trawls (Alternative 4). AR002070–79. This ROD uses the same justifications the agency later put forth for using a 40-foot cutoff. *See, e.g.*, AR002076 (citing safety and performance concerns). Although NMFS asserts in a litigation affidavit that

this ROD was *signed* by mistake, *see* AR011336−38,[6] its existence demonstrates that NMFS was prepared to issue a 26-foot final rule and, more importantly, that NMFS applied the same justifications for the 26-foot rule to its 40-foot rule.

This seemingly simple change in vessel length could have staggering negative consequences for sea turtle populations. The replacement of "26 feet" with "40 feet" with the stroke of a pen in effect slashes sea turtle protections by nearly half, reducing the maximum number of sea turtles annually saved from 2,040 to 1,168. *See supra* Fig. 1. Put in context, during the proposed rule stage, NMFS rejected Alternative 4—the *least* protective alternative originally considered—because it saved 500 fewer sea turtles than the original proposed alternative. AR002159. This change is double that. Such a drastic increase in sea turtle deaths from the least protective alternative could have significant and lasting impacts to the survival and recovery of sea turtle populations. *See infra* Argument § III.A.1.

The record similarly provides no support for NMFS's justifications for excluding pusher-head trawls and wing nets from TED requirements. NMFS asserts it exempts those gear types from the final rule because of concerns about data and "new information and advice" from NMFS's gear experts identifying "significant differences" with pusher-head trawls and wing nets. AR001674; *see also* AR009435, 009457. NMFS, however, does not explain what the agency's "concerns" are or how those concerns justify allowing those vessels to operate without TEDs. The record also lacks any information about "significant differences" in gear or the

---

[6] Courts may not accept such *post hoc* rationalizations from agencies. *State Farm*, 463 U.S. at 50; *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020). Such litigation affidavits that post-date the agency's decision also are not properly part of the administrative record for review. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971); *AT & T Info. Sys., Inc. v. Gen. Servs. Admin.*, 810 F.2d 1233, 1236 (D.C. Cir. 1987) ("[W]e have repeatedly applied [this rule] to bar introduction of litigation affidavits to supplement the administrative record.").

alleged "new information and advice" from NMFS's gear experts that warrant excluding pusher-head trawls and wing nets from TED coverage. NMFS must have a basis in the record to support its assertions; it cannot provide vague descriptions that convey no information at all. *See Tripoli Rocketry*, 437 F.3d at 82.

NMFS's justifications for limiting TED requirements to only skimmer trawl vessels 40 feet and greater in length lack any basis in the record. The agency points to concerns irrelevant to that standard and asserts reliance on alleged information that does not exist in the record. Without any basis to support its decision, NMFS acts arbitrarily and capriciously in issuing its final TED Rule, in violation of the APA. *See Babbitt*, 903 F. Supp. at 105; *State Farm*, 463 U.S. at 44.

## II.    NMFS's 40-foot final rule is not a logical outgrowth of the proposed rule, in violation of the APA (Count 3).

The APA requires an agency's final rule to be a "logical outgrowth" of the proposed rule to effectuate adequate public notice and comment. NMFS gave Conservation Groups and the public no indication in the proposed rule that it would consider exempting skimmer trawl vessels less than 40 feet. NMFS's significant departure from its proposed rule with the adoption of a 40-foot length metric for skimmer trawls is not a logical outgrowth, and the agency denied Conservation Groups a meaningful opportunity for notice and comment, in violation of the APA.

The APA requires an agency's final rule to be a "logical outgrowth" of the proposed rule. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (citation omitted); *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (stating agencies may not "pull a surprise switcheroo" in the final rule). The purpose of this requirement is to ensure the public has adequate notice and "an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). The logical outgrowth requirement

ensures that "the agency has alerted interested parties to the possibility of the agency's adopting a rule different than the one proposed." *Int'l Union*, 407 F.3d at 1260.

While an agency may promulgate a final rule that differs from the proposed rule, a final rule is a logical outgrowth of a proposed rule only if interested parties "should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004) (citation omitted). "By contrast, a final rule fails the logical outgrowth test and thus violates the APA's notice requirement where interested parties would have had to divine the agency's unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (citations omitted). If a new round of notice and comment would have provided commenters with "their first occasion to offer new and different criticisms which the agency might find convincing," the rule fails the logical outgrowth test. *Fertilizer Inst. v. U.S. EPA*, 935 F.2d 1303, 1311 (D.C. Cir. 1991) (citation omitted); *see also Am. Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274 (D.C. Cir. 1994).

