Case No. 1:21-CV-00930

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,
DEFENDERS OF WILDLIFE, and
TURTLE ISLAND RESTORATION NETWORK,

*Plaintiffs,*

v.

NATIONAL MARINE FISHERIES SERVICE,

GINA RAIMONDO, in her official capacity as Secretary of Commerce,

*Defendants.*

## OCEANA, INC.'S *AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS

Paul A. Werner
Imad S. Matini
Hannah J. Wigger
Charles H. Spencer-Davis
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2099 Pennsylvania Ave., N.W. Suite 100
Washington, D.C. 20006-6801
Tel. (202) 747-1931
Fax (202) 747-3817

*Counsel for Oceana, Inc.*

## TABLE OF CONTENTS

|  | Page |
|---|---|
| GLOSSARY | ii |
| CORPORATE DISCLOSURE STATEMENT | iii |
| IDENTITY OF THE AMICUS CURIAE | iv |
| INTRODUCTION | 1 |
| ARGUMENT | 2 |
| I. TEDs Are Proven, Effective Mechanisms For Preventing Sea Turtle Deaths And Benefit The Fisheries. | 2 |
| II. NOAA And OMB Have Refused To Adopt Effective TEDs Rules And Abide By Any Notice And Comment Procedures. | 6 |
| III. Defendants' Unlawful Conduct Related To The 2016 TEDs Rules Is Consistent With Their Habitual And Intentional Refusal To Abide By Their Statutory Obligations, And Necessitates Greater Judicial Oversight Here. | 9 |
|     i. NMFS Refuses To Provide Truthful And Accurate Information About Its Compliance With Its Statutory Obligations. | 9 |
|     ii. NMFS Will Not Comply With Its Statutory Obligations Absent A Court Order And Extensive Judicial Oversight. | 10 |
|     iii. NMFS Has A Long History Of Cherry Picking Data That Supports Its Preferred Conclusions. | 11 |
| CONCLUSION | 13 |

# GLOSSARY

**2016 TEDs Rule:** Sea Turtle Conservation; Shrimp Trawling Requirements, 81 Fed. Reg. 91,097 (proposed Dec. 16, 2016)

**2019 TEDs Rule**: Sea Turtle Conservation; Shrimp Trawling Requirements, 84 Fed. Reg. 70,048 (promulgated Dec. 20, 2019)

**APA**: Administrative Procedure Act

**Batched Fisheries Case:** *Oceana, Inc. v. Bryson et al.*, case no. 1:12-cv-00041 (D.D.C. 2012)

**BiOp**: Biological Opinion

**DOC**: United States Department of Commerce

**EIS**: Environmental Impact Statement

**EPA**: Environmental Protection Act

**ESA**: Endangered Species Act

**ITS**: Incidental Take Statement

**NEPA:** National Environmental Policy Act

**NMFS**: National Marine Fisheries Service

**NOAA**: National Oceanic and Atmospheric Administration

**Oceana**: Oceana, Inc.

**OMB**: Office of Management and Budget

**Sea Scallop Case:** *Oceana Inc. v. Gutierrez et al.*, case no. 1:08-cv-1881 (D.D.C. 2008)

**Shrimp Case:** *Oceana, Inc. v. Pritzker*, case no. 1:15-cv-555 (D.D.C. 2015)

**TEDs**: Turtle Excluder Devices

## CORPORATE DISCLOSURE STATEMENT

Oceana is a non-profit international advocacy organization. Oceana does not have any parent companies, subsidiaries, or affiliates which have a 10% or greater ownership interest in Oceana. *See* Fed. R. Civ. P. 26.1.

