**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY;
DEFENDERS OF WILDLIFE; and
TURTLE ISLAND RESTORATION
NETWORK,

        Plaintiffs,

     v.                                    Civil Case No. 1:21-cv-930-BAH

NATIONAL MARINE FISHERIES
SERVICE; and GINA RAIMONDO, in her
official capacity as Secretary of the United
States Department of Commerce,

        Defendants.

**Federal Defendants' Combined Memorandum in Response to
Plaintiffs' Motion for Summary Judgment
and in Support of Cross-Motion for Summary Judgment**

Table of Contents

I.      INTRODUCTION ............................................................................................. 2

II.     BACKGROUND ............................................................................................. 2

        A.      STATUTORY AND REGULATORY FRAMEWORK ....................................... 2

                1.      The Endangered Species Act ................................................... 2

                2.      The National Environmental Policy Act.................................... 3

        B.      FACTUAL BACKGROUND ............................................................. 5

III.    STANDARD OF REVIEW .............................................................................. 9

IV.     ARGUMENT ............................................................................................. 10

        A.      NMFS complied with the APA by providing a rational justification for the
                final TED Rule.............................................................................. 10

                1.      NMFS adequately explained the basis of its decision to change the
                        preferred alternative based on comments received (Count 1). ............... 11

                2.      NMFS's decision to limit TED requirements to skimmer trawl
                        vessels 40 feet and greater is supported by the record (Count 2). ........... 18

        B.      NMFS's 40-foot final rule is a logical outgrowth of the proposed rule
                (Count 3). ................................................................................... 22

        C.      NMFS complied with NEPA. .......................................................... 24

                1.      NMFS took a hard look at the Final Rule's environmental effects by
                        considering its impact on all affected sea turtles and analyzing
                        relevant qualitative and quantitative economic data (Count 5). ............... 25

                        a.      NEPA does not dictate an analysis on individual sea turtle
                                species. ..................................................................... 26

                        b.      NMFS properly considered all economic benefits and
                                detriments of the Final Rule......................................... 32

                2.      NMFS was not required to conduct a supplemental environmental
                        analysis because the impacts associated with the Final Rule were
                        within the range of impacts analyzed in the DEIS (Count 4). ................. 36

        D.      Plaintiffs' requested remedy is untenable. ......................................... 40

V.      CONCLUSION............................................................................................. 40

# I. INTRODUCTION

Plaintiffs in this case challenge the final rule promulgated by the National Marine Fisheries Service ("NMFS") addressing the use of turtle excluder devices ("TEDs") in the skimmer trawl sector of the southeastern U.S. shrimp fisheries. Sea Turtle Conservation; Shrimp Trawling Requirements; Final Rule, 84 Fed. Reg. 70,048-01 (Dec. 20, 2019) ("Final Rule"). The purpose of the Final Rule is to reduce incidental bycatch and mortality of sea turtles in the southeastern U.S. shrimp fisheries and to aid in the protection and recovery of sea turtles listed under the Endangered Species Act ("ESA"). *Id.* at 70,048 However, Plaintiffs allege violations of the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA") resulting from NMFS's decision not to require TEDs on vessels shorter than 40 feet.

NMFS's proposed rule proposed to require TEDs on almost all vessels in the southeastern U.S. shrimp fisheries. Sea Turtle Conservation Shrimp Trawling Requirements; Proposed Rule, 81 Fed. Reg. 91,097-01 (Dec. 16, 2016), AR002154 ("Proposed Rule"). In response to the Proposed Rule, NMFS received extensive public comments, including comments that questioned both the anticipated conservation benefits of TEDs, *see* AR002060-62, and the practicability of using TEDs on smaller vessels. *See* AR002063-66. In addition, some commenters raised serious concerns about the economic effects of the TED requirement in the Proposed Rule. AR002053-57. NMFS determined that if it required TEDs on the vessels as provided in the Proposed Rule, 2,810 vessels (48% of vessels affected by the TED requirement in the Proposed Rule) were expected to discontinue fishing. As a result, the Final Rule limited the size threshold for vessels subject to the TED requirement to those 40 feet in length or greater. NMFS determined that this change in the proposed action would provide conservation benefits (801-1,158 fewer annual sea turtle mortalities than under the status quo), AR001810, while

causing many fewer vessels to shut down in relation to the TED requirement described in the Proposed Rule, AR001865. As explained below, the agency's rationale for changing its preferred action is supported by the record before the Court, and the Final Rule complies with the requirements of the ESA and NEPA.

## II. BACKGROUND

## A. STATUTORY AND REGULATORY FRAMEWORK

### 1. The Endangered Species Act

In 1973, Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species . . . ." 16 U.S.C. § 1531(b). To accomplish that goal, Congress directed the Secretary of the Interior and the Secretary of Commerce to list endangered and threatened species and designate their critical habitat.[1] *See* 16 U.S.C. § 1533. An endangered species is one "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A threatened species "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). As provided in Section 7 of the ESA, federal agencies have a duty to avoid jeopardizing listed species and destroying or adversely modifying listed species' designated critical habitat. 16 U.S.C. § 1536(a)(2).

Once a species is listed as endangered or threatened, some provisions of the ESA help NMFS ensure the survival and recovery of the species. *See, e.g.,* 16 U.S.C. § 1533(f)

---

[1] Responsibility for the ESA is divided between the Secretary of the Interior and the Secretary of Commerce. The Secretary of the Interior, who is generally responsible for all terrestrial species, has delegated its responsibility to the U.S. Fish and Wildlife Service. The Secretary of Commerce, who is responsible for most marine species, including sea turtles in the ocean, has delegated its responsibility to NMFS.

(requirement to develop and implement recovery plans for listed species). ESA Section 9

contains certain prohibitions, including "take,"[2] that apply to endangered species. 16 U.S.C. §

1538(a)(1). NMFS has the discretion to extend those prohibitions to threatened species or to

issue other regulations to protect threatened species. Under ESA Section 4(d)

> [w]henever any species is listed as a threatened species . . . the Secretary shall
> issue such regulations as he deems necessary and advisable to provide for the
> conservation of such species. The Secretary may by regulation prohibit with
> respect to any threatened species any act prohibited under [section 9(a)(1)], in the
> case of fish or wildlife . . . .

16 U.S.C. § 1533(d). Thus, under the second sentence of Section 4(d), the Secretary "may"

extend the Section 9(a)(1) prohibitions to threatened species. The Secretary of Commerce has

extended the Section 9(a)(1) prohibitions to threatened turtles through 50 C.F.R. § 223.205.

Pursuant to ESA Section 11(f), NMFS has broad authority to promulgate "such regulations as

may be appropriate to enforce this chapter." 16 U.S.C. § 1540(f).

**2.      The National Environmental Policy Act**

The National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4370h, requires

federal agencies to examine the environmental effects of proposed federal actions and to inform

the public about those effects. 42 U.S.C. § 4332(2)(C). NEPA does not mandate particular

substantive results, but instead prescribes a process to ensure that agencies are fully informed of

the environmental consequences of their projects. *See Robertson v. Methow Valley Citizens*

*Council*, 490 U.S. 332, 350-51 (1989); *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def.*

*Council, Inc.*, 435 U.S. 519, 558 (1978). While NEPA requires agencies to take a "hard look" at

environmental effects, inherent in NEPA's procedural requirements is a "rule of reason" that

---

[2] Under the ESA, "[t]he term 'take' means 'to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.' 16 U.S.C. § 1532(19).

relieves agencies of the obligation to consider every conceivable environmental effect. *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 373-74 (1989); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767-68 (2004).

Under NEPA, whenever an agency proposes a "major Federal action[] significantly affecting the quality of the human environment," it must prepare an environmental impact statement ("EIS"). 42 U.S.C. § 4332(2)(C); *Town of Cave Creek v. FAA*, 325 F.3d 320, 327 (D.C. Cir. 2003). An EIS must "provide [a] full and fair discussion of significant environmental impacts" so as to "inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1 (2019)[3]. Where an agency provides a full and fair discussion of environmental impacts, and its EIS includes the necessary components, the agency has satisfied NEPA by taking the requisite "hard look" at environmental consequences. *The Lands Council v. McNair,* 537 F.3d 981, 1000-01 (9th Cir. 2008) (en banc) (*overruled on other grounds by Winter v. Nat. Res. Def. Council Inc.*, 555 U.S. 7 (2008)).

NEPA also requires federal agencies to prepare supplements to NEPA documentation when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(d)(1)(ii) (2019). As this Circuit has observed, "[t]he NEPA process involves an almost endless series of judgment calls," and "[i]t is of course always possible to explore a subject more deeply and to discuss it more thoroughly." *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987). However, because "[t]he line-drawing decisions necessitated by this fact of life are

---

[3] NEPA's implementing regulations were amended in 2020. However, because NMFS promulgated the Final Rule in 2019, the pre-2020 NEPA regulations are applicable to the case at bar. Unless otherwise noted, all other citations to regulations are to the current versions.

vested in the agencies, not the courts," the role of the courts "is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Id.* (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97-98 (1983)).

