**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | Case No. 1:21-cv-930-BAH |
| Plaintiffs, | |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE, et al., | |
| Defendants. | |

**PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 1

I.     NMFS Fails to Explain Why It Disregarded Its Previous Determinations
That More Comprehensive TED Regulations Are Necessary (Count 1) ................. 1

II.    NMFS Provides No Rational Basis or Support for Its Justifications for the
TED Rule Setting a 40-Foot Cutoff for Skimmer Trawls (Count 2) ....................... 4

III.    NMFS's Final Rule Is Not a Logical Outgrowth of the Proposed Rule
(Count 3) ................................................................................................................... 7

IV.    NMFS Failed to Take a Hard Look at the Environmental Effects (Count 5) .......... 8

       A.    NMFS did not take a hard look at the TED Rule's effects on sea
turtle species .................................................................................................. 8

       B.    NMFS did not take a hard look at the economic benefits lost in the
final rule. ..................................................................................................... 14

V.    NMFS Has Failed to Prepare a Required Supplemental Environmental
Impact Statement (Count 4) ................................................................................... 17

VI.    Remedy ................................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**            **Page(s)**

*Alaska Ctr. for Env't v. Browner*,
20 F.3d 981 (9th Cir. 1994) ........................................................................20

*Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n*,
965 F.2d 1118 (D.C. Cir. 1992) ..................................................................20

*Am. Rivers v. NOAA Fisheries*,
No. CV-04-00061-RE, 2006 WL 2792675 (D. Or. Sept. 26, 2006) ..................21

*Am. Water Works Ass'n v. EPA*,
40 F.3d 1266 (D.C. Cir. 1994) .................................................................7, 8

*Chippewa & Flambeau Improvement Co. v. FERC*,
325 F.3d 353 (D.C. Cir. 2003) .....................................................................2

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ..............................................................................4, 12

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008) ....................................................................14

*Ctr. for Biological Diversity v. Salazar*,
770 F. Supp. 2d 68 (D.D.C. 2011) .................................................................2

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) .................................................................................6

*\*Dist. Hosp. Partners, L.P. v. Burwell*,
786 F.3d 46 (D.C. Cir. 2015) ................................................................1, 2, 3

*Dubois v. U.S. Dep't of Agric.*,
102 F.3d 1273 (1st Cir. 1996) .....................................................................19

*Earth Island Inst. v. Hogarth*,
494 F.3d 757 (9th Cir. 2007) .................................................................12, 13

*Eco Tour Adventures, Inc. v. Zinke*,
249 F. Supp. 3d 360 (D.D.C. 2017) .............................................................20

*Fertilizer Inst. v. U.S. EPA*,
935 F.2d 1303 (D.C. Cir. 1991) ...............................................................7, 8

*Grazing Fields Farm v. Goldschmidt*,
626 F.2d 1068 (1st Cir. 1980) .....................................................................12

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
844 F.3d 1095 (9th Cir. 2016) ........................................................12

*Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*,
281 F. Supp. 2d 1 (D.D.C. 2003) ....................................................12

*High Country Conservation Advocs. v. U.S. Forest Serv.*,
52 F. Supp. 3d 1174 (D. Colo. 2014) .........................................15, 16

*Indian River County v. U.S. Dep't of Trans.*,
945 F.3d 515 (D.C. Cir. 2019) ......................................................10

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
387 F.3d 989 (9th Cir. 2004) ........................................................12

*Kunaknana v. U.S. Army Corps of Eng'rs*,
23 F. Supp. 3d 1063 (D. Alaska 2014) ...........................................17

*Michigan v. EPA*,
576 U.S. 743 (2015).......................................................................2

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).....................................................................4, 5

*Nat'l Audubon Soc'y v. Dep't of Navy*,
422 F.3d 174 (4th Cir. 2005) ..........................................................8

*Nat'l Comm. for the New River v. FERC*,
373 F.3d 1323 (D.C. Cir. 2004) .....................................................17

*Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*,
260 F.3d 1365 (Fed. Cir. 2001).......................................................21

*Nat'l Wildlife Fed'n v. Marsh*,
568 F. Supp. 985 (D.D.C. 1983) ....................................................12

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
524 F.3d 917 (9th Cir. 2008) ........................................................20

*Ne. Md. Waste Disposal Auth. v. EPA*,
358 F.3d 936 (D.C. Cir. 2004) ........................................................8

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
565 F.3d 683 (10th Cir. 2009) ......................................................18

*Oceana, Inc. v. Ross*,
483 F. Supp. 3d 764 (N.D. Cal. 2020) ............................................21

*Ore. Nat. Desert Ass'n v. Bureau of Land Mgmt.*,
625 F.3d 1092 (9th Cir. 2010) ....................................................10

*Ore. Nat. Desert Ass'n v. Rose*,
921 F.3d 1185 (9th Cir. 2019) ....................................................10

*Pac. Rivers Council v. U.S. Forest Serv.*,
689 F.3d 1012 (9th Cir. 2012) ....................................................13

*Pit River Tribe v. U.S. Forest Serv.*,
469 F.3d 768 (9th Cir. 2006) ......................................................12

*Pub. Emps. for Env't Resp. v. U.S. Dep't of the Interior*,
832 F. Supp. 2d 5 (D.D.C. 2011) ..........................................18, 19

*\*Pub. Emps. for Env't Resp. v. U.S. Fish & Wildlife Serv.*,
177 F. Supp. 3d 146 (D.D.C. 2016) ..............................................9

*Reid v. Johnson & Johnson*,
780 F.3d 952 (9th Cir. 2015) ......................................................20

