**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY;
DEFENDERS OF WILDLIFE; and
TURTLE ISLAND RESTORATION
NETWORK,

        Plaintiffs,

    v.                                        Civil Case No. 1:21-cv-930-BAH

NATIONAL MARINE FISHERIES
SERVICE; and GINA RAIMONDO, in her
official capacity as Secretary of the United
States Department of Commerce,

        Defendants.

**Federal Defendants' Reply Memorandum
in Support of Cross-Motion for Summary Judgment**

Table of Contents

I.      INTRODUCTION ........................................................................................... 1

II.     ARGUMENT ................................................................................................... 2

     A.     NMFS adequately explained the basis of its decision to change the preferred alternative based on comments received (Count 1). ................................................. 2

     B.     NMFS's decision to limit TED requirements to skimmer trawl vessels 40 feet and greater is supported by the record (Count 2). ............................................. 6

     C.     NMFS's 40-foot final rule is a logical outgrowth of the proposed rule (Count 3). ....................................................................................... 7

     D.     NMFS took a hard look at the Final Rule (Count 5). ............................................ 10

          1.     NMFS properly considered environmental consequences for all affected sea turtles and disclosed its methodological reasons for using sea turtle mortality data in its Environmental Consequence analysis. ................................................................................ 10

          2.     NMFS complied with NEPA's implementing regulations and properly analyzed the known quantitative and qualitative costs and benefits of the Final Rule. ........................................................ 15

     E.     NMFS was not required to conduct supplemental NEPA analyses (Count 4) .... 16

     F,     Plaintiffs' requested remedy is untenable. ......................................................... 21

III.    CONCLUSION .............................................................................................. 24

# I. INTRODUCTION

On December 16, 2016, the National Marine Fisheries Service ("NMFS") published a proposed rule to require the use of turtle excluder devices ("TEDs") on all skimmer trawls, pusher-head trawls, and wing nets, which in conjunction with existing regulations, would have required TEDs on almost all vessels in the southeastern U.S. shrimp fisheries. Sea Turtle Conservation Shrimp; Trawling Requirements, 81 Fed. Reg. 91,097 (Dec. 16, 2016) ("Proposed Rule"); AR002154 (same). After receiving public comments raising economic and other concerns, NMFS decided to issue a final rule requiring skimmer trawl vessels 40 feet and greater in length to use TEDs. Sea Turtle Conservation; Shrimp Trawling Requirements, 84 Fed. Reg. 70,048 (Dec. 20, 2019) ("Final Rule"); AR009456 (same). In short, NMFS determined that this change in the proposed action would provide conservation benefits (801-1,158 fewer annual sea turtle mortalities than under the status quo), AR001810, while causing many fewer vessels to cease operations in relation to the TED requirement described in the Proposed Rule, AR001865. The Final Rule was an appropriate exercise of NMFS's broad discretion to promulgate regulations that NMFS deems necessary and appropriate pursuant to Endangered Species Act ("ESA") Sections 4(d), 16 U.S.C. § 1533(d), and 11(f), 16 U.S.C. § 1540(f), respectively.

The record before the Court also confirms that NMFS appropriately considered the environmental effects of the Final Rule consistent with its obligations pursuant to the National Environmental Policy Act ("NEPA"). NMFS's Environmental Impact Statement ("EIS") took the requisite "hard look" at the environmental consequences of imposing a TED requirement. The 40-foot vessel size threshold established in the Final Rule was within the range of alternatives analyzed in the draft EIS ("DEIS"), and no further NEPA analysis is necessary. The Court should grant summary judgment in favor of Federal Defendants as to all claims.

## II.   ARGUMENT

**A.   NMFS adequately explained the basis of its decision to change the preferred alternative based on comments received (Count 1).**

Plaintiffs concede, as they must, that an agency may change its mind.  *See* ECF No. 29 at 8 ("NMFS misconceives Conservation Groups' argument as claiming that the agency is precluded from changing its rule. . .").  Nevertheless, Plaintiffs suggest that NMFS did not sufficiently explain the basis of its decision to impose the TED requirement on only *some* vessels in light of the agency's preliminary determination that the Proposed Rule covering *most* vessels furthers the ESA's specific conservation purpose.  Plaintiffs assert that the following statements in the Proposed Rule, AR002156, are determinative of their claims:

> Therefore, we preliminarily determined that the measures proposed here are necessary and advisable to conserve threatened and endangered sea turtle species. We have further preliminarily determined that the measures proposed here are necessary and appropriate to enforce the requirements of the ESA.

*See* ECF No. 23-1 at 26; ECF No. 29 at 7.

According to Plaintiffs' reasoning, because NMFS preliminarily determined it was necessary and advisable for conservation of sea turtles to require TEDS on most vessels, NMFS must make some further, express determination that the original proposal is *no longer* necessary and advisable for conservation of sea turtles.  *See id.*  Certainly, the agency is not required to prove a negative when it changes its mind.  As with any challenge to an agency's rulemaking process, the relevant issue here whether NMFS fulfilled its obligation to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm*

*Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*") (internal quotation marks and citation omitted). The record before the Court confirms that NMFS fulfilled this obligation.

