## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY, *et al.,*

               Plaintiffs,

               v.

NATIONAL MARINE FISHERIES SERVICE, *et al.*,

               Defendants.

Civil Action No. 21-930 (BAH)

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

In the 1980s, the National Marine Fisheries Service ("NMFS"), which is tasked under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, with protecting endangered and threatened species of sea turtles in U.S. waters, developed a tool to combat the incidental capture by vessels trawling for shrimp of sea turtles, which must swim to the water's surface to breathe. Known as a turtle excluder device ("TED"), this tool prevents sea turtles from getting caught in shrimp nets and drowning.[1]  By all accounts, TEDs have been successful in reducing the rate of sea turtle mortality due to shrimping, and many sea turtle populations across multiple species have rebounded since the species were listed as endangered or threatened in the early 1970s.  *See* Compl. ¶¶ 53, 57, 72, ECF No. 1.  Despite this rebound, however, out of the five species of sea turtles found in U.S. waters, three remain endangered, and the other two are threatened.  *Id.* ¶¶ 49, 50, 55, 58, 61.

---

[1]    As plaintiffs explain, a TED is a "metal grid[] . . . attached to the inside of trawl nets with an escape hatch," that prevent most turtles from entering the bag part of the net, and instead diverts their path up out of the neck of the net.  Pls.' Mem. Supp. Mot. Summ. J. ("Pls.' Mem.") at 5, ECF No. 23-1.

In 2016, as part of a stipulated agreement in a suit before another Judge on this Court, *see* Stipulated Agreement & Mot. Stay Case at 2–3, *Oceana, Inc. v. Pritzker*, No. 15-cv-555 (PLF) (D.D.C. Sept. 7, 2016), ECF No. 11, NMFS issued a proposed rule that would have required all shrimp trawlers to use TEDs to "reduce incidental bycatch and mortality of sea turtles in the southeastern U.S. shrimp fisheries," thereby "aid[ing] in the protection and recovery of listed sea turtle populations," Sea Turtle Conservation; Shrimp Trawling Requirements, 81 Fed. Reg. 91097, 91097 (proposed Dec. 16, 2016) (to be codified at 50 C.F.R. pt. 223) (the "2016 NPRM").  When the final rule was promulgated in 2019, however, the requirement to use TEDs extended only to certain classes of trawlers, "exempt[ing] over 80 percent of the targeted shrimp vessels and more than halv[ing] its sea turtle protections."  Pls.' Mem. Supp. Mot. Summ. J. ("Pls.' Mem.") at 9, ECF No. 23-1.  *See* Sea Turtle Conservation; Shrimp Trawling Requirements, 84 Fed. Reg. 70048 (Dec. 20, 2019) (to be codified at 50 C.F.R. pt. 223) (the "2019 Rule").  Specifically, while NMFS estimated that the proposed rule would affect 5,837 vessels and avoid 1,730–2,500 sea turtle deaths annually, 2016 NPRM, 81 Fed. Reg. at 91099–1100, the promulgated 2019 Rule extends the TED requirements to only 1,062 vessels, and is only anticipated to protect 801–1,158 turtles from drowning in shrimp nets annually.  *See* Admin. Record ("AR") at 1653–2069 (NMFS, *Environmental Impact Statement to Reduce the Incidental Bycatch and Mortality of Sea Turtles in the Southeastern U.S. Shrimp Fisheries* at 241 (Nov. 4, 2019) (the "Final EIS")).

In light of the 2019 Rule's reduced anticipated effects on sea turtle mortality compared to the 2016 NPRM, plaintiffs Center for Biological Diversity, Defenders of Wildlife, and Turtle Island Restoration Network ("TIRN"), all nonprofit conservation and environmental organizations, filed the instant suit against NMFS and U.S. Secretary of Commerce Gina

Raimondo, challenging the 2019 Rule as arbitrary and capricious under the Administrative

Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*., and unlawfully promulgated under the National

Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*.  Compl. ¶ 9.

The parties have cross-moved for summary judgment.  *See* Pls.' Mot. Summ. J. and

Request for a Hearing ("Pls.' Mot."), ECF No. 23; Defs.' Cross-Mot. Summ. J. ("Defs.' Mot."),

ECF No. 27.  For the reasons set forth below, plaintiffs' motion for summary judgment is denied

and defendants' cross-motion is granted.

## I.    BACKGROUND

To understand the implications of the 2019 Rule and properly evaluate the parties'

claims, a brief introduction to the shrimping industry is helpful.[2]  From the Gulf of Mexico to the

Atlantic seaboard as far north as North Carolina, in the same waters where migratory sea turtles

are also found, shrimp boats use nets to harvest wild shrimp for sale for human consumption and

as bait.  Final EIS at 28–30, 33.  Some portion of this industry operates out of large, commercial

vessels in deeper waters offshore; these vessels predominantly fish using nets called otter trawls,

on which their captains have long been required to install TEDs.  *Id.* at 30; 2019 Rule, 84 Fed.

Reg. at 70058.  Other vessels fish for shrimp from smaller boats in shallower waters, using any

of three different types of nets.  Final EIS at 30–32.  The most common is a skimmer trawl,

which is a "trawl that is fished alongside of the vessel," 50 C.F.R. § 222.102, using a skimmer

net that is elevated out of the water while being towed, to prevent shrimp from jumping over the

top of the net and escaping, 2016 NPRM, 81 Fed. Reg. at 91098.  Skimmer trawls increase

"shrimp catch rates" and effectively avoid underwater debris, *id.*, and account for upwards of

---

[2]      NMFS regulations define a shrimp trawler as "any vessel that is equipped with one or more trawl nets and that is capable of, or used for, fishing for shrimp, or whose on-board or landed catch of shrimp is more than 1 percent, by weight, of all fish comprising its on-board or landed catch."  50 C.F.R. § 222.102

90% of "non-otter trawl landings" in the Gulf of Mexico and South Atlantic, Final EIS at 157. Less common are pusher-head trawls, where the V-shaped net frame is "mounted on the bow [front] of the boat" and is "fished by pushing the net along the bottom," and wing nets, also known as butterfly trawls, which are mounted on the sides of a shrimp boat or on a stationary platform, 2016 NPRM, 81 Fed. Reg. at 91099, and "held open by a four-sided, rigid frame attached to the outrigger of the vessel," 50 C.F.R. § 222.102.  Historically, vessels with these three types of nets, *i.e.*, skimmer nets, pusher-head nets, and wing nets, have been exempted from the TED requirements.  2016 NPRM, 81 Fed. Reg. at 91098.

The statutory framework governing plaintiffs' claims is discussed first, followed by the NMFS actions at issue in this case, and the procedural history of this litigation.

### A.      Statutory and Regulatory Background

#### 1.      ESA

Enacted in 1973 to protect those "species of fish, wildlife, and plants . . . in danger of or threatened with extinction" and "of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people," 16 U.S.C. § 1531(a), the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation" in the world, *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).  The statute has three purposes: (1) "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved;" (2) "to provide a program for the conservation of such endangered species and threatened species;" and (3) "to take such steps as may be appropriate to achieve the purposes of the treaties and conventions" for the protection of wildlife to which the United States is a signatory.  16 U.S.C. § 1531(b).  Under the ESA, a species is endangered when it "is in danger of extinction throughout all or a significant portion of its

range," *id.* § 1532(6), and threatened when it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," *id.* § 1532(20).

To effectuate the statute's purposes, Congress has authorized the Secretaries of Commerce and of the Interior variously to "promulgate regulations listing those species of animals that are 'threatened' or 'endangered' under specified criteria, and to designate their 'critical habitat.'" *Bennett v. Spear*, 520 U.S. 154, 157–58 (1997) (quoting 16 U.S.C. § 1533).[3] Such decisions must be made "solely on the basis of the best scientific and commercial data available" to the agencies.  16 U.S.C. § 1533(b)(1)(A).  Once a species is listed as threatened or endangered, "it is then subject to a host of protective measures designed to conserve the species." *Friends of Animals v. Jewell*, 824 F.3d 1033, 1037 (D.C. Cir. 2016) (citation omitted).  Such listing triggers, for example, ESA § 9, which makes unlawful "for any person subject to the jurisdiction of the United States" to, *inter alia*, "take any such species within the United States or the territorial sea of the United States," 16 U.S.C. § 1538(a)(1)(B); "possess, sell, deliver, carry, transport, or ship, by any means whatsoever, any such species," *id.* § 1538(a)(1)(D); or "deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species," *id.* § 1538(a)(1)(E).  The "take" prohibition renders it unlawful "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19).  Moreover, ESA § 7 imposes on federal agencies a duty to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species

---

[3]      Generally speaking, the Secretary of Commerce is responsible for marine species, "and all other species are under the jurisdiction of the Secretary of the Interior." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 586 n.3 (1992) (Stevens, J., concurring) (quoting Interagency Cooperation – Endangered Species Act of 1973, 51 Fed. Reg. 19926, 19926 (June 3, 1986) (preamble to final regulations governing interagency cooperation under ESA § 7 between NMFS and the U.S. Fish and Wildlife Service, a component of the Department of the Interior)).  The Secretary of Commerce has delegated her responsibilities under the ESA to NMFS, which is a component agency of the National Oceanic and Atmospheric Administration ("NOAA").  *See* 50 C.F.R. § 222.101(a).

or threatened species," *id.* § 1536(a)(2), which mandate "reflect[s] a 'conscious decision by Congress to give endangered species priority over the primary missions of federal agencies,'" *Growth Energy v. EPA*, 5 F.4th 1, 26 (D.C. Cir. 2021) (quoting *Tenn. Valley Auth.*, 437 U.S. at 185).

While the ESA provides strict guidelines for the preservation of animal species, this statute also provides the designated agencies some flexibility in how they regulate species once they are designated as endangered or threatened. *See* 16 U.S.C. § 1539(a)(1). For example, while the "taking" of an endangered or threatened species is generally prohibited, an agency may permit, subject to terms and conditions, the "taking" of endangered or threatened species "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity[,]" *id.* § 1539(a)(1)(B), or "for scientific purposes or to enhance the propagation or survival of the affected species," *id.* § 1539(a)(1)(A).