NMFS's final rule is not a logical outgrowth of its proposed rule because the public, including Conservation Groups, was not alerted of the possibility that NMFS would adopt a new, 40-foot vessel length metric to exclude over 80 percent of all targeted shrimp trawl vessels from the rulemaking and allow them to incidentally kill thousands of sea turtles every year. During the proposed rule stage, all indications pointed to NMFS either requiring *all* skimmer trawls or all skimmer trawls greater than 26 feet in length to install TEDs. *See* AR001312−15, 002159. Neither the proposed rule nor draft EIS mentions 40 feet or any other potential length metric, or any reasons NMFS might consider a different length. Based on the stated goals, considerations,

26

and rationale of the agency's proposed rule, Conservation Groups could not possibly have anticipated NMFS would adopt a rule covering only skimmer trawls 40 feet and longer. *See Ne. Md. Waste Disposal Auth.*, 358 F.3d at 952; *Ctr. for Biological Diversity v. Everson*, 435 F. Supp. 3d 69, 88 (D.D.C. 2020) (final rule not logical outgrowth where proposed rule contained no reference or intention to apply a new interpretation).

The lack of notice is significant and prejudiced Conservation Groups. Had NMFS provided another round of notice and comment on its decision to implement the 40-foot metric, Conservation Groups and other commenters could have addressed two major issues unique to the new rule. *See Fertilizer Inst.*, 935 F.2d at 1311. First, Conservation Groups could have provided information, data, or critiques addressing NMFS's alleged concerns about safety, practical, and data underlying its selection of 40 feet as a cutoff and explaining why a 40-foot cutoff is not warranted. *See supra* Argument § I.B. For instance, Conservation Groups could have provided data that demonstrate how skimmer trawl vessels longer than 26 feet have the requisite capacity to safely use and store TEDs on deck. *Cf. CSX Transp.*, 584 F.3d at 1083 (notice would have provided commenters opportunity to make additional objections and present different evidence).

Second, if NMFS had given notice of the reduced protections, Conservation Groups and the public could have provided data and explanations of how the anticipated rate of mortality under the chosen alternative will hinder sea turtle recovery. Such comments could have avoided NMFS's error of failing to adequately consider the effects of the final rule on particular sea turtle populations and their recovery. *See infra* § III.A.1. Instead, Conservation Groups and the public were given no opportunity to consider or comment on the significantly higher number of annual sea turtle deaths that will result from NMFS's decision to impose a 40-foot cutoff. The "unexpected and significant" reduction in protections for ESA-listed sea turtles in a final rule

warrants an additional period of public review and comment. *Ctr. for Biological Diversity v. Kelly*, 93 F. Supp. 3d 1193, 1206 (D. Idaho 2015) (finding significant reduction in critical habitat area in final rule required renewed notice and comment).

In addition, "'it is especially important for the agency to identify and make available technical studies and data that it has employed' prior to the comment period." *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 262 (D.D.C. 2015) (quoting *Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982)); *see also Owner–Operator Indep. Drivers Ass'n v. FMCSA*, 494 F.3d 188, 199 (D.C. Cir. 2007). NMFS failed to reveal the technical basis or data behind its 40-foot metric in time for public comment under the APA. *See supra* Argument § I.B. NMFS "cannot rest a rule on data that, in critical degree, is known only to the agency." *Shands Jacksonville*, 139 F. Supp. 3d at 262 (citation omitted). The failure to provide the bases behind its changed decision is prejudicial for the same reasons described above: Conservation Groups and the public were given no opportunity to critique NMFS's technical information or provide additional data to show why NMFS's asserted data does not support selecting a 40-foot cutoff. *See id.*

Had NMFS opened a new round of notice and comment on the new 40-foot metric, it would have provided the public its "first opportunity . . . to offer comments that could persuade the agency to modify its rule." *Am. Water Works*, 40 F.3d at 1274. By failing to notify the public of any possibility of its final course of action, NMFS unlawfully denied the public the opportunity to comment on the basis for or effects of the new vessel length metric, to verify the agency's asserted scientific and technical data supporting the cutoff, or to persuade the agency not to adopt the final rule, in violation of the APA. *See CSX Transp.*, 584 F.3d at 1083.