# IDENTITY OF THE AMICUS CURIAE

Pursuant to Rule 7(o), Oceana, Inc. ("Oceana"), states the following:

1. Oceana is the largest international ocean conservation organization solely devoted to protecting the world's oceans. Oceana is dedicated to protecting and restoring the world's oceans through policy, advocacy, science, law, and education. For over twenty years, Oceana has pursued strategic, directed campaigns to achieve measurable outcomes to increase the biodiversity and abundance of our oceans. Oceana has over 1.2 million members and supporters in the United States, including over 340,000 members and supporters along the East Coast of the United States. Oceana is a non-profit organized under the laws of the District of Columbia, and maintains its headquarters in Washington, D.C. It has offices or staff in twelve states (Alaska, California, Florida, Georgia, Massachusetts, Maryland, New York, North Carolina, South Carolina, Oregon, Virginia, and Washington) and twelve foreign countries (Belgium, Belize, Brazil, Canada, Chile, Denmark, Mexico, Peru, the Philippines, Spain, Switzerland, and the United Kingdom). Oceana has been, and continues to be, a prominent advocate for protecting threatened and endangered marine species – including threatened and endangered sea turtles – and promoting environmentally and economically sustainable fisheries. Oceana is a leading advocate for the use of Turtle Excluder Devices ("TEDs") and Turtle Deflector Dredges in U.S. fisheries in the Atlantic to reduce sea turtle bycatch and deaths.

As an organization dedicated to preserving endangered species – including reducing sea turtle deaths caused by U.S. fisheries – Oceana and its members and supporters have a strong interest in challenging the unlawful 2019 TEDs rule promulgated by NMFS. Oceana's decade of experience litigating against NMFS in similar challenges prompted the development of the latest TEDs rule and other agency actions to better protect sea turtles. As a result, Oceana has a unique perspective regarding the 2019 TEDs rule and the government's development of the rule as well

as other fishery management measures related to sea turtles that will assist the Court in understanding and deciding the issues before it.

2. Oceana and its Counsel authored this brief in whole without authoring or input from any counsel to any party in this matter.

3. No party or a party's counsel contributed money intended to fund the preparation or submission of this brief.

4. No person other than the amicus curiae, its members, or its counsel contributed money that was intended to fund the preparation or submission of this brief.

**INTRODUCTION**

As the world's largest international ocean conservation organization, Oceana is dedicated to protecting threatened and endangered marine life, including sea turtles. Part of Oceana's campaign to protect the world's oceans has included advocating for regulations requiring fishermen to deploy turtle excluder devices – a.k.a., TEDs – on their vessels. TEDs allow sea turtles and other wildlife inadvertently caught in fishing nets to escape through a hatch built into the end of the net. If used correctly, TEDs can reduce sea turtle bycatch by a staggering 97%.

Because TEDs are such an effective tool, Oceana has advocated to expand their use for many years. As a result of Oceana's advocacy, NMFS proposed a TEDs rule in December 2016 that would have required TEDs with 3-inch bar spacing on all vessels using skimmer trawls, pusher-head trawls, and wing nets in the shrimp fisheries of the South Atlantic and Gulf of Mexico ("2016 TEDs rule"). That rule would have protected thousands of threatened and endangered sea turtles.

Unfortunately, the 2016 TEDs rule was never adopted. Instead, after NOAA submitted it to the Office of Management and Budget ("OMB"), the agency gutted it – without notice or comment – and published a final rule that only applied to vessels 40 feet or greater. That arbitrary decision is the subject of the Plaintiffs' lawsuit.

While Oceana has spent many years fighting to implement TED regulations, it has also pursued litigation against NMFS to require the agency to comply with its regulatory and statutory obligations. Beginning in 2008, Oceana challenged the agency's biological opinions related to the sea scallop fishery (*Oceana Inc. v. Gutierrez et al.*, case no. 1:08-cv-1881 (D.D.C. 2008) ("Sea Scallop Case")), "batched" fisheries, which include eight fisheries (*Oceana, Inc. v. Bryson et al.*, case no. 1:12-cv-00041 (D.D.C. 2012) ("Batched Fisheries Case")), and shrimp fishery (*Oceana, Inc. v. Pritzker*, case no. 1:15-cv-555 (D.D.C. 2015) ("Shrimp Case")). In each

case, Oceana alleged NMFS violated the Administrative Procedure Act ("APA") and Endangered Species Act ("ESA") by failing to set enforceable take limits or adequately monitor sea turtle takes, failing adequately to explain its conclusion that the fisheries would not jeopardize the continued existence of threatened and endangered sea turtles, and failing to consider the best available science. Oceana ultimately prevailed in each suit, notwithstanding the government's misrepresentations, refusals to abide by the Court's orders or its statutory obligations, and serial efforts to evade review.