## B.    FACTUAL BACKGROUND

Five species of sea turtles occur in U.S. waters:  Kemp's ridley, loggerhead, leatherback, green, and hawksbill.  Each of these sea turtle species has been listed by NMFS as either endangered or threatened under the ESA.  50 C.F.R. § 223.102(e) (enumeration of threatened sea turtles); *id.* § 224.101(h) (enumeration of endangered sea turtles).  In June 1987, NMFS issued regulations under its authority under the ESA Section 4(d) to protect sea turtles.  Sea Turtle Conservation Shrimp Trawling Requirements; Final Rule, 52 Fed. Reg. 24,244-01 (June 29, 1987).  These regulations require that shrimp trawlers[4] trawling in offshore waters from North Carolina through Texas use a NMFS-approved TED[5] in each net during certain times of the year in specific areas.  *Id.* at 24,244; 50 C.F.R. § 223.206(d)(2).  These regulations were reviewed and upheld in *Louisiana ex. rel. Guste v. Verity*, 681 F.Supp. 1178 (E.D. La. 1988), *aff'd,* 850 F.2d 211 (5th Cir. 1988) (per curiam), *opinion issued,* 853 F.3d 322 (5th Cir. 1988).  *See also Earth Island Inst. v. Christopher*, 913 F.Supp. 559, 563 n.1 (Ct. Int'l Trade 1995) (discussing regulatory requirements for use of approved TEDs in waters of the Gulf of Mexico and the Atlantic Ocean).

---

[4] A shrimp trawler is a type of fishing vessel equipped with trawl nets that fishes for shrimp, or whose on-board or landed catch is greater than one percent by weight of all the fish on board.  50 C.F.R. § 222.102.
[5] A TED is "a device designed to be installed in a trawl net forward of the cod end for the purpose of excluding sea turtles from the net."  50 C.F.R. § 222.102.

As part of a settlement reached in *Turtle Island Restoration Network et al. v. NMFS*, Case No. 1:11-cv-01813-ABJ (D.D.C.), NMFS agreed to publish a proposed rule to require TED use in certain trawl types including skimmer trawls.  NMFS published the proposed rule on May 10, 2012.  Proposed Rule; Request for Comments and Public Notice, 77 Fed. Reg. 27,411-01 (May 10, 2012).  During the development of that proposed rule, NMFS placed observers on skimmer vessels to collect additional data on the nature and extent of sea turtle interactions with the gear. The resulting data ultimately led the agency to withdraw the final rule on February 7, 2013. Proposed Rule Withdrawal, 78 Fed. Reg. 9,024-01 (Feb. 7, 2013).  Most of the sea turtles observed were small enough to pass between the required maximum four-inch bar spacing of the approved TED configurations, thereby negating much of the sea turtle conservation benefit expected from the recently proposed TED requirement.  *Id.* at 9,025; *See also* Proposed Rule, 81 Fed. Reg. at 91,097.

Following the withdrawal of the proposed rule, NMFS did additional testing and developed new TED configurations designed to allow small turtles to effectively escape the trawl nets.  Proposed Rule, 81 Fed. Reg. at 91,098, AR002154-55.  In response to litigation in *Oceana, Inc. v. Pritzker*, No 1:15-cv-00555-PLF (D.D.C.), NMFS agreed to publish another proposed rule requiring TEDs for additional gear types including skimmer trawls, pusher-head trawls, and wing nets.  NMFS published that proposed rule on December 16, 2016.  81 Fed. Reg. 91,097.  NMFS proposed to require use of the new TED design in all skimmer trawls, pusher-head trawls, and wing nets. 81 Fed. Reg. 91,097.  The proposed rule also contained minor modifications to the definition of "tow time" and minor changes to the official names of allowable TED gear, which were intended to improve clarity and understanding of the regulations.  *Id.*

After publication of the proposed rule, NMFS conducted six public hearings and two additional presentations throughout the northern Gulf of Mexico and in coastal North Carolina. AR001673. NMFS also received approximately 38,500 comments encompassed in 1,200 submissions. *Id.* As informed by comments received during the comment process, NMFS chose a different alternative that was within the range of alternatives contained in the draft EIS ("DEIS") but was not specifically analyzed in the DEIS, *i.e.*, a preferred alternative requiring skimmer trawl vessels 40 feet and greater in length to use TEDs designed to exclude small turtles. AR001653 (final EIS ("FEIS") Abstract); AR001678 (Description of Alternative 8); AR001810 (Effects of Alternative 8); AR002068 (Comment 64); AR002070 (ROD); AR009433 (Decision Memorandum). NMFS also made additional modifications to the proposed tow time definition to more accurately accommodate how skimmer trawling operations are conducted. AR009433-34.

Consistent with 40 C.F.R. § 1502.9, NMFS determined that it had not made substantial changes in the proposed action that are relevant to environmental concerns, and no significant new circumstance or information relevant to environmental concerns exists that bears upon the proposed action or its impacts. AR001673-74. NMFS reasoned that the new preferred alternative requiring skimmer trawl vessels 40 feet and greater in length to use TEDs was derived from the original seven alternatives, which ranged from requiring no shrimp trawlers to use the new TED designs, to requiring all shrimp trawlers to use the new TED designs. AR001673. Therefore, NMFS concluded that it was unnecessary to publish a supplement to the 2016 DEIS prior to the FEIS. AR001674. NMFS subsequently issued a final rule on December 19, 2019. Final Rule, 84 Fed. Reg. at 70,048. NMFS set the effective date of the rule as April 1, 2021. *Id.*

On March 31, 2021, NMFS published a notice delaying the effective date to August 1, 2021, due to concerns stemming from the COVID-19 pandemic. Final Rule Delay of Effective Date, 86 Fed. Reg. 16,676-01 (Mar. 31, 2021). Plaintiffs filed their complaint in the instant case on April 6, 2021. ECF No. 1. On April 20, 2021, NMFS published an advance notice of public rulemaking ("ANPR"), 86 Fed. Reg. 20,475 (Apr. 20, 2021), to solicit comments on the possibility of further modifying the TED-related requirements for skimmer trawl vessels shorter than 40 feet in length operating in the southeast U.S. shrimp fisheries.[6]

On August 11, 2021, the State of Louisiana filed suit in the U.S. District Court for the Eastern District of Louisiana, Case No. 21-cv-01523, *State of Louisiana, by and through Louisiana Dept. of Wildlife and Fisheries v. Raimondo.* On September 9, 2021, that court granted the State's motion for a preliminary injunction delaying the effective date of the Final

---

[6] As explained in detail *infra*, the feasibility and safety of using TEDs on vessels less than 40 feet in length was a significant concern raised in public comments that supported the agency's decision to adopt the 40-foot threshold in the Final Rule. It is possible that further comments received in response to the ANPR may prompt the agency to again reconsider the appropriate vessel size threshold for TEDs. NMFS is best suited to make further decisions with respect to whether a change in the vessel size threshold may be appropriate based on additional testing that has produced TED designs that may be effective on skimmer trawl vessels less than 40 feet in length. 86 Fed. Reg. 20.475. Thus, although Federal Defendants assert that the Court should grant summary judgment on the merits of Plaintiffs' claims for the reasons set forth herein, the Court may instead exercise its discretion to stay this case in deference to the primary jurisdiction of the agency as it considers comments received in response to the ANPR. *Pub. Citizen Health Research Grp. v. Commn'r, Food & Drug Admin.*, 740 F.2d 21 (D.C. Cir. 1984) (Citing recent publication of advance notice of public rulemaking and "the principle of respect for the integrity of the administrative process" the court remanded for a determination of whether the agency was unreasonably delaying resolution of petition for a rule requiring a Reye's Syndrome warning label on aspirin products.); *Ries v. Hornell Brewing Co.,* No. 10-113-JF (PVT), 2010 WL 2943860, *5 (N.D. Cal. Jul. 23, 2010) (Citing recent publication of advance notice of public rulemaking the court stayed case in deference to primary jurisdiction of agency.). *Cf. Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n, Inc.*, 965 F.2d 1118, 1120 (D.C. Cir. 1992) (A district court may dismiss a suit on the ground that an agency "has primary jurisdiction, i.e., that it is best suited to make the initial decision on the issues in dispute, even though the district court ha[s] subject matter jurisdiction.").

Rule "in Louisiana inshore waters" until February 1, 2022. *State of Louisiana*, ---F.Supp.3d---, 2021 WL 4125058, at *5 (E.D. La. Sept. 9, 2021). The Court reasoned that "a brief delay in implementation of the Final Rule to allow appropriate time for all shrimpers to come into compliance will not result in an unreasonable risk to sea turtles." *Id.* at *4.

## III.    STANDARD OF REVIEW

The Administrative Procedure Act ("APA") provides that a court may set aside final agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under the "arbitrary and capricious" standard is "highly deferential" and "presumes the agency's action to be valid." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981) (citing, *inter alia, Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)); *see also Am. Wildlands v. Kempthorne*, 478 F. Supp. 2d 92, 96 (D.D.C. 2007), *aff 'd*, 530 F.3d 991 (D.C. Cir. 2008). A reviewing court is forbidden from "substituting its judgment for that of the agency." *Costle*, 657 F.2d at 283 (citing, *inter alia, Overton Park*, 401 U.S. at 416). Rather, the APA standard "mandates judicial affirmance if a rational basis for the agency's decision is presented . . . even though [a court] might otherwise disagree." *Costle*, 657 F.2d at 283 (citations omitted). An agency's treatment of the evidence need not be a "paragon of clarity," as long as the reviewing court can discern a "rational basis" for the agency's treatment of the evidence. *Bowman Transp. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 289-90 (1974).

A reviewing court may reverse an agency's decision under the "arbitrary and capricious" standard only "if the agency has relied on factors which Congress has not intended it to consider, [has] entirely failed to consider an important aspect of the problem, [or has] offered an

explanation for [that] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co. (State Farm)*, 463 U.S. 29, 43 (1983). A reviewing court should determine the agency's compliance with the law solely on the basis of the record on which the decision was made. *Overton Park*, 401 U.S. at 419-20; *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).