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
588 F.3d 718 (9th Cir. 2009) ......................................................12

*Shands Jacksonville Med. Ctr. v. Burwell*,
139 F. Supp. 3d 240 (D.D.C. 2015) ..............................................7

*Shell Oil Co. v. EPA*,
950 F.2d 741 (D.C. Cir. 1991) ......................................................8

*Sierra Club v. FERC*,
867 F.3d 1357 (D.C. Cir. 2017) ..................................................15

*Sierra Club v. Sigler*,
695 F.2d 957 (5th Cir. 1983) ......................................................14

*Sierra Club v. U.S. Dep't of Energy*,
867 F.3d 189 (D.C. Cir. 2017) ....................................................16

*Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
437 F.3d 75 (D.C. Cir. 2006) ....................................................5, 6

*\*Utah Physicians for a Healthy Env't v. U.S. Bureau of Land Mgmt.*,
528 F. Supp. 3d 1222 (D. Utah 2021) ..........................................15

*\* Authorities upon which we chiefly rely are marked with an asterisk*

**Regulations**

40 C.F.R. § 1502.15 (2019) ..............................................................................................10

40 C.F.R. § 1502.16 (2019) ..............................................................................................11

40 C.F.R. § 1508.27 (2019) ........................................................................................9, 17

**Federal Register**

86 Fed. Reg. 20,475 (Apr. 20, 2021) ...............................................................................20

## INTRODUCTION

Without informed decisionmaking and behind closed doors, the National Marine

Fisheries Service (NMFS) issued a final rule for turtle excluder devices (TED Rule) that sharply

reversed course from its proposed rule and violates the Administrative Procedure Act (APA) and

National Environmental Policy Act (NEPA). In its response, NMFS largely talks past

Conservation Groups' arguments and fails to demonstrate that it has issued a rule rationally

based on evidence and informed by public comment. The agency continues to rely on conclusory

statements without pointing to relevant record evidence supporting its changed decisionmaking.

NMFS's inability to direct the Court to reasoned explanations only underscores how the

agency's decision was arbitrary and capricious and must be remanded with instructions to

comply with the APA and NEPA.

## ARGUMENT

I.  **NMFS Fails to Explain Why It Disregarded Its Previous Determinations That More Comprehensive TED Regulations Are Necessary (Count 1)**

NMFS violated the APA by failing to explain the inconsistencies between the final rule

and NMFS's earlier findings in its proposed rule that requiring TEDs on all vessels is necessary

for conservation and for enforcing the Endangered Species Act (ESA). *See* ECF No. 23-1 (MSJ)

at 16−19; *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 58–59 (D.C. Cir. 2015). In its brief,

NMFS continues to ignore the material inconsistencies between the final rule and its position in

the proposed rule and instead discusses extraneous matters. The agency's failure to rationally

explain its action makes the TED Rule arbitrary and capricious.

In its proposed rule, NMFS "preliminarily determined" that requiring TEDs across the

shrimping fleet is "necessary and advisable to conserve" listed sea turtle species and "necessary

and appropriate to enforce the requirements of the ESA." *See* MSJ 17 (quoting AR002156). Yet

the final rule implements less than what NMFS had previously found necessary for conservation,

without any stated recognition of or response for that "unexplained inconsistenc[y] in the final

rule." *Burwell*, 786 F.3d at 58–59; *see* MSJ 16−19.

In its brief, NMFS does not point to any explanation for the inconsistency; indeed, it

continues to disregard that *any* inconsistency exists between the final rule and its position in the

proposed rule. Instead, NMFS misconceives Conservation Groups' argument as claiming that the

agency is precluded from changing its rule or that it lacks discretion to determine what is

"necessary and advisable."[1] Opp. 16–18. Conservation Groups make no such argument. Rather,

the issue is that NMFS changed its position and failed to articulate a "*satisfactory explanation*

*for its action*." *Burwell*, 786 F.3d at 59 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *cf. Chippewa & Flambeau*, 325 F.3d at 358 ("A grant of

discretion to an agency does not, of course, authorize it to make an unprincipled decision . . . . "),

*cited by* Opp. 17; *Ctr. for Biological Diversity v. Salazar*, 770 F. Supp. 2d 68, 92 (D.D.C. 2011)

(finding change in position rational because "the Secretary has *fully explained* his change in

position" (emphasis added)), *cited by* Opp. 11. NMFS has failed to rationally explain its change

in position between the proposed rule—which preliminarily determined that requiring TEDs on

---

[1] NMFS's citations to *Michigan v. EPA* and *Chippewa & Flambeau Improvement Co. v. FERC* are inapposite because they involve an agency's *authority* to determine what is "necessary and advisable," not its *lack of explanation* for a changed position, as at issue here. Opp. 17 (citing *Michigan*, 576 U.S. 743, 751–52 (2015); *Chippewa & Flambeau*, 325 F.3d 353, 358 (D.C. Cir. 2003)). The various other provisions of the ESA cited by NMFS that give the agency discretion are also irrelevant because they involve different actions and duties not at issue in this case (i.e., designating critical habitat and selecting reasonable and prudent alternatives in a consultation), and in any event, still require rational explanations. Opp. 18 (citing, *e.g.*, *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 523 (9th Cir. 1998) (finding "there was a rational connection between the facts found . . . and the choice made")).

all shrimping vessels was necessary for sea turtle conservation—and the final rule—which was entirely silent on the issue.