As explained in our opening memorandum, ECF No. 27-1 at 13-20, NMFS reasonably decided to change the preferred alternative described in the Proposed Rule based on public comments received. Some commenters raised concerns about the practicality of employing TEDs on small skimmer vessels, as well as in pusher-head trawls and wing nets. AR009434-35; *see also* AR009464 ("Comment 44: TED requirements present safety issues when used on small vessels (*e.g.,* walking out on frames to remove debris snagged in TEDs, extension can result in net getting entangled in the propeller, etc.)."); AR009463 (Response to Comment 36) ("In addition, comments raising safety and other practical concerns about using TEDs on small skimmer trawls factored into the decision to change the preferred alternative and modify the final rule to focus solely on skimmer trawl vessels 40 feet and greater in length.") Others raised concerns regarding the economic impacts associated with requiring TEDs, particularly in shrimp trawl vessels whose owners were already operating near or below negative revenue levels, and NMFS's estimation that 48% of affected vessels could cease operating if they were required to use TEDs. AR001865; *see also* AR009460 ("Comment 17: NOAA's economic analysis does not take into account the long-term economic effect of vessels ceasing operations."). Some comments also questioned the need for further TED regulation, as there have been improvements in the nesting number of several species of sea turtles. AR002060; *see also* AR009462 ("Comment 32: New regulations are unnecessary, as NOAA's own data indicates sea turtle populations are recovering under the status quo."). Accordingly, the Final Rule incorporated the agency's reasoned explanation for changing the preferred alternative. AR009457 (NMFS revised the threshold "[b]ased on public comment raising performance and safety issues with

TED use on smaller vessels and regarding the economic impacts of the proposed rule, and new information indicating significantly lower levels of sea turtle mortality in the offshore fleet. . . ."). The record before the Court demonstrates that NMFS articulated the requisite "reasoned basis" for its decision to change its proposed action.

Plaintiffs mischaracterize NMFS's statements in the Proposed Rule concerning the efficacy of "tow times" as a mitigation measure to avoid drowning sea turtles. *See* ECF No. 23-1 at 26 ("NMFS's determinations were grounded in its findings that tow time requirements do not work."); ECF No. 29 at 9 ("[T]the proposed rule's preliminary determinations were grounded in its findings that tow time requirements do not work. . . ."). Contrary to Plaintiffs' repeated characterizations that NMFS has flatly concluded that tow time requirements do not work, the agency's position is more nuanced. The Proposed Rule acknowledged that tow times may be exceeded by fishers and that there are enforcement challenges. AR002155-56. At the same time, the agency has recognized tow time requirements have utility for skimmer trawl vessels because skimmer trawlers can retrieve their codends (the rearward, closed end of the trawl net) without hauling all gear back like an otter trawler. *See* AR009433. Moreover, because existing TED designs are not expected to work for all vessels, NMFS explained the basis of its decision to retain tow time requirements for specific fisheries in the responses to comments 41-43 in the Final Rule. AR009463-64.

Recognizing the continued utility of tow times as part of a suite of management measures for the skimmer trawl fishery[1], the Final Rule amended the definition of tow time applicable to

---

[1] NMFS never proposed to eliminate the tow time option for all shrimp fishers. In addition to the types of trawls specifically addressed via this rulemaking, a number of other alternative tow time exemptions to the TED requirements were untouched by the rule. *See* 50 C.F.R. § 223.206(d)(2)(ii)(A)(1-2) & (4-5).

the exemption for certain vessels less than 40 feet as specified at 50 C.F.R. §

223.206(d)(2)(ii)(A)(3) "to better clarify the intent and purpose of tow times to reduce sea turtle

mortality. . . ." AR009456. "The tow time begins at the time the trawl door enters the water and

ends at the time the trawl door is removed from the water." AR009471. "For a trawl that is not

attached to a door, the tow time begins at the time the codend enters the water and ends at the

time the codend is emptied of catch on deck." *Id.* NMFS reasoned that the revised definition

would allow for a more complete inspection of the net for any captured sea turtles. AR009457.

Thus, NMFS reasonably decided to maintain the tow time-requirement option for vessels shorter

than 40 feet, *id.,* and for Biscayne Bay wing net vessels and beam trawl vessels operating in the

Corpus Christi Bay, Texas bait shrimp fishery. AR009463-64.

    Contrary to Plaintiffs' assertion, ECF No. 29 at 8, there is no unexplained inconsistency

in the Final Rule in light of any preliminary determinations in the Proposed Rule with respect to

conservation. The Final Rule acknowledges the preferred alternative described in the Proposed

Rule—including the TED requirement—"may be a necessary and advisable action to conserve

threatened and endangered sea turtle species." AR009457. Indeed, the Final Rule affirms that

"the most effective protective measure for threatened and endangered sea turtle populations is to

reduce the total time sea turtles are entrained in a skimmer trawl by using TEDs." AR009458.

However, the Final Rule explains that the agency revised the regulation "[b]ased on public

comment raising performance and safety issues with TED use on smaller vessels and regarding

the economic impacts of the proposed rule, and new information indicating significantly lower

levels of sea turtle mortality in the offshore fleet. . . ." AR009457.

    Notwithstanding the revision to limit the TED requirements to skimmer trawl vessels 40

feet and greater in length, the conservation purpose of the Final Rule is manifest: "This rule will

achieve a significant conservation benefit for listed sea turtles, while affecting significantly fewer vessels and imposing far fewer costs upon industry." *Id.* Although Plaintiffs suggest that NMFS should have included some further, conservation-related determination in the Final Rule, the Supreme Court has explained that it will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 286 (1974); *Hüls Am. Inc. v. Browner*, 83 F.3d 445, 454 (D.C. Cir. 1996) (agency decision of less than ideal clarity will be upheld provided agency rationale is reasonably discernable from the record). The Final Rule amply meets this standard and supports the conclusions that the provisions therein are both necessary and advisable to conserve threatened and endangered sea turtle species and also necessary and appropriate to enforce the requirements of the ESA.