### 2.    NEPA

Through NEPA, Congress has expressed its "commitment to protecting and promoting environmental quality," *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989), including by furthering "efforts which will prevent or eliminate damage to the environment and biosphere" and "enrich the understanding of the ecological systems and natural resources important to the Nation," *Indian River Cnty., Fla. v. Dep't of Transp.*, 945 F.3d 515, 522 (D.C. Cir. 2019) (quoting *Mayo v. Reynolds*, 875 F.3d 11, 15 (D.C. Cir. 2017)); *see also* 42 U.S.C. § 4321. To this end, if a federal agency contemplates a "major Federal action[]" that could "significantly affect[]" the environment, NEPA requires the agency, "to the fullest extent possible," 42 U.S.C. § 4332(C), to prepare and include an Environmental Impact Statement ("EIS") "detailing the action's environmental impacts, potential mitigation methods, the action's cumulative impacts, and reasonable alternatives to the action, including a no-action alternative,"

*Sierra Club v. FERC*, 38 F.4th 220, 226 (D.C. Cir. 2022) (citing 40 C.F.R. §§ 1502.14, 1502.16, 1501.3(a)(3)).  "Preparing an EIS is a significant undertaking," *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1039 (D.C. Cir. 2021), and NEPA's implementing regulations, promulgated by the Council on Environmental Quality ("CEQ"), require an agency to address the direct and indirect effects—not only ecological, but also "aesthetic, historic, cultural, economic, social, or health" effects, 40 C.F.R. § 1508.8(b) (2019)—of the proposed action, *id.* §§ 1502.16(a)–(b) (2019).  The requirement to prepare an EIS thus "serves NEPA's 'action-forcing' purpose in two important respects," *Robertson*, 490 U.S. at 349, both by (1) "ensur[ing] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" and (2) "guarantee[ing] that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision," *Blue Ridge Env't Def. League v. U.S. Nuclear Regul. Comm'n*, 716 F.3d 183, 188 (D.C. Cir. 2013) (quoting *Robertson*, 490 U.S. at 349).

Notably, NEPA is "a purely procedural statute that 'does not mandate particular results, but simply prescribes the necessary process.'"  *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, No. 20-1489, 2022 WL 3205888, at *3 (D.C. Cir. Aug. 9, 2022) (quoting *Robertson*, 490 U.S. at 350).  "As the Supreme Court has explained, '[t]here is a fundamental distinction . . . between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other."  *Mayo*, 875 F.3d at 16 (quoting *Robertson*, 490 U.S. at 352) (alterations in original).  This statute "was not intended to resolve fundamental policy disputes," *Grunewald v. Jarvis*, 776 F.3d 893,

903 (D.C. Cir. 2015) (citation omitted), but only to "ensure that the agency has adequately considered and disclosed the environmental impacts of its actions," *Indian River Cnty., Fla.*, 945 F.3d at 523 (quoting *WildEarth Guardians v. Jewell*, 738 F.3d 298, 308 (D.C. Cir. 2013)).  Thus, NEPA is "'not a suitable vehicle' for airing grievances about the substantive policies adopted by an agency."  *Grunewald*, 776 F.3d at 903 (quoting *Found. on Econ. Trends v. Lyng*, 817 F.2d 882, 886 (D.C. Cir. 1987)); *see also Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978)).  Rather, in order "to create and maintain conditions under which man and nature can exist in productive harmony," 42 U.S.C. § 4331(a), NEPA simply requires the federal agency "undertaking any . . . major project to take a hard look at" and "rigorously appraise[] the project's environmental effects," *Standing Rock Sioux Tribe*, 985 F.3d at 1039 (quoting *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1077 (D.C. Cir. 2019)), unless the agency "finds that the project will have 'no significant impact,'" *id.* (quoting 40 C.F.R. § 1508.9(a)(1) (2019)).

### 3. NMFS Sea Turtle Regulations

NMFS fulfills its duties under the ESA to protect endangered and threatened marine species through a body of regulations propounded through notice-and-comment rulemaking.  *See* 50 C.F.R. § 222.101 *et seq.*  As required under ESA § 4(a), NMFS regulations enumerate which "species under the jurisdiction of the Secretary of Commerce [] have been determined to be endangered," which list includes three of the species of sea turtles found in U.S. waters:  the (1) Kemp's ridley sea turtle (*Lepidochelys kempii*); (2) leatherback sea turtle (*Dermochelys coriacea*); and (3) hawksbill sea turtle (*Eretmochelys imbricata*).  50 C.F.R. § 224.101.  The other two species of sea turtles found in U.S. waters are included on the "threatened" list: the (1) green sea turtle (*Chelonia mydas*); and (2) loggerhead sea turtle (*Caretta caretta*).  *Id.* § 223.102.

Pursuant to ESA § 9, NMFS regulations prohibit the "taking" of any of these species of sea turtles, 50 C.F.R. §§ 223.205(a); 224.102, with "taking" broadly defined to make it unlawful to, *inter alia*:

- "Own, operate, or be on board a vessel, except if that vessel is in compliance with all" incidental taking requirements, *id.* § 223.205(b)(1);
- "Fish for, catch, take, harvest, or possess, fish or wildlife while on board a vessel, except if that vessel is in compliance with all" incidental taking requirements, *id.* § 223.205(b)(2);
- "Possess a sea turtle in any manner contrary to [NMFS] handling and resuscitation requirements" or "[f]ail to follow any of the sea turtle handling and resuscitation requirements," *id.* §§ 223.205(b)(5) & (6);
- "Fail to comply immediately . . . with instructions and signals" from "an authorized officer, including instructions and signals to haul back a net for inspection," or "[r]efuse to allow an authorized officer to board a vessel, or to enter an area where fish or wildlife may be found, for the purpose of conducting a boarding, search, inspection, seizure, investigation, or arrest in connection with enforcement of this section," *id.* §§ 223.205(b)(7) & (8); and
- "Destroy, stave, damage, or dispose of in any manner, fish or wildlife, gear, cargo, or any other matter after a communication or signal from an authorized officer . . . before the officer has an opportunity to inspect" the same, *id.* § 223.205(b)(9).

NMFS regulations further outline a set of circumstances where the "taking" of sea turtles is lawful, such as where a taking is "necessary to aid a sick, injured, or stranded specimen," *id.* § 223.206(b), or "to carry out scientific research or conservation programs," *id.* § 223.206(c). As the prohibitions imply, the regulations also include an exception for the "incidental taking" of sea turtles "during fishing or scientific research activities," where the "take is not directed towards" the sea turtle itself. *Id.* § 223.206(d). To qualify for this exception to the taking prohibitions, however, vessels must comply with various gear requirements based on the type of fish they catch and the kinds of nets they use. *See id.* §§ 223.206(d)(2)(i)–(ii).

As relevant for purposes of this suit, NMFS regulations provide, by default, that shrimp trawlers operating "in the Atlantic Area or Gulf Area must have an approved TED installed in each net that is rigged for fishing." *Id*. § 223.206(d)(2)(i). So long as their vessels are fishing

with NMFS-approved TEDs, shrimpers are not liable under the ESA for any sea turtles incidentally "taken" up in the nets. *Id.* Certain types of shrimp trawlers, however, including pusher-head trawls, smaller skimmer trawls, and those using wing nets, are exempted from the TED requirements, *id.* § 223.206(d)(2)(ii)(A)(3), historically, "on the basis that the exempted [types of fishing] did not present a threat to sea turtle populations," Final EIS at v. Instead, such trawlers are subject to tow-time restrictions, which limit the period of time a vessel may keep its nets in the water to 55 minutes in the summer and 75 minutes in the winter, at which point the nets must be raised out of the water, 50 C.F.R. § 223.206(d)(3), and—pursuant to the concomitant requirement to "handle[] with due care" any sea turtles incidentally taken in the course of fishing—free and promptly return to the water any sea turtles that have been "taken," *id.* § 223.206(d)(1)(i).[4] *See also id.* § 224.104 (extending same "incidental capture[]" rules outlined in 50 C.F.R. § 223.206 for threatened species of sea turtles to endangered species of sea turtles).

### 4.    The 2016 Notice of Proposed Rulemaking

In late 2016, in accordance with a stipulated agreement in *Oceana Inc.*, No. 15-cv-555 (PLF), NMFS issued a proposed rule to amend the TED regulations by expanding the class of shrimp trawlers required to use TED-installed nets. *See* 2016 NPRM.[5] While for decades the agency had required "most shrimp trawlers operating in the southeastern United States to have an

---

[4]    This requirement extends to sea turtles that are "actively moving or determined to be dead." 50 C.F.R. § 223.206(d)(1)(i)(A). If a sea turtle is "comatose, or inactive," NMFS mandates that "[r]esuscitation must be attempted" according to procedures outlined in the regulations. *Id.* § 223.206(d)(1)(i)(B).

[5]    As defendants acknowledge, the agency has a pattern across the last decade of agreeing to engage in rulemaking as part of litigation settlements. For example, in 2012, "[a]s part of a settlement . . . , NMFS agreed to publish a proposed rule to require TED use in certain trawl types including skimmer trawls." Defs.' Mem. Supp. Cross-Mot. Summ. J. & Opp'n Pls.' Mot. Summ. J. ("Defs.' Opp'n") at 6, ECF No. 27-1; *see also* Settlement Agreement & Stipulation of Dismissal, *Turtle Island Restoration Network v. NMFS*, No. 11-cv-1813 (ABJ) (D.D.C. Apr. 26, 2012), ECF No. 11. Early the next year, NMFS withdrew the rule due to the fact that "[m]ost of the sea turtles observed were small enough to pass" through the TED into the net bag, "thereby negating much of the sea turtle conservation benefit" that had been expected. Defs.' Opp'n at 6; *see also* Pls.' Mem. at 7–8.

approved TED installed in each net that is rigged for fishing, to allow sea turtles to escape," *id.*, 81 Fed. Reg. at 91097, "skimmer trawls, pusher-head trawls, and vessels using wing nets" had been exempted from these requirements, so long as they complied with the tow-time restrictions outlined in Section I.3. *supra. Id.* at 91098.  The 2016 NPRM proposed to extend the TED requirements to these types of vessels "to reduce incidental bycatch and mortality of sea turtles in the southeastern U.S. shrimp fisheries, and to aid in the protection and recovery of listed sea turtle populations." *Id.* at 91097.