**III.    NMFS violates NEPA by failing to take a hard look at the environmental effects and failing to conduct a required supplemental environmental analysis.**

NMFS violates NEPA by failing to take the requisite "hard look" at the TED Rule's effects in its final EIS by ignoring the rule's disparate effects on individual sea turtle species and by disregarding the foregone economic benefits of the rule. NMFS also violates NEPA by failing to conduct the supplemental environmental analysis required when it made a substantial change to its proposed action.

**A.    NMFS fails to take a hard look at the effects on sea turtle species or at foregone economic benefits, in violation of NEPA (Count 5).**

NMFS fails to take the requisite hard look at the effects of its actions in two ways. First, in the final EIS when NMFS considers the effects of the TED Rule on sea turtles, it arbitrarily lumps all sea turtle species into a single uniform population despite the fact that shrimp bycatch affects species differently—particularly the critically endangered Kemp's ridley. Second, when considering the economic effects of the TED Rule, NMFS arbitrarily fails to quantify or even evaluate the economic benefits that were lost with the scaled-back TED requirements.

1.    <u>NMFS fails to consider the rule's effects on individual sea turtle species.</u>

NMFS violates NEPA's hard look requirement by failing to evaluate the population-level effects the final rule will have on sea turtles. NMFS assesses the TED Rule's effects on sea turtles by grouping the five affected species together and estimating a single mortality rate for all "sea turtles" categorically. Shrimp trawling, however, affects each species differently due to geographic and biological differences. The populations also have different tolerance levels for sustained death rates, with more critically endangered species (i.e., the Kemp's ridley) more susceptible to population-level harms. NMFS ignores such differences and makes no attempt to consider or evaluate the rule's effects on individual species, especially over time, abdicating its duty under NEPA to take a hard look at the effects on sea turtles.

An action's effect on a species or population is measured by comparing the baseline population to the estimated mortality, and then assessing the resulting population status. *Cf.* 50 C.F.R. § 402.14(g)(4) (explaining how action's effect on a species is measured under ESA). NMFS does not and could not analyze the impact of the TED Rule on sea turtle populations because it fails to break down either the baseline population or the estimated sea turtle deaths by species in its analyses.

Instead, in the final EIS, NMFS evaluates the direct and indirect effects of the alternatives on "sea turtles" generally, providing a single numerical range of estimated annual sea turtle deaths prevented under each alternative. *See* AR001662 (Table I), 001894 (Table 128), 001798−811. Undeniably, shrimp trawling affects each of the five sea turtle species differently. Each species differs in its ecology and global distribution, its abundance, and its varying habitat uses of the shallow waters of the Gulf of Mexico and southeastern Atlantic Ocean. RR-100650−52. These characteristics affect the likelihood that turtles of a given species will be captured by shrimp trawlers fishing in certain times and areas. NMFS knows each species' specific and unique geographic distributions and preferred habitats. *See, e.g.*, AR001696–1733. NMFS also knows the capture ratio of each sea turtle species in shrimp trawls, and even partially estimates such numbers for some species in the final EIS. *See, e.g.*, AR001918. Yet NMFS does not use this information to assess the effects of the TED Rule. Separating out and quantifying sea turtle deaths by species is not only feasible, but necessary in order for the agency to understand the impacts of the final rule.

This error is particularly glaring for Kemp's ridleys. NMFS knows that shrimp trawlers incidentally catch and kill Kemp's ridleys in disproportionate numbers, so they are especially affected by this rulemaking. *See, e.g.*, AR001713, 001918. This is because unlike other sea turtle

species, Kemp's ridleys have a limited range and rely almost exclusively on the Gulf of

Mexico's shallow, nearshore waters for foraging habitat. AR001709. Their distribution thus

significantly overlaps with prime shrimp trawling waters and places the turtles at heightened risk

for incidental capture. RR-101245. In fact, scientific data indicate Kemp's ridleys compose 80

percent or more of all sea turtles stranded and killed by forced submergence, likely from capture

in shrimp trawling nets. AR001712. NMFS disregards this known disproportionate harm and

fails to quantify the expected number of Kemp's ridleys impacted by the agency's actions.

Not only does NMFS fail to break down estimated mortality by species, it also

inexplicably fails to incorporate species-specific baseline population levels into its effects

analysis. *See* AR001793−811. Without incorporating existing population levels into its analysis,

NMFS has no context for what the continued mortality rates under the TED Rule actually means

for any species' future population status or chance of recovery. *Cf., e.g.*, *Defs. of Wildlife v. U.S.