Because of Oceana's experience with TED regulations and litigation against NMFS, Oceana is uniquely positioned to assist the Court here. As explained below, and as the government recognizes, TEDs are effective and cost efficient devices that save thousands of threatened and endangered sea turtles. But while NOAA submitted a TEDs rule to OMB that would have significantly benefited threatened and endangered wildlife, OMB arbitrarily demanded NOAA re-write the regulation without any opportunity for notice and comment. The result is a regulation that is contrary to law.

## **ARGUMENT**

**I.    TEDs Are Proven, Effective Mechanisms For Preventing Sea Turtle Deaths And Benefit The Fisheries.**

TEDs present a "win-win" way to protect endangered sea turtles and provide substantial benefits to the fishing and tourism communities. When used properly, TEDs can "protect marine life, open new markets for shrimpers, boost nature-based tourism, and leave more fish in the sea for other fisheries." TEDs for All Trawls: A Net Positive for Fishermen and Sea Turtles (May 2016), Benjamin Carr et al., Exhibit A at 2 ("TEDs for All Trawls").

In essence, TEDs are escape hatches built into shrimp trawl nets that allow sea turtles to escape out of the net through a flap of netting.[1] TEDs have bar spacings that determine what goes in the net and what gets ejected out the escape hatch. Without TEDs, sea turtles can become trapped in the nets and suffocate to death, as well as suffer severe and mortal injuries while tangled in them.

TEDs are a proven, cost-effective method of saving sea turtles from drowning as bycatch.[2] Shrimp trawling "has one of the highest bycatch rates among current fishing practices in the world." *See* TEDs for All Trawls, Exhibit A at 1. In the Gulf of Mexico alone in 2013 the "shrimp trawl fishery discarded an estimated 242 million pounds of seafood and ocean wildlife – about 62 percent of its total catch." *Id.* Shrimp trawl nets "come into contact with endangered and threatened sea turtles half-a-million times a year" and are estimated to result in *50,000 deaths*." *Id.* (emphasis added); *see also* What's In An Inch? The Case for Requiring Improved Turtle Excluder Devices in All U.S. Shrimp Trawls (2016), OCEANA, INC., Exhibit B at 2 ("What's In An Inch") (the "Southeast shrimp trawl fishery interacts with [threatened and endangered] sea turtles over 500,000 times a year, resulting in tens of thousands of deaths"). But TEDs drastically reduce shrimp trawl bycatch: When used properly, TEDs "are 97 percent effective at allowing captured turtles to escape." TEDs for All Trawls, Exhibit A at 1; *see also* What's In An Inch, Exhibit B at 2.

Both NMFS and NOAA recognize TEDs prevent bycatch by U.S. shrimp fishery trawls, and that poor TEDs compliance leads directly to more sea turtle deaths. In an internal email exchange from March 2016, NMFS acknowledged that "TEDs are effective at excluding sea

---

[1] D. Allison, et al., *U.S. Sea Turtles: A Comprehensive Overview of Six Troubled Species,* OCEANA, at 24-26 (attached as Exhibit C).
[2] "Bycatch" refers to marine wildlife inadvertently caught in commercial fishing nets.

turtles." Email from Michael Barnette to Jeff Gearhart (April 8, 2016, 11:16 AM) (attached as Exhibit D). This email predates the initial 2016 TEDs rule proposed by NMFS, demonstrating NMFS has long understood the benefit and necessity of TEDs requirements. NOAA has also explained in public proceedings that there is "significant information and documented evidence" showing that "poor TED compliance directly translates into increased sea turtle mortality." NOAA Response Letter to Public Comments, at 4 (attached as Exhibit E).

TEDs with narrow bar spacing are especially effective mechanisms for reducing sea turtle mortalities. For example, where a TED's bars are three, rather than four, inches apart, the TED "reduces fish bycatch by an additional 25 percent." TEDs for All Trawls, Exhibit A at 5. And the benefits are even greater depending on the species of sea turtle. For Kemp's ridley sea turtles, reducing the bar spacing by one inch saves "222 percent more" turtles. What's In An Inch, Exhibit B at 5. Thus, "requir[ing] all trawls to use smaller-spaced TEDs, including trawls that currently use the original TEDs, as well as increas[ing] enforcement and observer coverage in this fishery . . . would help sea turtle populations recover, open new markets to Southeast shrimp fishermen, reduce fish bycatch and help maintain a strong tourism industry." TEDs for All Trawls, Exhibit A at 5.