Reviewing courts are at their "most deferential" when the agency is "making predictions, within its area of special expertise, at the frontiers of science." *Balt. Gas & Elec. Co*, 462 U.S. at 96, 103, 105-06; *see also Marsh*, 490 U.S. at 375-77. As the D.C. Circuit has noted, the court "must look at the decision not as the chemist, biologist or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality." *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (*en banc*). This Court must be "particularly deferential when reviewing agency actions involving policy decisions based on uncertain technical information." *New York v. Reilly*, 969 F.2d 1147, 1150-51 (D.C. Cir. 1992).

## IV.     ARGUMENT

### A.     NMFS complied with the APA by providing a rational justification for the final TED Rule.

Plaintiffs criticize the Final Rule because NMFS applied the TED requirement to vessels above a 40-foot threshold instead of vessels 26-foot and larger. It is a fundamental tenet of administrative law that an agency may alter the substance of a final rule in response to public comments received during the rulemaking process. The Court should grant summary judgment in favor of Federal Defendants because NMFS fully explained the basis of its decision in the FEIS and the Final Rule, in light of comments received.

1. **NMFS adequately explained the basis of its decision to change the preferred alternative based on comments received (Count 1).**

It is hardly surprising that an agency would change its position on a proposed regulation in response to comments received through the rulemaking process.  Indeed, the purpose of the APA's notice and comment procedures is to allow changes to proposed rules in response to public comments.  *E.g.*, *PSWF Corp. v. F.C.C.*, 108 F.3d 354, 357 (D.C. Cir. 1997) ("[A]gencies may change their minds in the course of a rulemaking, even though those affected may be disappointed."); *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1300 (D.C. Cir. 2000) (stating that "the Agency's change of heart . . . only demonstrates the value of the comments it received"); *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 951 (D.C. Cir. 2004) (per curiam) ("Agencies, are free—indeed, they are encouraged—to modify proposed rules as a result of the comments they receive."); *Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1296 (D.C. Cir. 2004) (per curiam) ("If an agency decides to change course, however, we require it to supply a 'reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.'" (quoting *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970))); *Nat'l Cable & Telecomm. Ass'n v. F.C.C.*, 567 F.3d 659, 671 (D.C. Cir. 2009) ("That agencies may change their minds is, after all, a matter of hornbook law."); *Ctr. for Biological Diversity v. Salazar*, 770 F.Supp.2d 68, 92 (D.D.C. 2011) ("[T]he Secretary has fully explained his change in position from the proposed designation to the Final Rule and he cannot be criticized for taking public comments . . . into account in revising the designation . . . .") (citing *Northeast Md. Waste Disposal Auth.,* 358 F.3d at 952)).

Here, the record before the Court confirms that NMFS acted within its discretion to change the vessel size threshold for the TED requirement based on comments received.  The comments most relevant to the change in the proposed action raised concerns about the

practicality of employing TEDs in small skimmer vessels, as well as in pusher-head trawls and wing nets, where TEDs had never been tested by NMFS.  AR009434-35; *see also* AR002165 ("I have [a] small boat . . . I feel it will be unsafe to have the teds installed."); AR002173 ("The boats that use skimmer or butterfly nets are typically small vessels.  To have a cumbersome device in addition to heavy seas would definitely endanger the fisherman's lives."); AR002176 ("Small boats [cannot] work the turtle excluder devices [satisfactorily] and it would be a great burden for the shrimper."); AR002178 ("We have a small 17ft boat. . . . Our nets are so small I don't see any way to include a exclusion device."); AR002181 ("[M]ost of the smaller boats don't have nets with throats big enough to fit TED's and the entire net. . . ."); AR003156 ("Smaller vessels often operate with one person on board, limited amount of deck space, and in rough conditions posing hazardous circumstances.  Shrimpers could sustain injuries from TEDs swinging from the rigging or even be knocked overboard."); AR003225 ("In smaller skimmer trawls, TEDs can get entangled in propeller & create potential collision/ safety hazard for fishermen."); AR003228 (safety concerns for smaller boats); AR003390 ("On smaller skimmer trawl, TEDs can get entangled in propeller & create potential collision/ dangerous conditions."); AR004053 ("There was also a serious concern from all present [during an industry workshop held in Empire Louisiana on February 7, 2017] about the safety of carrying TEDs.  Recently in that area there was a death of a fishermen related to a TED."); AR004056 ("There was concern that in rough seas, the grate would swing and have the potential to either injure someone on the vessel or knock someone overboard.  One participant suggested that NOAA be responsible for injury to fishermen from a TED if they are going to be required."); AR008610 ("[E]xperienced shrimpers have expressed repeated concerns that application of TEDs to smaller vessels, particularly given the potential dangers with mandatory use of TEDs for smaller vessels,

with fewer crew, in volatile, shallow, or debris-entangled waters common in the Gulf of Mexico, may create safety hazards for fishermen that have never been assessed by NOAA."); and AR008617 ("There were concerns over TEDs making vessels unstable and the metal grates being unsafe, particularly in rougher seas.").

Others raised concerns regarding the economic impacts associated with requiring TEDs, particularly in shrimp trawl vessels whose owners were already operating near or below negative revenue levels, and NMFS's estimation that 48% of affected vessels could cease operating if they were required to use TEDs.  AR001865; *see also* AR002173 ("To impose a further economic burden would put us on the extinct list."); AR002189 ("A loss of just 30-50% annual gross revenue due to the massive decline in part-time shrimping vessels predicted by NOAA as a result of the new TED requirements, if projected upon the entire gross annual shrimp income, would result in a $390-650 million direct economic loss and, potentially, a permanent loss of 4,500-7,500 jobs."); AR002195 ("[A]ny one of the proposed Alternative TED regulations No. 2-7 will have a devastating adverse economic impact on families that have traditionally harvested shrimp from coastal Louisiana waters, with massive adverse economic and social impacts on the State of Louisiana and its coastal communities."); AR003155 ("Even Alternative 4, with the lowest estimated adverse economic effect of $8.76 million, would still have tremendous repercussions for Louisiana's shrimp industry, which is already operating at small economic margins given low shrimp prices and high fuel costs."); AR003218 ("[S]kimmer vessels will in most instances have to modify their A-frame rigging that is used to pick up the nets.  These modifications could cost anywhere from $1,000 to $10,000 depending on the size of the vessel, extent of change, cost of materials and labor."); AR003219 ("Fishers have serious concerns that TEDs would not work on their type or size of vessel.  These fishermen indicate that they would

have to transition to otter trawls and that could cost in excess of $20,000."); AR003638 ("The NOAA proposed regulation will create more economic hardship for my family and our livelihood."); AR003682 ("It will cause great economic hardship upon the fishing communities, who are already struggling as a result of the BP Oil Spill, the worst environmental disaster."); AR003853 ("In many cases, the entire skimmer net would have to be specially made to fit TEDs only designed to work in skimmer trawls. Many skimmer trawls vessels use very expensive netting called Dyneema; one net can cost more than $5,000 for materials alone. This does not include the cost to have a net maker piece together the net and accommodate a TED. To have 4-6 nets on board could cost over $30,000 for just one vessel."); AR008549 ("[The Mississippi Commercial Fishermen Union] believes the current economic impact data for the proposed TED rule is grossly underestimated. The proposed rules [have] the potential to severely impact tens of thousands of jobs throughout the entire American shrimp industry."); AR008597 ("A loss of just 30-50% annual gross revenue due to the massive decline in part-time shrimping vessels predicted by NOAA as a result of the new TED requirements, if projected upon the entire gross annual shrimp income, would result in a 390-650 million direct economic loss and, potentially, a permanent loss of 4,500-7,500 jobs."). Some comments also questioned the need for further TED regulation, as there have been improvements in the nesting number of several species of sea turtles. AR002060; *see also* AR002192 ("NOAA's own data clearly shows that turtle populations have thrived under the current regulatory practices which allow skimmer shrimping vessels to operate without TEDs."); AR003156 ("Given the general upward trend of nesting and nesters as indicated in the DEIS, skimmer trawl, wing net, and pusher-head trawl fishing does not seem to negatively affect the recovery of these species. Given the anticipated increase in populations of sea turtles, interactions in the northern Gulf of Mexico should also be expected to

increase."); and AR008549 ("[Mississippi Commercial Fishermen Union] believes no action would best serve to maintain the current regulatory environment that has allowed sea turtle populations and nesting sites to flourish to record high numbers over the last thirty years."). As explained in the FEIS, based on public comment regarding potential negative economic effects of the proposed rule and questioning the need for additional sea turtle conservation measures, NMFS sought to focus conservation requirements on larger, full-time vessels that would be expected to encounter sea turtles on fishing grounds more frequently than smaller, part-time vessels. AR001674.

The DEIS prepared in support of the proposed rule estimated that it could take up to 4.3 years for the existing net shops, operating at then-current production levels, to construct enough TEDs for every skimmer, pusher-head, and wing shrimp net in use, plus one spare TED for every net, as was expected under the proposed rule.[7] AR001501. By contrast, NMFS estimated that the time required for production of a sufficient number of TEDs under the new preferred alternative affecting vessels 40 feet and greater in length is only ten months. AR001662 (Table I). Therefore, NMFS reasonably concluded that "[t]he more focused scope of the final rule will allow for faster implementation of the TED requirement and is expected to result in a significant conservation benefit of 801-[1,158][8] sea turtles annually in the Southeastern U.S. shrimp fisheries." AR009466.

---

[7] The estimate of 4.3 years is uncertain because some vessels are expected to cease operating, while others likely will not make the expenditure for spare TEDs for each net, and net shops may increase production to satisfy increased demand. *See* AR001861-64*.* Regardless, NMFS determined that some delay in implementation would be needed to accommodate construction of the devices for the many trawls that will be required to use them. AR001922.