Instead of addressing the inconsistency with the agency's position on *conservation*, NMFS discusses extraneous, non-conservation factors it allegedly considered to support its rule. Opp. 11−15; *cf. Burwell*, 786 F.3d at 59 (stating agency "must examine *the relevant data*" to make "a rational connection between the facts found and the choice made" (quoting *State Farm*, 463 U.S. at 43)). *But see infra* Section II (explaining that NMFS did not rationally consider these other factors). NMFS does not identify any record evidence of an acknowledgment in its final rule that the need for comprehensive TED requirements had formed the entire foundation of the proposed rule, much less offer a rational explanation for why the final rule disregarded the proposed rule's findings in favor of less protection.

NMFS never grapples with the fact that the proposed rule's preliminary determinations were grounded in its findings that tow time requirements do not work and by the agency's recurrent findings in its sea turtle recovery plans that TEDs are necessary for sea turtle recovery. *See* MSJ 17–18. NMFS does not even acknowledge those factual premises in its brief. Simply put, NMFS perpetuates its failure from the final rule to meaningfully consider whether the final rule meets the conservation needs the agency previously identified.

NMFS at one point suggests it "concluded that the new preferred alternative is 'necessary and advisable' to provide for the conservation of listed sea turtle species." Opp. 16 (quoting, in part, AR001667). The quoted text, however, only concluded that the final rule is "necessary and advisable *in further reducing* sea turtle incidental bycatch and mortality and recovering listed sea turtle populations," not that it is necessary and advisable for "*conservation*." *Compare* AR001667, *with* AR002156 (proposed rule stating "the measures proposed here are necessary

and advisable *to conserve* threatened and endangered sea turtle species" (emphasis added)).

Incrementally reducing bycatch is not the same as "conservation," which is a term of art defined

by the ESA. *See* MSJ 18 (citing 16 U.S.C. § 1532(3)). Furthermore, the quoted text does not

provide any acknowledgement of or explanation for the agency's change in position between the

proposed and final rule. NMFS's statement in its brief only highlights the material inconsistency

between the proposed and final rule and the agency's failure to address it.

The absence of any record evidence of NMFS acknowledging and explaining in the final

rule that it chose to promulgate something less than what it had preliminarily determined was

necessary to conserve sea turtle species is a violation of the APA. NMFS's brief fails to provide

any explanation for that absence and instead attempts to divert the Court's attention to anything

except conservation.

## II. NMFS Provides No Rational Basis or Support for Its Justifications for the TED Rule Setting a 40-Foot Cutoff for Skimmer Trawls (Count 2)

Conservation Groups explained that NMFS's stated justifications for limiting TED

requirements to only skimmer trawl vessels 40 feet and greater in length lack any rational basis

or evidentiary support in the record. MSJ 19−20. In its brief, NMFS neither addresses these

justifications nor points to any record support for them. Opp. 18−21. The agency also offers no

response to Conservation Groups' argument that the record indicates NMFS arbitrarily

substituted 40 feet for 26 feet when it issued the final rule. Instead, it relies on conclusory

assertions of "discretion."[2] As NMFS recognizes, however, "an agency must cogently explain

why it has exercised its discretion in a given manner." *State Farm*, 463 U.S. at 48, *quoted by*

Opp. 19; *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)

---

[2] NMFS predominantly takes issue with various points made in *Amicus* Oceana's brief, not Conservation Groups', often confusing the parties and attributing passages from *Amicus*'s brief to Conservation Groups. Opp. 19–21 & n.9–10.

(explaining "presumption of regularity" does not "shield [agency's] action from a thorough, probing, in-depth review"). NMFS's complete failure to explain or support its stated reasons for its action violates the APA's basic requirements for agency action.

In selecting a 40-foot cutoff for skimmer trawls and exempting all pusher-head trawls and wing nets in the final rule, NMFS had explicitly stated it relied on alleged "safety and other practical concerns," "new information," and a purported public comment suggesting a 40-foot cutoff, but then provided no rational basis or evidentiary support in the record. MSJ 19–25. In its brief, NMFS completely fails to address any of the arguments or caselaw in Conservation Groups' brief for why its stated reliance on these bare assertions violates the APA. NMFS has provided *no* response to the fact that the record is devoid of any factual support for these asserted justifications for the TED Rule. The complete lack of record evidence or reasoning behind these conclusory rationales renders the final rule arbitrary and capricious. *See, e.g.*, *Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 81 (D.C. Cir. 2006).

As explained in Conservation Groups' opening brief, the evidence—including a signed Record of Decision for a 26-foot rule, AR002072—indicates that NMFS made the drastic change to a new 40-foot alternative based *not* on its stated reasons, but by arbitrarily replacing "26 feet" in its near final rule with "40 feet." MSJ 11–12, 23–24; *see also Amicus* Br. 7–9 (supporting the same). NMFS does not dispute this characterization.[3] The facts demonstrate that NMFS's stated justifications for a 40-foot cutoff in its final rule are actually those it developed to support a 26-foot cutoff and cannot rationally support NMFS's later decision. *See State Farm*, 463 U.S. at 43

---

[3] To the extent NMFS erroneously suggests that the proposed rule intended to set a "threshold" "of vessels 26-foot and larger," it is incorrect. *Compare* Opp. 10, 19, *with* AR002154–61 (proposed rule to require TEDs on nearly all shrimp vessels, regardless of length).

(APA requires "a rational connection between the facts found and the choice made"). NMFS does not deny these facts.

The remainder of NMFS's argument amounts to a summation that the agency allegedly relied on "comments received" to support its changed decisionmaking. Opp. 19, 21. The comments cited are inapposite to NMFS's defense for three reasons. First, their substance supports—if any—a 26-foot cutoff, not a 40-foot cutoff. *See* MSJ 11, 20–21 (explaining concerns raised about "small vessels" refer to vessels about 26 feet in length and smaller). NMFS cites *no* comment concerning vessels around 40 feet in length.[4] *See* MSJ 22. Second, NMFS developed a near final rule setting a 26-foot cutoff *after* it had already received and presumably incorporated public comments. AR002073−74. Third, the relevant information to consider is the *agency's* explanation for its action, not what commenters have stated. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" (citation omitted)).