**B.     NMFS's decision to limit TED requirements to skimmer trawl vessels 40 feet and greater is supported by the record (Count 2).**

In addition to challenging the agency's decision to require TEDs on only some skimmer trawl vessels (rather than all skimmer trawls, pusher-head trawls, and wing nets as proposed), Plaintiffs also challenge the specific 40-foot vessel size criterion adopted in the Final Rule. The agency's decision to establish the 40-foot criterion is supported by "Comment 64" as referenced in the final EIS ("FEIS"), AR002068, and the Final Rule, AR009466. Comment 64 states that "NOAA should exempt all skimmer trawls less than 40 feet in length from the TED requirements." AR009466. In response, the Final Rule states that "[b]ased on public comment and further deliberation, we revised our final rule to exempt skimmer trawl vessels less than 40 feet in length." *Id.* As with the agency's decision to require TEDs on only some vessels, the relevant issue with respect to the size criterion is whether the agency expressed a "reasoned basis" for its regulatory actions. *State Farm*, 463 U.S. at 43, 48 (citation omitted).

The record before the Court confirms that NMFS articulated the requisite "reasoned basis" for instituting the 40-foot criterion. In short, NMFS determined that the new preferred action would achieve approximately half of the conservation benefit that the proposed rule would have, while affecting only about 20% of the number of vessels. AR009436. NMFS also determined that the more focused scope of the Final Rule will allow for faster implementation of the TED requirement. AR009466. The Court should defer to the agency's selection of the 40-foot vessel size threshold based on the range of alternatives considered, as informed by public comments received raising various safety and economic concerns about the preferred alternative described in the Proposed Rule. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983); *FCC. v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 813-14 (1978); *see also Nat'l Mining Ass'n v. Mine Safety & Health Admin.,* 512 F.3d 696, 700 (D.C. Cir. 2008) ("It is enough if the agency's statement identifies the major policy issues raised in the rulemaking and coherently explains why the agency resolved the issues as it did.").

**C.     NMFS's 40-foot final rule is a logical outgrowth of the proposed rule (Count 3).**

The new preferred alternative requiring skimmer trawl vessels 40 feet and greater in length to use TEDs was a "logical outgrowth" of the Proposed Rule because it was informed by reasoned decisionmaking resulting from the public comment processes on the DEIS and the Proposed Rule, during which NMFS received approximately 38,500 public comments. *See* AR009457 (Summary of Comments). As explained in our opening memorandum, ECF No. 27-1 at 24-26, the 40-foot criterion was derived from the original seven alternatives described in the DEIS. AR001673 ("In response to public comment and further deliberation, we have added a new alternative, derived from the original 7, and made it our preferred alternative (i.e., Alternative 8)."). Although NMFS did not solicit comments on a specific alternative tied to the

40-foot vessel size threshold, this size criterion is within the range of size alternatives identified for purposes of the public comment process (i.e., alternatives ranging from TEDs required on most vessels to no additional TEDs required regardless of vessel size). Plaintiffs may disagree with this rationale, but they are incorrect in asserting that Federal Defendants made "no argument addressing the appropriate standard." ECF No. 29 at 14.

Plaintiffs suggest that the 40-foot vessel size criterion is not a logical outgrowth of the Proposed Rule because commenters could not have anticipated that the agency would adopt this particular vessel size threshold in response to public comments received. *See* ECF No. 29 at 13-14. However, the Proposed Rule stated that the agency was considering a phased-in approach for implementing the new TED requirements. AR002156 ("Another approach could be to phase the TED requirement based on vessel size, where the largest vessels would be the first vessels required to install the devices."). Consistent with the phased-in approach contemplated in the Proposed Rule, NMFS reasoned that "[t]he more focused scope of the final rule will allow for faster implementation of the TED requirement and is expected to result in a significant conservation benefit of 801–1,168 sea turtles annually in the Southeastern U.S. shrimp fisheries." AR009466. NMFS further stated that it "may address other trawls, such as pusher-head trawls, wing nets, and try nets, as well as small skimmer trawl vessels, in future rulemaking." *Id.* Thus, NMFS's decision to limit the TED requirement to vessels 40 feet and longer "[a]t this time," AR009458, is consistent with the Proposed Rule's stated intent "to first implement the requirement where it would achieve the greatest conservation benefit for listed sea turtles." AR002156.

Citing *Fertilizer Institute v. U.S. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991) and *Shell Oil Co. v. EPA,* 950 F.2d 741, 751 (D.C. Cir. 1991), Plaintiffs suggest that a new vessel size

criterion established in response to public comments received cannot be a logical outgrowth of the Proposed Rule because an agency itself must provide notice of a regulatory proposal. ECF No. 29 at 14 n.5. However, the U.S. Court of Appeals for the D.C. Circuit subsequently concluded that it could rely on information developed during public comment procedures to find that the public should have anticipated that changes to a proposed rule were possible. "While we often apply the doctrine simply by comparing the final rule to the one proposed, we have also taken into account the comments, statements and proposals made during the notice-and-comment period." *Nat'l Mining Ass'n* 512 F.3d at 699 (citing *Nat. Res. Def. Council, Inc. v. Thomas*, 838 F.2d 1224, 1243 (D.C. Cir. 1988); *Edison Elec. Inst. v. Occupational Safety & Health Admin.*, 849 F.2d 611, 621 (D.C. Cir. 1988); *United Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1221 (D.C. Cir. 1980); *District of Columbia v. Train*, 521 F.2d 971, 997 (D.C. Cir. 1975). Indeed, the court looked beyond the four corners of the proposed rule in "the case that gave birth to the 'logical outgrowth' formulation. . . ." *Id.* at 699 (quoting *S. Terminal Corp. v. EPA*, 504 F.2d 646, 659 (1st Cir. 1974)). "The court held that the final rule was a logical outgrowth—not simply of the proposed rule— but of the hearing and related procedures during the notice and comment period." *Id.* (internal quotation marks omitted).