NMFS offered two justifications for the change.  First, the agency cited improvements to TEDs themselves, which could now more effectively prevent the capture of the smaller-sized turtles most likely to be found in the shallower waters where skimmer trawls, pusher-head trawls, and wing-net vessels fish. *Id.* at 91098.  Second, NMFS pointed to "anecdotal information, law enforcement data, and past public comment" raising questions about the effectiveness of tow-time requirements as an alternative. *Id.*  As the agency explained, tow-time requirements are "inherently difficult to enforce" and easy to flaunt, given the "time required to monitor a given vessel" for compliance, "as well as the ability to do so covertly to observe unbiased fishing operations." *Id.*  Moreover, because of anecdotal evidence "that skimmer trawl vessels have increased the size and amount of gear they use to fish, allowing them to fish in deeper water," the agency was now concerned that the size of the nets, and the fact that "many vessels fish at night," would hinder the crew's ability to see and remove turtles captured in the TED-less nets. *Id.*

NMFS estimated the proposed rule would affect "5,837 vessels . . . identified as using this gear," and would lead to a yearly average revenue loss of 6.21% based on the loss of some shrimp through the TEDs, as well as periodic costs of $325 for "small vessels . . . less than 60

feet" and "$550 for large vessels" for the "purchase, installation, maintenance, and replacement of newly required TEDs." *Id.* at 91100. Due to these increased costs, the agency anticipated that "a high number of [] part-time vessels may not continue operating as a result of this proposed rule," but that given the preexisting hardships of the shrimping industry, and the continued participation by many part-time shrimpers despite these economic difficulties, "the decision to harvest shrimp is based on criteria other than, or in addition to, considerations of profit and loss" such as "personal consumption of harvested shrimp and the associated value" and "the value some fishermen place on the commercial fishing lifestyle," implying the effects might not be as extreme. *Id.* at 91102. Based on data collected through "observer effort[s] on Gulf of Mexico skimmer trawl vessels in 2012" and in North Carolina in 2015, NMFS estimated that "a TED requirement for all skimmer trawl, pusher-head trawl, and wing net vessels could reduce annual sea turtle mortalities from those currently occurring under the status quo by 789–1,543 in the near term and 1,730–2,500 after TED compliance r[ose] to final anticipated levels." *Id.* at 91099; *see also* AR at 1291–1651 (NMFS, *Draft Environmental Impact Statement to Reduce the Incidental Bycatch and Mortality of Sea Turtles in the Southeastern U.S. Shrimp Fisheries* (Nov. 29, 2016) (the "Draft EIS")).

Finally, NMFS explained that its proposed rule was one of seven "reasonable alternatives" considered, and because the seven alternatives are relevant to later agency action, they are outlined here. *See* 2016 NPRM, 81 Fed. Reg. at 91102; 40 C.F.R. § 1502.14 (2019) (requiring agency to "evaluate [all] reasonable alternatives" to "the proposed action" in an EIS). Alternative 1 (taking no action) was rejected because it "would not achieve the objection of reducing" sea turtle death. 2016 NPRM, 81 Fed. Reg. at 91102. Alternative 2 (requiring TEDs on all skimmer trawls, pusher-head trawls, and wing-net vessels 26 feet or longer), Alternative 4

(requiring TEDs on all skimmer trawls 26 feet or longer), and Alternative 5 (requiring "all vessels using skimmer trawls" to use TEDs "regardless of vessel length") were all rejected because they would affect fewer vessels than the proposed rule (3,103 vessels; 2,913 vessels; and 5,432 vessels, respectively) and thus "result in less protection of sea turtles," with the alternatives estimated to avoid 2,115; 1,726; and 1,986 sea turtle deaths, respectively. *Id.* Finally, Alternative 6 (requiring TEDs on "all shrimp vessels regardless of trawl type," but only when fishing in state waters) and Alternative 7 (requiring TEDs on "all shrimp vessels regardless of trawl type" or fishing location) were rejected because they were "expected to affect *more* vessels," specifically, 9,711 vessels, and thus "result in greater expected increases in TED costs and shrimp revenue loss"). *Id.* at 91102–03 (emphasis added).  Alternative 3 (extending TED requirements to all skimmer trawls, pusher-head trawls, and wing net vessels) was the one proposed to be adopted. *Id.* at 91102.

### 5.  2019 Rule

Three years after introducing the proposed rule, NMFS promulgated, in December 2019, the challenged rule, amending the incidental taking regulations to require "all skimmer trawls vessels 40 feet and greater in length" to use TEDs.  2019 Rule, 84 Fed. Reg. at 70048.[6]  NMFS recognized this significant change from the proposed rule, which would have applied more broadly to pusher-head trawls, wing-net vessels, and skimmer trawls shorter than 40 feet in length, and justified the diminished scope of the rule by citing "public comment[s] . . . regarding the economic impacts of the proposed rule," "raising performance and safety issues with TED

---

[6]     NMFS regulations create an exception for "vessels participating in the Biscayne Bay wing net fishery" in Florida, 2019 Rule, 84 Fed. Reg. at 70048, which are not required to use TEDs due to the agency's conclusion that "this fishery may not present a threat to sea turtles," *id.* at 70056.  Unlike in other shrimp fisheries, "Biscayne Bay wing nets are limited by state law to a frame size much smaller than frames of wing nets in other states" and shrimpers "fish by sight in surface waters," using "nets constructed of light monofilament webbing," *id.*, meaning that "[i]f a sea turtle was incidentally captured, it would be immediately obvious to the operator, and could be quickly released," 2016 NPRM, 81 Fed. Reg. at 91098.

use on smaller vessels," and "new information indicating significantly lower levels of sea turtle mortality in the offshore fleet." *Id.* at 70049.  Still, the agency asserted that the revised TED requirements would "achieve significant conservation benefit for listed sea turtles, while affecting significantly fewer vessels and imposing far fewer costs upon industry." *Id.*[7]

Specifically, NMFS estimated that, as compared to the proposed rule, the final rule "reduced the number of affected fishers by 82 percent, reduced the total economic effect by 73 percent, and [was] expected to result in a conservation benefit of 801–1,168 sea turtles annually" across the waters of the southeastern United States.  *Id.*  The 2019 Rule was set to take effect on April 1, 2021, *id.* at 70048, although the rollout was delayed until August 1, 2021, in light of "[s]afety and travel restrictions due to the COVID-19 pandemic" inhibiting the agency's ability to "conduct [its] planned outreach and training for fishers," Delay of Effective Date for Final Rule, *Sea Turtle Conservation; Shrimp Trawling Requirements*, 86 Fed. Reg. 16676, 16676 (Mar. 31, 2021).[8]  *See also* 2019 Rule, 84 Fed. Reg. at 70058 (describing NMFS's "plan to engage in significant outreach efforts . . . to educate owners and captains of affected skimmer vessels regarding how to use and maintain TEDs").

---

[7]     Although less directly relevant here, as plaintiffs do not challenge the 2019 Rule's "tow time definition," the 2019 Rule also revised the tow times requirements to "allow[] for a more complete inspection of the net for captured sea turtles" by pusher-head trawls, wing net vessels, and skimmer trawls under 40 feet by "requiring the net to be emptied of catch on the deck within the specified time."  84 Fed. Reg. at 70049.  As the agency recognized, this amended definition departed from the 2016 NPRM's proposed amendments to the tow times requirements, which would have required that "the entire net," including its frame, "be removed from the water at the end of a tow" when TEDs were not in use, to mark the end of the "tow time."  81 Fed. Reg. at 91099.  NMFS explained the changes were made in light of comments on the 2016 NPRM that "[f]or small vessels that lack hydraulics," the process of raising the entire net out of the water "takes significant time and potentially makes the vessel unstable while raising the nets, which could introduce safety issues."  2019 Rule, 84 Fed. Reg. at 70049.

[8]     The 2019 Rule's effective date "in Louisiana inshore waters" was further delayed until February 1, 2022, after the Louisiana Department of Wildlife and Fisheries sued and was granted a preliminary injunction "to allow appropriate time for all shrimpers to come into compliance."  *Louisiana v. Dep't of Commerce*, 559 F. Supp. 3d 543, 549–50 (E.D. La. 2021).

i.        **Comments Supporting and Contesting the 2019 Rule**

In promulgating the 2019 Rule, NMFS addressed dozens of comments received in response to the 2016 NPRM, both via online submissions and at a series of six public hearings held, in January 2017, across Louisiana, Mississippi, Alabama, and North Carolina.  *Id.* at 70049. As summarized below, this rule was controversial, with critics citing economic analysis and impact concerns as well as safety issues, and supporters expressing concern about the harmful effects to sea turtles of narrowing the rule's scope.

*Critics of Changing Status Quo*.  Many commenters opposed any changes to the *status quo*, on the grounds that (1) "current tow times are sufficient to avoid sea turtle bycatch mortality," *id.* at 70050; (2) "many skimmer trawls operate" in areas where sea turtles are not found, *id.*; and (3) as sea turtle populations rebound, "bycatch will increase" and "never be zero," and therefore asking "how much bycatch reduction is enough," *id.* at 70051.  Relatedly, comments accused the agency of "grossly overestimat[ing] sea turtle mortality attributable to the skimmer trawl fisheries."  *Id.* at 70055.

In response, NMFS defended its decision to expand the class of vessels subject to TED requirements, citing "observer data that document sea turtle mortality resulting from incidental capture in skimmer trawls during tows that were compliant with tow time limits, as well as tows that exceeded" them.  *Id.* at 70050.  The agency defended its mortality estimates as necessarily accounting for "post-interaction mortality"—where sea turtles "appear to be in good health at the time of release," but die thereafter due to "persistent or delayed effects" of their capture, *id.*—in addition to counting sea turtle deaths at the time of capture, *id.* at 70055.  Based on the "best available information and expert opinion" on post-interaction mortality, NMFS explained that tow times were now understood to be less "effective in reducing sea turtle bycatch and mortality as previously thought," leading NMFS to conclude that "the most effective protective measure

for threatened and endangered sea turtle populations is to reduce the total time sea turtles are entrained in a skimmer trawl by using TEDs." *Id.* at 70050.  At the same time, however, measuring average mortality rates per vessel was conceded to be an imperfect metric, because "[a]nnual fishing effort[s]" were "not evenly distributed among vessels in the fleet." *Id.* at 70055.  Critically, NMFS pointed out that "the smaller population of *full-time* skimmer trawl, pusher-head trawl, and wing net vessels," which also tended to be "40 feet and greater in length," would have "significantly higher" sea turtle mortality rates, and reasoned that focusing regulations on those shrimpers, rather than smaller vessels fishing only part-time, was appropriate.  *Id.* (emphasis added).