Dep't of Interior*, 931 F.3d 339, 353–54 (4th Cir. 2019) (in ESA context, explaining importance

of using proper species population baseline to accurately assess action's effects on species);

*Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 929 (9th Cir. 2008) (same).

Again, the critically endangered Kemp's ridley sea turtle suffers the most from NMFS's

failures to properly assess harm from the TED Rule. This baseline context is particularly

important to understand the impacts of the action on Kemp's ridleys because as the most

endangered sea turtle species in the world, AR001708, the species is acutely susceptible to

population-level harm, RR-101245. Its significantly reduced population numbers and high death

rate by trawlers make the imperiled population the most affected by NMFS's final rule. Although

NMFS has abundant evidence and data indicating the rule could have significant population-

level effects on Kemp's ridleys, the agency makes no effort in the final EIS to even consider or

evaluate the disproportionate harm its action will have on this species, much less any other sea

turtle species, in violation of NEPA. *Cf., e.g.*, *Defs. of Wildlife*, 931 F.3d at 354 (in ESA context,

holding agency must account for the species' "already precarious state" when assessing effects

of an action on the species).

The twin errors of failing to evaluate species-specific deaths and ignoring species-

specific population baselines prevent NMFS from making any reasonable assessment of the TED

Rule's fundamental effect on sea turtle species or their prospects for recovery. The TED Rule is

not an action that will impact a finite number of sea turtles at one point in time. NMFS estimates

that *every year* potentially up to 2,200 more sea turtles will die from incidental capture by

shrimpers using skimmer trawls, pusher-head trawls, and wing nets. AR001894 (TED Rule may

only prevent 800 of the nearly 3,000 sea turtle deaths that occur annually). The agency fails to

engage in population-level analyses and in doing so, fails to assess the true magnitude of harm of

its action on each population's ability to survive and recover over time. *See Pub. Emps. for Env't

Resp. v. U.S. Fish & Wildlife Serv.*, 177 F. Supp. 3d 146, 153, 156 (D.D.C. 2016) (it "defies

common sense" to not account for change in population number when years of "taking" occur).

NMFS's inexplicable failures to evaluate species-specific deaths, to contextualize such

deaths in terms of each sea turtle population's baseline numbers, and to analyze impacts on the

trajectory of those species' ability to survive and recover violates NEPA's hard look

requirement. NEPA requires agencies to assess the "degree to which the action may adversely

affect an endangered or threatened species." 40 C.F.R. § 1508.27(b)(9) (2019). A species-

specific analysis is needed to conduct a "searching and careful inquiry" that passes muster under

the "hard look" standard. *See Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 189, 191−92

(4th Cir. 2005) (finding hard look not satisfied because agency did not "perform species-specific

studies" and instead relied on non-species-specific data to assess risks and effects on species).

Here, NMFS cannot possibly evaluate the *degree* of adverse effects without considering and

evaluating the annual number of deaths expected to occur for each species and contextualizing

those death rates relative to population numbers. *See Pub. Emps. for Env't Resp. v. U.S. Fish &*

*Wildlife Serv.*, 177 F. Supp. 3d at 153, 156–157 ("it is hard to imagine a 'softer' look" than not

evaluating impacts on the species' current population). NMFS fails to take a hard look at how the

final rule may adversely affect the specific endangered and threatened species' populations, in

violation of NEPA.

> 2.    <u>NMFS overestimates the economic burden of its action.</u>

NMFS also violates NEPA's hard look requirement by failing to quantify in the final EIS

*any* economic benefit resulting from TED use now foregone in the final TED Rule. NMFS's

economic analysis therefore misleadingly and inaccurately overestimates the economic burden of

TED requirements on the shrimping industry, in violation of NEPA.

NEPA requires an EIS to discuss all effects on the environment, including economic

effects, whether direct, indirect, or cumulative. 40 C.F.R. §§ 1508.8, 1508.14 (2019). "[I]t is

essential that the EIS not be based on misleading economic assumptions." *Hughes River*

*Watershed Conservancy v. Glickman*, 81 F.3d 437, 446 (4th Cir. 1996). Misleading economic

assumptions can defeat the functions of an EIS by impairing the agency's fair consideration of

the effects of its action and skewing the public's evaluation of the action. *Id.*; *see also Nat. Res.*

*Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 811–812 (9th Cir. 2005). An agency must

present its relevant quantitative and qualitative information and analyses "in a way that the court

and the public can be confident that the agency has taken the requisite 'hard look.'" *Utah*

*Physicians for a Healthy Env't v. U.S. Bureau of Land Mgmt.*, 528 F. Supp. 3d 1222, 1230–32

(D. Utah 2021).