TEDs are also cost-effective for fisheries. On average, TEDs require only an upfront cost of approximately $150 to $350 per TED. *See* Louisiana Department of Wildlife & Fisheries, *Gov. Edwards announces program to help Louisiana shrimpers* (Oct. 13, 2020) (attached as Exhibit T).

In addition to protecting endangered and threatened wildlife, TEDs also can provide substantial economic benefits to shrimp fisheries and their local economies in a variety of ways. *First,* TEDs reduce labor and fuel costs for shrimping vessels. The reduction of bycatch from

proper TEDs usage "reduces the time that crews ha[ve] to spend sorting out the targeted shrimp from other non-target species." TEDs for All Trawls, Exhibit A at 6. With fewer non-target species caught in the net, shrimp vessels save on the time-intensive labor of removing species such as sea turtles – which can each weigh upwards of 500 pounds – from the catch. TEDs can also reduce fuel consumption as less bycatch reduces the weight of the net the boat pulls. *Id.* at 6-7. Pulling the net accounts for "70 percent of the fuel used by shipping vessels." *Id.* Even a slight reduction in fuel usage by each vessel meaningfully reduces overall fishing costs.

*Second*, the proper use of TEDs "grant[s] shrimpers access to retail markets that only buy shrimp from fisheries that are not red-listed," that is, fisheries that groups like the Monterey Bay Aquarium's Seafood Watch have labeled sustainable. TEDs for All Trawls, Exhibit A at 5.[3] More than 13,000 outlets across the country will not purchase products from red-listed shrimp fisheries. *Id.* at 6. Simply by requiring TEDs on all trawls the southeast shrimp fisheries can dramatically expand their market. *Id.*

*Third*, by saving more endangered and threatened sea turtles, TEDs "attract tourists to coastal towns in the South Atlantic and Gulf of Mexico." In those regions,"[n]ature-based tourism provides direct income to local residents through tours and dives and through other travel spending like lodging, food, transportation and fuel." TEDs for All Trawls, Exhibit A at 9. In 2011 alone, "more than 11.5 million tourists visited Gulf states . . . for wildlife viewing, spending $6.5 billion and generating $2 billion in federal, state and local taxes." *Id.* Requiring TEDs on all trawls – especially the TEDs with narrower bar spacing – will allow more sea turtles

---

[3] "Shrimp from fisheries without TED requirements (specifically skimmer) are red-listed by Monterey Bay Aquarium's Seafood Watch—a designation that urges consumers to avoid these products due to high levels of bycatch." TEDs for All Trawls, Exhibit A at 6.

to escape shrimp nets, and as more sea turtles survive and populations recover, "tourists can continue to observe sea turtles" to the great benefit of the local economies. *Id.* at 10.

## II. NOAA And OMB Have Refused To Adopt Effective TEDs Rules And Abide By Any Notice And Comment Procedures.

Despite the well-recognized benefits of TEDs, NOAA and OMB promulgated a TEDs rule that would protect substantially fewer endangered sea turtles – almost *54% fewer* than would have been protected under properly adopted and enforced TEDs rules. In the process, OMB has refused to abide by lawful agency rulemaking procedures and short-circuited the notice and comment process, attempting to make decisions "behind closed doors and without a record." Shrimp Fisheries Case, Dkt. 38, at 29 (attached as Exhibit F).

The 2016 TEDs Rule provided NOAA with an opportunity to comply with its statutory obligations to ensure the continued existence and recovery of sea turtles, as required under the Endangered Species Act and other federal laws. *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 (1978) ("The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost."). The 2016 proposed TEDs rule would have required TEDs with 3-inch bar spacing *on all* vessels using skimmer trawls, pusher-head trawls, and wing nets in the shrimp fisheries of the South Atlantic and Gulf of Mexico. Sea Turtle Conservation; Shrimp Trawling Requirements, 81 Fed. Reg. 91,097 (proposed Dec. 16, 2016) (attached as Exhibit U). The agency in fact determined and agreed that expanding the use of TEDs to all trawl vessels was "necessary and advisable" to conserve sea turtle species. *Id.* at 91,109. If adopted, the 2016 TEDs Rule would have significantly reduced annual sea turtle deaths because approximately 5,837 fishing vessels would have had to use the narrow-bar TEDs. *Id.* at 91,099-100.