[8] The responses to comments in the FEIS, AR002052 and AR002069, and the Final Rule, AR009457, incorrectly reference the number 1,168 as the upper range of sea turtles conserved annually under the 40-foot vessel threshold. The methodology for the correct estimate of up to 1,158 sea turtles conserved annually is explained at AR001810.

NMFS also determined the chosen action would have significantly reduced economic effects compared to the preferred action described in the DEIS, with only 17% of affected vessels estimated to potentially cease operating as a result of the rule, roughly one third of the vessels closing down that would have been affected by the original proposed rule. AR001865. NMFS concluded that the new preferred action would achieve approximately half of the conservation benefit that the proposed rule would have, while affecting only about 20 percent of the number of vessels. AR009436. Although the TED requirements pursuant to the Final Rule apply to fewer vessels in relation to the Proposed Rule, NMFS reasonably concluded that the new preferred alternative is "necessary and advisable" to provide for the conservation of listed sea turtle species. AR001667.

Plaintiffs incorrectly suggest that NMFS was generally precluded from changing course by adopting a new preferred alternative in the Final Rule, having "preliminarily determined" in the Proposed Rule that TEDs should be required on nearly all shrimp trawl vessels. Pls.' Mot. Summ. J., ECF No. 23-1 at 17. Contrary to Plaintiffs' suggestion, the fact that a "preliminary determination" is later overruled does not render the decisionmaking process arbitrary and capricious. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658–59 (2007). Rather, an agency is "fully entitled" to change its mind as long "as the proper procedures were followed." *Id.* Here the proper procedures were followed, as demonstrated by the agency's reasoned explanation in the Final Rule for changing its mind. AR009457 (NMFS revised the threshold "[b]ased on public comment raising performance and safety issues with TED use on smaller vessels and regarding the economic impacts of the proposed rule, and new information indicating significantly lower levels of sea turtle mortality in the offshore fleet. . . ."). In weighing comments received during the rulemaking process and selecting a new preferred

alternative, NMFS fulfilled its obligation to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quotations marks and citation omitted).

Plaintiffs also incorrectly suggest that NMFS was specifically precluded from exercising its rulemaking authority to establish a 40-foot vessel size threshold having "'preliminarily determined' that requiring TEDS on all vessels using skimmer trawls, pusher-head trawls, and wing nets is 'necessary and advisable to conserve threatened and endangered sea turtle species'" and to enforce the requirements of the ESA. ECF No. 23-1 at 17 (quoting AR002156). The Supreme Court's 2015 decision in *Michigan v. EPA*, 576 U.S. 743, 751-52 (2015), is instructive on this point. There, EPA sought to regulate power plants under a provision of the Clean Air Act that provides, "[t]he Administrator shall regulate electric utility steam generating units under this section, if the Administrator finds such regulation is appropriate and necessary . . . ." *See id.* at 748 (quoting 42 U.S.C. § 7412). This language is very similar to the "necessary and advisable" language in ESA Section 4(d). 16 U.S.C. § 1533(d). The Court stated that "[o]ne does not need to open up a dictionary in order to realize the capaciousness of [the] phrase. . . . 'appropriate' is the classic broad and all-encompassing term . . . ."). *Michigan,* 576 U.S. at 752 (citation and quotations marks omitted)); *accord Chippewa & Flambeau Improvement. Co. v. F.E.R.C.*, 325 F.3d 353, 358 (D.C. Cir. 2003) ("By enacting the 'necessary or appropriate' standard, the Congress invested the Commission with significant discretion").

Pursuant to ESA Section 4(d), as with the similarly worded provision of the Clean Air Act, NMFS has broad discretion to promulgate regulations that it deems "necessary and advisable" for the conservation of species. 16 U.S.C. § 1533(d). Likewise, NMFS has broad discretion to promulgate regulations that it deems "appropriate" pursuant to ESA Section 11(f).

16 U.S.C. § 1540(f). NMFS's rulemaking authority under these provisions includes discretion to consider economic effects when weighing the pros and cons of proposed regulations. Congress "clearly intended" that NMFS consider economic factors in connection with post-listing regulatory actions such as critical habitat designation under ESA Section 4. *N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 248 F.3d 1277, 1285 (10th Cir. 2001). Similarly, NMFS has discretion to select among a range of alternatives when it recommends a reasonable and prudent alternative ("RPA") to avoid jeopardy to a threatened or endangered species in its capacity as a consulting agency pursuant to ESA Section 7. *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 523 (9th Cir. 1998) ("The court was not in a position to determine if the draft RPA should have been adopted or if it would have afforded the Flycatcher better protection."); *Bennett v. Spear*, 520 U.S. 154, 176-77 (1997) (finding that one of the objectives underlying the "best scientific and commercial data available" requirement of ESA Section 7 is "to avoid needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives." (internal citation omitted)). Thus, in response to comments received, NMFS reasonably exercised its broad regulatory authority pursuant to ESA Sections 4(d) and 11(f) to select and implement a new preferred alternative that resulted in an overall reduction of sea turtle mortality while reducing the number of shrimp vessels that would cease operations in relation to the Proposed Rule.

## 2. NMFS's decision to limit TED requirements to skimmer trawl vessels 40 feet and greater is supported by the record (Count 2).

Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to difference in view or the product of

agency expertise." *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1144-45 (D.C. Cir. 2005) (quoting *State Farm*, 463 U.S. at 43 (1983)). The agency must have a "reasoned basis" for its regulatory actions, and must "cogently explain" why it has exercised its discretion in a given manner. *State Farm*, 463 U.S. at 443, 48 (citation omitted).

NMFS cogently explained why it exercised its discretion to establish a vessel size threshold larger than the 26-foot threshold described in the Proposed Rule. As stated in the Final Rule, NMFS revised the threshold "[b]ased on public comment raising performance and safety issues with TED use on smaller vessels and regarding the economic impacts of the proposed rule, and new information indicating significantly lower levels of sea turtle mortality in the offshore fleet . . ." AR009457. Furthermore, NMFS reasoned that "[t]his rule will achieve a significant conservation benefit for listed sea turtles, while affecting significantly fewer vessels and imposing far fewer costs upon industry." *Id.*

Because the agency's decision to adopt the 40-foot size threshold is supported by comments in the Administrative Record, Federal Defendants dispute the assertion by the Center for Biological Diversity, *et al.,* ("*Amici"),* that the agency's decision resulted from improper considerations. *See* ECF No. 25 at 13 ("Internal correspondence makes abundantly clear that the decision to modify the TEDs rule so that it applied to fewer vessels had nothing to do with complying with the ESA, APA, or any other vital statutory requirements."). In support of their assertions, *Amici* rely on numerous emails and other documents outside the administrative record in this case. It would be error for the Court to consider such documents.

It is well-settled that the appropriate scope of the Court's review in APA cases, such as the instant case, is based on the agency administrative record. "The task of the reviewing court

is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citation omitted). Because they are entirely outside the administrative record, the Court should disregard the exhibits proffered by *Amici.*

Even if *Amici* could identify some lawful basis for the Court to consider these extra-record exhibits, the exhibits do not undermine the rationale cited by the agency in support of its decision to adopt the 40-foot threshold in the Final Rule. It is of no moment that internal government emails reflect that fishermen and other potentially affected individuals expressed economic concerns about the TED requirement in the Proposed Rule. The economic concerns referenced in the extra-record exhibits, including emails from the Office of Management and Budget ("OMB")[9], echoed a chorus of similar comments submitted by individuals and groups through the comment process.

It would also be error for the Court to credit Plaintiffs' unwarranted argument that Federal Defendants' actions in this case should be viewed in the context of what Plaintiffs characterize as Federal Defendants' "standard operating procedure" consisting of "habitual and intentional refusal to abide by their statutory obligations." ECF No. 25 at 15. As explained above, the issue before the Court is whether the agency expressed a "reasoned basis" for its regulatory actions. *State Farm*, 463 U.S. at 43, 48 (citation omitted).[10] The administrative

---

[9] The OMB reviews every major proposed rule to, among other things, ensure that the proposal is consistent with applicable law. *See Banner Health v. Sibelius,* 945 F. Supp. 2d 1, 24 n.19 (D.D.C. 2013) (citing Regulatory Planning and Review, 58 Fed. Reg. 51,735 (Sept. 30, 1993), which sets out Executive Order Number 12866, § 2(b)), *vacated in part*, No. 10-01638 (CKK), 2013 WL 11241368 (D.D.C. July 30, 2013). The court in *Public Citizen Health Research Group v. Tyson*, 796 F.2d 1479, 1507 (D.C. Cir. 1986), expressly refused to address whether comments made by OMB on a proposed rule have any legal effect on the validity of a rulemaking.

[10] Furthermore, there is a strong presumption of regularity in reviewing administrative actions, including actions of NMFS. *Citizens to Pres. Overton Park*, 401 U.S. at 415 ("Certainly, the

record before the Court demonstrates the agency's reasoned basis to adopt the 40-foot vessel size

threshold considering both economic and ecological costs and benefits. And, as explained in

detail above, consideration of potential economic effects of an environmental regulation is fully

consistent with the agency's broad discretion to promulgate regulations that it deems "necessary

and advisable" pursuant to ESA Section 4(d) and/or "appropriate" pursuant to ESA Section

11(f). Moreover, selecting management measures among various options is exactly the type of

administrative action in which it is appropriate for an agency to bring to bear its extensive

expertise, and thus the agency's discretion is at its zenith. *Balt. Gas & Elec. Co*, 462 U.S. at 103;

*F.C.C. v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 813-14 (1978). The Court should

defer to the agency's selection of the 40-foot vessel size threshold based on the range of

alternatives considered, as informed by public comments received raising various safety and

economic concerns about the preferred alternative described in the Proposed Rule.