NMFS has not substantiated its asserted justifications in the final rule for selecting a 40-foot cutoff for skimmer trawls and exempting pusher-head and wing net trawls. Because of the agency's lack of reasoned bases, the TED Rule is arbitrary and capricious under the law. *See Tripoli Rocketry*, 437 F.3d at 81.

---

[4] In its response, NMFS references a single citation for its assertion that a 40-foot vessel can qualify as "small." *See* Opp. 39 (citing AR001821). But in the citation, NMFS made clear that it was using "small" for a different, limited context. AR001821 ("*In this context*, a 'small' vessel" is less than 60 feet in length (emphasis added)); *contra, e.g.*, AR001312 (FEIS alternatives analysis defining "small" as "(i.e., less than 26 ft in length)"), 001314 (same).

**III.**     **NMFS's Final Rule Is Not a Logical Outgrowth of the Proposed Rule (Count 3)**

NMFS acknowledges that the logical outgrowth standard is whether interested parties "should have anticipated" the change to the final action was possible, Opp. 23, but makes no argument for why the TED Rule meets that standard. As discussed in Conservation Groups' brief and below, Conservation Groups and the public could not have anticipated NMFS would drastically change course and adopt a novel length metric for skimmer trawls. Thus, the TED Rule is not a logical outgrowth of the proposed rule.

Conservation Groups have explained that commenters could not possibly "have anticipated" the agency's adoption of a novel alternative permitting over 80 percent of all targeted vessels to incidentally kill thousands of sea turtles every year. MSJ 25−26 (quoting *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004)). Relatedly but separately, commenters were also given no opportunity to review any scientific or technical data behind NMFS's final rule. MSJ 28; *see Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 262 (D.D.C. 2015). Without an "occasion to offer new and different criticisms which the agency might find convincing," Conservation Groups were prejudiced by NMFS's backdoor decisionmaking. *Fertilizer Inst. v. U.S. EPA*, 935 F.2d 1303, 1311 (D.C. Cir. 1991); *see also* MSJ 26−27.

In its response, NMFS does not address any of Conservation Groups' arguments. Rather than applying the relevant legal standard, NMFS merely makes a conclusory assertion that the TED Rule is "within the range of alternatives," so is *per se* a logical outgrowth of the proposed rule. Opp. 24. The logical outgrowth test, however, requires courts to determine whether "the purposes of notice and comment have been adequately served," *Fertilizer Inst.*, 935 F.2d at 1311; that is, whether a new round of notice and comment would provide the "first opportunity for interested parties to offer comments that could persuade the agency to modify its rule." *Am.*

*Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274 (D.C. Cir. 1994). NMFS makes no argument addressing the appropriate standard.[5]

Contrary to NMFS's hyperbolic characterization, Conservation Groups do not seek to force the agency to "re-propose virtually any proposed rule that the agency decides to modify in response to public comments," Opp. 24, only those that fail the logical outgrowth test. And Conservation Groups have demonstrated the TED Rule fails that test: commenters could not have "'anticipated' that the change was possible, and thus reasonably [could not] have filed their comments on the subject during the notice-and-comment period." *Ne. Md. Waste Disposal Auth.*, 358 F.3d at 952 (citation omitted). NMFS fails to present any valid argument that its vastly different final rule is a logical outgrowth of its proposed rule and thus has violated the APA.

## IV. <u>NMFS Failed to Take a Hard Look at the Environmental Effects (Count 5)</u>

### A. NMFS did not take a hard look at the TED Rule's effects on sea turtle species.

The stated intent of the TED Rule is to address conservation of five sea turtle species, yet in the FEIS, NMFS fails entirely to assess the effects of its action on those species. MSJ 29−33. In its brief, NMFS erroneously argues that it had no obligation to assess the effects of the action on individual sea turtle species and attempts to divert the Court's attention to other parts of the EIS and extraneous non-NEPA documents. Opp. 26−28. NMFS's arguments are unavailing, and its fundamental failure to evaluate the effects of the action on species violates NEPA's hard look requirement. *See Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 191−92 (4th Cir. 2005);

---

[5] To the extent NMFS attempts to claim public comments demonstrate the TED Rule is a logical outgrowth of the proposed rule, Opp. 24, the D.C. Circuit has made clear that an agency cannot bootstrap notice from a comment—it "must *itself* provide notice of a regulatory proposal." *Fertilizer Inst.*, 935 F.2d at 1312; *see also Shell Oil Co. v. EPA*, 950 F.2d 741, 751 (D.C. Cir. 1991) ("[C]omments by members of the public would not in themselves constitute adequate notice.").

*Pub. Emps. for Env't Resp. v. U.S. Fish & Wildlife Serv.*, 177 F. Supp. 3d 146, 153 (D.D.C. 2016) ("*PEER v. FWS*") (stating "[i]t is hard to imagine a 'softer' look" than not evaluating impacts on the species' current population).

As Conservation Groups explained, NMFS's effects analysis fails to distinguish between the five sea turtle species, completely ignoring the vulnerabilities and considerations relevant to conservation of each unique species—particularly the critically endangered Kemp's ridley. MSJ 29−33. This foundational failure prevents any meaningful analysis of the impacts of the TED Rule on sea turtles. *Id.* NMFS does not contest that it did not do an analysis of effects on individual species. As conceded in its brief: "the environmental effects section cited by Plaintiffs analyzed sea turtles as a group." Opp. 28.