It would be of no moment if the 40-foot criterion was not itself proposed in a specific comment or set of comments. The agency's decision to adopt the criterion was informed by an extensive body of comments that raised concerns about the feasibility of requiring most vessels to install and use TEDs, as well as the dire economic consequences that would result from that requirement. *See* ECF No. 27-1 at 13-16. Viewing the record as a whole consistent with reasoning in *National Mining Association*, it is apparent that the 40-foot criterion is a logical outgrowth of the Proposed Rule because it addresses safety, feasibility and economic concerns

raised by stakeholders during the notice and comment period, *see supra*. The Court should grant

summary judgment in favor of Federal Defendants as to Plaintiffs' Count 3 claims.

**D.      NMFS took a hard look at the Final Rule (Count 5).**

NMFS took a hard look at the Final Rule's effect on sea turtles in the Southeastern U.S.

Shrimp Fisheries by dedicating over 100 pages in the FEIS to an analysis of the environmental

consequences of its action.  AR001793–914.  Yet, Plaintiffs still insist that NMFS "fails entirely"

to assess the effects of its action on sea turtles because it did not assess the effects on individual

sea turtle species at the population level.  ECF No. 29 at 14.  As stated in Federal Defendants'

opening memorandum, nothing in NEPA or its implementing regulations requires NMFS to

conduct a species-specific analysis.  ECF No. 27-1 at 28-29.  While the agency must take a hard

look at the environmental consequences of its actions, it need not utilize Plaintiffs' preferred

methodology in doing so, or arrive at the same conclusions advocated by Plaintiffs.  *Nat. Res.*

*Def. Council v. U.S. Nuclear Regul. Comm'n*, 823 F.3d 641 (D.C. Cir. 2016) ("NEPA requires

agencies to take a hard look before approving a major federal action," BUT "does not mandate

adoption of a particular process for doing so.").

**1.      NMFS properly considered environmental consequences for all affected sea turtles and disclosed its methodological reasons for using sea turtle mortality data in its Environmental Consequence analysis.**

As in their initial brief, Plaintiffs again cite to a section of NEPA's implementing

regulations—40 C.F.R. § 1508.27(b)(9) (2019)—for the incorrect notion NEPA requires

agencies to engage in species-specific analysis.  ECF No. 23-1 at 41; ECF No. 29 at 15.  This is

misleading, as that section of the White House Council on Environmental Quality's ("CEQ's")

NEPA regulations has a very narrow scope.  It is not part of the regulatory sections establishing

requirements for an EIS, which are laid out in detail in sections 1502.1 through 1502.25 and

include no requirement for species-specific analysis. Instead, section 1508.27(b)(9) is part of the "terminology and index" section, and its purpose is to interpret the meaning of the word "significantly" where it is used in NEPA.[2] *See* 40 C.F.R. §§ 1502.1–1502.25, 1508.27(b)(9) (2019). The most notable and important use of the word "significantly" in NEPA occurs in 42 U.S.C.A. § 4332(2)(C) (2019), which requires agencies to prepare an EIS for "major Federal actions *significantly* affecting the quality of the human environment." *Id.* (emphasis added). Thus, when an agency is initially determining *whether* to prepare an EIS, and considering *whether* an action will "significantly" affect the environment, 40 C.F.R. § 1508.27(b)(9) (2019) instructs the agency to consider whether the action may "adversely affect an endangered or threatened species." *Id.* Here, that issue is not before the Court as NMFS clearly determined that an EIS was necessary and prepared one in accordance with NEPA. *See* AR000001–03 (Notice of Intent to Prepare an Environmental Impact Statement for Sea Turtle Conservation and Recovery Actions and To Conduct Public Scoping Meetings). Plaintiffs do not challenge NMFS's decision to prepare an EIS, which would implicate 40 C.F.R. § 1508.27, but the contents and scope of the EIS it prepared. Those decisions are within the discretion of the agency. *Nat'l Parks Conservation Ass'n v. Jewell*, 965 F. Supp. 2d 67, 82 (D.D.C. 2013) ("An agency's decision about the appropriate scope of the FEIS is entitled to deference.").

Additionally, despite NMFS's scientifically-backed conclusion that the sea turtle population estimates Plaintiffs seek "do not exist because of the difficulties in sampling turtles over their geographic ranges and within their marine environments," AR001700, RR-101326,

---

[2] In full, 40 C.F.R. § 1508.27 states that "'[s]ignificantly' as used in NEPA requires considerations of both context and intensity." *Id.* Subsection (b)(9) asserts that as part of the "intensity" analysis, agencies must consider "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973." *Id.* § 1508.27(b)(9).

Plaintiffs still insist that NMFS's failure to engage in species-specific population analysis invalidates its NEPA analysis. But population data is not the only way to measure the rule's effect on sea turtles. Because NMFS did not have access to population data, it worked with the reliable data it *did* have by using estimated sea turtle mortalities to evaluate the Final Rule's effects on sea turtles. *See* AR001793 ("The capture and mortality of sea turtles in bottom fishing trawl gear is well documented." (internal citations omitted)). NMFS identified and described its methodology for using mortality data as the basis of its effects analysis. AR001793–98. It explained that, in addition to capture and mortality rates, it would consider "post-interaction mortality" to include turtles in its analysis that are released from capture but subsequently die due to the effects of capture or injuries sustained during the interaction. AR001793. This explanation of methodology not only clarifies why NMFS focused its analysis on sea turtle mortality data, but also refutes Plaintiffs' assertion that NMFS employed "no methodology whatsoever." ECF No. 29 at 15–16; *see e.g.,* AR001795 ("The process for calculating sea turtle bycatch estimates for skimmer trawls is described below."). NMFS's conclusion that sea turtle population estimates are not possible, AR001700, RR-101326, and its corresponding reliance on mortality data, are entitled to "an extreme degree of deference." *Huls Am. Inc.*, 83 F.3d at 452; *see also Ctr. for Biological Diversity v. EPA*, 749 F.3d 1079, 1087 (D.C. Cir. 2014) (asserting that "[d]ecades of decisions in this court stand in the way of [petitioners'] arguments" that EPA lacked sufficient scientific information to make reasoned judgement); *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554 (D.D.C. 2002) (per curiam) ("[P]articular deference is given by the court to an agency with regard to scientific matters in its area of technical expertise . . . .").