*Critics of Narrowing Scope of 2016 NPRM*.  Conversely, other commenters urged the agency to adopt the proposed rule in full, and even urged the agency to extend the TED requirements further, to "[a]ll bottom trawls in the southeast region . . . not just selected gear in the shrimp fisheries." *Id.* at 70049.  While agreeing that TED use in skimmer trawls would "benefit sea turtle populations," the agency expressed uncertainty as to whether TED use on wing nets and pusher-head trawls would have the same benefit, citing the need for "further study," due to "a lack of data" and "efficacy and safety issues related to TED use on pusher-head trawls and wing nets, as well as small skimmer trawl vessels" and other trawlers.  *Id.*  Noting that "TED testing on wing nets" and pusher trawls had not been conducted, the agency explained that because such "gear fishes very differently from trawl vessels," it had decided to continue to exclude vessels of these types from the TED requirements.  *Id.* at 70055.

*Safety Issues*.  The agency's concern regarding the lack of TED testing on smaller vessels stemmed from multiple comments raising concerns about requiring this use of TEDs.  For example, one comment observed that "[s]mall vessels cannot use a standard TED grid and need a

smaller grid to fit in the nets," and others cited safety issues such as "walking out on frames to remove debris snagged in TEDs" and the risk that the additional materials required to install a TED could cause the net to become entangled in the propeller of a small vessel.  *Id.* at 70056. While the agency clarified that placement of the TEDs at the front of the net would not require walking out onto the frame to remove debris, it acknowledged that due to the lack of "comprehensive[] test[ing] [of] TEDs on small vessels," "comments relating to the feasibility of using TEDs on small vessels" had led it to "change[] [its] preferred alternative."  *Id*.  NMFS also noted it would "examine this and other issues related to TED use on small vessels and present solutions or adaptations . . . so that TEDs could be effectively used on these smaller vessels in the future."  *Id.*

  *Social and Economic Impacts*.  In response to comments on the social and economic effects of the 2019 Rule, NMFS disputed the claim that its "data [was] insufficient to support this regulation," noting that the changes made to the final rule from the 2016 NPRM were based on "further data analysis" of sea turtle mortality rates and economic and social effects of the TED expansion; and "extensive TED testing on skimmer trawl vessels using a variety of configurations and fishing under a variety of different conditions."  *Id.* at 70054.  "Where data was lacking or the efficacy of TEDs merited further evaluation," the agency explained, "the scope of the final rule" was narrowed, including as to "the use of TEDs in pusher-head trawls, wing-nets, and smaller skimmer trawls," *id.*, rendering the rule well supported by the available data.

  Other commenters challenged NMFS's approach to economic analysis asserting, *inter alia*, that the (1) proposed regulation would have "significant adverse economic effects" on the industry*, id.* at 70050; (2) economic analysis "underestimate[d] shrimp loss," *id.* at 70051; (3)

use of TEDs would reduce the bycatch of other, non-endangered species, resulting in a loss of income from their sale, *id.*; (4) "six percent loss in shrimp is not trivial given the margins" at which inshore skimmer trawl fisheries operate, *id.* at 70052; and (5) the anticipated adverse economic impacts on coastal communities more broadly, including on shrimp processors, and for vessels that would cease operations, *id.* at 70051–52.  In response, NMFS "acknowledge[d] the regulation may have significant adverse economic effects on the shrimp industry," and asserted that with the modifications from the 2016 NPRM, the 2019 Rule would "achieve[] a significant conservation benefit" while also "substantially reduc[ing] adverse economic effects on industry." *Id.* at 70050.  The agency defended its shrimp loss estimations as grounded in "extensive testing of TEDs in skimmer trawls," *id.* at 70051–52 (citing Final EIS at 28–38; 194–99), agreeing that while such losses were "not trivial" and estimating that "about 32 percent of the affected part-time vessels could cease operations due to this rule," the changes to the final rule from the 2016 NPRM had "significantly reduced the total adverse economic effects expected to result from shrimp loss," across the Gulf of Mexico and South Atlantic region, *id.* at 70052.

Finally, commenters also offered various recommendations for enforcement of the TED and tow-time requirements, as well as other means of monitoring endangered and threatened marine species.  *Id.* at 70057–58.  Notably, one comment suggested, without further elaboration, that the agency "should exempt all skimmer trawls less than 40 feet in length from the TED requirements," to which NMFS responded that, "[b]ased on public comment and further deliberation," it concurred.  *Id.* at 70058.

### ii.      Final EIS

In the Final EIS, NMFS further elaborated on its decision to amend the regulation from the 2016 NPRM proposal.  In light of "public comment and further deliberation," the agency had "explored additional alternatives that would focus conservation requirements on larger, full-time

vessels that would be expected to encounter sea turtles on the fishing grounds more frequently than smaller, part-time vessels," Final EIS at 20–21, and "developed another alternative, added . . . as Alternative 8," that would require TEDs on all skimmer trawls 40 feet or longer, *id.* at ix. As discussed above, this new alternative, which the agency adopted, was estimated to protect between 801 and 1,158 sea turtles annually, while affecting only 1,062 vessels.  *Id.* at 241.

While the previous Draft EIS and 2016 NPRM had "not specifically mentioned" vessels "40 ft and greater in length," *id.* at ix, the agency emphasized that "[a]ll vessels subject to this new alternative" had been "included within the range of all vessel sizes the original [seven] alternatives considered and analyzed" in the previous proposed rulemaking documents, *id.* at 20.[9]  As such, "the impacts associated with this new preferred alternative were within the range of impacts analyzed" previously, when the agency had "analyzed the im[p]acts associated with requiring no shrimp trawlers to use the new TED designs, to requiring all shrimp trawlers to use the new TED designs."  *Id.*  Regarding the 2019 Rule's exception for pusher-head trawls and wing nets, NMFS also explained that "new information and advice from [its] gear experts at the Harvesting Systems and Engineering Branch of the Southeast Fisheries Science Center (SEFSC) Mississippi Laboratories" had indicated "significant differences in the manner pusher-head trawls and wing nets operate from skimmer trawls," leading the agency to determine that "additional gear testing is needed for these gear types" before applying the TED requirements to them.  *Id.* at 21.

After detailing the seven original alternative proposals and the eighth alternative derived from public comment and selected for the rule, the Final EIS turned to descriptions of the

---

[9]      NMFS explained that it had "decided to use 26 [feet] as the delineation point" for Alternatives 2 and 4 because the agency "currently [did] not have any observer data" or "TED testing data on skimmer trawl vessels less than 25 ft in length" due to "logistics" and "lack [of] available space to accommodate fishery observers safely." Final EIS at 22.

"affected environment," *id.* at 28, including, *inter alia*, the fisheries, physical environs, and the five types of sea turtles with "populations that may be affected by the action," *id.* at 43. For each of the five species, the Final EIS extensively discussed their physical characteristics, distribution, life cycle, population dynamics, and the specific threats faced by that species. *See id.* at 43–51 (green sea turtle); *id.* at 51–55 (hawksbill sea turtle); *id.* at 55–61 (Kemp's ridley sea turtle); *id.* at 61–68 (leatherback sea turtle); and *id.* at 68–76 (loggerhead sea turtle). Recognizing that across the different sea turtle populations, "[i]ncidental capture in fishery operations remains one of the primary marine anthropogenic mortality sources," *id.* at 80, the Final EIS further detailed its understanding of post-interaction mortality, and how observer data from otter trawls and skimmer trawls was synthesized to reach its statistical conclusions, *id.* at 140–45. Throughout the Final EIS, the agency cited and relied upon studies conducted on specific sea turtle species to support its conclusions. *See, e.g.*, *id.* at 77, 145, 156.

In response to concerns raised by commenters to the 2016 NPRM, and in light of its requirements under NEPA, *see* 40 C.F.R. §§ 1502.16; 1508.8(b) (2019), NMFS also provided "additional examination of the economic effects" of the revised TED regulations, and "expand[ed] [its] environmental justice analysis," Final EIS at ix. The agency looked at the economic effects of the revised TED requirements on all aspects of the industry, from vessels, to harvesters, dealers, and processors, *see id.* at 94–133, generally and at the community and state levels, "to provide a geographical distribution of shrimp involvement," *id.* at 110. Examining the indirect effects of the regulation, the agency noted that despite its adverse economic effects on other actors in the industry, the expanded TED requirements "would result in additional economic activity for TED manufacturers and retailers and, therefore, be expected to significantly increase their gross revenues and likely net revenues/profits," which in turn, at least

in the short term, would "partially offset the adverse economic impacts to affected communities and regions resulting from reductions in gross revenues/sales in the onshore sector." *Id.* at 208. The agency noted that the 2019 Rule might "generate other benefits," including that "[t]he reduction in debris and bycatch would . . . be expected to reduce 'drag,' thereby improving fuel efficiency and reducing fuel costs." *Id.* at 269. Ultimately, however, the agency recognized the likelihood that the 2019 Rule's "negative economic impacts" would "cause some participants already struggling in the fisheries to leave entirely," but despite "the additive effects of this action [to] contribute to or result in significant adverse cumulative impacts on the human community," concluded that the rule would "benefit sea turtles by reducing the capture of and mortality of small sea turtles in the Southeastern U.S. shrimp fisheries." *Id.* at 257.

### 6.    2021 Advance Notice of Proposed Rulemaking

On April 20, 2021, NMFS published an advance notice of proposed rulemaking "to solicit comments on the possibility of modifying the turtle excluder device (TED) related requirements for skimmer trawl vessels less than 40 feet . . . in length operating in the southeast U.S. shrimp fisheries." Potential New Turtle Exclusion Device Requirements for Skimmer Trawl Vessels Less Than 40 Feet (12.2 Meters) in Length, 86 Fed. Reg. 20475, 20475 (proposed Apr. 20, 2021) (to be codified at 50 C.F.R. pt. 223) ("2021 NPRM"). The comment period closed on May 20, 2021, *id.*, but NMFS has not yet promulgated a final rule.