In particular, an agency has a duty to monetize the foregone benefits of a changed rule. *California*, 472 F. Supp. 3d at 616. It is arbitrary and capricious for an agency to equate a zero dollar value where the record shows the value is "certainly not zero." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1200 (9th Cir. 2008); *see High Country Conservation Advocs. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1192 (D. Colo. 2014) (agencies "effectively zeroed out the cost in its quantitative analysis" by not quantifying costs when the record never suggested cost was as low as $0 per unit).

The economic benefits for shrimpers from TEDs have been known for decades. *See e.g.*, AR002206−9; *Louisiana, ex rel. Guste v. Verity*, 853 F.2d 322, 330 (5th Cir. 1988) (noting TED use reduces bycatch of other species, increases fuel efficiency, and reduces drag). NMFS notes in the final EIS that TEDs are known to increase fuel efficiency by reducing drag and marine debris build-up in the nets, reduce finfish bycatch, reduce sorting and processing time of shrimp due to cleaner catch, improve ecotourism by increasing sea turtle viewing, and improve local seafood economy through consumer-driven choices in eating sustainably-caught shrimp. AR001922. Yet NMFS does not incorporate *any* benefit of TED requirements in its economic analysis of the alternatives in its final EIS. AR001818−74. It summarily claims that "the magnitude of these benefits is highly uncertain" and in essence equates a zero dollar value to each benefit. AR001922. NMFS fails to make any attempt in its analysis to account for economic benefits even though, as discussed below, it makes a presumptive account of the economic costs. AR001818−74.

By completely excluding any TED benefit from its comparative economic analysis, NMFS unlawfully skews its dollar-for-dollar economic calculations and fails to take a hard look at its final rulemaking. *See Hughes River*, 81 F.3d at 446. As described above, the value of TED

requirements is certainly not zero. NMFS claims it cannot quantify benefits because "the magnitude of these benefits is highly uncertain," AR001922, but NMFS's asserted inability to quantify *magnitude* does not suggest the values of known benefits of TEDs are as low as $0. *See High Country Conservation Advocs.*, 52 F. Supp. 3d at 1192. By failing to account for any value of these benefits, whether quantitatively or qualitatively, NMFS grossly mischaracterizes the economic effects of the action and impairs the agency's fair consideration of the effects of its action. *See Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d at 811–812.

In stark contrast to omitting benefits due to alleged "high uncertainty," NMFS incorporates multiple uncertain costs to the industry in its economic analysis. AR001818−74. For instance, NMFS projects gross and net revenue losses both in the near term first year as well as over the long term for each of the alternatives. *See, e.g.*, AR001822. Although it has no concrete data, NMFS makes—and relies on—assumptions as to which vessels operate full- or part-time and predicts an *exact* number of vessels that will shut down as a result of TED requirements under each alternative. *See, e.g.*, AR001823; AR001864−65. The analysis also assumes the number of nets and spare nets shrimpers will have on board their vessels to calculate the total TED purchase costs, without certainty as to the number of nets that shrimpers will actually use. *See, e.g.*, AR001821. The analysis even quantifies the indirect economic effects on dealers, processors, and TED manufacturers. AR001852−74. NMFS cannot plausibly use "uncertainty" as a shield to avoid including foregone economic benefits in its assessment when it has chosen to incorporate equally uncertain economic costs. *See Sierra Club v. Sigler*, 695 F.2d 957, 979 (5th Cir. 1983) (agency cannot "tip the scales of an EIS by promoting possible benefits while ignoring their costs"); *High Country Conservation Advocs.* 52 F. Supp. 3d at 1191 (unlawful for

agency to quantify the benefits of its actions but claim a similar analysis of costs was impossible).

NMFS chooses not to analyze *any* economic benefit resulting from TED use now foregone in the final TED Rule, and in the process, grossly overestimates the economic burden of its action. NMFS's economic analysis in the final EIS is inaccurate, incomplete, and misleading, in violation of NEPA. *See Hughes River*, 81 F.3d at 446.