But NMFS and NOAA, along with OMB, side-stepped lawful agency procedures to avoid adopting the 2016 TEDs Rule.  NMFS and NOAA submitted the proposed TEDs rule to OMB on June 29, 2017, after which the rule changed substantially and without any notice and comment procedures.  *See* Email from Interagency Reviews to Matthew Oreska (Dec. 12, 2018 5:03 PM) (attached as Exhibit G).  At first, OMB wanted to "amend the alternative tow time restriction to require all skimmer trawl vessels 26 feet and greater in length to use turtle excluder devices (TEDs)."  Email from Jim A. Laity to Stuart Levenbach (Jul. 24, 2017, 5:37 PM) (attached as Exhibit H).  The revision also "exempt[ed] two gear types from the TED requirement."  Email from James A. Laity to Stuart Levenbach (Jul. 7, 2017, 12:40 AM) (attached as Exhibit I).   But the agencies did not articulate a reasoned explanation for gutting the proposed TEDS rule.

Internal correspondence makes abundantly clear that the decision to modify the TEDs rule so that it applied to fewer vessels had nothing to do with complying with the ESA, APA, or any other vital statutory requirements.  Rather, it resulted from private business and economic pressures.  Internal emails reveal that OMB stated it had "met with several shrimp fishermen this week to discuss NOAA's final rule on shrimp trawling requirements . . . [and] [t]hey expressed significant concerns with the rule."  Email from Stuart Levenbach to Neomi J. Rao et al. (July 21, 2017, 5:16 PM) (attached as Exhibit J).  OMB "estimated that the draft final rule would result in 780 vessels out of roughly 9,700 potentially affected vessels to leave the fishery."  *Id.*  NOAA and the Department of Commerce noted the "optimal breakpoint on vessel length (turtle savings vs economics)."  Email from Chris Oliver to James Uthmeier (Sept. 6, 2017, 9:45 PM) (attached as Exhibit K).  None of these discussions or meetings were made public.

Then, throughout September of 2017, OMB pressured the Department of Commerce and NOAA to nix the proposed rule altogether. Despite more than 25,000 petition emails urging the adoption of the proposed TED rule for all trawls, the Department of Commerce confirmed the proposed rule is "one of the rules OMB is pushing us to modify or not adopt." Email from Earl Comstock to James Rockas et al. (Sept. 21, 2017, 3:43 PM) (attached as Exhibit L). The Secretary of Commerce proposed further limiting the TED Rule to apply only to "40' and up" vessels and later "assess[ing] the results." Email from Earl Comstock to Chris Oliver (Nov. 11, 2017, 5:11 PM) (attached as Exhibit M). The Department of Commerce stated it "would be better if someone has to impose" the TED regulations, "that it is the court rather than [Department of Commerce and NOAA]." Email from Christ Oliver to Earl Comstock (Oct. 31, 2017, 12:57 PM) (attached as Exhibit N).

Months after these exclusively internal discussions, NOAA withdrew the proposed 2016 TEDs Rule from OIRA review without explanation. Email from Asha Mathew to Matthew P. Oreska (Feb. 26, 2018, 11:28 AM) (attached as Exhibit O). On that same day, OMB sent an internal email stating it "expect[s] to receive a revised final rule in March or April [2018] that exempts vessels <40' in length from the turtle excluder device requirement." Email from Matthew P. Oreska to Neomi J. Rao (Feb. 26, 2018, 6:26 PM) (attached as Exhibit P). This unsupported decision came to fruition on December 12, 2018, when OMB circulated a "revised version of [the] draft final rule" that required "skimmer trawl vessels greater or equal to 40 feet in length to install turtle excluder devices in their fishing nets." *See* Exhibit G.