---

Secretary's decision is entitled to a presumption of regularity."); *Hercules, Inc. v. EPA*, 598 F.2d 91, 123 (D.C. Cir. 1978) ("[A] strong presumption of regularity supports the inference that when administrative officials purport to decide weighty issues within their domain they have conscientiously considered the issues.") (quoting *Braniff Airways, Inc. v. CAB*, 379 F.2d 453, 460 (1967))). To overcome the presumption, a party must present "well-nigh irrefragable proof" of bad faith or bias on the part of government officials. *Haney v. United States*, 676 F.2d 584, 586 (Ct. Cl. 1982) (per curiam) (citation omitted). No party has presented such proof in this case. To the extent that Plaintiffs insinuate that Judge Friedman made any findings case, No. 15-0555, with respect to the merits of the Final Rule at issue here, *see* ECF No. 25 at 15 (citing Exhibit F), such an assertion is patently incorrect. The cited court opinion, *Oceana, Inc. v. Ross*, No. 15-0555 (PLF) 2020 WL 5995125, at *13-14 (D.D.C. Oct. 9, 2020), clearly states that it was quoting a hearing transcript concerning the merits of the 2014 biological opinion, which Plaintiffs do not challenge in this case. *See* ECF No. 25-6. The case was concluded after the Court remanded the 2014 Biological Opinion to the agency, *see Oceana, Inc.v. Ross,* No. 08-1881 (PLF) 2020 WL 6701072 (D.D.C. Nov. 13, 2020), and NMFS completed the 2021 Biological Opinion, which *Amici* did not see fit to challenge.

**B.      NMFS's 40-foot final rule is a logical outgrowth of the proposed rule (Count 3).**

In cases where rulemaking is required, APA Section 553 requires an agency to provide published notice of its proposed rulemaking.  5 U.S.C. §§ 551-559.  Such notice must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b)(3).  However, the requirement of a proposed rule for comment does not automatically generate a new opportunity for comment whenever a rule promulgated by an agency differs from the rule it proposed.  *Int'l Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 632 (D.C. Cir. 1973).  The D.C. Circuit has long held that this notice requirement is satisfied as long as the content of the agency's final rule is a "logical outgrowth" of its rulemaking proposal. *Aeronautical Radio, Inc. v F.C.C.*, 928 F.2d 428, 445-46 (D.C. Cir. 1991) (citing *United Steelworkers of Am. v. Marshall*, 647 F.2d 1189, 1221 (D.C. Cir. 1980)).

The D.C. Circuit first adopted the logical outgrowth test in the case of *United Steelworkers of America,. v. Marshall*, 647 F.2d 1189 (D.C. Cir. 1980).  In *Marshall*, trade associations representing the lead industry argued that the Occupational Safety and Health Administration ("OSHA") had violated the Occupational Safety and Health Act and the APA by adopting certain standards for exposure to airborne lead without first issuing these standards in a proposed rule. *Id.* at 1217-18.  While acknowledging that the difference between the proposed and final standards was "obviously substantial," the court held that OSHA had given adequate notice. *Id.* at 1221.  The court reasoned that the final standard was a "logical outgrowth" of the rulemaking proceeding.  *Id.* at 1222.

As further explained in cases following *United Steelworkers*, the logical outgrowth doctrine requires the Court to consider whether "the purposes of notice and comment have been adequately served," *Fertilizer Institute v. EPA*, 935 F.2d 1303, 1311 (D.C. Cir. 1991).  Stated

differently, the Court must determine "whether a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule." *Am. Water Works Ass'n v. E.P.A.*, 40 F.3d 1266, 1274 (D.C. Cir. 1994). The relevant test "is whether . . . [the party], *ex ante*, should have anticipated that such a requirement might be imposed." *Small Refiner Lead Phase-Down Task Force v. U.S. E.P.A.*, 705 F.2d 506, 549 (D.C. Cir. 1983) (as cited in *City of Portland v. EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007)). *See also CSX Transp. Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079-80 (D.C. Cir. 2009) ("A final rule qualifies as a logical outgrowth 'if interested parties "should have anticipated" that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period.' (citation omitted)); *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 548 (D.C. Cir. 2006).

It is always a possible outcome, and therefore a logical outgrowth, of a proposed rule that the agency will not, in fact, adopt the rule or some portion thereof. *See, e.g., Envtl. Integrity Project v. EPA,* 425 F.3d 992, 997 (D.C. Cir. 2005) ("Of course, there is nothing objectionable in the Agency's refusal to adopt its proposed amendments . . . ."); *Am. Iron & Steel Inst. v. EPA*, 886 F.2d 390, 400 (D.C. Cir. 1989) ("One logical outgrowth of a proposal is surely, as EPA says, to refrain from taking the proposed step."). And the agency may reject the proposed rule precisely because it is not supported by the underlying statute. *See. e.g., Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174-75 (2007) (finding that an agency's decision not to adopt the proposal it had set forth in its proposed rule because rejecting the proposal "is more consistent with statutory language" was a "logical outgrowth" of the proposed rule(internal quotation marks and citation omitted)). The ultimate issue is whether the agency engaged in

reasoned decisionmaking. *Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*, 822 F.2d 104, 112 (D.C. Cir. 1987).

Here, as explained in detail above, the record before the Court confirms that the Final Rule was informed by reasoned decisionmaking resulting from the public comment process. The new preferred alternative requiring skimmer trawl vessels 40 feet and greater in length to use TEDs was derived from the original seven alternatives, which ranged from requiring no shrimp trawlers to use the new TED designs to requiring all shrimp trawlers to use the new TED designs. AR001673. Although NMFS did not solicit comments on a specific alternative tied to the 40-foot vessel size threshold, this size criterion is within the range of size alternatives identified for purposes of the public comment process (i.e., alternatives ranging from TEDs required on most vessels above 26-feet and to no additional TEDs required regardless of vessel size). Moreover, an agency is always free to reconsider a proposed rule in light of comments received. Plaintiffs' misguided logic would force NMFS to re-propose virtually any proposed rule that the agency decides to modify in response to public comments. The preferred alternative described in the FEIS and implemented in the Final Rule addresses concerns raised by members of the regulated community during the public comment process and therefore is clearly a logical outgrowth of the preferred alternative described in the DEIS and the Proposed Rule. No further notice and comment is required, and the Court should grant summary judgment in favor of Federal Defendants as to Plaintiffs' Count III.

**C.      NMFS complied with NEPA.**

Congress passed NEPA to accomplish two goals: "[t]o oblige the agency 'to consider every significant aspect of the environmental impact of a proposed action' and to ensure that the agency informs the public 'that it has indeed considered environmental concerns in its

decisionmaking process.' *Comm. Of 100 on the Fed. City v. Foxx*, 87 F.Supp. 3d 191, 200

(D.D.C.. 2015) (quoting *Balt. Gas & Elec.*, 462 U.S. at 97. Here, NMFS considered every

important impact the Final Rule would have on the environment, including its effects on all sea

turtle species encountered in the Southeastern U.S. shrimp fisheries. The record also reveals that

NMFS informed the public of the Final Rule's economic impact by explaining the methods it

used to analyze economic data and properly included both qualitative and quantitative analyses

in the EIS. NMFS prepared a thorough EIS that fairly discussed the significant impacts likely to

stem from its proposed rulemaking, which demonstrates the hard look NMFS took at its action

before promulgating the Final Rule. Because the Final Rule was the result of informed

rulemaking, and because NMFS met every procedural requirement of NEPA, this Court should

grant summary judgment in favor of Federal Defendants.

1. **NMFS took a hard look at the Final Rule's environmental effects by considering its impact on all affected sea turtles and analyzing relevant qualitative and quantitative economic data (Count 5).**

"A court reviewing an EIS considers whether an 'agency took a "hard look" at the

environmental consequences of its decision to go forward'" with an action. *Nuclear Info. & Res.*

*Serv. v. Nuclear Regul. Comm'n*, 509 F.3d 562, 568 (D.C. Cir. 2007) (internal citations omitted).

NEPA's hard look doctrine is "designed 'to ensure that the agency has adequately considered

and disclosed the environmental impact of its actions and that its decision is not arbitrary or

capricious.'" *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 111 (D.C. Cir.

2014) (quoting *Nat'l Comm. For the New River v. F.E.R.C.*, 373 F.3d 1323, 1327 (D.C. Cir.

2004)). "[W]hile NEPA requires agencies to take a hard look before approving a major federal

action, it does not mandate adoption of a particular process for doing so." *NRDC v. U.S. Nuclear*

*Regul. Comm'n*, 823 F.3d 641, 642 (D.C. Cir. 2016). Here, NMFS took a hard look at the

expected environmental effects of the Final Rule by considering how the rule would impact all species of sea turtles found in the southeastern U.S. shrimp fisheries. Additionally, NMFS considered the Final Rule's impact on the economic environment by analyzing qualitative and quantitative data regarding both economic benefits and detriments.