NMFS instead claims that it did not need to analyze the effects of the action on individual sea turtle species and seeks deference from the Court. Opp. 26. Deference is unwarranted. When an agency's action is "explicitly designed" to affect a species' population numbers, "the impact on [species] is a not a trivial part of the [NEPA] inquiry." *PEER v. FWS*, 177 F. Supp. 3d at 156−57; *see also* 40 C.F.R. § 1508.27(b)(9) (2019) (requiring agencies to assess the "degree to which the action may adversely affect *an* endangered or threatened species"—in the singular, not as a group (emphasis added)). The entire purpose of the TED Rule is to ameliorate the harms of the shrimp fishery on five separate sea turtle populations, particularly the Kemp's ridley. AR001306. NMFS was required under NEPA to evaluate the effects of its rule on each species, *a fortiori* because the rule was explicitly designed to protect such species.

NMFS mischaracterizes Conservation Groups' argument as taking issue with the agency's choice of methodology for assessing effects. Opp. 26−27, 29. Conservation Groups do not quibble with NMFS's choice of methodology—the problem is NMFS employed *no*

methodology whatsoever. Courts "cannot defer to a void" where the agency has failed to use *any* methodology. *Ore. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019); *Ore. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1111–12 (9th Cir. 2010). Additionally, *Indian River County v. U.S. Department of Transportation* does not suggest an agency has discretion to simply decline to analyze the effects of its action, as NMFS implies. Opp. 26−27 (citing 945 F.3d 515, 533 (D.C. Cir. 2019)). "Instead, it requires that an agency take a 'hard look' at the reasonably foreseeable impacts of a proposed major federal action." *Indian River Cnty.*, 945 F.3d at 533 (citation omitted). And effects to the different sea turtle species surely are "reasonably foreseeable" here. *See* MSJ 30.

In its brief, NMFS points to two types of information—basic sea turtle background, Opp. 28, and mortality estimates, *id.* at 27−28—as proof that it did take a hard look at species impacts in its FEIS. Neither, however, amounts to an *analysis* of species-specific effects from the rule. As discussed below, they are predicate *components* that go into an effects assessment, but they do not on their own evaluate the impact of the rule on sea turtle species.

First, a background discussion of species ecology is *not* a consideration of species impacts. NMFS attempts to claim that because "thirty-three pages of the FEIS" describe the unique characteristics of each individual sea turtles species, it has "considered" sea turtle impacts as required under NEPA. Opp. 28. The cited pages simply constitute the "Affected Environment" section of the FEIS, which CEQ has made clear does *not* amount to a consideration of impacts: "Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement." 40 C.F.R. § 1502.15 (2019). Describing the existing conditions of each species in the background discussion of the FEIS does not evaluate the future impacts of the action to those species. Instead, it is the Environmental Consequences section of

an EIS that considers the direct and indirect environmental effects of the alternatives and discusses their significance. *Id.* § 1502.16. It is this section that forms the "scientific and analytic basis" for the EIS's discussion of alternatives. *Id.* And it is this section that NMFS fails to provide species-specific analysis.

Second, NMFS points to its estimates of "mortalities," which the agency erroneously and repeatedly conflates with sea turtle "populations." *See, e.g.*, Opp. 27 (claming agency analyzed effects "on sea turtle *populations* as a whole" but citing only estimates of *mortalities* (AR001796, 001810) (emphasis added)). Mortalities and populations are not one and the same. A mortality rate estimates how many individuals will die, while a population estimates the total number of individuals in a group. Mortalities change population numbers. In order to evaluate the impact an estimated annual number of deaths will have on a population, NMFS needed to analyze mortalities *against* a population baseline. MSJ 31−33. Contrary to NMFS's assertions that the agency analyzed the effects on sea turtle "populations," NMFS engaged in no population analysis whatsoever—it only estimated lump mortality rates of all sea turtles in the fisheries. *See id.* at 30. It did not assess how those mortalities may change the populations. As already explained, this failure is significant because certain mortality levels may be significant for smaller, more sensitive populations (i.e., the critically endangered Kemp's ridley sea turtle) but not large populations. MSJ 30−32. The FEIS only presents part of the effects equation. By failing to contextualize the estimated mortalities against any population number, NMFS arbitrarily prevented itself and the public from garnering an informed understanding of the rule's impacts.

Finally, NMFS attempts to rescue its flawed NEPA analysis by pointing to two non-NEPA documents, a 2014 and a 2021 biological opinion (BiOp). Opp. 29−31. For multiple

reasons, neither BiOp cures NMFS's NEPA violation. As a threshold matter, "[a] non-NEPA document . . . cannot satisfy a federal agency's obligations under NEPA." *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009); *see also Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 998 (9th Cir. 2004) (explaining tiering to a non-NEPA document "cannot save" a faulty NEPA document). NMFS must meet its obligations *in its EIS*, which it did not do here. *See Nat'l Wildlife Fed'n v. Marsh*, 568 F. Supp. 985, 997 (D.D.C. 1983); *see also Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1072–74 (1st Cir. 1980) (explaining why NEPA requires analysis to appear in the EIS itself).