Like Plaintiffs' reliance on an inapplicable NEPA regulation, the quotation Plaintiffs repeatedly include from *Public Employees for Environmental Responsibility v. U.S. Fish and*

*Wildlife Service,* ECF No. 23-1 at 42; ECF No. 29 at 15, that "[i]t is hard to imagine a 'softer' look" than not evaluating impacts on the species' current population status, was taken out of context and is not applicable to the factual situation here. 177 F. Supp. 3d 146, 153 (D.D.C. 2016). In *Public Employees*, the agency failed to update three of the four population models that it used to assess impacts to cormorant populations between a 2009 environmental assessment and a 2014 environmental assessment. *Id.*. The court determined that the agency failed to take a hard look at the effects of its actions because it "simply lifted the findings from its 2009 [environmental assessment]" into its 2014 environmental assessment. *Id.* In contrast, here, NMFS "used observer data collected on skimmer trawls operating in the Gulf of Mexico from 2012-2015" as the basis of its Environmental Consequences analysis. AR001793. Thus, NMFS did not simply recycle old data gathered for its previous TED-related EIS, which was published in 2012. AR001666. Unlike the agency in *Public Employees for Environmental Responsibility*, NMFS took a hard look at the impacts of the Final Rule using the best data it had access to and tailoring its analysis accordingly.

Finally, Plaintiffs mischaracterize Federal Defendants' discussion of the 2014 and 2021 Biological Opinions ("BiOps"). Federal Defendants did not and do not claim that the two BiOps are NEPA documents; indeed, Federal Defendants noted in their opening memorandum that they were prepared under ESA Section 7, not NEPA. ECF No. 27-1 at 31-32. Instead, Federal Defendants referenced the BiOps for two reasons: first, they were responding to *Plaintiffs*' reliance on ESA Section 7 regulations and case law to argue that the NMFS had certain obligations under NEPA, ECF No. 23-1 at 39–41; and second, Federal Defendants used the BiOps as a point of comparison between the analysis requirements under the ESA versus the analysis requirements under NEPA. As noted in Federal Defendants' opening memorandum,

while NEPA does not dictate specific methodology, the ESA Section 7 implementing regulations establish certain methods an agency must follow, which include species-specific analysis.  ECF No. 27-1 at 31.  Federal Defendants pointed the Court to the two BiOps to demonstrate that NMFS did conduct species-specific analysis when required by law, but cannot be faulted for failing to include species-specific analysis where the law is silent on this issue.

Moreover, the 2021 BiOp is properly before the Court.[3]  Federal Defendants assert that it should be considered part of the administrative record addressing Plaintiffs' claims because it informs the Court concerning the status of the alleged actions and inactions described in Plaintiffs' Complaint.  Plaintiffs' Complaint filed April 6, 2021, alleged that NMFS had not issued the BiOp as of the date of that filing.  *See* ECF No 1 ¶ 137.  As part of their request for relief, Plaintiffs specifically requested the Court "[d]eclare that NMFS failed to complete required ESA Section 7(a)(2) consultation before issuing the TED Rule, in violation of the ESA."  ECF No. 1 at 42.  NMFS issued the BiOp shortly thereafter on April 26, 2021.  While Plaintiffs have stated that they are "no longer pursuing Count 6 regarding NMFS's failure to complete Section 7 consultation under the Endangered Species Act," ECF No. 23 at 1 n.1, the parties have a mutual obligation to notify the Court of developments that might arguably affect the Court's jurisdiction as to specific claims.  *See Bd. of License Comm'rs of the Town of Tiverton v. Pastore*, 469 U.S. 238, 240 (1985) (per curiam) (The parties have a "continuing duty to inform the Court of any development which may conceivably affect the outcome of the litigation." (citation and internal quotation marks omitted)).  In any event, NMFS is not engaging in a "post hoc reliance" on the BiOp to "cure" deficiencies in its EIS, as Plaintiffs claim.  ECF

---

[3] Because the Plaintiffs dispute whether the 2021 BiOp was properly included in the agency's Administrative Record, *see* ECF No. 29 at 18, Federal Defendants include a copy of the 2021 BiOp with this filing, labeled as Exhibit 1.

No. 29 at 18–19. Federal Defendants merely discussed the BiOp—a public document relevant to this litigation—to contextualize their NEPA analysis as compared to an ESA analysis.