### B.    Procedural Background

On April 6, 2021, shortly before issuance of the 2021 NPRM, plaintiffs initiated this lawsuit challenging the 2019 Rule and accompanying EIS as unlawful under the ESA, NEPA, and APA. *See* Compl. ¶¶ 139–181. The briefing schedule for cross-motions for summary judgment proposed by the parties was adopted, *see* Min. Order (June 25, 2021), and extended twice at the parties' request, *see* Min. Order (Sept. 7, 2021); Min. Order (Oct. 13, 2021). As

required under D.D.C. Local Civil Rule 7(n), NMFS compiled the administrative record, with a certified notice of the contents filed with the Court. *See* Notice of Filing Index to Administrative Record, ECF No. 17.[10]  In addition to the parties' briefing, Oceana, Inc., an ocean conservation organization, was granted leave, without objection from the parties, to file an *amicus curiae* brief in support of the plaintiffs.  Min. Order (Nov. 10, 2021); Br. of *Amicus Curiae* in Support of Pls. ("Amicus Br."), ECF No. 25.[11]  This matter is now ripe for resolution.

## II.    LEGAL STANDARD

The APA provides for judicial review of any "final agency action for which there is no other adequate remedy in a court," 5 U.S.C. § 704, and "instructs a reviewing court to set aside agency action found to be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,'" *Cigar Ass'n of Am. v. FDA*, 964 F.3d 56, 61 (D.C. Cir. 2020) (quoting 5 U.S.C. § 706(2)(A)).  This standard "'requires agencies to engage in reasoned decisionmaking,' and . . . to reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach." *Bhd. of Locomotive Eng'rs & Trainmen v. FRA*, 972 F.3d 83, 115 (D.C. Cir. 2020) (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.* ("*Regents*"),

---

[10]    The 2019 Rule's administrative record totals 11,333 pages and includes regulations; environmental impact statements; reports, analyses, and technical memoranda for the rulemaking; and public comments. *See* Defs.' Notice of Filing Index to Administrative Record.  The parties' Joint Appendix totals 1110 pages, comprising NMFS regulations and rulemaking documents; environmental impact statements; public comments; and reports and recommendations regarding recovery plans for various sea turtle species. *See* Not. Filing of Appendix Containing Portions of Admin. Record Relevant to Pending Mots. Summ. J., ECF No. 31.

[11]    Although *amicus* purports to be "uniquely positioned to assist the Court here," given its "experience with TED regulations and litigation against NMFS," its brief largely echoes arguments set out by plaintiffs that, as discussed more fully in the text, are largely unpersuasive based on the current record.  Amicus Br. at 2; *see id.* at 1–9.  To the extent *amicus* attempts to shift the focus from the administrative record by introducing "[i]nternal correspondence" suggesting NMFS's "decision to modify the TEDs rule . . . resulted from private business and economic pressures," *id.* at 7; *see also id.*, Exs. 1–21, ECF Nos. 25-1 to 25-21, such correspondence is outside the record—with no motion to supplement the record properly before the Court—and therefore not part of "the ground that the agency invoked when it took the action," to which judicial review is limited.  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)).  Regardless of the contents of these emails, NMFS has adequately "defend[ed] its actions based on the reasons it gave when it acted." *Id.* at 1909.

140 S. Ct. 1891, 1905 (2020)).  While "judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action,'" *Regents*, 140 S. Ct. at 1907 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)), the agency, too, "must defend its actions based on the reasons it gave when it acted," *id*. at 1909.

The law is well-settled that "[a] rule is arbitrary and capricious if (1) the agency 'has relied on factors which Congress has not intended it to consider'; (2) the agency 'entirely failed to consider an important aspect of the problem'; (3) the agency's explanation 'runs counter to the evidence before the agency'; or (4) the explanation 'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 663 (D.C. Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983)).  Notably, the court "'may not substitute [its] own judgment for that' of the agency," *id*. (quoting *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016)), but nonetheless is "not a 'rubber stamp' and [] must ensure that the agency considered all of the relevant factors," *Oceana, Inc. v. Ross*, 920 F.3d 855, 863 (D.C. Cir. 2019) (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976) (en banc)).

In APA cases such as this one, involving cross-motions for summary judgment, "the district judge sits as an appellate tribunal," *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)), since the "'entire case on review is a question of law,' and the 'complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action,'" *id*. (quoting *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).

## III.    DISCUSSION

Plaintiffs raise three challenges to the 2019 Rule.[12]  First, they allege that the agency "inexplicably reversed course" between the 2016 NPRM and the 2019 Rule, Pls.' Mem. at 1, failing "to explain its decision to omit TED requirements it previously determined were necessary" in the 2016 NPRM, *id.* at 15.  Second, plaintiffs contend that the final rule is not a

---

[12]       NMFS correctly does not contest, *see generally* Defs.' Opp'n, plaintiffs' standing to challenge the 2019 Rule "on their own behalf and on behalf of their members," as plaintiffs have sufficiently established that they suffer an injury-in-fact due to the violation of their members' "protectable aesthetic, recreational, scientific, and other interests in the survival and recovery of the sea turtle species affected by NMFS's TED Rule," Pls.' Mem. at 16 n.4; *see also* Pls.' Mot., Ex. A, Decl. of Center for Biological Diversity Conservation Director Peter Galvin ("Galvin Decl.") ¶¶ 2, 5, 9, ECF No. 23-2 (stating he and the other "members and staff" of plaintiff Center for Biological Diversity "use the Gulf of Mexico for wildlife observation, research, nature photography, aesthetic enjoyment, as well as recreational, educational, and other activities" and that he has "spent considerable time enjoying the Gulf of Mexico in the panhandle region of Florida and on . . . the Alabama coast where [he is] always on the lookout for sea turtles and other wildlife" such that his "interests and the interests of other members of the Center for Biological Diversity are adversely affected by NMFS's failure to require TEDs on shrimping vessels"); *id.*, Ex. B, Decl. of TIRN Gulf Program Coordinator Kimber De Salvo ("De Salvo Decl.") ¶¶ 4–5, 15, ECF No. 23-3 (stating that "as a staff member," she relies on plaintiff TIRN "to represent [her] interests in conserving and protecting species in their native habitat, specifically the sea turtles that rely on Gulf of Mexico waters," on which she has "conducted years of research," and especially the "critically-endangered Kemp's ridley sea turtle" and declaring that the 2019 Rule "harms [her] personal, professional, recreational, educational, and aesthetic interests in sea turtles"); *id.*, Ex. C, Decl. of Defenders of Wildlife Senior Florida Representative Elizabeth H. Fleming ("Fleming Decl.") ¶¶ 7, 19, 24–25, ECF No. 23-4 (explaining that plaintiff Defenders of Wildlife's "work on sea turtles focuses on reducing threats to these species and their habitats from fisheries interaction," among other threats, and that personally, "the rule threatens to undermine the decades of work" she has "championed to protect and conserve sea turtles" and would injure her "recreational and aesthetic interests in sea turtles," as she regularly visits various locations across Florida "to see sea turtles swimming, nesting, and/or hatching"); *id.*, Ex. D, Decl. of Defenders of Wildlife Senior Texas Representative Sharon Wilcox ("Wilcox Decl.") ¶¶ 9–10, 12, 14, ECF No. 23-5 (stating that given her "personal interests in sea turtles," which she regularly travels to view, and her "professional interest in their conservation as a scientist, employee, and member of Defenders" of Wildlife, she "will be harmed by the final rule" and further alleging the "reversal of [the] proposed rule denied [her] and other scientists and community members alike the opportunity to share [their] expertise and concerns"); *id.*, Ex. E, Decl. of Center for Biological Diversity member Ann Wiley ("Wiley Decl.") ¶¶ 6, 12, 14, ECF No. 23-6 (stating that as a professional "ecological tour guide," she gives sea turtle tours "about six times a year," although prior to the COVID-19 pandemic she "led these tours up to 4 to 5 days a week" and that "the loss of sea turtles could affect [her] income, decrease [her] number of tours and talks and effectively decrease the number of tourists who visit the turtle related locations" across Florida, such that "NMFS's inadequate regulations directly harm [her] personal and professional interests" in sea turtles' survival). *See NRDC v. EPA*, 489 F.3d 1364, 1370 (D.C. Cir. 2007) (for standing "to represent [its] individual members," an organization "must demonstrate that at least one member would have standing under Article III to sue in his or her own right, that the interests it seeks to protect are germane to its purposes, and that neither the claim asserted nor the relief requested requires that an individual member participate in the lawsuit"); *Lujan*, 504 U.S. at 564–66 (in cases where federal action affects wildlife, "[i]t is clear that the person who observes . . . a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist," but nevertheless, a plaintiff must provide more than "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—[to] support a finding of the 'actual or imminent' injury that [the Supreme Court's] cases require." (emphasis in original)).

"'logical outgrowth' of the proposed rule," *id.* at 25, because neither plaintiffs nor the general public were "alerted of the possibility that NMFS would adopt a new, 40-foot vessel length metric," *id.* at 26, and therefore were deprived of the opportunity to "provide[] data and explanations of how the anticipated rate of mortality under the chosen alternative will hinder sea turtle recovery," *id.* at 27.  As such, they argue the rule was subjected to insufficient "public notice and comment," in violation of the APA.  *Id.* at 25.  Finally, plaintiffs challenge the sufficiency of the EIS prepared in connection with the 2019 Rule, arguing that the agency violating NEPA by "failing to take the requisite 'hard look' at the [2019] Rule's effects . . . by ignoring the rule's disparate effects on individual sea turtle species and by disregarding the foregone economic benefits of the rule," and contending that NMFS should have conducted a "supplemental environmental analysis," and failing to do so "when it made a substantial change to its proposed action" violates NEPA.  *Id.* at 29.

For the reasons set forth below, the Court finds that the 2019 Rule and EIS were promulgated lawfully, in compliance with both NEPA and the APA.  Plaintiffs' challenge to the 2019 Rule as arbitrary and capricious under the APA is discussed first, followed by the analysis of whether the 2019 Rule is a "logical outgrowth" of the 2016 NPRM, and finally, the parties' arguments regarding the sufficiency of the EIS.