**B.      NMFS fails to conduct supplemental environmental analyses of the substantial changes to its proposed action, in violation of NEPA (Count 4).**

NMFS further violates NEPA by failing to prepare a supplemental EIS after substantially changing its proposed action and relying on "new information" that allegedly had been significant enough to warrant the development of a new alternative. NMFS, however, fails to prepare a supplemental EIS to examine the impacts of such changes, in violation of NEPA.

An agency must prepare a supplemental EIS if the agency makes "substantial" changes to the proposed action or new information shows the action will affect the environment in a significant manner or to a significant extent not already considered. 40 C.F.R. § 1502.9(c)(1) (2019); *Marsh*, 490 U.S. at 374. Whether a change is "substantial" so as to warrant a supplemental EIS is "determined not by the modification in the abstract, but rather by the significance of the environmental effects of the changes." *Pub. Emps. for Env't Resp. v. U.S. Dep't of the Interior*, 832 F. Supp. 2d 5, 29–30 (D.D.C. 2011). A supplemental EIS is required "where new information provides a *seriously* different picture of the environmental landscape." *City of Olmsted Falls v. FAA*, 292 F.3d 261, 274 (D.C. Cir. 2002) (citations omitted). An agency must prepare a supplemental EIS if the new information affects the environment "in a significant manner or to a significant extent not already considered." *Marsh*, 490 U.S. at 361. NMFS is required to prepare a supplemental EIS under both prongs.

First, NMFS made a substantial change to its proposed action, omitting over 80 percent of the targeted vessels from the rulemaking. This substantial change will have significant environmental effects, as potentially 1,700 *more* threatened and endangered sea turtles will die every year compared to the original proposal. AR001662; *see supra* Fig. 1. For context, the proposed rule was expected to save a *minimum* of 1,700 sea turtles a year. *See supra* Fig. 1. This increase in deaths with the final TED Rule is particularly significant because NMFS's action could have severe and lasting long-term impacts on the chances of survival and recovery for multiple sea turtle populations, especially the critically endangered Kemp's ridley. *See supra* Argument § III.A.1. The final action's drastic increase in sea turtle deaths is significant enough to warrant the development of a supplemental EIS. *See Env't Def. Fund v. Marsh*, 651 F.2d 983, 993 (5th Cir. 1981) (supplemental EIS required because the 50 percent increase in land use had significant effects on the environment).

Second, insofar as NMFS relies on "new information" to justify the changes to its rule—and there is no evidence that it does, *see supra* Argument § I.B.—such reliance also triggers a duty to supplement the EIS. 40 C.F.R. § 1502.9(c)(1)(ii) (2019). NMFS asserts in the final rule that it obtained "new information indicating significantly lower levels of sea turtle mortality in the offshore fleet" significant enough to warrant the development and selection of an entirely new alternative. AR009457. If the "new information" is significant enough to warrant changing the rule, then it surely is "significant" enough to trigger the supplemental EIS requirement under NEPA. *See Marsh*, 490 U.S. at 361.

NMFS has not produced a supplemental EIS even though it substantially changed its proposed action and relies on purported "new information" to support its decision to implement a novel alternative. NMFS violates its NEPA obligations by failing to conduct the requisite

supplemental environmental analyses to account for the changes. 40 C.F.R. § 1502.9(c)(1) (2019).

## CONCLUSION

For the foregoing reasons, Conservation Groups request this Court declare the final rule and associated EIS unlawful, arbitrary, capricious, an abuse of discretion, and otherwise contrary to the APA and NEPA. The Court should remand the TED Rule without vacatur to NMFS, *see, e.g.*, *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1265 (D.C. Cir. 2007) (Rogers, J., concurring in part and dissenting in part) ("Where the court has concluded that a final rule is deficient, the court has traditionally not vacated the rule if doing so would have serious adverse implications for public health and the environment." (citing cases)); *Fertilizer Inst.*, 935 F.2d at 1312 (remanding without vacatur where removal of rule would risk environmental harm), and order the agency to prepare a new rule within six months that fully complies with the APA and NEPA.

Respectfully submitted this 12th day of November, 2021.

*/s/ Grace Bauer*
Grace P. Bauer (*pro hac vice*)
Stephen D. Mashuda (DDC Bar. WA0005)
Christopher D. Eaton (*pro hac vice*)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 | Telephone
415-217-2040 | Fax
gbauer@earthjustice.org
smashuda@earthjustice.org
ceaton@earthjustice.org

*Attorneys for Plaintiffs*