This proposed draft final version of the TEDs rule significantly departed from the original proposed rule – or any of the alternatives originally identified by the agency. *Id.*

*(*confirming it had been more than a year since any interagency review, and nearly ten months since NOAA withdrew the proposed 2016 TEDs Rule from OMB).

In short, eight months after the proposed 2016 TEDs Rule entered OMB on June 29, 2017, OMB and DOC rejected the 2016 TEDs Rule and replaced it through internal meetings and discussions while avoiding any public procedures or comment process. At no point did it offer any public explanation for its changed policy or the new rule – let alone why it operated "behind closed doors and without a record." *See* Shrimp Case, Dkt. 38, at 29 (attached as Exhibit F).

### III. Defendants' Unlawful Conduct Related To The 2016 TEDs Rules Is Consistent With Their Habitual And Intentional Refusal To Abide By Their Statutory Obligations, And Necessitates Greater Judicial Oversight Here.

The 2016 TEDs rule proceedings are only one example of the agency's chronic delay and intentional refusal to comply with statutory obligations. This has become a standard operating procedure that Oceana knows all too well after litigating multiple cases challenging the agency's unlawful conduct in related proceedings. Oceana's long history of litigating against NMFS illustrates the agency's willingness to make misrepresentations to the Court, turn a blind eye to data it does not like, and ignore remand orders. The Court should consider this history in evaluating the agency's representations and timelines, and hold the agency to its clear statutory obligations.

#### i. NMFS Refuses To Provide Truthful And Accurate Information About Its Compliance With Its Statutory Obligations.

Oceana's Sea Scallop Case against NMFS and NOAA demonstrates the agency's willingness to misrepresent facts. There, the agency misled the Court regarding whether the sea scallop fishery had exceeded the number of sea turtles takes allowed under the applicable ITS. At oral argument, the agency denied its take limit had ever been exceeded, stating "if it had been,

'that would have triggered the consultation obligation.' " Sea Scallop Case, Dkt. 155, at 22 (attached as Exhibit Q). But less than a month after oral argument, NMFS filed a notice of reinitiation of consultation that admitted the agency had exceeded its take limit *in two prior years* – but the agency failed to reinitiate consultation, as required by the ESA. *Id.*, Dkt. 155, at 20-21; Sea Scallop Case, Dkt. 150-1, at 2 (attached as Exhibit R). Even worse, the agency had known it was under an obligation to reinitiate consultation since the spring of 2019 – almost *a full year* before oral argument. *Id.*

While the agency later feigned ignorance, the court saw through agency's excuses. Sea Scallop Case, Dkt. 150-1, at 2-3 (attached as Exhibit R); Sea Scallop Case, Dkt. 155, at 21 (attached as Exhibit Q). As Judge Friedman made clear, the agency's misrepresentations "illuminate[d] the conduct and credibility of the agency, necessitating the need for greater judicial oversight." Sea Scallop Case, Dkt. 155, at 23-24 (attached as Exhibit Q). The Court should be cognizant of the agency's past willingness to dodge statutory obligations as it evaluates the agency's conduct here.

    **ii.**     **NMFS Will Not Comply With Its Statutory Obligations Absent A Court Order And Extensive Judicial Oversight.**

Even where courts order the agency to comply with its statutory obligations, NMFS often refuses to comply with the remand orders without extensive judicial oversight and direction. Oceana's three cases against NMFS resulted in *five remand orders*. In the Sea Scallop Case alone, Oceana sought – and obtained – three remand orders on the same issue related to NMFS's failure adequately to monitor sea turtle takes. In ordering a third remand, Judge Friedman stated "[t]wo remands and eight years later, the unfortunate reality is that this case is in the same position as it was when summary judgment briefs were originally filed . . . NMFS has failed to explain how its proposed monitoring surrogate of dredge hours is an adequate proxy for the

numerical take limit established in the ITS." Sea Scallop Case, Dkt. 155, at 18 (attached as Exhibit Q). NMFS subsequently issued an entirely new BiOp.