### a.     NEPA does not dictate an analysis on individual sea turtle species.

Nothing in NEPA or its implementing regulations requires an agency to perform species-specific analysis when formulating an EIS. While an EIS must consider "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat," 40 C.F.R. § 1508.27(b)(9) (2019), an agency is free to use its expertise and discretion to determine the most appropriate way to evaluate such information. *Indian River Cnty. v. U.S. Dep't of Trasp*, 945 F.3d 515, 533 (D.C. Cir. 2019) ("In sum, the Supreme Court has made it clear that we must give deference to agency judgments as to how best to prepare an EIS." (citing *Robertson v. Methow Valley Citizen* Council, 490 U.S. 332 (1989))), *cert. denied*, 141 S. Ct. 243 (2020). Similarly, courts must defer to an agency's decision about the appropriate scope and methodology of an EIS. *Nat'l Parks Conservation Ass'n v. Jewell*, 965 F.Supp. 2d 67, 82 (D.D.C. 2013). This is because determining the extent and effect of environmental impacts is a task requiring the "special competency of the appropriate agencies." *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976).

Plaintiffs acknowledge that NMFS has "abundant evidence and data" about specific threats faced by certain species of sea turtle, like the Kemp's ridley, but complain that the agency failed to evaluate the Final Rule's effect on sea turtles in terms of species-specific deaths compared to species-specific population baselines. ECF No. 23-1 at 40. In other words, Plaintiffs take issue not with *what* information NMFS considered in the FEIS, but *how* NMFS

considered it. However, that is not Plaintiffs' decision to make. NEPA gives the *agency* the power to determine which methods to use when preparing an EIS. *Indian River Cnty*., 945 F.3d at 533.

Here, when discussing alternatives proposed to reduce the capture of sea turtles incidental to shrimping operations, it was reasonable for NMFS to focus its analysis on the various types, sizes, and locations of shrimping vessels, as opposed to breaking the data down by sea turtle species. AR001793-811 (Section 4.1: "Direct and Indirect Effects on Sea Turtles"). In the "Direct and Indirect Effects on Sea Turtles" section of the FEIS, NMFS compiled a combination of available studies and clinical experience to provide a basis for its analysis of sea turtle mortality. AR001794. It analyzed four years of observer effort on skimmer trawls in the Gulf of Mexico to provide insight related to the effects the fisheries may have on sea turtle populations. AR001794. NMFS also analyzed data from three other studies to determine the effects of skimmer trawls in North Carolina, and relied on a separate study to analyze otter trawl fisheries. AR001795, AR001798. NMFS then used this data from the various types of fisheries, in conjunction with data from sea turtle biologists, veterinarians, resource managers, and observer program experts, to divide all observed captured sea turtles into four categories based on risk of mortality: low risk, intermediate risk, high risk, and death. AR001793-94. This methodology allowed the agency to analyze which shrimping methods and locations were causing the most harm to sea turtles, which in turn allowed the agency to analyze the effect each of the eight alternatives would ultimately have on sea turtle populations as a whole. *See, e.g.* AR001796 (Table 36; portraying the observed mortalities of sea turtles, separated by risk category, in the Gulf of Mexico skimmer trawl, pusher-head trawl, and wing net fisheries extrapolated out to estimate total sea turtle mortalities in the fisheries); AR001810 (concluding that exempting

skimmer trawl vessels under 40 feet in length would result in a conservation benefit of 801-1,158 sea turtles).

Moreover, just because NMFS did not break down its effects analysis by species does not mean that the agency "ignor[ed] the differences" between the different species of sea turtle, as Plaintiffs claim. EFC No. 23-1 at 38. Rather, NMFS both "considered" and "disclosed" in the FEIS important differences between the five affected species of sea turtle. *Minisink Residents*, 762 F.3d at 111. At the outset of the FEIS, NMFS discussed the five species of turtle that occur in the southeastern U.S. shrimp fisheries, noting that the leatherback, hawksbill, and Kemp's ridley turtles are listed as endangered, while the loggerhead and green sea turtles are listed as threatened. AR001667. NMFS then dedicated thirty-three pages of the FEIS to a detailed analysis of the differences between the five species, including descriptions of the species, population and distribution statistics, and threats unique to each species. AR001696-729 (Section 3.3.3: "Sea Turtles;" at AR001696, ("The following subsections are synopses of the best available information on the life history, distribution, population trends, and current status of the 5 species of sea turtles that are likely to be affected by one or more components of the action."). In the section on the Kemp's ridley, NMFS noted factors that make that species particularly vulnerable to incidental catch by shrimp trawlers, such as their "preference for shallow, state waters" and their small size. AR001712-13. Indeed, it was considerations of the Kemp's ridley's small size that led NMFS to reduce the required TED bar spacing from four inches to three inches as part of the Final Rule. AR001713. Therefore, although the environmental effects section cited by Plaintiffs analyzed sea turtles as a group, the rest of the FEIS put that analysis into context by explaining the important differences between the species.

Additionally, the species-specific data analysis Plaintiffs seek from the FEIS had already been compiled and evaluated in a biological opinion prior to preparation of the DEIS, which is a part of the administrative record in this case.  RR-101271-616.  In contrast to NEPA, which does not dictate specific methodology,[11] the implementing regulations under Section 7 of the ESA establish certain methods an agency must follow to evaluate the effects of an action on a particular species through a "formal consultation" process and preparation of a Biological Opinion.  50 C.F.R. § 402.14.  Part of a formal consultation requires the agencies involved to "[e]valuate the current status and environmental baseline of a particular species and the effects of the action, then "[a]dd the effects of the action and cumulative effects to the environmental baseline" to determine if the action is likely to jeopardize the continued existence of the species. 50 C.F.R. § 402.14(g)(2)–(4).  Tellingly, in their brief, Plaintiffs cite to ESA Section 7 regulations—not NEPA regulations—and ESA Section 7 cases—not NEPA cases—for their assertions that NMFS did not properly analyze impacts of the TED rule.  *See* ECF No. 23-1 at 39 (citing 50 C.F.R. § 402.14(g)(4) to explain how an action's effect on a species is measured under ESA); *see also id.* at 40 (citing *Defs. Of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 353-54 (4th Cir. 2019) and *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 929 (9th Cir. 2008) to explain proper species-specific population baseline analysis "in ESA context").

---

[11] NEPA's implementing regulations state that agencies "shall insure the professional integrity, including scientific integrity" of the analysis in an EIS and shall identify the methodologies used and make "explicit reference by footnote" to the scientific and other sources for their conclusions.  40 C.F.R § 1502.24 (2019).  But NEPA "allows the agency the discretion of what methodology to use and does not require the use of the best scientific methodology available." *Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 731 F. Supp. 2d 15, 35 (D.C. Cir. 2010).

NMFS has prepared two Biological Opinions under ESA Section 7 that are relevant to this litigation, both of which include species-specific population data and analysis.[12] The first was completed in 2014 and focused on the "Continued Implementation of the Sea Turtle Conservation Regulations under the ESA . . .". RR-101271. The 2014 Biological Opinion ("2014 BiOp"), which was in place while NMFS evaluated and promulgated the Final Rule, included analysis of estimated population baselines and mortalities for each species. *See, e.g.,* RR-101369 (Table 8; estimating the annual number of interactions and mortalities between sea turtles and shrimp trawls in the Gulf of Mexico for leatherbacks, loggerheads, Kemp's ridley, and green sea turtles); RR-101442 (Tables 26 and 27; displaying sea turtle catch rates in shrimp trawl nets for loggerhead, leatherback, green, and Kemp's ridley); RR-101482-95 (analyzing whether proposed regulations would jeopardize the continued existence of each species, including population estimates for each species). Thus, NMFS's consideration of management alternatives in the FEIS was informed by the 2014 Biological Opinion.

The fundamental assumptions of the 2014 Biological Opinion concerning potential effects of the Final Rule on bycatch are supported by the new bycatch information incorporated in the new Biological Opinion completed after publication of the Final Rule.[13] AR011037-333.

---

[12] Each of the five species is not included in every table and comparative analysis in the Biological Opinions. For instance, hawksbills have data limitations that are not an issue for the other species, so the impacts to hawksbills are analyzed separately using different methods in the 2014 BiOp. RR-101410; RR-101440; RR-101451; RR-101461-64. Additionally, leatherbacks and hawksbills are not frequently encountered by shrimp trawls, so there is no data presented for those species in some of the tables in the 2014 BiOp. *See, e.g.*, RR-101449-50. In the 2021 BiOp NMFS accounted for this lack of data by assuming that some of the "unknown" turtle mortalities in the analyses will be leatherback or hawksbill, and by using sea turtle stranding data to consider "the potential rare bycatch of leatherback and hawksbill sea turtles." AR011190.

[13] In their Complaint, Plaintiffs suggest that NMFS erred by failing to issue the new Biological Opinion prior to issuing the Final Rule, *see* Complaint, ECF No. 1 ¶ 137. That point is now moot, as the new Biological Opinion was issued subsequent to the filing of Plaintiffs' Complaint on April 26, 2021, in accordance with a court order in *Oceana, Inc. v. Pritzker,* 1:15-cv-00555-

As with the 2014 Biological Opinion, the new 2021 Biological Opinion ("2021 BiOp") also

includes species-specific mortality and population estimates for each affected sea turtle species,

and uses that data to analyze the Final Rule's effects on each species. *See, e.g.,* AR011194 ("We

will use [a] species distribution to estimate species-specific take for the combined Gulf of

Mexico and South Atlantic (i.e. North Carolina) skimmer trawl fisheries"); AR011185-95

(presenting tables that analyze sea turtle bycatch and mortality, broken down by gear type and

sea turtle species).[14] Ultimately, the 2021 BiOp concluded that the Final Rule would not

jeopardize the continued survival of any of the five species of sea turtle. *See* AR011216-38.