The 2021 BiOp is not properly before the Court in this APA review case because it postdates the TED Rule. *See Overton Park*, 401 U.S. at 419–20 ("review is to be based on the full administrative record that was before the Secretary at the time he made his decision"). The 2021 BiOp—which does not analyze the alternatives under consideration for the TED Rule— was clearly not before the agency when it made its decision on the final rule on December 20, 2019. The Court should therefore disregard the discussion of the 2021 BiOp in NMFS's brief at pages 30−32. *See Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 281 F. Supp. 2d 1, 30 (D.D.C. 2003) (rejecting NMFS's attempt to use a biological opinion to defend regulations because opinion was issued after the promulgation of regulations so was not "*before the Secretary at the time he made his decision*" (quoting *Overton Park*, 401 U.S. at 420)). In addition, in the NEPA context, "a post-EIS analysis . . . cannot cure deficiencies in an EIS." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016); *see also Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 785 (9th Cir. 2006) ("[W]e have repeatedly held that dilatory or ex post facto environmental review cannot cure an initial failure to

undertake environmental review."). NMFS's post hoc reliance on the 2021 BiOp in this case is simply inappropriate.

NMFS's reliance on the 2014 BiOp is also misplaced. While NMFS makes a post hoc argument that its FEIS was "informed by" the 2014 BiOp's analysis of population baselines and mortalities, Opp. 30, the FEIS never mentions the 2014 BiOp in any population baseline analysis. *See* AR001696–1728 (description of sea turtle baseline with no citation to 2014 BiOp); *cf.* AR001798 (only substantive discussion of 2014 BiOp, in context of otter trawl bycatch). Regardless, even if NMFS could properly consider the substance of the 2014 BiOp, the BiOp could not cure the agency's flawed NEPA analysis because it does not contain the assessment that is lacking in the FEIS. The BiOp does not analyze how the alternatives under consideration for the TED Rule would affect individual sea turtle populations.

The 2014 BiOp in fact undercuts any claim by NMFS that its choice to avoid species-specific analyses in its FEIS was reasonable. Although the BiOp did not assess the effects of the TED Rule, its analysis demonstrates that NMFS was capable of applying methodologies to break down mortality numbers by species, *see* RR-101369 (Table 8); estimate species population numbers, *see* RR-101482-95; and "assess each . . . species' response to [mortality and sublethal impacts], in terms of overall population effects," RR-101481; *see, e.g.*, RR-101484 (assessing loggerhead population response). NMFS simply chose not to make any of these assessments in the FEIS for the TED Rule. Such a failure to do any species-specific effects analysis when the agency has demonstrated it has the means to do so deserves no deference and consistutes a failure to take a hard look at the action's effects. *Pac. Rivers Council v. U.S. Forest Serv.*, 689 F.3d 1012, 1030 (9th Cir. 2012), *vacated as moot*, 570 U.S. 901 (2013); *see Earth Island Inst. v.*

*Hogarth*, 494 F.3d 757, 763 (9th Cir. 2007) (no deference is granted "when the agency ignores its own statistical methodology").

Ultimately, the BiOps are insufficient substitutes for the agency's requirement under NEPA to take a hard look at impacts and only show that NMFS had the means to do species-specific impacts analyses but inexplicably declined to do so in its FEIS. Despite pointing to various pieces of information in its brief, the fact remains that NMFS did not analyze the effects of the TED Rule on sea turtle species and therefore could not understand—nor explain to the public—how the TED Rule will affect each of the five sea turtle species or their conservation. NMFS's failure amounts to a violation of NEPA's requirement to assess the effects of an action.

## B.     NMFS did not take a hard look at the economic benefits lost in the final rule.

Despite having undisputed evidence of the value of TEDs, NMFS arbitrarily omitted benefits of TED use in its economic analysis, in effect setting a zero dollar value to such benefits and improperly skewing its comparisons of economic effects among alternatives. *See* MSJ 33−36. NMFS attempts to defend that approach, but a decision not "to monetize the benefit" of the TED Rule is arbitrary and capricious when the value of that benefit "is certainly not zero." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin*., 538 F.3d 1172, 1200 (9th Cir. 2008).

NMFS devotes much of its argument to describing the *costs* it chose to quantify, as if that is an adequate substitute for quantifying benefits. Opp. 33–34.[6] This one-sided focus on costs while ignoring quantitative benefits is precisely how NMFS "tip[ped] the scales" of its EIS in the first place. *Sierra Club v. Sigler*, 695 F.2d 957, 979 (5th Cir. 1983).

---

[6] The agency cites a quantification of just one type of economic benefit for TED manufacturers and retailers, Opp. 33–34, but ignores the several other economic benefits of TED use for fishermen and local communities, *see* MSJ 34.

NMFS then falls back on the assertion that it "considered the qualitative benefits of TEDs in multiple other sections of the FEIS," *outside* of its economic analysis. Opp. 34–35. First, any qualitative discussion of benefits is no substitute for incorporating the benefits into the agency's cost-benefit effects assessment. An agency cannot qualitatively acknowledge benefits exist and then omit them when actually weighing costs against benefits. Doing so skews the presentation of the action's quantitative economic effects. *See, e.g.*, *Utah Physicians for a Healthy Env't v. U.S. Bureau of Land Mgmt.*, 528 F. Supp. 3d 1222, 1232 (D. Utah 2021) ("The socioeconomics section may not lay out the economic benefits from the proposal without analyzing the socioeconomic costs . . . ."); *High Country Conservation Advocs. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1182 (D. Colo. 2014) ("[W]here such a[] [quantitative economic] analysis is included it cannot be misleading."). In addition, presenting qualitative and quantitative economic assessments in different parts of the EIS fails to "paint a clear picture for decisionmakers and the public": it is "unacceptable" under NEPA when the relevant analysis is "spread out and disjointed in such a way that the public is unlikely to find the related pieces and put them together or to have confidence that the agency considered the interrelated qualitative and quantitative information as a whole." *Utah Physicians*, 528 F. Supp. 3d at 1232.