> **2. NMFS complied with NEPA's implementing regulations and properly analyzed the known quantitative and qualitative costs and benefits of the Final Rule.**

Plaintiffs' argument that NMFS should have quantified the economic benefits of TEDs is not supported by NEPA's implementing regulations. NEPA does not require a cost-benefit analysis. *See* 40 C.F.R. § 1502.23 (2019). NEPA's implementing regulations clarify that *if* an agency chooses to prepare a cost-benefit analysis, it must address any "unquantified environmental impacts" relative to that analysis. *Id.*. NMFS accomplished this, and complied with NEPA, in the "Economic Effects (Costs and Benefits) of the Management Measures" section of the Regulatory Impact Review ("RIR"), which is a part of the FEIS prepared in accordance with Executive Order 12866. AR001915–36. The RIR, which NMFS asserts is to be considered "[i]n conjunction with the analysis of direct and indirect effects in the 'Environmental Consequences' section of this EIS (see Section 4)," discusses the unquantified benefits of TEDs. AR001914. Thus, Plaintiffs' statement that "[a]n agency cannot qualitatively acknowledge benefits exist and then omit them when actually weighing costs against benefits," ECF No. 29 at 21, is incorrect. *See* 40 C.F.R. § 1502.23 (2019) ("the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are important qualitative considerations").

Finally, this is not a case where the agency "put a thumb on the scale" by undervaluing known benefits and overvaluing costs, like *Center for Biological Diversity v. National Highway Traffic Safety Administration*, 538 F.3d 1172, 1198 (9th Cir. 2008) ("*CBD v. NHTSA*"). In *CBD v. NHTSA*, the agency placed no value on carbon emissions in a cost-benefit analysis prepared to

determine the maximum feasible fuel economy standard *even though the record reflected a known range of values*, generally between $3 and $50 per ton carbon.  *Id.* at 1200-01.  The court found that NHTSA's reasoning was arbitrary and capricious because it valued carbon emissions at zero when the record, and counsel's own admissions at oral argument showed that the value was "certainly not zero."  *Id.* at 1200.  Here, NMFS was not aware of specific values for the benefits of TEDs that it chose to ignore.  It repeatedly stated throughout the FEIS that is was unable to accurately quantify the benefits of TEDs and would thus discuss them qualitatively instead.  *See* AR001874, 76 (explaining that social benefits like business conservation benefits to sea turtles and recreational value are difficult to analyze due to a lack of quantitative data); AR001922 (discussing benefits but noting that because the magnitude of such benefits is highly uncertain, NMFS could only describe them qualitatively).  Such assertions are not "baseless[]," as Plaintiffs claim, ECF No. 29 at 22, but based on NMFS's experience and expertise, which is entitled to deference.  *See Conservation L. Found. v. Ross*, 374 F. Supp. 3d 77, 89 (D.D.C. 2019) ("[W]hen an agency talks scientific data, courts listen.").

**E.    NMFS was not required to conduct supplemental NEPA analyses (Count 4).**

When NMFS published the Final Rule in the Federal Register, it noted that since publishing the proposed rule, it had obtained "new information indicating significantly lower levels of sea turtle mortality in the offshore fleet." AR009457.  Plaintiffs now insist that NMFS relied on the new information when choosing a different alternative, ECF No. 29 at 23, and that the new information caused the agency to change its action.  ECF No. 29 at 23 n.7.  But, the "new information" did not form the basis for the specific changes NMFS ultimately made between the DEIS and the FEIS.  As explained in the record, the "offshore fleet" refers to the otter trawl fleet.  *See* AR001320 ("Various types of gear are used to capture shrimp . . . [t]he

otter trawl, with various modifications, is the dominant gear used in offshore waters.");

AR001683 (same). And TEDs have been required in otter trawls for many years. AR001819.

NMFS noted the new information related to otter trawls because in its rulemaking, NMFS

considered multiple alternatives that would have impacted otter trawls: specifically, Alternatives

6 and 7 would have required otter trawlers to utilize TEDs designed to exclude small turtles in

their nets. AR001315; AR001677–78. But NMFS did not select Alternative 6 or Alternative 7

as its preferred alternative in the DEIS, AR001434, in part because it lacked adequate data and

sufficient information to accurately assess the conservation benefits that additional TED

requirements would have on the otter trawl fleet. *See* AR001437 ("[W]e don't have adequate

spatially-explicit data on otter trawl effort in state waters . . . "); AR001440 ("[W]e lack

sufficient information to come to any conclusions on differential sea turtle CPUE by otter

trawlers using TEDs with either 4-in or 3-in bar spacing across a range of water depths and

fishing areas."). Instead, the Proposed Rule proposed new TED requirements only for skimmer

trawls, pusher-head trawls, and wing nets—not otter trawls. AR002154. Likewise, the "new

information" did not impact NMFS's ultimate selection of Alternative 8 as its preferred

alternative in the FEIS, because Alternative 8 applied only to vessels using skimmer trawls, not

otter trawls. AR0016778. Therefore, NMFS's reference to significantly lower levels of sea

turtle mortality in the offshore fleet, while related to certain alternatives that NMFS had

considered and rejected, was not "significant" for purposes of 40 C.F.R. § 1502.9(c)(1) (2019)

because it was not "bearing on the proposed action nor its impact." *Id.*

Additionally, when NMFS published the Final Rule in the Federal Register and explained

changes from the proposed rule, it *also* referenced "public comment[s] raising performance and

safety issues with TED use on smaller vessels and regarding the economic impacts of the

proposed rule." AR009457. Unlike the "new information" about the offshore fleet, these comments informed the agency's decision not to finalize the preferred alternative identified in the Proposed Rule, which would have required TEDs on smaller vessels. AR001677. But the referenced comments, which are summarized in Federal Defendants' opening memorandum, ECF No. 27-1 at 13–17, also do not constitute significant new information that presents "a seriously different picture of the environmental impact of the proposed project from what was previously envisioned," which would trigger the need for a supplemental EIS. *Blue Ridge Env't Def. League v. Nuclear Regul. Comm'n*, 716 F.3d 183, 196 (D.C. Cir. 2013) (citation omitted.). Again, the comments related to "performance and safety issues with TED use on smaller vessels" as well as "the economic impacts of the proposed rule." AR009457. But NMFS *already considered* performance and safety issues with TED use on smaller vessels and economic impacts in the DEIS. *See, e.g.* AR001497 ("Safety at sea could be an issue, particularly under Alternatives 3, 5, 6, and 7, which include small vessels."); AR001506 (discussing "man overboard" as a potential safety problem if TEDs were required on small vessels with "limited deck space"); AR001447–1495 (analyzing the direct and indirect effects on the economic environment). Therefore, because neither the "new . . . information" nor the referenced comments are significant for purposes of 40 C.F.R. § 1502.9(c)(1) (2019), NMFS need not prepare a supplemental EIS. *See id.*