## A.     The 2019 Rule is Not Arbitrary and Capricious

Plaintiffs challenge the 2019 Rule as arbitrary and capricious on two grounds because, first, this rule departed from the 2016 NPRM without adequately acknowledging and explaining the rationale for doing so, and, second, the reasoning for selecting the cutoff for application of the TED requirements to skimmer trawls 40 feet and longer was not explained.

An agency acts arbitrarily and capriciously when it "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Gresham v. Azar*, 950 F.3d 93, 99 (D.C. Cir. 2020) (quoting *State Farm*, 463 U.S. at 43); *see also Nasdaq Stock Mkt., LLC v. SEC*, 38 F.4th 1126, 1135 (D.C. Cir. 2022) ("Besides adhering to statutory and regulatory requirements, the Commission is required to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" (quoting *State Farm*, 463 U.S. at 43)).  While this "is not a high bar, . . . it is an unwavering one."  *Judulang v. Holder*, 565 U.S. 42, 45 (2011).

As set forth below, plaintiffs have not demonstrated that NMFS's decision to walk back the TED requirements from the 2016 NPRM to cover only skimmer trawls longer than 40 feet was arbitrary and capricious, nor have they shown that NMFS failed to justify the 40-foot cutoff.  The 2019 Rule's explanation for the changes from the 2016 NPRM is discussed first, followed by its justification for the revised TED requirements.

### 1.    NMFS Adequately Explained the Changes from the 2016 Proposed Rule

In narrowing the scope of TED requirements in the 2019 Rule from the 2016 NPRM proposal, plaintiffs argue the agency failed to explain why it disregarded its previous finding that it was "'necessary and advisable' for conserving sea turtle species and 'necessary and appropriate' for enforcing the ESA to require TEDs on *all* skimmer trawl, pusher-head trawl, and wing net shrimp vessels," leaving an unexplained inconsistency in the 2019 Rule that renders it arbitrary and capricious.  *See* Pls.' Mem. at 16 (quoting 2016 NPRM, 81 Fed. Reg. at 91099 (emphasis in original)).  NMFS, on the other hand, defends the changes as "adequately explained . . . based on comments received," observing that "[i]t is hardly surprising that an agency would change its position on a proposed regulation in response to comments received through the rulemaking process," which is, in fact, "the purpose of the APA's notice and comment

26

procedures." Defs.' Mem. Supp. Cross-Mot. Summ. J & Opp'n Pls.' Mot. Summ. J. ("Defs.'
Opp'n") at 11, ECF No. 27-1.

When making a "policy change," an agency "must show that there are good reasons for
the new policy," but "need not always provide a more detailed justification" for changing course
"than what would suffice for a new policy created on a blank slate," and the agency "need not
demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the
reasons for the old one." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009)
(emphasis in original).  Exceptions to this general limitation on APA review may be found when
a "new policy rests upon factual findings that contradict those which underlay its prior policy; or
when its prior policy has engendered serious reliance interests," in which cases no "further
justification is demanded," but only "a reasoned explanation . . . for disregarding facts and
circumstances that underlay or were engendered by the prior policy."  *Id*.  *See Am. Farm Bureau
Fed'n v. EPA*, 559 F.3d 512, 521 (D.C. Cir. 2009) ("[I]f the relevant facts have changed or the
[agency] has reasonably made a different policy judgment, then it need only explain itself and we
will defer."); *Nasdaq Stock Mkt., LLC*, 38 F.4th at 1141 (describing an agency's duty to
"acknowledge and explain its departure from past policy" as "not [an] especially high bar" to
clear (quoting *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019))); *Earthworks v.
Dep't of Interior*, 496 F. Supp. 3d 472, 498–99 (D.D.C. 2020) ("An agency 'is not required to
adopt a final rule that is identical to the proposed rule,'" but to "the contrary, '[a]gencies are
free—indeed, they are encouraged—to modify proposed rules as a result of the comments they
receive.'" (quoting *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 951 (D.C. Cir. 2004))).

In promulgating the 2019 Rule, NMFS complied with these requirements, pointedly
acknowledging in a section at the start of the rule entitled "Changes From the Proposed Rule,"

that the previous conclusions regarding the scope of the TED requirements had changed.  2019 Rule, 84 Fed. Reg. at 70049.  That beginning section listed reasons for the change, which were more fully elaborated on in the following portions of the rule, as well as in the Final EIS.  These listed reasons included "performance and safety" concerns regarding TED use on "smaller vessels"; public comments calling into question the agency's estimated "economic impacts of the proposed rule"; and a realization that testing data on the use of TEDs in skimmer trawls might not be directly applicable to pusher-head trawls and wing nets, for which vessels the agency "lack[ed] . . . observer data."  *Id.*  Contrary to plaintiffs' arguments, NMFS plainly "acknowledged" the change, as well as explained it.  Plaintiffs clearly disagree with certain of the agency's conclusions—for example, as to whether "skimmer trawl vessels longer than 26 feet" but shorter than 40 feet "have the requisite capacity to safely use and store TEDs on deck," Pls.' Mem. at 27—but nowhere do they argue that the agency acted improperly by considering such issues when crafting and adopting a final version of the rule.  *Cf. State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious if, *inter alia*, the agency "has relied on factors which Congress has not intended it to consider").

Moreover, plaintiffs seize on the following text from the 2016 NPRM as support for their challenge:  "Therefore, we *preliminarily* determined that the measures proposed here are necessary and advisable to conserve threatened and endangered sea turtle species.  We have further *preliminarily* determined that the measures proposed here are necessary and appropriate to enforce the requirements of the ESA."  81 Fed. Reg. at 91099 (emphasis added).  The specific "material inconsistenc[y]" plaintiffs rely on—the agency's alleged failure to reconcile the 2019 Rule's TED requirements with the agency's 2016 "preliminary" conclusions that the proposed measures were "'necessary and advisable' for conserving sea turtle species and 'necessary and

appropriate' for enforcing the ESA to require TEDs on *all* skimmer trawl, pusher-head trawl, and wing net shrimp vessels," Pls.' Mem. at 16 (quoting 2016 NPRM, 81 Fed. Reg. at 91099)—reflect policy judgments formed by the agency's expert conclusions, not a "factual finding[] . . . contradict[ing] those which underlay its prior policy," *Fox*, 556 U.S. at 515.  Indeed, the quoted language from the 2016 NPRM highlights the "preliminary" nature of the policy determinations, pending completion of the requisite notice and comment process.  Changes in policy determination are not subject to the same degree of judicial scrutiny as contradictory factual conclusions.  The course of action charted in the 2019 Rule was plainly different than what was proposed in 2016, and NMFS offered entirely proper reasons to explain the shift in direction.[13] The APA requires nothing further.

### 2. The 2019 Rule Provides Adequate Justification for its TED Requirements

Plaintiffs further challenge the 2019 Rule as arbitrary and capricious because the stated justifications for extending TED requirements only to skimmer trawls 40 feet or longer "lack any rational basis or evidentiary support in the record."  Pls.' Reply Supp. Mot. Summ. J. & Opp'n Defs.' Cross-Mot. Summ. J. ("Pls.' Opp'n") at 20, ECF No. 28.  NMFS counters that the agency "cogently explained why it exercised its discretion to establish a vessel size threshold larger than the 26-foot threshold described in the Proposed Rule," rendering the rule lawfully promulgated. Defs.' Opp'n at 19.

---

[13]      Plaintiffs' reliance on *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 649–50 (D.C. Cir. 2016), to argue that the 2019 Rule is arbitrary and capricious because "NMFS's assertions that vessels between 26 and 40 feet have the same safety and practical concerns as vessels 26 feet and smaller 'flatly contradict' its earlier discussions," Pls.' Mem. at 21, and the agency "'point[ed] to no comments or evidence supporting this assertion,'" *id.* at 22 (quoting *U.S. Sugar Corp.*, 830 F.3d at 644), is misplaced.  In that case, the EPA's extension of a regulatory exemption to synthetic boilers as "similar in size and sophistication" to non-synthetic boilers, which were already exempted, was found to be arbitrary and capricious, because EPA's justifications for the rule "flatly contradict[ed]" its explanations in the previous rule that synthetic and non-synthetic boilers were different in meaningful ways.  *U.S. Sugar Corp.*, 830 F.3d at 649–650.  By contrast, here, the conclusions in the 2019 Rule about where, on a *spectrum* of vessel lengths, to set the regulatory cutoff, do not "flatly contradict" the 2016 NPRM's determinations, which NMFS consciously labeled as "preliminary," *see, e.g.,* 2016 NPRM, 81 Fed. Reg. at 91099, particularly when the agency has extensively explained the evolution of reasoning in 2019 Rule and Final EIS.

A rule is arbitrary and capricious, under the APA, "if (1) the agency 'has relied on factors which Congress has not intended it to consider'; (2) the agency 'entirely failed to consider an important aspect of the problem'; (3) the agency's explanation 'runs counter to the evidence before the agency'; or (4) the explanation 'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Am. Bankers Ass'n*, 934 F.3d at 663 (quoting *State Farm*, 463 U.S. at 43). Here, the agency made no such mistakes in promulgating the 2019 Rule. Rather, in both describing the changes from the 2016 NPRM and discussing the comments received on the proposed rule, the agency effectively explained the decision to extend the TED requirements only to skimmer trawls longer than 40 feet. NMFS made clear that the revised requirements were the agency's attempt to balance the need to expand the TED requirements to cover more vessels, because of the inadequacy of the tow time alternative at protecting sea turtles, with the need to prevent mass exodus of shrimpers from the industry, as well as address safety concerns to smaller vessels and their crew. *See* 2019 Rule, 84 Fed. Reg. at 70049. Further, the agency supported the decision with reasoning that reducing the number of vessels would "allow for faster implementation of the TED requirement," because of the more limited number of new TEDs that would have to be manufactured and installed. *Id.* at 70058.