Similarly, in the Shrimp Case, the court granted Oceana's motion for summary judgment in part on an almost identical issue, ordering the agency to explain how "effort levels" are a meaningful proxy for sea turtle takes by the shrimp fisheries. *See* Shrimp Case, Dkt. 38, at 27–30 (attached as Exhibit F). In other words, the court remanded the shrimp biological opinion to the agency for further explanation of the same base issue it flagged for NMFS in the Sea Scallop Case in 2014. *See* Sea Scallop Case, Dkt. 109, at 42-43 (attached as Exhibit S).[4]

In evaluating the agency's representations and conduct, the Court should bear in mind the agency's need for extensive oversight to comply with judicial instructions.

### iii. NMFS Has A Long History Of Cherry Picking Data That Supports Its Preferred Conclusions.

Oceana's litigation against NMFS has also highlighted the agency's willingness to present pseudo statistics as fact to justify its actions.

For example, in the Sea Scallop Case, the agency employed dredge effort (*i.e.*, the number of hours fishermen spent dredging) as a surrogate for sea turtle takes. The court repeatedly ordered it to explain how a dredge hour was related to any particular number of turtle takes. Sea Scallop Case, Dkt. 155, at 12 (attached as Exhibit Q).

---

[4] NMFS also often asks for, and receives, months to respond to remand orders and engages in other tactics to make its actions practically unreviewable. *See, e.g.*, Sea Scallop Case at Dkts. 110, 130 & 154 (showing more than 3.5 years between the first and second remand, and more than 2 years between the second and third remand). When the agency does not actually comply with the remand orders, it takes entities challenging the agency's response many more months—or years—to obtain a second or third remand. *Id.* But if the agency publishes BiOps with five or ten year terms, it becomes impossible to challenge the agency action before the agency issues a new BiOp, mooting the challenge and starting the process over again. *See Oceana v. Raimondo*, Case No. 20-5362 (D.C. Cir. 2020).

In response, the agency put forward a graph with a few data points and a line drawn through the data, asserting "the relationship between dredge hours and takes [i]s a strong positive linear relationship." *Id.* When Oceana challenged the agency's statistical modeling, the agency "did an about-face and expressly disclaimed any reliance on a predictive, linear relationship." *Id.* The Court noted the agency "left things precisely where they were prior to remand – without sufficient basis to believe that 359,757 dredge hours will serve as an adequate proxy for 161 takes." *Id.* at 12–13. The court remanded to the agency a second time.

The third time around, NMFS presented the same graph, stating it merely showed a "positive relationship" between dredge hours and takes, but was "not intended to be. . . predictive." *Id.* at 13. So the Court remanded to the agency a third time, stating "[i]n doubling down on the explanation that the Court already found insufficient, NMFS has failed to address the specific issues remanded by the Court, as it is required to do." *Id.* at 14.

In the six years between the court's first and third remands, NMFS continued to present the same flawed data to the court, even after the court rejected it twice. This Court should not allow NMFS to present poorly reasoned statistics in this case.

In this case, the agency is once again pushing questionable math to prove its point. For example, NMFS is manipulating the data related to sea turtle takes by creating an arbitrary mortality rate for all sea turtles, rather than each species. Plaintiffs' Mot. at 30. And it refuses to analyze each species' survival and recovery in light of its existing baseline population levels. *Id.* at 31. In other words, NMFS has no idea if any given number of deaths of Kemp's ridley sea turtles will have any effect on the species' recovery, or push it over the edge into extinction. *Id.* at 30-31 (stating shrimp trawlers take a disproportionate number of Kemp's ridley turtles). The Court should not allow the agency to manipulate or misstate the data on which it purports to rely.

## **CONCLUSION**

The Court should grant Plaintiffs' motion for summary judgment and hold the agency to the six month timeline Plaintiffs propose.

Dated: November 19, 2021

Respectfully submitted,

By: _____
Paul Werner
Imad Matini
Hannah Wigger
Charles Spencer-Davis
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
2099 Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006-6801
Tel. (202) 747-1931
Fax (202) 747-3817
pwerner@sheppardmullin.com
imatini@sheppardmullin.com
hwigger@sheppardmullin.com
cspencerdavis@sheppardmullin.com

*Counsel for Oceana, Inc.*

## CERTIFICATE OF SERVICE

I certify that on November 19, 2021, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

_____
Paul A. Werner