NMFS took a hard look at the effects its action would have on individual sea turtle

species, as well as sea turtles as a whole. In its NEPA analysis, it dedicated an entire section to

discussions of the differences among the species and the risks that stem from those differences.

AR001696-729. In the ESA Section 7 Biological Opinions, NMFS also engaged in rigorous

species-specific analysis, including dozens of Tables breaking down the anticipated effects of sea

---

PLF (D.D.C.). To the extent that Plaintiffs may assert that the new Biological Opinion is not
properly part of the administrative record for the Final Rule, the Court may still appropriately
take judicial notice based on the reasoning of *Board of License Commissioners of Town of
Tiverton v. Pastore*, 469 U.S. 238, 240 (1985) (per curiam) (the parties have a "continuing duty
to inform the Court of any development which may conceivably affect the outcome of the
litigation." (citations and quotations marks omitted)). The new Biological Opinion "supersedes
the 2014 Opinion and fulfills [Federal Defendants'] Section 7 consultation responsibilities on
both our implementation of the existing sea turtle conservation regulations under the ESA, and
our authorization of federal shrimp trawling under the [Magnuson Stevens Fishery Conservation
and Management Act] for all listed species." AR011046.

[14] Even though the 2021 BiOp relies on new bycatch information, the two conservation
recommendations from the 2021 BiOp for the relevant federal agencies relating to TEDs are not
in conflict with the Final Rule. The 2021 BiOp recommends (1) the agencies should investigate
the efficacy of the new TED designs for the otter trawl fisheries that would reduce the incidental
bycatch and mortality of small sea turtles that would pass through the bars of currently-required
four-inch bar spacing, and (2) the agencies should investigate the efficacy of TEDs in the
skimmer trawl fisheries for vessels less than 40 feet in length. AR011266. Thus, the 2021 BiOp
merely invites the agency to continue its investigations and studies of TEDs as it considers the
most effective way to conserve sea turtles in the southeast U.S. shrimp fisheries.

turtle regulations by individual species. *See, e.g.*, AR011185 (Table 12, portraying the number of sea turtle observer records from 2012 to 2019 in each injury category for all trawl gear captures combined, as well as the overall estimated mortality rates by sea turtle species); AR011186 (Table 14, portraying the number of sea turtle observer records from 2012 to 2019 for otter trawl captures for each sea turtle species); AR011195 (Table 27, portraying the total annual estimated bycatch mortality for each sea turtle species in the southeastern U.S. skimmer trawl fisheries). Given that NMFS focused the scope of its NEPA analysis broadly on "reduc[ing] the mortality of sea turtles in the shrimp fisheries of the southeastern United States," it was reasonable for the agency to focus its data analysis on how different shrimping vessels in different locations interact with sea turtle populations as a whole. AR000299. Based on the species-specific analysis supporting the agency's decision to promulgate a Final Rule based on the preferred alternative in the FEIS, this Court should defer to the agency's scientific expertise and find that NMFS met its obligations under NEPA.

### b. NMFS properly considered all economic benefits and detriments of the Final Rule.

The White House Council on Environmental Quality ("CEQ") regulations require NEPA analyses to consider, among other things, the economic effects of an action. 40 C.F.R. § 1508.8 (2019). However, NEPA does not require "the weighing of the merits and drawbacks of . . . alternatives [to] be displayed in a monetary cost-benefit analysis." 40 C.F.R. § 1502.23 (2019). If such analysis is prepared, the agency must discuss the relationship with "any analyses of unquantified environmental impacts. . . ." *Id.* So long as an EIS indicates consideration of important "qualitative considerations," it shall comply with NEPA. *See* 42 U.S.C.S. § 4332(2)(B) (requiring agencies to identify and develop methods to insure that unquantified environmental values be appropriately considered along with economic and technical values).

Here, NMFS properly considered and presented both quantitative and qualitative economic data in the "Direct and Indirect Effects" section of the FEIS. AR001818-74. For each of the eight alternatives considered, NMFS analyzed direct economic effects using quantitative, measurable data points, including number of vessels, vessel size, food shrimp landings, gross and net revenue figures, number of TEDs, and TED costs. *Id.* NMFS aggregated this data into easy-to-digest tables showing baseline economic conditions for vessels and expected economic effects, such as changes in revenue per vessel according to size. *See, e.g.*, AR001820 (Table 46, summarizing the average annual aggregate and per-vessel baseline economic conditions for vessels affected under Alternative 2, using 2014 dollars); AR001822 (Table 48, estimating net revenue and average percentage loss in gross and net revenue per vessel under Alternative 2, in both the first year and in the long term). Accompanying each table, NMFS explained its methodology in detail, describing how it arrived at the figures and flagging areas where it lacked sufficient data to include in the analysis. For instance, the analysis assumed that TED costs would not recur on an annual basis even though vessel owners would need to replace their TEDs eventually. AR001820. NMFS explained that, because it lacked data on how vessel owners would use and maintain their TEDs, it was "not feasible to project" what those costs would be or when they would be incurred in the future. *Id.* Accordingly, those uncertain costs were not quantified in the economic evaluation. *Id.* By discussing the relationship between the quantifiable data included in the tables and "unquantifiable" factors, such as TED replacement schedules, satisfied its NEPA obligations. 40 C.F.R. § 1502.23 (2019).

Additionally, Plaintiffs' allegation that NMFS failed to quantify "any economic benefit resulting from TED use" is incorrect. ECF No. 23-1 at 42. In its analysis of indirect economic effects, NMFS asserted that although the costs of purchasing TEDs represent an adverse

economic effect to individual vessels, those costs represent expenditures "that would result in additional economic activity for TED manufacturers and retailers." AR001861. This means that funds spent manufacturing, selling, and purchasing TEDs would serve as an economic benefit to the affected communities. While NMFS noted that it lacked data to determine the magnitude of the countervailing positive effects in the long term, it was able to quantify the number of TEDs and TED expenditures by region and alternative. AR001863. NMFS expected that under the preferred alternative (Alternative 8), TED manufacturing would result in total expenditures of about $1.38 million to benefit the southeastern region, while the preferred alternative from the DEIS (Alternative 3) would result in $7.56 million in total expenditures. AR001863.

Beyond the FEIS section addressing the economic environment, NMFS considered the qualitative benefits of TEDs in multiple other sections of the FEIS as well. In the section dedicated to effects on the social environment, NMFS considered that TEDs would have a positive effect on the public because of the "conservation benefit to sea turtles" and the "naturalistic/outdoor recreational value which is derived from contact or experience with endangered wildlife . . . ." AR001876. NMFS noted a lack of quantitative data on such social effects, thus limited its analysis to qualitative discussion. AR001874. Further, in its Regulatory Impact Review,[15,] NMFS considered additional benefits of TED use, like excluding debris from nets, reducing the bycatch of other species, reducing sorting time for crews, increasing "return" on labor, improving fuel efficiency by reducing "drag," and reducing the likelihood of damaged shrimp. AR001922. NMFS determined, though, that because the magnitude of such benefits is

---

[15] NMFS prepared a Regulatory Impact Review ("RIR") to satisfy its obligations under Executive Order 12866. The RIR, in conjunction with the analysis of the direct and indirect effects in the "Environmental Consequences" section of the FEIS, analyzed the expected effects and impacts of the Final Rule.

highly uncertain, they could only be described qualitatively. *Id.* NMFS offered an additional explanation regarding benefits of TEDs in response to a comment that the agency should have expanded the economic analysis to include the benefits of TEDs and value of sea turtles. AR002058 ("Responses to Comments" at Comment 26). NMFS explained that "based on existing peer-reviewed literature, there is no theoretical or empirical basis for asserting that the expected reductions in sea turtle mortalities under [the Final Rule] will result in increased ecotourism and concomitant economic benefits." *Id.* NMFS reiterated that because it "currently lack[s] data and models to quantitatively estimate these ancillary benefits," it "summarized these issues qualitatively" in the analysis. *Id.* These determinations are entitled to deference. *See Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 199 (D.C. Cir. 2017) (finding the Department of Energy's determination that an economic model estimating localized impacts would be "far too speculative to be useful" was a product of expertise and entitled to deference).

NMFS took a hard look at the effects of the Final Rule by analyzing quantitative data (like number of vessels, number of TEDs, revenue values, and TED expenditures) alongside qualitative data for costs and benefits that could not be quantified (like conservation or recreational benefits.) *See, e.g.*, AR001818-74; AR001820; AR001861. NMFS explained instances where it lacked data, where the data was too uncertain to quantify, or where it made assumptions in its analysis. *See, e.g.*, AR002057-58. And while Plaintiffs allege that NMFS's methods led to "misleading" and "inaccurate" results, ECF No. 23-1 at 45, it is Plaintiffs who appear to suggest that NMFS should have guessed at quantities and made up values for costs and benefits that NMFS repeatedly urged could not be reliably quantified.

Finally, Plaintiffs wrongly claim that NMFS should have monetized the "foregone benefits of [the] changed rule." ECF No. 23-1 at 43. But, here there was no "changed rule;"

rather, there was a proposed rule set forth in a *draft* environmental impact statement, and a final rule promulgated in response to further agency deliberations and public comment. AR001673 ("Changes from the DEIS"). The agency met its obligations under NEPA by adding an additional alternative, Alternative 8, to the FEIS to consider the 40-foot rule. *See* 42 U.S.C. § 4332(2)(C)(iii). If a member of the public wanted to understand the economic difference between (1) requiring all shrimping vessels to use TEDs versus (2) only requiring skimmer trawl vessels 40 feet and greater to use TEDs, he or she could simply read the economic impacts sections of the FEIS addressing, respectively, Alternative 3 and Alternative 8. AR001826-31; AR001847-52.