Second, any discussion of some benefits of TED use in those other sections cannot satisfy NEPA's hard look requirement because it provides the public and the agency no comparison of benefits *between the alternatives considered*. *See* AR001876 (offering no comparison of social benefits *between* alternatives); *Sierra Club v. FERC*, 867 F.3d 1357, 1370 (D.C. Cir. 2017) ("An EIS is meant to help agency heads choose among the relevant alternatives . . . and to help the public weigh in."). NMFS ironically highlights the precise problem in its brief:

> If a member of the public wanted to understand the economic difference between (1) requiring all shrimping vessels to use TEDs versus (2) only requiring skimmer trawl vessels 40 feet and greater to use TEDs, he or she could simply read the economic impacts sections of the FEIS addressing, respectively, Alternative 3 and Alternative 8. AR001826-31; AR001847-52.

Opp. 36. But a member of the public reading the cited portions of the economic analysis section would have an entirely *incomplete* understanding because they do not even mention any benefit from TED use—qualitatively or quantitatively.

To be clear, Conservation Groups do not seek precise quantification, *contra* Opp. 34–35—the issue is that NMFS in essence attributed a *zero* dollar value to benefits it acknowledges exist. *See* MSJ 33−36. While agencies may reasonably decline to quantify certain economic effects if it is speculative *whether* the effects will occur and the agency "offer[s] a *reasoned explanation as to why* it believe[s]" the effects are "not reasonably foreseeable," *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 198 (D.C. Cir. 2017) (emphasis added), *cited by* Opp. 35, they may not baselessly assert it is "impossible to quantify" one side of the ledger and "prepare[] half of a cost-benefit analysis," *High Country Conservation*, 52 F. Supp. 3d at. Here, NMFS knows that the benefits *will* occur. *See, e.g.*, AR001922 (TEDs are "*known* to reduce the bycatch of other species" which "*will reduce* sorting time for crews, thereby reducing their work burden," it "would also be expected to reduce 'drag,'" thereby improving fuel efficiency and reducing fuel costs," and it "would be expected to reduce the likelihood" of shrimp damage (emphases added)). Regardless of any uncertainty as to "the *magnitude* of these benefits," *id.* (emphasis added), NMFS has no explanation for why it chose to exclude *all* mention of the benefits in its comparative economic analysis.

The economic impacts section of the FEIS is *not* an accurate assessment of the economic differences between alternatives. Without an appropriate discussion of benefits from TED use,

NMFS has skewed its economic analysis and failed to take a hard look at the impacts of its rule, in violation of NEPA.

## V.  NMFS Has Failed to Prepare a Required Supplemental Environmental Impact Statement (Count 4)

NMFS was required to prepare a supplemental EIS because of both its stated reliance on new information and its changed decisionmaking in promulgating the TED Rule. *See* MSJ 36−38 (citing 40 C.F.R. § 1502.9(c)(1) (2019)). The elephant in NMFS's room is that it told the public it had chosen a novel alternative—one that will double sea turtle mortality—*based on new information*. NMFS now attempts to underplay the apparent significance of such information to its own decision and claim the associated change in impacts are not significant enough to warrant the development of a supplemental EIS. Such assertions ignore the facts.

First, with regard to the new information, NMFS's stated reliance on the information in the TED Rule to support its changed action *makes* the information significant under NEPA. MSJ 37. The agency cannot assert on the one hand that significant new information warrants its decision to develop and choose an entirely new alternative, and then argue that the information was minor, not significant, and did not trigger any obligations to supplement its EIS. *Kunaknana v. U.S. Army Corps of Eng'rs*, 23 F. Supp. 3d 1063, 1094 (D. Alaska 2014). *Contra* Opp. 38.[7] NMFS asserts that the new information is nonetheless insignificant because it "did not meaningfully change the *nature of the environmental issues* it already analyzed in the DEIS," only "the *degree* of the protections to sea turtles." Opp. 38. "Degree," however, is precisely how agencies determine the significance of an action under NEPA. *See, e.g.*, 40 C.F.R. § 1508.27(b)(9) (2019). A change in the degree of environmental effect can be significant for

---

[7] NMFS relies on *National Committee for the New River v. FERC* to support its incongruous positions, but the case is inapposite because, unlike here, the "new information . . . did not cause" the agency to change its action. 373 F.3d 1323, 1330 (D.C. Cir. 2004).

supplemental EIS purposes. *E.g.*, *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 706 (10th Cir. 2009) (rejecting argument that supplementation is not required when "impacts would differ only in degree, not in kind," and finding "difference in the degree of habitat fragmentation" required supplementation). Here, a change in the degree of annual mortality could significantly alter the rule's effects on sea turtle populations and their ability to recover, making NMFS's asserted new information significant. NMFS simply cannot have it both ways and disclaim the significance of new information it expressly relied on to change its action.

Second, the final rule is a substantial change from the proposed rule and its alternatives originally considered. *See* MSJ 37. Contrary to NMFS's assertions, the fact that the agency had considered alternatives ranging from requiring TEDs on "all" to "no" shrimping vessels does not make the final rule a "minor variation" "qualitatively within the spectrum of alternatives." Opp. 39−40. In the context of "determining whether a supplemental EIS is required," "an agency may not decline to analyze the alternative it actually adopts simply because the overall level of environmental protection it offers falls between that offered by analyzed alternatives." *New Mexico*, 565 F.3d at 706 n.28. The proper test is to determine whether the change is substantial based on "the significance of the environmental effects of the changes," not "by the modification in the abstract." *Pub. Emps. for Env't Resp. v. U.S. Dep't of the Interior*, 832 F. Supp. 2d 5, 29–30 (D.D.C. 2011) ("*PEER v. DOI*"); *see also* MSJ 36.