Plaintiffs continue to complain that NMFS has not provided sufficient "evidence" of a specific comment that resulted in the agency's decision to establish the 40-foot vessel size criterion adopted in the Final Rule. *See* ECF No. 29 at 25. However, in addition to including copies of written comments submitted, the record before the Court also memorializes the agency's responses to oral comments presented during six public hearings and two additional

presentations. *See* AR002050. "Comment 64" as included in the agency's summary of comments and responses recommended that "NOAA should exempt all skimmer trawls less than 40 feet in length from the TED requirements," AR002068 (FEIS APPENDIX IV: RESPONSE TO COMMENTS); AR009466 (Final Rule). It is unnecessary to present additional evidence that a specific comment supporting the 40-foot vessel size criterion exists because "Comment 64" and the agency's response thereto remains in the record, where it has always been. *See id.* In any event, as explained in our opening memorandum, NMFS was not required to conduct a supplemental environmental analysis concerning the effects of the 40-foot criterion specifically because that was within the range of impacts analyzed in the DEIS. ECF No. 27-1 at 38-42.

Consistent with CEQ guidance, the Final Rule is "qualitatively within the spectrum of alternatives" discussed in the DEIS because NMFS considered alternatives ranging from requiring new TEDs on all shrimping vessels to requiring new TEDs on no shrimping vessels. *See* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,035 (Mar. 23, 1981) (*followed by Nat'l Parks Conservation Ass'n*, 965 F. Supp. 2d at 78); AR001659–60; ECF No. 27-1 at 42. Therefore, because NMFS had already considered the environmental impact the Final Rule would have on the affected sea turtles, there was no "substantial change" and supplementation was not required. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989) (supplemental EIS is only required where the impacts have not already been considered); *see also Friends of Marolt Park v. U.S. Dep't of Transp.*, 382 F.3d 1088, 1096–97 (10th Cir. 2004) (finding that when "the relevant environmental impacts have already been considered" earlier in the NEPA process, no supplement is required). The D.C. Circuit has upheld an agency's decision not to conduct a supplemental EIS where the agency changed course after the DEIS and adopted a new alternative

that was similar to the no-action alternative it had already analyzed. *Cnty. of Rockland, N.Y. v. Fed. Aviation Admin.*, 335 F. App'x. 52, 55 (D.C. Cir. 2009). The situation here is analogous to *County of Rockland, N.Y.,* because NMFS selected a new alternative in the FEIS that was similar to alternatives it has already considered, like Alternatives 2 and 4, which would have required vessels 26 feet and greater to use TEDs. AR001312–14.

Moreover, courts disfavor interpretations of NEPA that call for an endless cycle of supplemental analyses. *See Marsh,* 490 U.S. at 373 ("[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made.") (citations omitted); *Vt. Yankee Nuclear Power Corp. v. Nat Res. Def. Council,* 435 U.S. 519, 554–555 (1978) (urging that if "litigants might demand rehearing as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening") (citation omitted); *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 510–11 (D.C. Cir. 2010) (refusing to require an agency to recalculate ozone impacts in an EIS because it adopted a different methodology for future air quality analyses one month after completing the EIS "because a still newer method could have been developed during that re-analysis, the process could have been endless"); *Cascadia Wildlands v. Carlton*, 341 F. Supp. 3d 1195, 1201–1202 (D. Or. 2018) (finding that an agency did not violate NEPA where the public was not given an opportunity to comment on two amendments to an environmental analysis because requiring "public comment would likely result in a never-ending process of supplements and further comment"). Thus, courts have emphasized that "agencies must have some flexibility

to modify alternatives canvassed in the draft EIS to reflect public input," without having to circulate a supplemental draft EIS describing the proposed action.  *See Half Moon Bay Fishermans' Mktg. Ass'n v.* Carlucci, 857 F.2d 505, 508-09 (9th Cir. 1988).  And, the Supreme Court has held that courts must defer to an agency's "informed discretion" in deciding whether to prepare a supplemental EIS because the decision requires "substantial agency expertise." *Marsh*, 490 U.S. at 376–77.  An agency's decision as to what constitutes "substantial changes in the proposed action that are relevant to environmental concerns" under 40 C.F.R. § 1502.9(c)(1) (2019) is also subject to deference.  *Id.*  Consistent with these authorities, NMFS reasonably concluded that "we have not made substantial changes in the proposed action that are relevant to environmental concerns, and no significant new circumstance or information relevant to environmental concerns exists that bears upon the proposed action or its impacts."  AR001673. The Court should grant summary judgment in favor of NMFS with respect to Plaintiffs' NEPA claims.