Contrary to plaintiffs' arguments, *see* Pls.' Mem. at 19–23; Pls.' Opp'n at 1–4, the 2019 Rule does not rely on "unexplained inconsistencies," *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015), but instead provides sufficient evidence and explanation for how the agency reached its conclusions, which are only further supported by the Final EIS and by additional comments in the Administrative Record. First, the agency cited "performance and safety issues with TED use on smaller vessels" as part of its rationale in extending the TED requirements only to vessels 40 feet and longer, 2019 Rule, 84 Fed. Reg. at 70049, and

highlighted comments it had received that "TED requirements present safety issues when used

on small vessels" including "walking out on frames to remove debris snagged in TEDs" and the

TED equipment "result[ing] in [the] net getting entangled in the propeller," *id*. at 70056.  While

NMFS advised that "walking out on frames to remove debris" from a TED would be

unnecessary, based on its placement close to the front of the net, it also explained that the

exemption for skimmer trawls under 40 feet would "allow [NMFS] additional time to examine

issues related to TED use on these smaller vessels," where such "potential safety issues. . . may

be more significant." *Id.*  The administrative record contains numerous other comments from

shrimpers expressing similar safety concerns, including the risk that "in rough seas, the grate

would swing and have the potential to either injure someone on the vessel or knock someone

overboard."  AR004056 (comment from Outreach Manager of the Audubon Nature Institute's

Gulf United for Lasting Fisheries); *see also* Defs.' Opp'n at 11–13 (quoting additional comments

from administrative record expressing safety concerns).  NMFS's decision to extend the TED

requirements only to comparatively larger vessels is thus well supported by the safety concerns

presented to the agency.

 The decision to exempt all pusher-head trawls and vessels fishing with wing nets from

the TED requirements is similarly supported by the record, given the conclusions of NMFS's

"gear experts" about "significant differences in the manner pusher-head trawls and wing nets

operate from skimmer trawls," Final EIS at 21, the lack of testing TEDs on these types of nets,

and the agency's understanding that its data on TEDs in skimmer trawls might not be directly

applicable to these other classes of vessels, *see* 2019 Rule, 84 Fed. Reg. at 70049, 70055.[14]

---

[14]      Indeed, had NMFS moved ahead with requiring TEDs on pusher-head trawls and wing nets, despite lack of direct testing on these types of nets and what it knew of the important functional differences between those nets and skimmer trawls, the decision to do so would have risked being deemed to "run[] counter to the evidence before the agency," rendering the rule arbitrary and capricious.  *State Farm*, 463 U.S. at 43.

At the same time, the agency clearly recognized the deficiencies in the *status quo*, both because tow times were less adequate a substitution for TEDs than previously thought, *see id*. at 70050, and because "new analysis of sea turtle bycatch and bycatch mortality in the otter trawl shrimp fisheries" indicated that "bycatch by otter trawlers," which have been required for decades to use TEDs, was "significantly lower than previously estimated," making the need to prevent sea turtle bycatch by skimmer trawls, the second most common type of net, even greater, *id.* at 70054.  *See also* EIS at 145 (describing results of recent study of sea turtle bycatch mortality by otter trawls in the Gulf of Mexico and South Atlantic).  Thus, to protect sea turtle populations effectively, as mandated by the ESA, NMFS stated that it needed to "reduce the total time sea turtles are entrained in a skimmer trawl by using TEDs."  2019 Rule, 84 Fed. Reg. at 70050.  The agency navigated this policy and statutory mandate conundrum by extending the TED requirements only to vessels "40 feet and greater in length," which "smaller population of . . . skimmer trawl[s]," tended to fish "full-time" and thus would be responsible for a greater percentage of sea turtle mortalities, on average, than smaller boats more likely to fish part time. *Id.* at 70055.  Put a different way, while the 2019 Rule extends the TED requirements to many fewer vessels than the 2016 NPRM, it reflects the agency's finding that responsibility for the incidental "taking" of sea turtles is not evenly distributed across the vessel population, and therefore its conclusion that tailoring the requirements to apply only to those vessels most likely to harm sea turtles, is an appropriate way to protect sea turtles, while limiting the incidental effects on the shrimping industry.  That the proffered explanation might also support a slightly different conclusion (for example, setting the cutoff at 30 feet, or 26 feet) is of no moment, so

long as this reasoning also supports the final determination made by the agency.[15]  NMFS's

reasoning in the 2019 Rule does so here.

### B.    The 2019 Rule is a Logical Outgrowth of the 2016 Proposed Rule

NMFS adopted a TED requirement that was not explicitly included among the

alternatives listed in the 2016 NPRM, prompting plaintiffs to argue that the 2019 Rule was "not a

logical outgrowth of the proposed rule," such that the rule was not subjected to "adequate public

notice and comment," in violation of the APA.  Pls.' Mem. at 25.  NMFS counters that the TED

requirements set out in the 2019 Rule were "derived from the original seven alternatives" and

"within the range of size alternatives identified for purposes of the public comment process,"

making the 2019 Rule a logical outgrowth of the 2016 NPRM.  Defs.' Opp'n at 24.  The Court

agrees with NMFS.

As part of notice-and-comment rulemaking, the notice of proposed rulemaking must

include "either the terms or substance of the proposed rule or a description of the subjects and

issues involved," 5 U.S.C. § 553(b)(3), a requirement that has been construed to "to mean that

the final rule the agency adopts must be a logical outgrowth of the rule proposed," *Long Island*

---

[15]     Plaintiffs put great weight on the fact that, shortly before promulgation of the 2019 Rule, the Deputy
Assistant Administrator for Regulatory Programs at NMFS signed a Record of Decision ("ROD") "approving a final
rule establishing a 26-foot vessel length cutoff" based on very similar "justifications and support" as those put
forward in support of the 2019 Rule.  Pls.' Mem. at 11.  The administrative record contains a declaration from this
Deputy Assistant Administrator asserting that "[a]fter filing the certified index to administrative record with the
Court and providing copies of the administrative record to Plaintiffs in this case, it was discovered that [he] had
signed an incorrect version of the ROD," which was "actually a prior draft ROD that did not contain the same
alternatives analyzed" in the Final EIS, "including the preferred alternative requiring TED use by skimmer trawls 40
feet and greater in length."  AR011336 (Decl. of Samuel D. Rauch).  The agency's explanation comports with other
documentation in the administrative record, including the September 6, 2018 Decision Memorandum submitted by
an NMFS Regional Administrator to the Assistant Administrator for Fisheries requesting this official to "make
determinations" on the proposed "final rule requir[ing] the use of TEDs in skimmer trawls 40 feet and greater in
length" and "transmit it to the NOAA General Counsel and the Department of Commerce General Counsel for
clearance to publish in the *Federal Register*."  *See* AR009433–AR009437.  While plaintiffs are perhaps correct that
the erroneous ROD's "existence demonstrates that NMFS was prepared to issue a 26-foot final rule and . . . applied
the same justifications for the 26-foot rule to its 40-foot rule," Pls.' Mem. at 24, it does not necessarily follow that
the decision to set the cutoff for vessel length at 40 feet instead of 26 feet was unjustified or inappropriate.

*Care at Home, Ltd. v. Coke* ("*Long Island Care*"), 551 U.S. 158, 174 (2007) (internal quotation omitted). "'A final rule is the logical outgrowth of a proposed rule if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period.'" *Chesapeake Climate Action Network v. EPA*, 952 F.3d 310, 319 (D.C. Cir. 2020) (quoting *Clean Air Council v. Pruitt*, 862 F.3d 1, 10 (D.C. Cir. 2017) (per curiam)); *see also Idaho Conservation League v. Wheeler*, 930 F.3d 494, 508 (D.C. Cir. 2019) (same). A rule fails the logical outgrowth test if "interested parties would have had to divine the agency's unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." *Chesapeake Climate Action Network*, 952 F.3d at 319–20 (quoting *Clean Air Council*, 862 F.3d at 10). In other words, the public must have one clear chance to offer feedback on agency proposals, a requirement that is met "if a new round of notice and comment would not provide commentators with their first occasion to offer new and different criticisms which the agency might find convincing." *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.* ("*UMWA*"), 626 F.3d 84, 95 (D.C. Cir. 2010) (quoting *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1311 (D.C. Cir. 1991)). "The object, in short, is one of fair notice," *Long Island Care*, 551 U.S. at 174, and notice-and-comment processes that result in an unfair surprise being sprung on regulated entities are therefore deficient.

Here, the 2019 Rule is plainly rooted in the 2016 NPRM. Although differing from the TED requirements outlined in the proposed rule, the final TED requirements fall within the range of alternatives set out in the 2016 NPRM, which, as discussed in Part I.A.4 *supra*, included alternatives that would save fewer sea turtles and affect fewer vessels (such as Alternative 1, taking no action) compared to alternatives that would have saved *more* sea turtles from incidental taking and death, while affecting greater numbers of vessels (such as Alternative 5, requiring

TEDS on all skimmer trawls).  *See* 2016 NPRM, 81 Fed. Reg. at 91102.  This range of

alternatives also should have made clear to plaintiffs, and the general public, that the agency was

considering defining the class of vessels required to use TEDs based on vessel length, given that

two of the proposed alternatives—Alternatives 2 and 4—used vessel length as a metric.  *See id.*

As such, this is not a situation where the end result "was surprisingly distant from the proposed

rule," *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1080 (D.C. Cir. 2009) (internal

quotation omitted), and the 2019 Rule presents no unfair surprise to plaintiffs or the general

public.  *See Env't Integrity Project v. EPA*, 425 F.3d 992, 997 (D.C. Cir. 2005) ("Of course,

there is nothing objectionable in the Agency's refusal to adopt its proposed amendments," as

"[o]ne logical outgrowth of a proposal is surely . . . to refrain from taking the proposed step"

(quoting *Am. Iron & Steel Inst. v. EPA*, 886 F.2d 390, 400 (D.C. Cir. 1989))); *cf. District of*

*Columbia v. Dep't of Agriculture*, 496 F. Supp. 3d 213, 229 (D.D.C. 2020) (finding agency

"failed to provide adequate notice" of new rule where "no indication" was given that the agency

was contemplating eliminating "extended unemployment benefits . . . as a basis for State waiver

requests" for food stamp eligibility given that "the Proposed Rule expressly and repeatedly stated

that extended unemployment benefits *would* be retained as a basis for State waiver requests"

(emphasis added)).