Both of Plaintiffs' "hard look" arguments fail for essentially the same reason: Plaintiffs cannot accuse NMFS of disregarding all benefits to TEDs, and in the next sentence, cite to specific instances in the FEIS where NMFS *did* consider benefits. ECF No. 23-1 at 43. Similarly, Plaintiffs cannot allege that NMFS "completely ignored" relevant differences between sea turtle species, then point out examples from the record where NMFS discussed such differences. *Id.* at 30-31. NMFS did not violate NEPA because it chose not to analyze the data in the specific manner Plaintiffs would have preferred. The hard look doctrine requires that agencies adequately consider and disclose the effects of an action. *Minisink Residents*, 762 F.3d at 111 (D.C. Cir. 2014). NMFS did so, and has therefore met that burden and complied with NEPA.

2. **NMFS was not required to conduct a supplemental environmental analysis because the impacts associated with the Final Rule were within the range of impacts analyzed in the DEIS (Count 4).**

NEPA does not require NMFS to conduct a supplemental Environmental Impact Statement because it had already analyzed the impacts of the Final Rule when it prepared the

DEIS.  An agency is required to prepare a supplemental EIS if: (1) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impact, or (2) the agency makes substantial changes in the proposed action that are relevant to environmental concerns.  40 C.F.R. § 1502.9(c)(1) (2019).  However, an agency "need not supplement an EIS every time new information comes to light," as this would "render agency decisionmaking intractable."  *Marsh*, 490 U.S. at 373–74.  Only changes "that cause effects which are significantly different from those already studied" require a supplemental EIS. *Mayo v. Jarvis*, 177 F. Supp. 3d 91, 117 (D.D.C. 2016) (citation omitted), *aff'd* 875 F.3d 11 (D.C. Cir. 2017).  "And because an agency's decision whether to prepare a supplemental EIS requires 'substantial agency expertise,' courts must defer to the agency's 'informed discretion.'" *Mayo v. Reynolds*, 875 F.3d 11, 16 (D.C. Cir. 2017) (quoting Marsh, 490 U.S. at 366–77).

Plaintiffs make much of the fact that NMFS referred to "new information" among its reasons for revising the TED rule.  ECF No. 23-1 at 45-47.  But not all "new information" is significant within the meaning of NEPA's implementing regulations.  A 2004 D.C. Circuit Court of Appeals case is instructive on this point.  In *National Committee for the New River, Inc. v. FERC*, an environmental group sought review of the Federal Energy Regulatory Commission's approval of a gas pipeline in the southeast United States.  373 F.3d at 1324.  FERC issued a DEIS assessing the environmental impacts associated with the construction and operation of the pipeline.  *New River*, 362 F.3d at 1326.  In a comment on the DEIS, the gas company referenced a report that revealed potential issues with the plan, including factors that could result in drill failure, like the large diameter of the pipeline and the difficult subsurface conditions, as well as proximity of the pipeline to campgrounds and water wells.  *Id.* at 1330–31.  Although the court acknowledged that the report provided "new information that is environmentally significant," the

court found that it was reasonable for FERC to conclude that "the information did not significantly transform the nature of the environmental issues raised in the DEIS and comments." *Id.* at 1330. Accordingly, the Court found that supplementation of the DEIS was unnecessary.

The same is true here. NMFS referenced "new information indicating significantly lower levels of sea turtle mortality in the offshore fleet" among its reasons for revising the TED regulations. AR009457. But this does not automatically "trigger" a duty to supplement the EIS as Plaintiffs assert. ECF No. 23-1 at 46. Even if NMFS considered the new information to be "environmentally significant," as was the case in *New River*, and relied on the new information when altering its preferred alternative, it was still reasonable for NMFS to conclude that the new information did not meaningfully change the *nature of the environmental issues* it already analyzed in the DEIS. By shifting the rule to exclude shrimping vessels under 40 feet, NMFS changed only the *degree* of the protection to sea turtles (from 1,730–2500 sea turtles protected to 801 to 1,158 sea turtles protected), not the nature of environmental issues implicated. *See* AR001811 ("The anticipated conservation benefits resulting from [Alternative 8] are obviously greater than the status quo (Alternative 1), but less than that expected from Alternatives 2-7"). And when NMFS selected a new preferred alternative in the FEIS it had already received comments urging the agency to limit TED requirements for certain shrimping vessels. *See, e.g.*, AR003630 (opposing the rule and noting that "[s]ome vessels have great concerns that requiring TEDs would be impossible for multiple reasons and would ultimately force them out of their livelihood . . ."). The new information NMFS partially relied on to develop a new preferred alternative did not significantly transform the nature of the environmental issues already raised in the DEIS and comments, thus no supplemental EIS was needed.

As to the second circumstance requiring supplemental analysis—where the agency makes "substantial changes in the proposed action that are relevant to environmental concerns," 40 C.F.R. § 1502.9(c)(1) (2019)—CEQ guidance makes clear that NMFS's selection of a new preferred alternative was not a substantial change requiring a supplemental EIS. In an instructive memo for agencies entitled "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," CEQ addressed situations such as this, where a new alternative was developed during preparation of the FEIS. 46 Fed. Reg. 18,026-01 (Mar. 17, 1981). CEQ explains that when a comment on a draft EIS raises an alternative that is a "minor variation of one of the alternatives discussed in the draft EIS," but which was not considered by the agency, as long as the new alternative is "qualitatively within the spectrum of alternatives that were discussed in the draft," the agency need not prepare a supplemental EIS.[16] *Id.* at 18,035 (paragraph 29b).

Here, NMFS received a comment on the DEIS recommending that the rule exempt all skimmer trawls less than 40 feet from the TED requirements. AR009466. This suggested new alternative was a minor variation from some of the existing alternatives NMFS considered in the DEIS, like Alternative 2, which considered exempting all vessels under 26 feet, and Alternative 4, which considered exempting all skimmer trawl vessels under 26 feet. AR001659-60. In fact, both 26-foot and 40-foot vessels would qualify as "small" vessels based on some of NMFS's studies, making the change from 26 to 40 feet inconsequential in the context of certain analyses already included in the DEIS. *See* AR001821 (discussing expected costs of TEDs and defining a

---

[16] While this language is used in the context of adding a new alternative, and not necessarily a new preferred alternative, there is nothing to suggest that its application to a new preferred alternative is unreasonable. In fact, some courts have applied the same standard to changes in the preferred alternative between a draft and final EIS. *See Wyoming v. Dept. of Agriculture*, 661 F.3d 1209 (10th Cir. 2011).

"small" vessel as a vessel less than 60 feet). The Final Rule is also squarely "qualitatively within the spectrum of alternatives" discussed in the DEIS. NMFS considered alternatives ranging from requiring new TEDs on all shrimping vessels to requiring new TEDs on no shrimping vessels. AR001659-60. Because it had already effectively analyzed the implications of the new alternative on the environmental landscape, and because the new alternative was qualitatively within the spectrum of alternatives discussed in the DEIS, nothing in NEPA or its implementing regulations required NMFS to prepare a supplemental EIS for the Final Rule.

**D.     Plaintiffs' requested remedy is untenable**.

The Court should grant summary judgment in favor of Federal Defendants for the reasons set forth above. However, if the Court finds in favor of Plaintiffs with respect to any of their claims, the Court clearly has discretion to retain the challenged Final Rule in effect. *E.g., Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009). Plaintiffs themselves agree that remand without vacatur would be warranted. ECF No. 23-1 at 47 (citing *Nat. Res. Def. Council v.* EPA, 489 F.3d 1250, 1265 (D.C. Cir. 2007) (Rogers, J., concurring in part and dissenting in part). However, Plaintiffs' request to order the agency to prepare a new rule within six months would unnecessarily truncate the time available for public comment and agency analysis to comply with the APA and NEPA, as Plaintiffs urge. The Court should entertain further briefing on the issue of remedy if the Court concludes that any portion of the challenged Final Rule is invalid.

## V.     CONCLUSION

NMFS reasonably exercised its broad regulatory authority pursuant to ESA Sections 4(d) (authority to issue regulations "necessary and advisable" to provide for the conservation of threatened species) and 11(f) (authority to promulgate "such regulations as may be appropriate to

enforce this chapter") to adopt the 40-foot vessel size threshold in response to comments received on the Proposed Rule. The vessel size threshold adopted in the Final Rule is a logical outgrowth of the alternatives presented in the Proposed Rule. The resulting Final Rule fully complies with the requirements of the APA, ESA, and NEPA, and the Court should grant summary judgment in favor of Federal Defendants as to all claims.

Dated: December 17, 2021          Respectfully submitted,

TODD KIM,
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
SETH M. BARSKY, Section Chief
MEREDITH L. FLAX, Asst. Section Chief


*/s/ Mark Arthur Brown*
MARK ARTHUR BROWN
Senior Trial Attorney
D.C. Bar No. 470050
Wildlife & Marine Resources Section
Ben Franklin Station
P. O. Box 7611
Washington, DC 20044-7611
(202) 305-0204 (tel.)
(202) 305-0275 (fax)

*/s/ Hannah E. O'Keefe*
HANNAH E. O'KEEFE
Trial Attorney
IL Bar No. 6336475
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
(202) 616-3353 (tel.)
(202) 305-0506 (fax)

Attorneys for Defendants

Of Counsel:

Shepherd R. Grimes
Attorney-Advisor
Office of the General Counsel
National Oceanic and Atmospheric Administration
U.S. Department of Commerce
263 13th Avenue South
St. Petersburg, FL 33701
Shepherd.Grimes@noaa.gov