A decision to nearly halve the amount of sea turtle protections from *any* of the previous alternatives and exempt over 80 percent of the targeted vessels from the rulemaking will have significant environmental effects on both sea turtles and fishermen. *See* MSJ 37 (citing *Env't Def. Fund v. Marsh*, 651 F.2d 983, 993 (5th Cir. 1981)). NMFS's dismissive response that an

annual death rate of over 2,200 threatened and endangered sea turtles is "inconsequential" only highlights its failure to acknowledge the significance of its change to conservation of sea turtles. Opp. 39.

NMFS also cannot rely on a single purported comment as evidence that a supplemental EIS was not warranted. *See id.* First, there is no evidence such comment exists, *see* MSJ 22−23, and NMFS still provides none. Second, even if the comment did exist, it would not minimize "the significance of the environmental effects of the changes" in the final rule. *PEER v. DOI*, 832 F. Supp. 2d at 29–30.

Because NMFS explicitly relied on new information and significantly changed the environmental effects for sea turtle conservation in its new final action, the agency was obligated under NEPA to prepare a supplemental EIS. MSJ 36−38. NMFS's failure to engage in the supplemental EIS process deprived the public of its role in the decisionmaking process and the agency of "the benefit of informed comments and suggestions," frustrating the purposes of NEPA. *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1291 (1st Cir. 1996); *see* MSJ 26−28.

## VI. <u>Remedy</u>

Conservation Groups respectfully contend that the Court can and should rule on the appropriate remedy in the context of this briefing if it finds the TED Rule invalid. In its response, NMFS makes a bare assertion that Conservation Groups' requested remedy is "untenable," but declines to provide any explanation or evidence in support of its defense. Opp. 40. The Court should not countenance NMFS's failure to defend its position by granting NMFS's request to defer briefing on remedy until some date in the future. There is no reason the parties cannot address remedy at this stage of briefing. Postponing remedy for further briefing would only delay the requested relief that NMFS correct its failures, and more importantly, delay already long overdue sea turtle protections.

In its brief, NMFS simply claims, without support or explanation, that an order to prepare a new rule within six months is "untenable" because it allegedly "would unnecessarily truncate the time available for public comment and agency analysis." *Id.* NMFS's argument is without merit. NMFS offers no affidavits from agency staff or any other support for its bare assertion that the remedy is untenable, even though it had ample opportunity to do so in its opening brief. NMFS has also already collected data for the potential alternatives in the last round of rulemaking and updated that information through an advance notice of proposed rulemaking. 86 Fed. Reg. 20,475 (Apr. 20, 2021).

The Court has the inherent "discretionary authority to impose a deadline for the remand proceedings" under the APA. *Alaska Ctr. for Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 937 (9th Cir. 2008). Setting a deadline in this case is necessary to ensure NMFS remains accountable given its extensive decade-long history of foot-dragging. *See* MSJ 7−9; *Amicus* Br. 10−11. As one NMFS official even noted, it "would be better if someone has to impose" the TED regulations, "that it is the court rather than us." *Amicus* Exhibit N, ECF No. 25-14.[8] "[I]n order to bring about any progress toward achieving the congressional objectives" of NEPA and the ESA, NMFS must "be directed to take specific steps." *Browner,* 20 F.3d at 986.[9] A six-month deadline is reasonable. *See, e.g.,*

---

[8] "[E]xtra-record evidence may be used 'in cases where relief is at issue.'" *Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 370 n.7 (D.D.C. 2017) (quoting *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)).

[9] NMFS's assertion of the "primary jurisdiction" doctrine as a basis for the Court to stay the case is inapplicable here. *See* Opp. 8 n.6. The rarely applied doctrine can be invoked if there is a compelling reason to allow an agency "to make the *initial* decision on the issues in dispute." *Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n*, 965 F.2d 1118, 1120 (D.C. Cir. 1992) (emphasis added). There is no "initial decision" to make here; NMFS already "made considered judgments on the legal issues" when it issued the TED Rule. *Reid v. Johnson & Johnson*, 780 F.3d 952, 967 (9th Cir. 2015). Indeed, it continues to defend that position before this Court. The Court should therefore proceed to rule on the legal validity of NMFS's positions on the merits.

*Oceana, Inc. v. Ross*, 483 F. Supp. 3d 764, 788 (N.D. Cal. 2020) (setting 120-day deadline for new rule); *Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1381 (Fed. Cir. 2001) (same). Additionally, there is nothing barring NMFS from later requesting an extension if it has made demonstrable progress. *Cf., e.g., Am. Rivers v. NOAA Fisheries*, No. CV-04-00061-RE, 2006 WL 2792675, at *5 (D. Or. Sept. 26, 2006) (ordering completion of remand within four months and providing that "the court may grant Federal Defendants an extension of time provided that significant progress is being made and will continue to be made"). Conservation Groups accordingly respectfully request that the Court remand the TED Rule without vacatur and order NMFS to issue a new, legally compliant regulation for TEDs within six months.

Respectfully submitted this 21st day of January, 2022.

*/s/ Grace P. Bauer*
Grace P. Bauer (*pro hac vice*)
Stephen D. Mashuda (DDC Bar. WA0005)
Christopher D. Eaton (*pro hac vice*)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 | Telephone
415-217-2040 | Fax
gbauer@earthjustice.org
smashuda@earthjustice.org
ceaton@earthjustice.org

*Attorneys for Plaintiffs*