**F.    Plaintiffs are not entitled to the requested remedy.**

        For the reasons set forth above and in our opening memorandum, the Court should grant summary judgment in favor of Federal Defendants as to all of Plaintiffs' claims.  However, if the Court determines that the Final Rule was deficient in any respect, the only appropriate remedy would be for the Court to remand this matter to NMFS.  As the Supreme Court explained in *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), if the grounds for an agency's action are inadequate and a court remands that action as a result, the agency has two choices on remand: "First, the agency can offer a fuller explanation of the agency's reasoning at the time of the agency action . . .  Alternatively, the agency can deal with the problem afresh by taking new agency action." *Id*. at 1907-08 (citations omitted).

Applied here, this means NMFS may address the Court's opinion on remand (if necessary) either by providing a fuller explanation of its reasoning or taking a new agency action (*e.g.*, issuing a new Final Rule). This is consistent with the fundamental administrative law principle that "the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the [agency] for reconsideration." *Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20 (1952); *see also Vt. Yankee*, 435 U.S. at 544–545 (absent substantial justification "a reviewing court may not, after determining that additional evidence is requisite for adequate review, proceed by dictating to the agency the methods, procedures, and time dimension of the needed inquiry") (citations omitted). Just as NMFS has discretion as to the substance of any necessary action on remand, NMFS must also exercise discretion with respect to the amount of time it determines will be necessary to undertake any further actions to address any Court order on remand. *See Ctr. for Biological Diversity v. EPA,* 861 F.3d 174, 189 n.12 (D.C. Cir. 2017) (denying environmental group's request to order EPA to complete ESA consultation by a specific deadline and file six-month progress reports). Based on these authorities, the Court should deny Plaintiffs' request to impose a deadline for NMFS to complete any necessary actions on remand.

While Federal Defendants believe it is premature for the parties to discuss the amount of time required for NMFS to provide a fuller explanation on remand or, if necessary, to promulgate a new TED rule, Plaintiffs request the Court to order NMFS to complete such a remand in only six months. *See* ECF No. 29 at 27. Plaintiffs further suggest that the Court may consider extra-record evidence "in cases where relief is at issue." *Id.* at 26 n.8 (quoting *Eco Tour Acventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 370 n.7 (D.D.C. 2017) and *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)). To that end, Federal Defendants are filing herewith the

Declaration of Fishery Biologist Michael C. Barnette (Exhibit 2), which sets forth the specific tasks and amounts of time required to promulgate a new TED rule, if the Court determines that such remedy is appropriate. Taking into account the time required to produce a draft and final EIS under NEPA, *see* 40 C.F.R. § 1501.10(b)(2); to allow the Office of Management and Budget to review pursuant to Executive Order 12866, *see* Regulatory Planning and Review, 58 Fed. Reg. 51,735 (Oct. 4, 1993); to provide public notice and comment pursuant to the Administrative Procedure Act ("APA") pursuant to Executive Oder 13563, *see* Improving Regulation and Regulatory Review, 76 Fed. Reg. 3,821 (Jan. 21, 2011); and to conduct ESA Section 7 consultation, *see* 16 U.S.C. § 1536, NMFS anticipates that any new rulemaking would take approximately 30 months to complete the NEPA and APA processes, and an additional 12 months to complete the necessary BiOp.

NMFS's estimate of the time required to promulgate a new rule on remand is entitled to deference. "Indeed, where an agency justifies its conclusions with evidence, courts should not substitute their own prediction about the length of time an agency needs to evaluate data and promulgate rules, especially where those predictions turn on scientific matters." *Anacostia Riverkeeper, Inc. v. Jackson*, 713 F. Supp. 2d 50, 54 (D.D.C. 2010) (citing *Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 519 (D.C. Cir. 2009) ("We give an 'extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise . . . .'") (other citations omitted). This approach accords with the rule that courts must be at their "most deferential" when an agency makes predictions "within its area of special expertise." *Balt. Gas & Elec. Co.,* 462 U.S. at 103. Thus, although Federal Defendants assert that Plaintiffs are not entitled to any relief whatsoever, if the Court grants Plaintiffs' request to impose a schedule for Defendants to promulgate a new Final Rule on remand, the Court should allow NMFS a period

of 30 months to complete the NEPA and APA processes, and an additional 12 months to conclude the necessary BiOp.

## III.    CONCLUSION

It is undisputed that the Final Rule implements a vessel size threshold that imposes a TED requirement on fewer vessels than the Proposed Rule.  Nevertheless, as Plaintiffs themselves acknowledge, the Proposed Rule was based on what the agency had "preliminarily determined."  ECF No. 29 at 7.  As we have shown, an agency may change its mind, and the record before the Court supports the agency's decision to change its mind in this case.  NMFS fulfilled its obligation to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks and citation omitted).  No further notice and comment proceedings or NEPA analyses were necessary.  The Court should grant Federal Defendants' motion for summary judgment on all claims and deny Plaintiffs' motion for summary judgment.

Dated: February 18, 2022                    Respectfully submitted,

TODD KIM,
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
SETH M. BARSKY, Section Chief
MEREDITH L. FLAX, Asst. Section Chief
*/s/ Mark Arthur Brown*
MARK ARTHUR BROWN
Senior Trial Attorney
D.C. Bar No. 470050
Wildlife & Marine Resources Section
Ben Franklin Station
P. O. Box 7611
Washington, DC 20044-7611
(202) 305-0204 (tel.)
(202) 305-0275 (fax)

*/s/ Hannah E. O'Keefe*
HANNAH E. O'KEEFE
Trial Attorney
IL Bar No. 6336475
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
(202) 616-3353 (tel.)
(202) 305-0506 (fax)

Attorneys for Defendants

Of Counsel:

Shepherd R. Grimes
Attorney-Advisor
Office of the General Counsel
National Oceanic and Atmospheric Administration
U.S. Department of Commerce
263 13th Avenue South
St. Petersburg, FL 33701
Shepherd.Grimes@noaa.gov