　　　　Moreover, contrary to plaintiffs' arguments, had NMFS sought comments on the final

TED requirements before adoption, no reason has been presented that doing so would have

"provide[d] commentators with their first occasion to offer new and different criticisms which

the agency might find convincing.'"  *UMWA*, 626 F.3d at 95 (quoting *Fertilizer Inst.*, 935 F.2d at

1311).  Plaintiffs assert that, had they been given the opportunity, they "could have provided

information, data, or critiques addressing NMFS's alleged concerns about safety" and "data

underlying its selection of 40 feet as a cutoff," such as "data that demonstrate how skimmer trawl vessels longer than 26 feet have the requisite capacity to safely use and store TEDs on deck" and on "how the anticipated rate of mortality under the chosen alternative will hinder sea turtle recovery."  Pls.' Mem. at 27.  Yet, even if plaintiffs had been able to put forward unique arguments not already in the record to assuage these specifically cited concerns, the comments in the 2019 Rule and discussion in the Final EIS suggest the agency's safety concerns were more multifaceted than simply safe TED storage.  As NMFS explains, the "decision to adopt the criterion was informed by an extensive body of comments that raised concerns about the feasibility of requiring most vessels to install and use TEDs, as well as the dire economic consequences that would result from that requirement," and "[v]iewing the record as a whole[,] . . . the 40-foot criterion is a logical outgrowth of the Proposed Rule because it addresses safety, feasibility and economic concerns raised by stakeholders during the notice and comment period." Defs.' Reply at 9–10.  Plaintiffs and the general public were provided with sufficient, "meaningful opportunity for notice and comment," Pls.' Mem. at 25, and the fact that the agency adopted a different result than the position advocated by plaintiffs does not render the rulemaking process unlawful.

### C.    The 2019 Rule's Environmental Impact Statement Meets the Requirements of NEPA

Finally, plaintiffs take issue with the final EIS prepared along with the 2019 Rule. Plaintiffs first allege that NMFS failed to take a "hard look" at the effects of the 2019 Rule because the EIS "arbitrarily lumps all sea turtle species into a single uniform population despite the fact that shrimp bycatch affects species differently."  Pls.' Mem. at 29.  As plaintiffs explain, the different species' populations "have different tolerance levels for sustained death rates, with more critically endangered species (*i.e.*, the Kemp's ridley) more susceptible to population-level

36

harms." *Id.*  In addition, differences in species' usage "of the shallow waters of the Gulf of Mexico and southeastern Atlantic Ocean . . . affect the likelihood that turtles of a given species will be captured by shrimp trawlers fishing in certain times and areas." *Id.* at 30.  Plaintiffs are also critical of NMFS for "failing to quantify in the final EIS *any* economic benefit resulting from TED use now foregone in the final TED Rule," such that its economic analysis "misleadingly and inaccurately overestimates the economic burden of TED requirements on the shrimping industry," *id.* at 33 (emphasis in original), given that TED usage has been shown to "reduce[] bycatch of other species, increase[] fuel efficiency, and reduce[] drag," *id.* at 34 (citing *Louisiana ex rel. Guste v. Verity*, 853 F.2d 322, 330 (5th Cir. 1988)).

NEPA "requir[es] federal agencies to take a 'hard look' at their proposed actions' environmental consequences in advance of deciding whether and how to proceed." *Sierra Club v. U.S. Army Corps of Eng'rs,* 803 F.3d 31, 37 (D.C. Cir. 2015).  "The definition of 'hard look' may be 'imprecise,'" but the D.C. Circuit has made clear that "an agency has taken a 'hard look' at the environmental impacts of a proposed action if 'the statement contains sufficient discussion of the relevant issues and opposing viewpoints, and . . . the agency's decision is fully informed and well-considered.'" *Myersville Citizens for a Rural Cmty. v. FERC*, 783 F.3d 1301, 1324–25 (D.C. Cir. 2015) (omission in original) (quoting *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)).  "[I]nherent in NEPA and its implementing regulations is a 'rule of reason.'" *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004).  Given that "[a]gencies may decide that 'other values outweigh the environmental costs' and may move forward with a proposed action so long as they undergo the necessary process," *Oglala Sioux Tribe*, 2022 WL 3205888, at *3 (quoting *Robertson*, 490 U.S. at 350), the court's role is "simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision

is not arbitrary or capricious," *Indian River Cnty., Fla.*, 945 F.3d at 527 (internal citation omitted). Notably, "while NEPA requires agencies to take a hard look before approving a major federal action, it does not mandate adoption of a particular process for doing so." *NRDC v. U.S. Nuclear Regul. Comm'n*, 823 F.3d 641, 642 (D.C. Cir. 2016). Instead, courts "'give deference to agency judgments as to how best to prepare an EIS,' so long as the EIS 'contains sufficient discussion of the relevant issues and opposing viewpoints' and . . . 'is fully-informed and well-considered.'" *Gulf Restoration Network v. Haaland*, No. 20-5179, 2022 WL 3722429, at *2 (D.C. Cir. Aug. 30, 2022) (quoting first *Indian River Cnty., Fla.*, 945 F.3d at 553, then *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)).

Given the leeway provided to the agency in carrying out the "hard look" process, then, NMFS adequately complied with NEPA's procedural requirements. While the agency estimated the mortality rate for sea turtles collectively, rather than disaggregating by species to account for differences in various species' "tolerance levels for sustained death rates," it can hardly be said that the agency "ignore[d] such differences and ma[de] no attempt to consider or evaluate the rule's effects on individual species," Pls.' Mem. at 29, given the dozens of pages in the EIS devoted to a breakdown of each turtle species's location ranges; population sizes, both currently and historically; and other specific qualities. As NMFS rightly explains, "although the environmental effects section cited by Plaintiffs analyzed sea turtles as a group, the rest of the [EIS] put that analysis into context by explaining the important differences between the species." Defs.' Opp'n at 28; *see also Indian River Cnty., Fla.*, 945 F.3d at 533 ("[O]nce an agency has taken a 'hard look' at 'every significant aspect of the environmental impact' of a proposed major federal action, it is not required to repeat its analysis simply because the agency makes subsequent discretionary choices in implementing the program." (quoting *Balt. Gas & Elec. Co.*

*v. NRDC*, 462 U.S. 87, 97 (1983))); RR-101271–1616 (2014 Biological Opinion prepared by NMFS under ESA § 7 including targeted population data and analysis by species); AR011037–110333 (2021 Biological Opinion analyzing same, based on more recent data).  Moreover, in comparing the various alternative TED requirements, the agency opted to "focus its analysis on the various types, sizes, and locations of shrimping vessels, as opposed to breaking the data down by sea turtle species," which "allowed the agency to analyze which shrimping methods and locations were causing the most harm to sea turtles" in the locations where these vessels operate.  Defs.' Opp'n at 27.  In short, plaintiffs' preference for a different approach, does not mean that the agency's analysis was unreasonable.

Second, plaintiffs take issue with the economic analysis contained in the Final EIS, arguing that the agency "fail[ed] to account . . . , whether quantitatively or qualitatively," for "the values of known benefits of TEDs," which would be lost by not requiring all skimmer trawls, pusher-head trawls, and wing nets to use them, thereby "grossly mischaracteriz[ing] the economic effects of the action and impair[ing] the agency's fair consideration of the effects of its action."  Pls.' Mem. at 35.  This argument is unpersuasive because of the extent to which the EIS *does* identify and credit economic benefits of broader TED usage where possible, including the likely economic boon to TED manufacturers and installers, *see* Final EIS at 208–211, as well as the "relatively minor benefits" for improving fuel efficiency by reducing drag, *id.* at 269.  While these recognized economic benefits were not substantial enough, in the agency's view, to outweigh the economic costs, leading to the agency's conclusion that the "cumulative impacts on the human community" would be "adverse," *id.* at 257, the agency plainly considered and accounted for them.[16]  *See Friends of the Earth v. Haaland*, No. 21-cv-2317 (RC), 2022 WL

---

[16]    Relatedly, plaintiffs also argue that the "substantial changes" to the proposed action between the 2016 NPRM and 2019 Rule meant that the agency should have prepared a supplemental EIS, and that its failure to do so

254526, at *19 (D.D.C. Jan. 27, 2022) ("Plaintiffs would no doubt have preferred that [the

agency] act with greater urgency, but 'NEPA merely prohibits uninformed—rather than

unwise—agency action.'" (quoting *Robertson*, 490 U.S. at 351)).[17]

## IV.    CONCLUSION

For the reasons set forth above, plaintiffs' motion for summary judgment, ECF No. 23, is

**DENIED** and defendant's cross-motion for summary judgment, ECF No. 27, is **GRANTED**.[18]

An Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: September 14, 2022

_____
BERYL A. HOWELL
Chief Judge

---

violated NEPA.  *See* Pls.' Mem. at 36–37.  Plaintiffs' arguments fail on both accounts.  As discussed, *supra*, in Part III.A.1., the TED requirements set out in the 2019 Rule were within the range of alternatives considered in the 2016 NPRM, even though the 40-foot cutoff was not explicitly discussed.  Since the requirements of the 2019 Rule are rooted in the 2016 NPRM, the final rules includes no "substantial changes" from the 2016 NPRM, and NEPA therefore does not mandate the preparation of a supplemental EIS.  *See Mayo*, 875 F.3d at 16 (noting that, "because an agency's decision whether to prepare a supplemental EIS requires 'substantial agency expertise,' courts must defer to the agency's 'informed discretion.'" (quoting *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377 (1989))).

[17]    Given the extensive review and discussion of the parties' arguments and record, as set forth in roughly two hundred pages of briefing and exhibits, and a thousand-page joint appendix, no hearing is necessary to resolve the pending motions, and plaintiffs' request for oral argument is therefore denied.  *See* D.D.C. Local Civil Rule 7(f) (allowance of an oral hearing is "within the discretion of the Court").

[18]    The grant of summary judgment in the agency's favor renders moot the parties' arguments regarding plaintiffs' proposed remedy and thus those arguments need not be addressed.  *See* Pls.' Mem. at 38 (urging the Court to "remand the TED rule without vacatur to NMFS . . . and order the agency to prepare a new rule within six months"); Defs.' Opp'n at 40 (calling plaintiffs' requested relief "untenable").